IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

THE STATE OF MISSISSIPPI, ex rel.
LYNN FITCH, in her official capacity as
Attorney General of the State of Mississippi,

      Plaintiff,


      v.                           Civil Action No.1:20-cv-168-TBM-RPM

THE PEOPLE'S REPUBLIC OF CHINA,
THE COMMUNIST PARTY OF CHINA,
NATIONAL HEALTH COMMISSION OF
THE PEOPLE'S REPUBLIC OF CHINA,
MINISTRY OF EMERGENCY
MANAGEMENT OF THE PEOPLE'S
REPUBLIC OF CHINA, MINISTRY OF
CIVIL AFFAIRS OF THE PEOPLE'S
REPUBLIC OF CHINA, PEOPLE'S
GOVERNMENT OF HUBEI PROVINCE,
PEOPLE'S GOVERNMENT OF WUHAN
CITY, WUHAN INSTITUTE OF
VIROLOGY, and CHINESE ACADEMY
OF SCIENCES,

      Defendants.


***AMICUS CURIAE* BRIEF**
**OF THE CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW**

**TABLE OF CONTENTS**

STATEMENT OF INTEREST.................................................................................................. 1

INTRODUCTION .................................................................................................................... 1

LEGAL STANDARD ............................................................................................................... 2

ARGUMENT ............................................................................................................................ 4

    I.    The "commercial activity" exception to sovereign immunity does not apply. ................... 4

        A.    The gravamen of this lawsuit.................................................................................... 4

        B.    The alleged "commercial activities" are not commercial in nature............................. 6

            1.    *Regulating* "commercial activities" is not commercial activity............................... 6

            2.    Plaintiff fails to allege that activities of production, purchase, and sale of PPE are of Defendants or otherwise attributable to them. ................................................................. 8

            3.    A government's control of information is an exercise of its "police power," not a commercial activity. ......................................................................................................... 10

            4.    Government-directed research is not commercial in nature. ...................................11

        C.    Defendants' alleged acts had no "direct effect" in the United States. ........................ 12

    II.    The "noncommercial tort" exception to sovereign immunity does not apply. ................. 16

        A.    The entire tort alleged in the Complaint did not occur in the U.S............................. 17

        B.    The "discretionary function" exception to the noncommercial tort exception separately bars suit against Defendants.......................................................................................... 18

    III.    A U.S. state should not be permitted to sue foreign states under the FSIA. ................. 19

    IV.    This Court should not adjudicate this lawsuit under the act of state doctrine............... 21

    CONCLUSION ..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alberti v. Empresa Nicaraguense de la Carne*,
   705 F.2d 250 (7th Cir. 1983).................................................................................. 8

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) .................................................................................... 17, 19

*American Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ........................................................................................ 20

*Arriba Ltd. v. Petroleos Mexicanos*,
   962 F.2d 528 (5th Cir. 1992)............................................................................. 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 11

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*,
   533 F.3d 1183 (10th Cir. 2008)......................................................................... 16

*Callejo v. Bancomer, S.A.*,
   764 F.2d 1101 (5th Cir. 1985).......................................................................... 4, 21

*Croyle by & through Croyle v. United States*,
   908 F.3d 377 (8th Cir. 2018)............................................................................ 18

*Dale v. Colagiovanni*,
   443 F.3d 425 (5th Cir. 2006)............................................................................... 2

*De Csepel v. Rep. of Hungary*,
   714 F.3d 591 (D.C. Cir. 2013) ............................................................................ 8

*Doe 1 v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005) .................................................................... 17

*Doe v. Fed. Democratic Republic of Ethiopia*,
   851 F.3d 7 (D.C. Cir. 2017) .............................................................. 16, 17, 18, 19

*Evans v. Petroleos Mexicanos (PEMEX)*,
   2006 WL 952265 (5th Cir. Apr. 13, 2006)......................................................... 12

*Exxon Corp v. C.I.R.*,
    1993 WL 534017 (U.S. Tax Ct. 1993) ......................................................................... 7

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ...................................................................................................... 9, 21

*Fisher v. Madlock*, No.,
    2022 WL 1233751 (E.D. Tex. Feb. 16, 2022) .............................................................. 3

*Forsythe v. Saudi Arabian Airlines*,
    885 F.2d 285 (5th Cir. 1989) ........................................................................................ 3

*Frank v. Commonwealth of Antigua & Barbuda*,
    842 F.3d 362 (5th Cir. 2016) .............................................................................. 2, 4, 12

*Garb v. Republic of Poland*,
    440 F.3d 579 (2d Cir. 2006) ......................................................................................... 7

*Haven v. Rzeczpospolita Polska (Republic of Poland)*,
    68 F. Supp. 2d 947 (N.D. Ill. 1999) ............................................................................ 8

*Herrick v. Islamic Republic of Iran*,
    2022 WL 3443816 (S.D. Tex. Aug. 17, 2022) ............................................................ 3

*Home Builders Ass'n of Miss., Inc. v. City of Madison*,
    143 F.3d 1006 (5th Cir. 1998) ("A suit is properly dismissed ................................... 2

*Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*,
    129 F.3d 543 (11th Cir. 1997) ..................................................................................... 7

*Hunt v. Mobil Oil Corp.*,
    550 F.2d 68 (2d Cir. 1977) ........................................................................................... 7

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 109 (2d Cir. 2013) ....................................................................................... 17

*Int'l Ass'n of Machinists & Aerospace Workers, (IAM) v. Org. of Petroleum Exporting Countries (OPEC)*,
    649 F.2d 1354 (9th Cir. 1981) ................................................................................... 21

*Jerez v. Republic of Cuba*,
    775 F.3d 419 (D.C. Cir. 2014) ............................................................................... 3, 17

*Joseph v. Off. of Consulate Gen. of Nigeria*,
    830 F.2d 1018 (9th Cir. 1987) .................................................................................... 18

*Missouri ex rel. Schmitt v. People's Republic of China*,
   610 F. Supp. 3d 1174 (E.D. Mo. 2022) ........................................................... 3, 10, 13

*MOL, Inc. v. Peoples Republic of Bangladesh*,
   736 F.2d 1326 (9th Cir. 1984) ................................................................................. 7

*Murray v. The Schooner Charming Besty*,
   6 U.S. (2 Cranch) 64 (1804) .................................................................................. 20

*NML Cap., Ltd. v. Spaceport Sys. Int'l, L.P.*,
   788 F. Supp. 2d 1111 (C.D. Cal. 2011) ................................................................. 11

*OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015) .................................................................................................. 4

*O'Bryan v. Holy See*,
   556 F.3d 361 (6th Cir. 2009) ................................................................................. 17

*Papasan v. Allain*,
   478 U.S. 265 (1986) .............................................................................................. 11

*Peterson v. Royal Kingdom of Saudi Arabia*,
   416 F.3d 83 (D.C. Cir. 2005) ................................................................................. 16

*Practical Concepts, Inc. v. Republic of Bolivia*,
   811 F.2d 1543 (D.C. Cir. 1987) ............................................................................... 3

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ...................................................................................... 6, 7, 10

*Rodriquez v. Pan American Health Organization*,
   502 F. Supp. 3d 200 (D.D.C. 2020) ......................................................................... 8

*Roth v. Islamic Republic of Iran*,
   78 F. Supp. 3d 379 (D.D.C. 2015) ........................................................................... 3

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) .................................................................................... 4, 5, 6, 10

*Stirling v. China*,
   No. 3:20-CV-00713-SB, 2020 WL 5638630 (D. Or. Aug. 14, 2020, adopted Sept. 21, 2020)
   ............................................................................................................................ 19civ

*Underhill v. Hernandez*,
   168 U.S. 250 (1897) .............................................................................................. 21

*United States v. Gaubert,*
  499 U.S. 315 (1991) ................................................................................................. 18, 19

*United States v. Moats,*
  961 F.2d 1198 (5th Cir. 1992) ............................................................................................ 6

*Verlinden B. V. v. Central Bank of Nigeria,*
  461 U.S. 480 (1983) ............................................................................................................ 2

*Walters v. Indus. & Commer. Bank of China, Ltd.,*
  651 F.3d 280 (2d Cir. 2011) ....................................................................................... 2, 3, 9

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l,*
  493 U.S. 400 (1990) ......................................................................................................... 21

## Statutes

28 U.S.C. § 1603(a) ............................................................................................................... 2

28 U.S.C. § 1603(d) ............................................................................................................... 6

28 U.S.C. § 1604 .................................................................................................................... 2

28 U.S.C. § 1605(a)(2) ................................................................................................. 4, 9, 12

28 U.S.C. § 1605(a)(5) ......................................................................................................... 16

28 U.S.C. § 1605(a)(5)(A) .................................................................................................... 18

28 U.S.C. § 1605(a)(5)(B) .................................................................................................... 19

28 U.S.C. § 1608(e) ............................................................................................................... 3

50 U.S.C. § 4501 .................................................................................................................... 7

## Rules

Fed. R. Civ. P. 12(h)(3) .......................................................................................................... 2

## Other Authorities

Bret Baier, et al., *Sources believe coronavirus outbreak originated in Wuhan lab as part of
  China's efforts to compete with US*, Fox News (Apr. 15, 2020), available at:
  https://www.foxnews.com/politics/coronavirus-wuhan-lab-china-compete-us-sources ........... 11

*Canadian Province of Ontario Angry Over 'Unacceptable' U.S. Move to Block Face Masks*, New York Times, April 6, 2020 ................................................................................................ 22

Deborah Netburn, *A timeline of the CDC's advice on face masks*, LOS ANGELES TIMES, July 27, 2021, https://www.latimes.com/science/story/2021-07-27/timeline-cdc-mask-guidance-during-covid-19-pandemic .................................................................................................... 13

*Health Experts Slam US Hoarding of Only Licensed Virus Drug*, New York Times, July 1, 2020 ................................................................................................................................................ 22

H.R. Rep. 94-1487 ........................................................................................................................ 19

Juliet Eilperin, et al., *U.S. sent millions of face masks to China early this year, ignoring pandemic warning signs*, WASHINGTON POST (April 18, 2020), https://www.washingtonpost.com/health/us-sent-millions-of-face-masks-to-china-early-this-year-ignoring-pandemic-warning-signs/2020/04/18/aaccf54a-7ff5-11ea-8013-1b6da0e4a2b7_story.html .................................................................................................... 15

*Mississippi Gov Says He Should Have Worn Mask at Funeral* (June 18, 2020), https://apnews.com/89b7faf058ff97d0d53ece6cfcb1a54c ...................................................... 15

Prioritization and Allocation of Certain Scarce or Threatened Health and Medical Resources for Domestic Use; Exemptions, 85 Fed. Reg. 22,021 (Apr. 21, 2020) ............................................ 7

Restatement Fourth of the Foreign Relations Law of the United States § 454 (b)(3) ................. 12

Restatement Fourth of the Foreign Relations Law of the United States § 454............................ 13

Testimony of Chimène Keitner to Senate Committee on the Judiciary, "The Foreign Sovereign Immunities Act, Coronavirus, and Addressing China's Culpability" (June 23, 2020), available at https://www.judiciary.senate.gov/imo/media/doc/Keitner%20Testimony.pdf ................ 14, 15

The Lancet Microbe, Editorial, *US CDC's unexpected change of stance on mask use*, THE LANCET, May 20, 2021, https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00122-1/fulltext.............................................................................................................. 13

*US buys up world stock of key Covid-19 drug remdesivir*, The Guardian, June 30, 2020........... 22

*Why Is the United States Exporting Coronavirus?*, New York Times, June 18, 2020................. 22

## STATEMENT OF INTEREST

The China Society of Private International Law ("The Society") is an academic organization formed under Chinese law and dedicated to the theory and practice of private international law. It is one of the largest academic groups in the world focused on private international law, and its members include law professors, scholars, experts, consultants, and practicing attorneys. The Society publishes "The Model Law of Private International Law" and the annual "Chinese Yearbook of Private International Law and Comparative Law."

The Society is interested in furthering relations between China and the United States through the consistent application of international law and principles of foreign sovereign immunity. The Society has been following the instant matter before the Court because it raises important foreign sovereign immunity issues under the FSIA and because it may have significant implications for Sino-U.S. relations and the Executive Branch's handling of foreign affairs.

## INTRODUCTION

The Society respectfully submits its *Amicus Curiae* brief ("*Amicus* Brief") addressing that the alleged acts in China by Defendants responding to COVID-19 do not confer subject-matter jurisdiction over the claims based on the Foreign Sovereign Immunity Act's ("FSIA") "commercial activity" exception to sovereign immunity, because the alleged "commercial activities" are not commercial in nature and Plaintiff fails to allege that the acts this lawsuit is based upon caused any direct effect in the U.S. In addition, the "non-commercial tort" exception under the FSIA also would not bar immunity. Separately, this *Amicus* Brief also submits that a state like Mississippi should not be permitted to sue foreign states, and this Court should not adjudicate this lawsuit.

## LEGAL STANDARD

The FSIA provides the sole source of subject-matter jurisdiction in suits against a foreign state. *Frank v. Commonwealth of Antigua & Barbuda*, 842 F.3d 362, 367 (5th Cir. 2016); 28 U.S.C. § 1604. A "foreign state" is defined by the FSIA to include, *inter alia*, a political subdivision of a foreign state. *See* 28 U.S.C. § 1603(a). In the order dated March 31, 2023, this Court "effectively deem[ed] all named Defendants as 'the foreign state or [a] political subdivision' thereof under the FSIA." *See* ECF No. 31. Therefore, all Defendants have the status of "foreign state."

"The general rule under the FSIA is that foreign states [such as Defendants] are immune from the jurisdiction of the United States Courts." *Frank*, 842 F.3d at 367 (quoting *Dale v. Colagiovanni*, 443 F.3d 425, 428 (5th Cir. 2006)). There are, however, exceptions. *If* an FSIA exception applies, the Court may have subject-matter jurisdiction. *Id*. Conversely, if no FSIA exception applies, the suit must be dismissed. *Id*. (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) ("A suit is properly dismissed when a court lacks subject matter jurisdiction…."); *see also* Fed. R. Civ. P. 12(h)(3).

The Court must decide whether subject-matter jurisdiction exists regardless of whether a Defendant asserts immunity. *Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 494 n.20 (1983) (holding that "even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act."). Indeed, it makes no difference who raises subject-matter jurisdiction. *Walters v. Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 292-93 (2d Cir. 2011) (holding that a "court may consider [subject-matter jurisdiction] once it is suggested by any party – or, for that matter, *non-party* – even if there is no reason to confer a special right of 'third-party standing' on that party.") (emphasis added). This reasoning makes sense. "If a court may consider an issue on its own motion [such as subject

matter jurisdiction], it does not matter what triggers the court's inquiry." *Id.* Accordingly, this Court should consider the subject-matter jurisdiction concerns raised here, even though raised only by an amicus.[1]

Further, a court may not enter a default judgment without subject-matter jurisdiction. *Fisher v. Madlock*, No. 6:18CV083, 2022 WL 1233751, at *3 (E.D. Tex. Feb. 16, 2022) (citing *Forsythe v. Saudi Arabian Airlines*, 885 F.2d 285, 288 (5th Cir. 1989) ("a party cannot waive subject matter jurisdiction by its silence.") If a default judgment is issued but subject matter jurisdiction was in fact lacking, that judgment may be vacated by way of collateral attack. *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1547 (D.C. Cir. 1987); *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) (holding default judgment void because of lack of subject-matter jurisdiction). Addtionally, "[n]o judgment by default shall be entered by a court of the United States . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief *by evidence satisfactory to the court*." 28 U.S.C. § 1608(e). A court may not simply accept the unsupported allegations in the complaint as true, and the plaintiff must provide some form of evidentiary support. *Herrick v. Islamic Republic of Iran*, No. 1:21-CV-168, 2022 WL 3443816, at *1 (S.D. Tex. Aug. 17, 2022) (citing *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015)).

---

[1] In a similar FSIA suit brought by the state of Missouri against the same defendants here in relation to the COVID-19 pandemic, no defendant appeared, and the district court accepted two *amici*'s briefs, including the Society's, addressing subject-matter jurisdiction. *Missouri ex rel. Schmitt v. People's Republic of China*, 610 F. Supp. 3d 1174, 1180 n.1 (E.D. Mo. 2022).

3

## ARGUMENT

**I.    The "commercial activity" exception to sovereign immunity does not apply.**

The Complaint alleges that the FSIA's "commercial activity" exception to immunity confers subject-matter jurisdiction; specifically, pursuant to the exception's third clause. *See* Complaint, at ¶¶ 36, 38; *see also* 28 U.S.C. § 1605(a)(2). The "commercial activity" exception's third clause provides, in pertinent part, that "a foreign state is *not* immune from suit in the United States when '[1] the action is based … upon an act outside the territory of the United States [2] in connection with a commercial activity of the foreign state elsewhere and [3] that act causes a direct effect in the United States….'" *Frank*, 842 F.3d at 368 (emphasis added) (quoting 28 U.S.C. § 1605(a)(2)). The Complaint fails to satisfy at least two of these requirements.

### A.   The gravamen of this lawsuit.

The first requirement is that the action is ***based upon*** an act outside the U.S. To identify the particular conduct a plaintiff's action is based upon, a court should look to the basis or foundation for a claim, i.e., those elements that, if proven, would entitle the plaintiff to relief, and the ***gravamen of the complaint***. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33 (2015) (emphasis added) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993)). Rather than individually analyzing each cause of action, the court should zero in on the ***core of the suit***, which is the acts that actually injured the plaintiff. *Sachs*, 577 U.S. at 35 (emphasis added); *see also Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1109 (5th Cir. 1985) (focus should be on the "gravamen of the complaint").

*Nelson* is instructive in analyzing the gravamen of the claims. In that case, an American employee of a Saudi hospital and his wife brought action against the Kingdom of Saudi Arabia for injuries arising from his alleged detention and torture by Saudi Government. The complaint sets out three categories of causes of action: (1) various intentional torts; (2) negligent failure to give

warning of dangers of employment; and (3) derivative injury that the wife sustained. *Nelson*, 507 U.S. at 353-54. The complaint did not raise a breach of contract claim. *Id.* at 354. While the Court of Appeals held that the action was "based upon" the commercial activities of recruitment and hiring of the employee, the Supreme Court disagreed:

> The [plaintiffs] have not, after all, alleged breach of contract . . . but personal injuries caused by [defendants'] intentional wrongs and by [defendants'] negligent failure to warn [plaintiff employee] that they might commit those wrongs. Those torts, and not the arguably commercial activities that preceded their commission, form the basis for the [plaintiffs'] suit.

*Id.* at 358.

Similarly, when we analyze the gravamen of the current suit, we analyze what Plaintiff alleges. Plaintiff sets out two causes of action in the Complaint. The first is the violation of state consumer protection law, claiming that Defendants engaged in various acts which affected commerce, such as withholding information about COVID-19, "hoarding" personal protective equipment (PPE), nationalizing PPE manufacturers, and selling defective PPE. The second cause of action is the violation of state antitrust law, which also concerns PPE, claiming that Defendants restrained or attempted to restrain the freedom of trade. Notably, Plaintiff does not allege that Defendants committed any common law tort. As such, the gravamen of the suit, *i.e.* the acts that actually injured Plaintiff that form the basis of Plaintiff's instant suit, should be (1) withholding information about COVID-19, (2) "hoarding" PPE through nationalizing production and export restrictions, and (3) misrepresenting the quality of PPE. *See also generally*, Plaintiff's Memorandum Brief in Support of Plaintiff's Motion for Default Judgment, ECF No. 44-1. In other words, these are the alleged acts upon which this lawsuit is based.[2]

---

[2] Even though the complaint references the studying of the virus, it is not part of the gravamen.

**B.  The alleged "commercial activities" are not commercial in nature.**

The second requirement under the "commercial activity" exception necessary to deprive immunity is that the act upon which  the lawsuit is based s must be made in connection with a commercial activity of the foreign state elsewhere. Under the FSIA, the term "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992) (quoting 28 U.S.C. § 1603(d)). The "nature" of the alleged activity is determinative of whether it is commercial. *Id*. "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id*. [3]

Plaintiff alleges the following "commercial activities" in the Complaint: (1) hoarding PPE[4]; (2) production, purchasing, selling, import and export of PPE[5]; and (3) studying the virus.[6] None of the activities on which the Complaint is actually based, as analyzed above, nor  any other activity alleged in the complaint – i.e., studying the virus – qualifies as a commercial activity under the FSIA, because they are neither  commercial in nature nor  attributable to Defendants.

**1.  *Regulating* "commercial activities" is not commercial activity.**

A foreign state engages in commercial activity under the FSIA "when a foreign government acts, **not as a *regulator* of a market**, but in the manner of **a *private player* within it**." *Id.* at 614 (emphasis added); *Saudi Arabia v. Nelson*, 507 U.S. 349, 370 (1993). To determine whether a foreign state is acting as a "regulator" or a "private player," the Court must decide whether the alleged acts are the type typically seen when "a private party engages in 'trade and traffic or

_____

[3] Defendants' "desire to profit" as alleged in the complaint (Complaint, ¶ 126) is therefore irrelevant. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).
[4] Complaint, ¶ 6.
[5] *Id.* ¶¶ 6, 38.
[6] *Id.* ¶ 46.

commerce.'" *Weltover*, 504 U.S. at 614; *United States v. Moats*, 961 F.2d 1198, 1205 (5th Cir. 1992) ("An activity is considered 'commercial' if it is *the type a private person normally would engage in for profit*.") (internal citation omitted) (emphasis added).

The Complaint alleges that China, during the global pandemic, engaged in "commercial activity" by restricting exports of PPE and nationalizing American companies that manufactured PPE. *See* Complaint, ¶ 6, 118-20. If these allegations are true, they are quintessentially sovereign regulatory functions, not commercial activity. *Weltover*, 504 U.S. at 614 (holding that a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity as such authoritative control of commerce cannot be exercised by a private party). Regulating imports and exports is a sovereign prerogative therefore immune. *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 549 (11th Cir. 1997) (citing *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328-29 (9th Cir. 1984)); *see also Exxon Corp v. C.I.R.*, 1993 WL 534017, *54 (U.S. Tax Ct. 1993) (describing Saudi Arabia's threatened "cutbacks in crude supplies and nationalization" as "not the type of threat that would have existed in normal contractual relationship between private parties"). Indeed, the United States imposed similar export bans on PPE during the global pandemic. [7] *See Prioritization and Allocation of Certain Scarce or Threatened Health and Medical Resources for Domestic Use; Exemptions,* 85 Fed. Reg. 22,021 (Apr. 21, 2020). Like the United States, China has a sovereign right to protect the health of its citizens. While a government's nationalization of property and regulation of markets during a crisis may *affect* commercial interests, these acts are sovereign, not commercial, under the FSIA.

---

[7] A U.S. export ban was issued pursuant to the Defense Production Act of 1950, as amended (50 U.S.C. § 4501 *et seq.*), which gives the United States, as a sovereign, broad powers to regulate U.S. domestic production of products.

In addition, courts have held that the nationalization of property is a quintessential sovereign act that does not fall within the "commercial activity" exception. *Garb v. Republic of Poland*, 440 F.3d 579, 586–87 (2d Cir. 2006) (holding that "expropriations by defendants do not fall within the commercial activity exception of the FSIA," as "[e]xpropriation is a decidedly sovereign – rather than commercial – activity….") (citing *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 73 (2d Cir. 1977) ("Expropriations of … property … within the boundaries of the sovereign state are traditionally considered to be public acts of the sovereign removed from judicial scrutiny….."); *De Csepel v. Rep. of Hungary*, 714 F.3d 591, 600 (D.C. Cir. 2013) ("Expropriation constitutes a quintessentially sovereign act."); *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 254 (7th Cir. 1983) (the nationalization of property is a "quintessential [g]overnment act"); *Rodriquez v. Pan American Health Organization*, 502 F. Supp. 3d 200, 221 (D.D.C. 2020) ("Only a sovereign, of course, has the capacity to nationalize or expropriate property."); *Haven v. Rzeczpospolita Polska (Republic of Poland)*, 68 F. Supp. 2d 947, 954 (N.D. Ill. 1999) ("It is obvious that governmental expropriation of private property under governmental authority … is the classic type of [sovereign, rather than commercial] activity…."). Therefore, to the extent that Plaintiff's *hoarding* claim refers to Defendants' conduct of *regulating* commercial activities, such conduct is not commercial in nature.

**2. Plaintiff fails to allege that activities of production, purchase, and sale of PPE are of Defendants or otherwise attributable to them.**

To the extent that Plaintiff alleges that Defendants directly participated in the production, purchasing, selling, import and export of PPE, Plaintiff fails to allege with specificity which of the Defendants – all qualified as "foreign state" – were engaged in the production, purchase, or sale of PPE. For example:

- "***Defendants*** . . . engaged in commercial activities, including . . . selling substandard PPE at inflated prices . . . ." (Complaint, ¶ 6);

- "***China*** went from a net exporter of personal protective equipment – they are the largest producer of that in the world – to a large net importer." (*Id.* ¶ 120) (internal citation omitted);

- "The PPE ***China*** has released has drawn complaints across the world for being faulty, raising the prospect that it is keeping quality materials for itself while shipping defective equipment elsewhere." (*Id.* ¶ 124).

As such, Plaintiff fails to allege with specificity ***Defendants'*** involvement, therefore fails to allege that the aforementioned activities are "commercial activity ***of the foreign state***." 28 U.S.C. § 1605(a)(2) (emphasis added).

If Plaintiff believes that it or those it claims to represent have purchased substandard PPE from ***businesses*** located in China, or that those ***businesses*** have misrepresented the quality of such PPE, it should seek compensation from said businesses that have actually engaged in such commercial activity. Under *Bancec*, the alleged malfeasance of those businesses cannot be automatically attributed to Defendants. *See First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 627-29 (1983) ("*Bancec*"). Here, however, Plaintiff does not allege any facts that attribute any commercial activities of actual PPE manufacturers and/or dealers to Defendants.

To the extent Plaintiff attributes the activities of all Chinese entities, including businesses that produce, purchase and sell PPE, to Defendants and even the Chinese state itself, as if they are all an undifferentiated part of the Chinese state, such attribution is contrary to the principle that the Supreme Court established in *Bancecban*: "government instrumentalities established as

juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626-27. *See also Walters v. Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 298-99 (2d Cir. 2011).

### 3. A government's control of information is an exercise of its "police power," not a commercial activity.

The Complaint alleges that Defendants were engaged in censoring, misrepresenting, and/or withholding information about the virus and its transmission[8], as well as other acts directed at containing the virus.[9] For example, the Complaint alleges that government censors took action to stop the circulation of warning messages on WeChat[10]; that the Wuhan Municipal Health Commission warned medical professionals not "to to release treatment information to the public without authorization"[11]; that the Wuhan police "[took] legal measures" against doctors sharing information online and threatened "zero tolerance"[12]; and that Chinese citizens who uploaded to the internet videos of overcrowded hospitals "have gone missing in recent weeks."[13]

These alleged acts are examples of the exercise of police power, because they are "not the sort of action by which private parties can engage in commerce." *Saudi Arabia v. Nelson*, 507 U.S. 349, 362 (1993). They "cannot be performed by an individual acting in his own name. They can be performed only by the state acting as such." *Id.* "[A] foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory [of foreign sovereign immunity] as peculiarly sovereign in nature." *Id.* at 361. *See also Missouri ex rel. Schmitt v. People's Republic of China*, 610 F. Supp. 3d 1174, 1191 (E.D. Mo. 2022) (holding that the alleged

---

[8] Complaint, ¶¶ 1-7, 61-62, 64, 68-105, 130.
[9] *Id.* ¶¶ 65-67.
[10] *Id.* ¶ 70.
[11] *Id.* ¶¶ 68-69.
[12] *Id.* ¶¶ 73-75.
[13] *Id.* ¶ 104.

conduct "is not the type of conduct by which a private party engages in 'trade and traffic or commerce' and thus it is not commercial activity.") (citing *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992)), *appeal docketed*, No. 22-2495 (8th Cir. July 14, 2022).

**4. Government-directed research is not commercial in nature.**

The Complaint alleges that the Wuhan Institute of Virology ("WIV") "was studying the virus as part of a commercial activity." Complaint, ¶ 46. Government-directed research is not commercial in nature for FSIA purposes. One court, for example, found that Argentina's "act of cooperating with nation-states to advance human understanding of the earth's ocean salinity is not a 'commercial activity.'" *NML Cap., Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1122 (C.D. Cal. 2011).

Here, the Complaint alleges that WIV's actions are directed and controlled by the Communist Party,[14] and that the reason COVID-19 was being studied was to further the sovereign interest "as part of China's attempt to demonstrate that its efforts to identify and combat viruses are equal to or greater than the capabilities of the United States . . . ."[15] Like in *NML Cap.*, WIV's government-directed scientific research for the sovereign interest is not the type a private person normally would engage in for profit, therefore it is not commercial in nature.

Moreover, the Complaint fails to allege a single commercializing activity in relation to the WIV. Conclusory allegations, whether factual or legal, are insufficient to state a claim, much less confer subject-matter jurisdiction under the FSIA. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*,

---

[14] Complaint, ¶ 19.
[15] Bret Baier, et al., *Sources believe coronavirus outbreak originated in Wuhan lab as part of China's efforts to compete with US*, Fox News (Apr. 15, 2020), available at: https://www.foxnews.com/politics/coronavirus-wuhan-lab-china-compete-us-sources (cited in Complaint, ¶ 46, n.8).

556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (internal citations omitted); *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Conclusory allegations are also insufficient in the FSIA context. In *Evans v. Petroleos Mexicanos (PEMEX)*, the plaintiff was employed by a Mexican corporation on a construction site. *Evans v. Petroleos Mexicanos (PEMEX)*, No. 05-20434, 2006 WL 952265, at *1 (5th Cir. Apr. 13, 2006). He allegedly sustained injuries at work and brought suit against the employers that were found to have foreign state status. *Id.* The district court dismissed the case and the Fifth Circuit affirmed, holding, *inter alia*, that "[g]eneralized and conclusory allegations that the § 1605(a)(2) exceptions apply are not sufficient to establish a jurisdictional nexus." *Id.* at *2. The Fifth Circuit therefore found the appellant-employee did not adequately plead an exception to FSIA to establish subject matter jurisdiction. *Id.*[16]

Similarly, in the current action, Plaintiff fails to allege that WIV conducted any commercializing activity that is sufficient to establish jurisdiction under the commercial activity exception. Therefore, Plaintiff's allegations are insufficient in this regard.

### C. Defendants' alleged acts had no "direct effect" in the United States.

Even if the Defendants' alleged acts were deemed "in connection with" commercial activities, the Complaint fails to allege the acts caused a "direct effect" in the United States. The "direct effect" element requires that the conduct the suit is "based upon" have a direct effect in the United States. *Frank*, 842 F.3d at 369 n.8 (citing 28 U.S.C. § 1605(a)(2)).

---

[16] Notably, in *Evans*, the Fifth Circuit also denied the appellant-employee's argument that he was entitled to discovery, reasoning that "[s]overeign immunity comprises more than just immunity from liability; rather, it is an immunity from the burdens of becoming involved in any part of the litigation process. . . . As the facts alleged by [Appellant] are insufficient to support a § 1605(a)(2) exception to FSIA, [Appellant] is not entitled to burden Appellees with the lengthy and costly process of discovery to build his case." *Evans*, No. 05-20434, 2006 WL 952265, at *2 (5th Cir. Apr. 13, 2006) (cleaned up).

Under the FSIA, a "direct effect" is one that occurs as an immediate consequence of a defendant's activity with no intervening element. *Id.* at 368. Stated differently, a "direct effect" flows in a straight line without deviation or interruption. *Id.*; *see also* Restatement Fourth of the Foreign Relations Law of the United States § 454 (b)(3) ("a direct effect is one that follows as an immediate consequence of the act") and § 454, comment (e) ("An effect is not direct . . . if it is caused by an intervening act").

As the gravamen of this suit, the Complaint alleges that PPE restrictions allegedly imposed by Defendants caused Mississippi's ills by "adversely impair[ing] the ability of health care providers . . . from safely and effectively treating patients with the virus." Complaint, ¶ 127. Yet, the Complaint fails to allege a single fact to support the allegation that China's PPE restrictions had a "direct effect" in Mississippi "as an immediate consequence" with no intervening cause. Indeed, whatever tangential effects China's efforts to manage its supply of PPE may have had outside China were riddled with intervening causes as every nation acted in ways that affected global supply and demand. Moreover, China was not the only manufacturer of PPE in the world during the pandemic. The U.S. had options for PPE other than China, and U.S. policy determined what importance to place on acquiring PPE from these other sources. U.S. policy, however, was not static. As was widely reported, the U.S. view of PPE, and its effectiveness, evolved over the course of the pandemic.[17] As U.S. policy toward PPE evolved, the global supply of PPE ebbed and flowed. Quite literally, every country in the world was seeking PPE at one time or another during the pandemic, and each country was seeking an amount that, in its own sovereign judgment,

---

[17] *See, e.g.*, The Lancet Microbe, Editorial, *US CDC's unexpected change of stance on mask use*, THE LANCET, May 20, 2021, https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00122-1/fulltext; Deborah Netburn, *A timeline of the CDC's advice on face masks*, LOS ANGELES TIMES, July 27, 2021, https://www.latimes.com/science/story/2021-07-27/timeline-cdc-mask-guidance-during-covid-19-pandemic ("The story of mask requirements in the United States has had many twists and turns since the early days of the pandemic").

satisfied the needs of its citizens. These policy decisions, each of which affects global PPE supply and demand over time, are stark examples of intervening causes that necessarily break any causal connection between the acts alleged and a "direct effect" in the United States. *See Missouri ex rel. Schmitt v. People's Republic of China*, 610 F. Supp. 3d 1174, 1193 (E.D. Mo. 2022) (noting that the need for PPE manifested and evolved over time as the virus spread). Even more tenuously, the Complaint attempts to tie Defendants to other types of COVID-related losses, such as infections. These alleged losses are even more remote, and thus indirect, in relation to China's alleged acts to regulate and preserve its supply of PPE.

The Complaint also alleges that Defendants caused a "direct effect" in the United States by failing to contain the virus. Specifically, Plaintiff points to the flow of information within China and across its borders during the earliest stages of the pandemic as alleged acts that allowed the virus to spread to the United States. The Complaint, however, makes no effort, save conclusory allegations, to establish a causal connection between the alleged acts and any actual, direct effect in the United States. Indeed, no causal connection exists, let alone any that is direct.

Assuming *arguendo* that the coronavirus originated in China, the pandemic would have begun when someone became infected. The virus would have spread as the infected people unknowingly infected other people within the same vicinity, and so on. Eventually, some infected people would have chosen to travel within China and outside its borders, and the virus would have been transmitted to others who eventually reached the United States, most often *via* persons infected in Europe and other jurisdictions outside China.[18] Further, the responses of the United States and the various states to the coronavirus, such as border controls and decisions on whether

---

[18] *See* Testimony of Chimène Keitner to Senate Committee on the Judiciary, "The Foreign Sovereign Immunities Act, Coronavirus, and Addressing China's Culpability" (June 23, 2020), available at https://www.judiciary.senate.gov/imo/media/doc/Keitner%20Testimony.pdf (collecting various theories of the chain of infection).

to allow business entities to remain open, are yet additional links in the chain that would have contributed to Plaintiff's alleged injuries. Even a Wahsington Post article cited by Plaintiff claims that the U.S. government's action "contributed to a significant loss of life in the United States."[19] In sum,  the causal chain of a virus is infinitely complex, and myriad individual and governmental choices around the globe necessarily impacted the spread of a virus. According to testimony before the Senate Judiciary Committee, innumerable intervening acts occur within the causal chain of a virus spreading and the effects are anything but direct:

> [T]he causal chain has dozens, if not hundreds, of additional links. To take but one example: if I attend a funeral in Mississippi and contract coronavirus, does China owe me damages, or am I entitled to compensation from the asymptomatic or pre-symptomatic carrier who, for whatever reason, did not wear a mask?

Testimony of Chimène Keitner to Senate Committee on the Judiciary, "The Foreign Sovereign Immunities Act, Coronavirus, and Addressing China's Culpability" (June 23, 2020), available at https://www.judiciary.senate.gov/imo/media/doc/Keitner%20Testimony.pdf (citing *Mississippi Gov Says He Should Have Worn Mask at Funeral* (June 18, 2020), https://apnews.com/89b7faf058ff97d0d53ece6cfcb1a54c).

Finally, Plaintiff attempts to satisfy the "direct effect" requirement by simply affixing the word "direct" to unsupported allegations in the Complaint. For example, the Complaint alleges that "Mississippi's government entities have suffered *direct* economic losses as a result of the pandemic, including loss of revenues and budgetary shortages, with *direct effects* on state services, state pension funds, and many other state proprietary and economic interests." Complaint, ¶ 111

---

[19] Juliet Eilperin, et al., *U.S. sent millions of face masks to China early this year, ignoring pandemic warning signs*, WASHINGTON POST (April 18, 2020), https://www.washingtonpost.com/health/us-sent-millions-of-face-masks-to-china-early-this-year-ignoring-pandemic-warning-signs/2020/04/18/aaccf54a-7ff5-11ea-8013-1b6da0e4a2b7_story.html  (cited in Complaint, ¶ 122).

(emphasis added). Of course, this is insufficient. A bald allegation of "economic losses" in the United States does not suggest, much less establish, the "direct effect" required by the FSIA:

> The mere fact that an American corporation ultimately "suffered a financial loss" in the United States was insufficient "to place the direct effect of the defendants' actions in the United States." . . . To allow such a loss to be the basis for jurisdiction "would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state." . . . Such a result, we held, was inconsistent with Congress's intent to limit jurisdiction to those cases in which the act caused a "direct" effect.

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1190 (10th Cir. 2008) (Gorsuch, J.) (internal citations omitted); *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 90 (D.C. Cir. 2005).

## II.    The "noncommercial tort" exception to sovereign immunity does not apply.

In addition to the "commercial activity" exception, the FSIA provides a "noncommercial tort" exception to the general rule of sovereign immunity. The relevant portion of the "noncommercial tort" exception states:

> (a)  A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>    . . .
> (5) not otherwise encompassed in [the commercial activity exception to immunity], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, ***occurring in the United States*** and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . .

28 U.S.C. § 1605(a)(5) (emphasis added). While Plaintiff does not invoke this exception, Plaintiff's claim would fail on this ground as well, because it has not alleged that the entire tort occurred in the U.S., and because the "discretionary function" exception under this exception would operate to bar this action.

16

### A.  The entire tort alleged in the Complaint did not occur in the U.S.

"The phrase 'occurring in the United States' is no mere surplusage." *Doe v. Fed.*
*Democratic Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017). Unlike the "commercial activity"
exception, which considers the gravamen of an occurrence, the "noncommercial tort" exception
requires ***the entire tort***, including ***both*** the **alleged *act*** and the ***injury***, to have occurred in the
United States. *Id.* at 10, 12; *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014); *In re*
*Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 116 (2d Cir. 2013); *See also Doe 1 v. State*
*of Israel,* 400 F. Supp. 2d 86, 108 (D.D.C. 2005); *O'Bryan v. Holy See*, 556 F.3d 361, 382 (6th Cir.
2009).

In *Doe v. Ethiopia*, plaintiff claimed he received an e-mail attachment infected with a
wiretapping virus. 851 F.3d at 8. The infected email allegedly originated either in Ethiopia or
London. *Id.* The plaintiff sued Ethiopia in the United States, and the district court dismissed the
case for, *inter alia,* lack of subject-matter jurisdiction. *Id.* at 9. In affirming dismissal, the D.C.
Circuit held the "noncommercial tort" exception inapplicable because "the entire tort" did not
occur in the United States. *Id.* at 10-12. The circuit court reasoned that "the tortious intent aimed
at [the plaintiff] plainly lay abroad and the tortious acts of computer programming likewise
occurred abroad." *Id*. at 10. "Ethiopia's placement of the [virus] on [the plaintiff's] computer,
although completed in the United States when [the plaintiff] opened the infected e-mail attachment,
began outside the United States. It thus cannot be said that the entire tort occurred in the United
States." *Id*. The circuit court concluded the alleged cyberespionage was "a transnational tort over
which we lack subject matter jurisdiction." *Id.* at 11.

In reaching its conclusion, the D.C. Circuit considered the FSIA's legislative history to
discern Congressional intent. The court found that Congress's "primary purpose in enacting §
1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts

17

committed in the United States, for which liability is imposed under domestic tort law.'" *Id.* at 11 (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439-40 (1989)).

The Complaint alleges acts by Defendants that, if they occurred at all, occurred wholly within China. Accordingly, the "noncommercial tort" exception to sovereign immunity, which requires the entire tort to have occurred in the United States, does not apply.

### B. The "discretionary function" exception to the noncommercial tort exception separately bars suit against Defendants.

Assuming *arguendo* that the "noncommercial tort" exception to sovereign immunity were to apply, the "discretionary function" exception to the "noncommercial tort" exception would nevertheless bar Plaintiff's suit against Defendants under the FSIA. The "discretionary function" exception to the "noncommercial tort" exception to sovereign immunity provides that a foreign state otherwise subject to suit under the "noncommercial tort" exception is nevertheless immune from "any claim based upon the exercise or performance or the failure to exercise or perform a *discretionary function*…." 28 U.S.C. § 1605(a)(5)(A) (emphasis added).

"The existence of a discretionary function under the FSIA is generally analyzed under the principles developed pursuant to the Federal Tort Claims Act's ('FTCA') discretionary function exception." *Joseph v. Off. of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987) (cited in *Croyle by & through Croyle v. United States*, 908 F.3d 377, 382 (8th Cir. 2018)).

In *United States v. Gaubert*, the Supreme Court analyzed the FTCA's "discretionary function" exception holding that a government agent exercising discretion pursuant to a government policy derived, whether expressly or impliedly, by statute, regulation, or agency guidelines is presumed to have acted pursuant to that policy for purposes of the FTCA's discretionary function exception. *United States v. Gaubert,* 499 U.S. 315, 324 (1991).

The Complaint alleges acts by Defendants that, if they occurred at all, are wholly discretionary in nature. Like the rest of the world, Defendants were confronted by a fast-moving virus that quickly spread into a global pandemic. Defendants acted within their respective roles to manage the spread of the virus, avoid public panic, and mitigate economic loss. These discretionary decisions required government agents from China and every other nation to balance various factors and interests necessarily involving "an element of judgment or choice." *Gaubert*, 499 U.S. at 322 (explaining the term, "discretionary"). Whether Plaintiff agrees with Defendants' decisions is of no moment. Defendants, each a "foreign state" for purposes of the FSIA, are presumed to have acted in their respective roles carrying out governmental policies in China aimed at controlling the pandemic and its impact. This is the essence of a discretionary function. *See Stirling v. China*, No. 3:20-CV-00713-SB, 2020 WL 5638630, at *1 (D. Or. Aug. 14, 2020, adopted Sept. 21, 2020) (holding that discretionary function exception precluded claim against China for alleged negligent release of coronavirus).

Accordingly, Plaintiff's claims against Defendants are barred by the "discretionary function" exception to the "noncommercial tort" exception to sovereign immunity. [20]

## III.    A U.S. state should not be permitted to sue foreign states under the FSIA.

The FSIA was enacted by Congress for the benefit of *private* litigants, according to its legislative history. *See* H.R. Rep. 94-1487 (1976), *reprinted in* U.S. Code Cong. & Admin. News 6604, 6607. Before the FSIA, a "private litigant" with legal claims against a foreign state was subject to "considerable uncertainty." *Id*. at 6622. Thus, § 1605 and, similarly, § 1608 were

---

[20] In addition, another exception to the "noncommercial tort" exception would foreclose an action based on misrepresentation and deceit, which Plaintiff alleges Defendants committed by suppressing information about COVID-19 and mispresenting PPE quality. *See* 28 U.S.C. § 1605(a)(5)(B).

intended "to insure that *private persons* have adequate means for commencing a suit against a foreign state to seek redress in the courts." *Id*. (emphasis added).[21]

The Plaintiff is a U.S. state seeking to avail itself of rights created expressly for individuals, and thereby interjecting itself headlong into U.S. foreign policy and the complex relationship between the United States and China. Plaintiff's claims infringe on China's sovereignty and the discretionary acts of its agents attempting to manage the pandemic under Chinese law.

For more than 200 years, U.S. courts have sought to construe U.S. statutes without violating the laws of other nations. *See Murray v. The Schooner Charming Besty*, 6 U.S. (2 Cranch) 64, 118 (1804) (holding that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."); *see also American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003).

In *Garamendi*, the Supreme Court held that a California statute "interfere[d] with the National Government's conduct of foreign relations." *Id.* at 401. The Supreme Court reasoned that "at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Id.* at 413 (internal citations omitted).

Plaintiff's lawsuit has implications far beyond Mississippi's alleged interests, including significant potential to harm myriad political, diplomatic, and economic agreements, relationships, and interactions between China and the United States. If a State were allowed to sue a foreign state, each State's attorney general would be able to seek to enforce their views of what China should or

---

[21] As stated previously, Congress's "primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States [by its agents], for which liability is imposed under domestic tort law.'" *Id.* at 11 (citing *Amerada Hess Shipping Corp.*, 488 U.S. at 439–40).

should not do. Federalism dictates that foreign relations, including Sino-U.S. relations, are exclusively within the purview of the federal government pursuant to the United State Constitution. Plaintiff, the State of Mississippi, should be precluded from interjecting itself in these relationships by using the FSIA in a manner beyond Congressional intent.

**IV.    This Court should not adjudicate this lawsuit under the act of state doctrine.**

Finally, the Defendants' regulation of activities within national borders constitutes an act of a state whose legitimacy cannot be attacked, and therefore cannot be subject to adjudication in a U.S. court.

U.S. courts have long held that "[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The act of state doctrine requires acts of foreign sovereigns taken within their own jurisdictions be deemed valid. *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1985); *Int'l Ass'n of Machinists & Aerospace Workers, (IAM) v. Org. of Petroleum Exporting Countries (OPEC)*, 649 F.2d 1354, 1358 (9th Cir. 1981), *cert. denied*, 454 U.S. 1163 (1982) (action against OPEC sovereigns dismissed on "act of state" grounds). Under the act of state doctrine, a United States court will not adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state. *IAM*, 649 F.2d at 1358. This doctrine is not superseded by the FSIA nor diluted by FSIA's commercial activity exception. *Id.* at 1360.

Moreover, considerations of international comity militate against a domestic court of one country claiming for itself the right to decide how much  fault is attributatble to its own government for harm suffered by its citizens  versus  how much  fault is attributatble to another government . "Judicial comity among nations, an important principle acknowledged in [*First Nat'l City Bank v.*

21

*Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983)], has become increasingly important to today's global economy." *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 537 (5th Cir. 1992). Even if subject-matter jurisdiction existed, which it does not, this Court should decline based on the state of act doctrine and considerations of international comity.

A U.S. court is not more qualified to declare China's regulation of PPE production, importation, and exportation wrongful or invalid, than a Chinese court or any other foreign court is to declare U.S. regulation of the production, importation, and exportation of PPE – **or medicines** – wrongful or invalid. If the activities at issue are subject to suit, numerous activities of the U.S. government could be attacked in the courts of other countries. *See, e.g.*, *US buys up world stock of key Covid-19 drug remdesivir*, The Guardian, June 30, 2020 ("The US has bought up virtually all the stocks for the next three months of one of the two drugs proven to work against Covid-19, leaving none for the UK, Europe or most of the rest of the world."); *Health Experts Slam US Hoarding of Only Licensed Virus Drug*, New York Times, July 1, 2020 ("Health experts on Wednesday slammed the U.S. decision to hog nearly the entire global supply of remdesivir"); *Canadian Province of Ontario Angry Over 'Unacceptable' U.S. Move to Block Face Masks*, New York Times, April 6, 2020 ("Allies of the United States have complained about what they call its 'Wild West' tactics in outbidding or blocking shipments to buyers who have already signed deals for medical equipment."). *See also Why Is the United States Exporting Coronavirus?*, New York Times, June 18, 2020 ("the United States, with the largest number of coronavirus cases in the world, is now consciously spreading the pandemic beyond its borders by continuing to deport thousands of immigrants, many infected with the coronavirus, to poor countries ill equipped to cope with the disease.").

## CONCLUSION

For the reasons set forth herein, The China Society of Private International Law respectfully submits that Defendants are immune from suit under the Foreign Sovereign Immunities Act, and the Court lacks subject-matter jurisdiction.

Dated: July 25, 2023

Respectfully submitted,

THE CHINA SOCIETY OF PRIVATE
INTERNATIONAL LAW
c/o International Law Institute of Wuhan University
Wuchang District
Wuhan, China 430072

By Its Attorneys,

CARROLL BUFKIN, PLLC


/s/ Thomas G. Bufkin

By: _____

Thomas G. Bufkin, MSB# 10810




Thomas G. Bufkin, MSB#10810
CARROLL BUFKIN, PLLC
1076 Highland Colony Parkway, Ste 125
Ridgeland, Mississippi 39157
T: (601) 982-5011
F: (601) 853-9540
tgb@carrollbufkin.com