# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

THE STATE OFMISSISSIPPI,
*ex rel.* LYNN FITCH, in Her
Official Capacity as Attorney General
of the State of Mississippi

       Plaintiff,

Civil Action No. 1:20-cv-168-TBM-RPM

THE PEOPLE'S REPUBLIC OF CHINA,
THE COMMUNIST PARTY OF CHINA,
NATIONAL HEALTH COMMISSION OF
THE PEOPLE'S REPUBLIC OF CHINA,
MINISTRY OF EMERGENCY
MANAGEMENT OF THE PEOPLE'S
REPUBLIC OF CHINA, MINISTRY OF
CIVIL AFFAIRS OF THE PEOPLE'S
REPUBLIC OF CHINA, PEOPLE'S
GOVERNMENT OF HUBEI PROVINCE,
PEOPLE'S GOVERNMENT OF WUHAN
 CITY, WUHAN INSTITUTE OFVIROLOGY,
and CHINESE ACADEMY OF SCIENCES

       Defendants.

---

## MEMORANDUM BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

---

COMES NOW, the Plaintiff, State of Mississippi, *ex rel.* Lynn Fitch, Attorney General (hereafter "Mississippi"), and respectfully files this Memorandum Brief in Support of its Motion for Default Judgment against all defendants, and would show unto the Court as follows:

# I.    INTRODUCTION AND PROCEDURAL HISTORY

Mississippi filed its Complaint on May 12, 2020. [Dkt. #1]. Pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention") and the Foreign Sovereign Immunity Act, 28 U.S.C. § 1608(a)(2) ("FSIA"), Mississippi sent a request to China's Central Authority to serve Defendants on or about August 17, 2021. On February 22, 2022, Mississippi received notice from the Ministry of Justice, People's Republic of China that service was rejected under Article 13 of the Hague Service Convention because, "[t]he execution of the request would infringe the sovereignty or security of the People's Republic of China (Article 13)." [Dkt. #12]. Article 13 of the Hague Service Convention permits rejection of properly submitted service requests "only if it deems that compliance would infringe its sovereignty or security."[1]

On April 27, 2022, Mississippi delivered documents to the Clerk's Office to serve Defendants People's Republic of China, People's Government of Hubei Province, People's Government of Wuhan City, National Health Commission of the People's Republic of China, Ministry of Emergency Management of the People's Republic of China, and the Ministry of Civil Affairs of the People's Republic of China to the Clerk's Office. The Clerk transmitted these documents to the U.S. Department of State on the same day.

Following communication of receipt from the U.S. Department of State, Mississippi provided translated copies of the reissued summons to the U.S.

---

[1] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Article 13,  November 15, 1965 f4520725-8cbd-4c71-b402-5aae1994d14c.pdf (hcch.net).

Department of State via the Clerk's Office, and the U.S. Department of State initiated the process of serving the governmental Defendants via diplomatic channels. Mississippi received the diplomatic notes from the U.S. Department of State confirming that service was effectuated for the Defendants. 28 U.S.C. § 1608(a)(4)[2].

As of today's date, even as additional declassified intelligence and investigative reporting uncover further details of China's complicity in the COVID-19 pandemic, Defendants have failed to answer or otherwise defend against Mississippi's Complaint.[3]  In fact, the package of diplomatic notes included a letter from the Ministry of Foreign Affairs of the People's Republic of China stating that they have no intention to "participate" in Mississippi's lawsuit. Exhibit A.

## II.    ARGUMENT

The authority to grant a default judgment against the Defendants is found in Fed. R. Civ. P. 55(b)(2). Further, a decision to enter a default judgment is reviewed only for an abuse of discretion. *SUA Ins. Co. v. Buras*, 421 Fed. Appx. 384, 385 (5th Cir. 2011) (citing *Rogers v. Harford Life & Accident Co.*, 167 F.3d 933, 936 (5th Cir. 1999)).  "A defendant, 'by his default, admits the plaintiff's well-pleaded allegations

---

[2] Mississippi served non-govermental Defendants Communist Party of China, Wuhan Institute of Virology, and the Chinese Academy of Sciences on January 5, 2024. [Dkt. #56, 57, 58].

[3] . Michael R. Gordon, Lab Leak Most Likely Origin of Covid-19 Pandemic, Energy Department Now Says, THE WALL STREET JOURNAL (Feb. 26, 2023) https://www.wsj.com/articles/covid-origin-china-lab-leak-807b7b0a?mod=article_inline; Dustin Volz, China's Refusal to Help Probes of Covid-19 Origins Leaves Critical Gap, Spy Chief Says, THE WALL STREET JOURNAL (March 3, 2023) https://www.wsj.com/articles/lack-of-chinese-cooperation-leaves-critical-gap-on-covid-19-origins-spy-chief-says-13cee980?mod=article_inline; Kristen Welker and Dareh Gregorian, China's stonewalling of Covid origin probe led Biden to reveal latest intelligence review, NBC News (May 27, 2021) https://www.nbcnews.com/politics/joe-biden/china-s-stonewall-covid-origin-probe-pushed-biden-reveal-latest-n1268875.

of fact.'" *Allstate Property & Cas. Ins. Co. v. Pickett*, 2014 WL 202758, at 1 (S.D. Miss. 2014) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)). A default judgment is proper "if those well-pleaded factual allegations establish a valid cause of action…" *Pickett*, 2014 WL at 1 (quoting *Nishimatsu Constr. Co.*, 515 F.2d at 1206). The Defendants have failed to respond or otherwise defend against Mississippi's Complaint, and a default judgment should be entered against them.

Defendants have not only failed to respond to Mississippi's Complaint, but they also sent a letter, in returning the diplomatic notes, addressed from the Ministry of Foreign Affairs of the People's Republic of China stating, "China does not recognize and will not participate in these two vexatious litigation lawsuits." Exhibit A. (referencing Mississippi's case and another private case pending in Florida).

A.    **The Foreign Sovereign Immunity Act Confers Jurisdiction in this Matter**

The Foreign Sovereign Immunity Act "provides the exclusive jurisdictional basis for suits in the United States against foreign states." *Juels v. Fed. Rep. of Germany*, 32 F. 3d 566 (5th Cir. 1994). Foreign states are presumptively immune from the jurisdiction of U.S. courts "unless a specified exception applies." [*Id.* (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993))]. "Under the FSIA, courts have personal jurisdiction over a foreign state when the court has subject matter jurisdiction and 'proper service has been effected.'" *Koch Minerals Sàrl,* 514 F. Supp. 3d. at 31 (citing *Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018) ((citing 28 U.S.C. § 1330(b) and *I.T.*

*Consultants, Inc. v. Islamic Republic of Pakistan*, 351 F.3d 1184, 1191 (D.C. Cir. 2003))). Defendants in this case have been properly served, and the court has subject matter jurisdiction over this matter. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)-(3) and (f)(1)-(2) because a substantial part of the events or omissions giving rise to Mississippi's claims occurred in this District and in this Division of this District.

Furthermore, Defendants are not immune to the jurisdiction of courts of the United States where they act "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). A commercial activity is defined to be "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

In the matter now before this Court, Defendants engaged in commercial activity by creating information asymmetry through their deceptive acts and using that advantage to corner the market on PPE as commercial actors, when they nationalized production and distribution of PPE and medical supplies[4]. [Dkt. # 1, ¶¶ 118-119 (citing Bradsher, The World Needs Masks.)]. The Complaint now before this Court derives both directly from the commercial activities of Defendants and acts "in connection with" their commercial activities. As commercial actors, Defendants

---

[4] CECIRE, CONG. RESEARCH SERV., R46628

hoarded PPE, cornered the market, raised prices, and sold faulty PPE in Mississippi and elsewhere. [Dkt. #1, ¶¶ 118-27]. Defendants restrained the freedom of trade and engrossed or forestalled the trade of PPE. In connection with these activities, Defendants suppressed information about the seriousness of COVID-19, allowing them time to corner the market and carry out this scheme. [Id].

Mississippi followed all procedural steps required by the Federal Rules of Civil Procedure (F.R.C.P.), the FSIA, and the Hague Service Convention in effectuating service. The provisions of the FSIA, § 1608 "are hierarchical, such that a plaintiff must attempt the methods of service in the order they are laid out in the statute." *Magness v. Russian Federation*, 247 F. 3d 609, 613 (5th Cir. 2001). No special arrangement exists between the plaintiff and the foreign state or any political subdivisions. Therefore, service under (a)(1) is inapplicable. 28 U.S.C. § 1608(a)(1); *Koch Minerals Sàrl v. Bolivarian Rep. of Venezuela*, 514 F. Supp. 3d 20, 31 (D.D.C. 2020) ("If no such arrangement exists, the plaintiff must deliver the summons and complaint "in accordance with an applicable international convention on service of judicial documents.").

The United States and China are both signatories to the Hague Service Convention.[5] Mississippi first attempted service under provision (a)(2) by delivering the required service documents "in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(a)(2). F.R.C.P. 4(f)(1) authorizes service, "by any internationally agreed means of service that is reasonably

[5] Status Table, HCCH | #14 - Status table.

calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." However, Mississippi's first service attempt was rejected by China's Central Authority.

Like service under (a)(1), service under (a)(3), sending service documents "by any form of mail requiring a signed receipt" is also unavailable to Mississippi because China has objected to Article 10(a) of the Hague Service Convention, which provides for service "by postal channels."[6] Mississippi then proceeded under 28 U.S.C. § 1608(a)(4), and sent the required service documents, via the clerk of the court, to the Secretary of State's Office. As proscribed by the rule, these documents were transmitted "through diplomatic channels to the foreign state." 28 U.S.C. § 1608(a)(4). On March 30, 2023, Mississippi received the diplomatic notes from the U.S. Department of State, confirming that service was perfected for the six governmental Defendants. Mississippi received similar diplomatic notes from the State Department regarding the non-governmental Defendants on January 5, 2024. Therefore, all of the Defendants in this case have been served and have failed to answer or otherwise defend against Plaintiff's Complaint.

### B.   A Default Judgment is Proper in this Matter

In determining whether to enter a default judgment, the Fifth Circuit requires district courts to examine six factors: "(1) whether material issues of fact exist; (2) whether there has been substantial prejudice; (3) whether the grounds for default are clearly established; (4) whether the default was caused by a good faith mistake or

---

[6] Declaration/Reservation/Notification, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=393&disp=resdn.

excusable neglect; (5) the harshness of a default judgment; and (6) whether the Court would consider itself obligated to set aside a default on the defendant's motion." *Lindsayca USA, Inc v. de Venezuela*, 2022 WL 3588041 at \*4 (S.D. Tex. Aug. 22, 2022) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998)).

First, as in *Lindsayca*, there are no material issues of fact. "Because [Defendants] have failed to answer the lawsuit, they are deemed to have admitted the allegations against them set forth in the Complaint." *Lindsayca*, 2022 WL 3588041 at \*4. Second, there is no prejudice to Defendants. They were properly served and, other than to call Mississippi's suit "vexatious," Defendants "failed to respond to the lawsuit." *Id.* Third, the grounds for default are clearly established in the complaint and below. Fourth, there is no excusable neglect on the part of the Defendants. Defendants have instead advised that, though they have been properly served, they will not "participate" in Mississippi's lawsuit. Exhibit A. Fifth, a default judgment would not be harsh "when [Defendants] have not even bothered to respond to the lawsuit," especially considering the harm alleged in the Complaint. *Id.* Sixth, Mississippi knows of no facts that would cause the court to set aside the default judgment should it be challenged at a later date.

## 1. Count I: Defendants' Violated the Mississippi Consumer Protection Act

The Mississippi Consumer Protection Act ("MCPA") Miss. Code Ann. § 75-24-1 *et seq.*, governs prohibited acts and practices relating to unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce. Under § 75-24-5(1), there is a general prohibition against "Unfair methods

of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." For instance, the Mississippi Supreme Court upheld a chancery court finding that a drug manufacturer's practice of reporting fictitious prices constituted an unfair or deceptive practice. *In re Mississippi Medicaid Pharmaceutical Average Wholesale Pricing Litigation*, 190 So. 3d 829, 841-42 (Miss. 2015).

What constitutes an unfair or deceptive trade practice in Mississippi is guided by, but not limited to, interpretations of the Federal Trade Commission Act from the Federal Trade Commission and federal courts, 15 U.S.C. 45(a)(1). Miss. Code Ann. § 75-24-3(c); *Watson Labs., Inc. v. State*, 241 So. 3d 573, 590 (Miss. 2018). The Supreme Court has determined that a particular act or practice is unfair or deceptive if it has the capacity or tendency to deceive. *FTC v. Raladam Co.*, 316 U.S. 149, 152 (1942). Here, Mississippi alleges that the Defendants took many affirmative steps to hide information about COVID-19 from Mississippi and the world, including the virus' transmission capabilities, by suppressing vital and potentially life-saving medical information while spreading misinformation. This deception left Mississippi without crucial information needed to prepare for a global pandemic. Second, Mississippi claims that the Defendants hoarded personal protective equipment ("PPE") for the purpose of cornering the market, knowing that there would soon be a global uptick in demand. Third, Mississippi maintains that, after nationalizing PPE production and distribution, defendants misrepresented that the PPE sold was of a certain type and

quality, when it was not, in direct violation of Miss. Code Ann Section 75-24-5(2)(e) and (g).

Mississippi alleges that, in response to a serious health threat, Defendants took action to contain information that was critical to mitigating the effects of COVID-19. [Dkt. #1]. Mississippi also alleges that Defendants' actions left Mississippi and the world at large with a lack of information, that *only* the Defendants possessed, which prevented Mississippi and others from taking reasonable precautionary measures in response to the then-unknown threat. [Id.]. Mississippi claims that the Defendants capitalized on this information asymmetry to hoard and raise prices of PPE, products the Defendants knew would be crucial in combatting the spread of the disease. [Id.], It was not only Defendants' act of omission – concealing the seriousness of COVID-19 – but also actions of commission, i.e. profiteering in the PPE market, that constitute unfair and deceptive trade practices.

Defendants first began suppressing information about COVID-19 within China. [Dkt. #1, ¶¶ 68-70 (citing Yong Xiong, et al., This Chinese doctor tried to save lives, but was silenced. Now he has coronavirus, CNN (Feb. 4, 2020), available at: https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-; Jeremy Page, et al., How It All Started: China's Early Coronavirus Missteps, THE WALL STREET JOURNAL (Mar. 6, 2020), available at: https://www.wsj.com/articles/how-it-allstarted-chinas-early-coronavirus-missteps-11583508932)]. On December 30, 2019, the Wuhan Municipal Health Commission released a notice that prohibited individuals or institutions from releasing treatment

information to the public without authorization. [Dkt. #1, ¶ 69 (citing Xiong, This Chinese doctor tried to save lives, but was silenced.). Information about the virus shared on social media was stopped and key words were censored. [Dkt. #1, ¶¶ 70-72 (citing Page, How It All Started; Lotus Ruan, et al., Censored Contagion How Information on the Coronavirus is Managed on Chinese Social Media, UNIV. OF TORONTO, THE CITIZEN LAB (Mar. 3, 2020)]. Police action was taken against Chinese citizens who tried to share information via social media. [Dkt. #1, ¶¶ 73-76, 82 (citing Xiong, This Chinese doctor tried to save lives, but was silenced; Xie Haunchi, Six days of silence when China didn't warn public of likely pandemic, ST. LOUIS POST DISPATCH (April 16, 2020), available at: https://www.stltoday.com/news/sixdays-of-silence-when-china-didnt-warn-public-of-likely-pandemic/article_ae11db70-6704-5b49-8040-78bf21579e07.html.)]. On January 1, 2020, Dr. Ai Fen, who ran an emergency department at a Wuhan hospital ordered her staff to wear masks, suspecting human-to-human transmission. [Dkt. #1, ¶ 78 (citing Page, How It All Started.)]. The next day, Dr. Fen was censured by the hospital's disciplinary department for spreading rumors, and hospital leadership banned staff from discussing the virus in public or via text messaging. [Dkt. #1, ¶ 79 (citing Page, How It All Started.)]. On January 3, 2020, Defendant National Health Commission of the People's Republic of China ordered institutions to refrain from publishing any information about the disease and ordered labs to either transfer samples to designated institutions or destroy the samples. [Dkt. #1, ¶ 83 (citing Xiong, This Chinese doctor tried to save lives, but was silenced.)].

Defendants stalled virus testing efforts and delayed the release of information about the virus. On January 1, 2020, a genomics company received a call from an official at the Hubei Provincial Health Commission ordering the company to stop testing and destroy all existing virus samples from Wuhan. [Dkt. #1, ¶ 77 (citing Gao Yu, et al., How early signs of the coronavirus were spotted, spread and throttled in China, THE STRAIGHT TIMES (Feb. 28, 2020), available at: https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-werespotted-spread-and-throttled-in-china)]. On January 2, 2020, the Wuhan Institute of Virology completed sequencing the virus' genome. [Dkt. #1, ¶¶ 80-81 (citing Xiong, This Chinese doctor tried to save lives, but was silenced.)]. On January 5, 2020, a medical research center in Shangai notified Defendant National Health Commission of the People's Republic of China that one of their professors had mapped the genome as well. [Dkt. #1, ¶ 85 (citing Xiong, This Chinese doctor tried to save lives, but was silenced.)]. On January 9, 2020, Chinese authorities publicly announced that the outbreak originated from a novel coronavirus. [Dkt. #1, ¶ 90 (citing Xiong, This Chinese doctor tried to save lives, but was silenced.)]. However, even though the virus was rapidly spreading and time was of the essence, they waited a week, until January 12, 2020, to share the genome with the international community. [Dkt. #1, ¶ 93 (citing Xiong, This Chinese doctor tried to save lives, but was silenced.)]. In 2023, the Director-General of the World Health Organization ("WHO"), Tedros Adhanom Ghebreyesus, said that the newly disclosed genetic

material should have been shared when the first cases were detected in Wuhan in late 2019[7].

To make matters worse, information released by Defendants to the public was dangerously deceptive and contradicted then-existing evidence. On January 5, the WHO released a statement that information provided by the Chinese investigation team found "'no evidence of significant human-to-human transmission.'" [Dkt. #1, ¶ 87 (citing World Health Organization, Disease Outbreak News, Pneumonia of Unknown Cause – China (Jan. 5, 2020), available at: https://www.who.int/csr/don/05-january-2020-pneumonia-of-unkown-cause-china/en/)]. On January 8, 2020, the WHO released another statement, again relying on information from Chinese officials, recommending no travel or trade restrictions with China. [Dkt. #1, ¶ 89 (citing World Health Organization, WHO Statement regarding cluster of pneumonia cases in Wuhan, China (Jan. 9, 2020), available at: https://www.who.int/china/news/detail/09-01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan-china.)]. On January 11, 2020, the Wuhan City Health Commission issued a statement saying that "no related cases have been found" and that "no clear evidence of human-to-human transmission has been found."[Dkt. #1, ¶ 92 (citing Jim Geraghty, The Comprehensive Timeline of China's

---

[7] Joe McDonald, China health officials lash out at WHO chief, defend search for origin of COVID-19, PBS (Apr. 8, 2023) available at: https://www.pbs.org/newshour/world/china-health-officials-lash-out-at-who-chief-defend-search-for-origin-of-covid-19

COVID-19 Lies, NATIONAL REVIEW (March 23, 2020), available at: https://www.nationalreview.com/the-morningjolt/chinas-devastating-lies/)].

Defendants continued the campaign of denial or silence even as the virus spread beyond China's borders. The first case of COVID-19 was reported outside of China on January 13, 2020, but Chinese officials continued to deny human-to-human transmission. [Dkt. #1, ¶¶ 94-97 (citing Yu, How early signs of the coronavirus were spotted, spread and throttled in China; Geraghty, The Comprehensive Timeline of China's COVID-19 Lies.)]. When President and General Secretary Xi Jinping, leader of Defendants the People's Republic of China and the Communist Party of China, made his first public statement on the crisis on January 20, 2020, he was silent on the question of human-to-human transmission. [Dkt. #1, ¶ 98 (citing Page, How It All Started.)]. By the time this official statement was made millions of travelers had passed through Wuhan, and an estimated 3,000 additional people were infected. [Dkt. #1, ¶ 99 (citing Yu, How early signs of the coronavirus were spotted, spread and throttled in China.)].

A week after the virus had spread beyond China's borders, on January 20, 2020, Chinese authorities confirmed that human-to-human transmission was occurring. [Dkt. #1, ¶ 100 (citing Yu, How early signs of the coronavirus were spotted, spread and throttled in China; Lily Kuo, China confirms human-to-human transmission of coronavirus, THE GUARDIAN (Jan. 20, 2020), available at: https://www.theguardian.com/world/2020/jan/20/coronavirus-spreads-to-beijing-as-chinaconfirms-new-cases.)]. This was confirmed by the WHO after conducting an

investigation in China on January 20 and 21, 2020. Even after confirming human-to-human transmission, China continued to mislead Mississippi and the world about key statistics of COVID-19 and to spread other misinformation. [Dkt. #1, ¶¶ 103-105 (citing Scott Neuman, China Raises Wuhan Death Stats By Half To Account For Reporting Delays And Omissions, NATIONAL PUBLIC RADIO (April 17, 2020), available at: https://www.npr.org/sections/coronavirus-live-updates/2020/04/17/836700806/china-raiseswuhan-death-stats-by-half-to-account-for-reporting-delays-and-omiss.; Frank Miles, 2 Wuhan whistleblowers missing months after helping expose coronavirus outbreak, activists say, FOX NEWS (April 15, 2020), available at: https://www.foxnews.com/world/wuhan-whistleblowers-missing-exposing-coronavirus; Bradford Betz, Guest on Chinese-produced Arabic-language program claimed US may be to blame for coronavirus pandemic, FOX NEWS (April 19, 2020), available at: https://www.foxnews.com/world/chinese-arabic-language-program-us-coronaviruspandemic.)].

In early February of 2020, the Chinese government nationalized control of the production and distribution of PPE and other medical supplies[8]. Not only did China take over factory production located within China, including those factories that once made masks on behalf of American companies, but they also ramped up imports of PPE. [Dkt. #1, ¶¶ 118-120 (citing Keith Bradsher, et al., The World Needs Masks. China Makes Them, but Has Been Hoarding Them, N.Y. TIMES (Mar. 13, 2020),

---

[8] MICHAEL H. CECIRE, CONG. RESEARCH SERV., R46628, COVID-19 AND DOMESTIC PPE PRODUCTION AND DISTRIBUTION: ISSUES AND POLICY OPTIONS, DEC. 7, 2020 https://crsreports.congress.gov/product/pdf/R/R46628.

available at: https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html.)].

Having cornered the market on PPE production and possessing a hoard of supplies in the face of a global pandemic, Chinese manufacturers, under the control of the Chinese government, increased the price on these critical supplies. [Dkt. #1, ¶ 121 (citing Talia Kaplan, Peter Navarro: China 'cornered' the personal protective equipment market and 'is profiteering' during coronavirus outbreak, FOX NEWS (April 19, 2020), available at: https://www.foxnews.com/media/peter-navarro)]. As early as March 2020, the WHO reported that the price of surgical masks increased sixfold, N95 masks increased threefold, and surgical gowns doubled[9].  In April of 2020, a Canadian news source reported that Chinese manufacturers increased the price of N95 masks fivefold. Canada donated masks to China. Chinese mask makers now price-gouging Canada, THINKPOL (Apr. 29, 2020) available at: https://thinkpol.ca/2020/04/29/canada-donated-masks-china-now-chinese-mask-makers-now-price-gouging-canada/ The Washington Post reported that White House officials believed China's actions were a "deliberate attempt by China to corner the market as it concealed and downplayed the danger posed by the outbreak". [Dkt. #1, ¶ 122 (citing Juliet Eilperin, et al., U.S. sent millions of face masks to China early this year, ignoring pandemic warning signs, WASHINGTON POST (April 18, 2020),

---

[9] Talha Burki, Global shortage of personal protective equipment, SCIENCE DIRECT (July 2020), available at: https://www.sciencedirect.com/science/article/pii/S1473309920305016?ref=pdf_download&fr=RR-2&rr=7e2145979ba12447.

available at: https://www.washingtonpost.com/health/us-sent-millions-of-face-masks-to-china-early-thisyear-ignoring-pandemic-warning-signs/2020/04/18/aaccf54a-7ff5-11ea-8013-1b6da0e4a2b7_story.html)].

Without limiting the broad language conferred by subsection (1) of the MCPA, Miss. Code Ann. § 75-24-1 et seq, subsection (2) specifies certain acts and practices that violate this provision as well. One such prohibition includes the act of "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another[.]" Miss. Code Ann. § 75-24-5(2)(g). Under the rule set forth in Miss. Code § 75-24-5(2)(g), defendants misrepresented the standard, quality, and grade of PPE the state of Mississippi received from China.

The PPE, which China actually sold, was not only overpriced but also faulty and not the N95 and KN95 grade represented. [Dkt. #1, ¶ 124 (citing David Brunnstrom, et al., U.S. asks China to revise export rules for coronavirus medical gear, REUTERS (April 16, 2020), available at: https://www.reuters.com/article/heathcoronavirus-usa-china/us-asks-china-to-revise-export-rules-for-coronavirus-medical-gearidUSL1N2C502N)]. A news report explained, "as it's name advertises, the KN95 mask is meant to filter out 95% of aerosol particles."[10] A study conducted by a nonprofit patient organization, ECRI, found that up to 70% of KN95 masks imported from China did not meet these

_____

[10] Adrianna Rodriguez, UP to 70% of KN95 masks imported from China don't meet filtration standards, study says, USA TODAY (Sept. 22, 2020), available at: COVID-19: KN95 face masks from China don't meet standards, ECRI finds (usatoday.com).

purported filtration standards. *Id.* Mississippi purchased N95 and KN95 masks manufactured in China[11]. An article on May 20, 2020, cited the executive director of the Mississippi Emergency Management Agency ("MEMA") who estimated that as of that time, Mississippi had purchased four million masks. *Id.* While reliance is not a required element of the MCPA, Mississippi purchased these masks believing them to be of their purported quality, when they were not.

## 2. Count II: Defendants Violated the State's Antitrust Laws

Miss. Code Ann. § 75-21-1 establishes the State's antitrust laws. Miss. Code Ann. § 75-21-3 governs unilateral anticompetitive conduct and, in part, prohibits unilateral action to "restrain or attempt to restrain the freedom of trade or production." The restraint of trade must be unreasonable and be done "to a degree inimical to the public welfare." Miss Code Ann. § 75-21-3; *Brown v. Staple Cotton Coop. Ass'n*, 96 So. 849, 855 (1923) ("There must be an unreasonable or undue restraint of trade. It must be such a restraint of trade as is detrimental to the public interest.). Intent is not required for a unilateral violation of Mississippi state antitrust law. Miss Code Ann. § 75-21-3 ("with intent to accomplish the results herein prohibited or *without* such intent…") (emphasis added).

Defendants began their campaign to unlawfully restrain the freedom of trade by nationalizing the production and distribution of PPE and other medical supplies.

---

[11] Giacomo Bologna, Mississippi emergency agency spent $20M on coronavirus supplies. Here's what we bought., CLARION LEDGER (May 20, 2020), available at: Mississippi coronavirus: MEMA spent millions on N95 masks from China (clarionledger.com).

[Dkt. #1, ¶¶ 118-119 (citing Bradsher, The World Needs Masks); CECIRE, CONG. RESEARCH SERV., R46628]. Defendants diminished the available supply of PPE in the global market by importing large quantities of PPE to hoard, in what former White House officials believed to be a "'deliberate attempt by China to corner the market.'" [Dkt. #1, ¶ 122 (citing Eilperin, U.S. sent millions of face masks to China)]. In addition, a Congressional Research Service report shows that in early February of 2020, China's Ministry of Commerce "directed its bureaucracy, local governments and industry to secure critical technology, medical supplies, and medical-related raw material inputs from the global market, a situation that likely further exacerbated supply shortages in the United States and other markets[12] The same report explains that these policies led to steep increases in the Chinese import of PPE and "contributed to sharp decreases in China's exports of these critical medical products to the world." *Id.* Defendants further restrained the trade of PPE by imposing export restrictions on PPE. [Dkt. #1, ¶ 123 (citing O'Keeffe, China's Export Restrictions Strand Medical Goods.)].

Defendants' actions placed an undue or unreasonable restraint on the trade of PPE. Defendants restrained the trade of PPE in furtherance of their efforts to control supply and garner profit. PPE. [Dkt. #1, ¶ 121 (citing Kaplan, Peter Navarro: China 'cornered' the personal protective equipment market.)]. And it was clearly to a degree

---

[12]Karen M. Sutter, et al., CONG. RESEARCH SERV., R46304, COVID-19: CHINA MEDICAL SUPPLY CHAINS AND BROADER TRADE ISSUES, Dec. 7, 2020 COVID-19: China Medical Supply Chains and Broader Trade Issues (congress.gov) CRS Report R46304.

that was "detrimental to the public interest." *Staple Cotton*, 96 So. at 855. Defendants hoarded PPE supplies, exacerbating the supply shortage in a time of global need. Even a year after the President's proclamation declaring a national emergency concerning COVID-19, Mississippi hospitals were still experiencing PPE supply shortages[13]. The shortage in PPE also led to steep price increases, with at least one Mississippi hospital director reporting an increase of over six dollars per mask. *Id.* (from approximately $1.25/mask to $7.50/mask). Mississippi, and others, did not know how vital masks would be in combatting the spread of COVID-19, because of Defendants' actions to conceal information about the virus, and were subsequently forced to pay inflated prices as a further result of the Defendants' actions.

The detriment to the public, resulting from the shortage of PPE, goes beyond economic harm. The lack of access to a critical health care supply during a global pandemic endangered the lives and safety of countless citizens, particularly Mississippi's health care workers.

Defendants have also violated Mississippi's antitrust statutes by engrossing and forestalling trade. [Dkt. #1, ¶ 134]. Mississippi's antitrust statutes additionally prohibit unilaterally "engross[ing] forestall[ing] or attempt[ing] to engross or forestall any commodity." Miss. Code Ann. § 75-21-3 (c); *Georgia Pacific Corp. v. Cook Timber Co.*, 194 So.3d 118, 121 (Miss. 2016). This statutory provision has three elements: [1] unilateral action by a market participant, [2] engrossing or forestalling a commodity,

---

[13] John Fitzhugh, Hospitals still seeing higher prices for PPE, causing logistic and financial challenges, WLOX (Mar. 10, 2021), available at: <u>Hospitals still seeing higher prices for PPE, causing logistic and financial challenges (wlox.com)</u>

and [3] results that are inimical to the public welfare. Miss. Code Ann. § 75-21-3 (c). The Mississippi Supreme Court has stated, "'engross,' for antitrust purposes, means 'to buy large quantities of (a stock or commodity) in an effort to corner the market and control the price.'" *Georgia Pacific*, 194 So.3d at 122 (Miss. 2016) (quoting Black's Law Dictionary 478 (abr. 9th ed.)). Also, in the same paragraph, the court stated, "'forestall' means '[t]o buy (goods) for the purpose of reselling at a higher price.'" *Id.*

Defendants' actions readily satisfy the first element— unilateral action by a market participant. Defendants took unilateral action to nationalize and take over companies who manufacture and produce PPE. The Defendants then sold PPE to the U.S. market, thereby participating in the market as market participants. [Dkt. #1, ¶¶ 126-129 (citing Amber Athey, Italy gave China PPE to help with coronavirus — then China made them buy it back, THE SPECTATOR (April 4, 2020), available at: https://spectator.us/italychina-ppe-sold-coronavirus/.)]. They further hoarded PPE and interfered with supply and demand patterns, thereby unjustly enriching themselves while trafficking PPE. [Dkt. #1,¶¶ 118-127, 130, 134-135 (citing Bradsher, The World Needs Masks; Kaplan, Peter Navarro: China 'cornered' the personal protective equipment market; Eilperin, U.S. sent millions of face masks to China early this year; O'Keeffe, China's Export Restrictions Strand Medical Goods; Brunnstrom, U.S. asks China to revise export rules.)].

Defendants' actions also satisfy the second element — engrossing or forestalling a commodity. *Black's Law Dictionary* defines "engross" as "to buy large quantities of (a stock or commodity) in an effort to corner the market and control the

price.'" *Black's Law Dictionary,* 478 (abr. 9th ed.). Defendants bought large quantities of PPE. [Dkt. #1, ¶¶ 120-137]. They did this in an effort to corner the market. [*Id.* at ¶¶ 122, 134].

*Black's Law Dictionary* defines "forestall" as "[t]o buy (goods) for the purpose of reselling at a higher price." *Black's Law Dictionary,* 564 (abr. 9th ed.). Defendants did this as well; they bought PPE and resold it at higher prices. [Dkt. #1, ¶¶ 1, 6 ("reselling substandard PPE...at inflated prices."))].

Lastly, Defendants' actions satisfy the third element — the result of their conduct was inimical to the public welfare. [*Id.* at ¶¶ 106-117 (citing Neuman, China Raises Wuhan Death Stats; Mississippi Department of Health, Coronavirus Disease 2019 (COVID-19), available at: https://www.msdh.ms.gov/msdhsite/_static/14,0,420.html#Mississippi; Jeffry Bartash, Millions of layoffs set to push unemployment rate to highest level since Great Depression, MARKET WATCH (May 4, 2020), available at: https://www.marketwatch.com/story/millions-of-lost-jobs-may-push-unemployment-rate-tohighest-since-great-depression-2020-05-02; Anna Wolfe, Mississippi is fighting an uphill battle with jobless claims. A decades-long shift in employment strategy didn't help., MISSISSIPPI TODAY (May 3, 2020), available at: https://mississippitoday.org/2020/05/03/mississippi-is-fighting-an-uphill-battle-with-joblessclaims-a-decades-long-shift-in-employment-strategy-didnt-help/; Luke Ramsath, 'Deeply disturbing': Coronavirus impact on Mississippi's economy, The Clarion-Ledger (Mar. 20, 2020),

https://www.clarionledger.com/story/news/politics/2020/03/20/coronavirus-impactmississippi-economy/2865088001/; Letter from Lieutenant Governor Delbert Hosemann, Speaker of the House Philip Gunn, Senate Appropriations Chairman Briggs Hopson, House Appropriations Chairman John Read (April 24, 2020))]. At least 303 people in Mississippi died from COVID-19 as of May 2, 2020. [*Id.* at ¶ 106 (citing United States Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Cases in the U.S., available at: https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.)].

According to the Centers for Disease Control and Prevention, from January 1, 2020 to July 1, 2023, 14,726 Mississippians have died from COVID-19. Fitzhugh, Hospitals still seeing higher prices for PPE.

Many citizens suffered economic losses, as well. [Dkt. #1, at ¶¶ 109, 112]. Both Mississippi and the citizens of this state suffered direct economic damages as a result of the inflated prices for which the PPE was resold. Mississippi's government entities suffered direct economic losses as a result of the pandemic, including loss of revenues and budgetary shortages, with direct effects on state services, state pension funds, and many other state proprietary and economic interests. [*Id.* at ¶ 111]. All these things are "inimical to public welfare." Miss. Code Ann. § 75-21-3.

**C. The Eighth Circuit's Decision in** *Missouri ex rel Bailey v. People's Republic of* *China* **supports Mississippi's request for Default Judgment**

On March 1, 2024, this Court denied Mississippi's original Motion for Default Judgment. [Dkt. #59].  In its order, this Court directed Mississippi to "thoroughly address" the Eighth Circuit's opinion in *Missouri ex rel Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024), as part of any new request for default judgment. [Id.].  The Eighth Circuit in *Bailey* revived Missouri's claim that China engaged in anticompetitive conduct by manipulating the worldwide PPE market.  *Bailey,* 90 F. 4th at 938-39.  As such, *Bailey* fully supports Mississippi's request for default judgment.

The Eighth Circuit recognized the commercial activity exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(2), and found that Missouri's PPE hoarding claim survived because it is premised on commercial activities by the defendants.  [Id.].  Taking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of 'a private player' in the market…The same goes for the act of selling those items for a profit." Id. at 938 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).

The Eighth Circuit also found that Missouri plausibly alleged that the defendants' anticompetitive behavior had a direct effect in the United States. *Id.* at 939. "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects." *Id.* Further, having taken over the factories and cornering the market before the rest of the world

knew what was happening meant that once the virus spread, "China was able to maintain its stockpile and prolong the shortage." *Id.* The *Bailey* court reasoned that "basic supply-and-demand principles tell us that these market effects depended little, if at all" on independent variables, "given the information asymmetry and tight timeframe that existed at the time." *Id.*

Finally, the Eighth Circuit affirmed the dismissal of three of Missouri's claims, which are not at issue in the present case. Unlike Mississippi's Complaint, Missouri's first two claims were that defendants conduct in concealing information about COVID-19 constituted a public nuisance and a breach of their duty of care. Exhibit B. Unlike Mississippi's Complaint, Missouri's third claim was that defendants engaged in abnormally dangerous activities by conducting dangerous research at the Wuhan Institute of Virology, despite known safety concerns. Exhibit B. In the present case, Mississippi has alleged that Defendants' hoarded PPE and concealed necessary information about the virus in furtherance of their scheme to corner the market on PPE in violation of Mississippi's antitrust laws and Consumer Protection Act. [Dkt. #1]. Mississippi also alleges that Defendants misrepresented the grade, standard, or quality of the PPE they sold, thereby in further violation of the MCPA. [Dkt. #1].

Overall, Mississippi and Missouri have alleged very different violations of law. Mississippi's claims relate to Defendants PPE-hoarding activities, the same Missouri claim that was allowed to go forward. Consistent with the requirements of the FSIA, Mississippi has alleged that Defendants engaged in anticompetitive "commercial activity." 28 U.S.C. § 1605(a)(2). This activity had a "direct effect" in the United States

and in the State of Mississippi. *Id.* Thus, just as the Eighth Circuit recognized when it remanded Missouri's claim for further proceedings, this Court should enter a default judgment in Mississippi's favor awarding Mississippi damages, restitution, civil penalties, and injunctive relief.

## III.    CONCLUSION

Mississippi requests a default judgement in favor of Plaintiff against Defendants The People's Republic of China, the Communist Party of China, National Health Commission of the People's Republic of China, Ministry of Emergency Management of the People's Republic of China, Ministry of Civil Affairs of the People's Republic of China, People's Government of Hubei Province, People's Government of Wuhan City, Wuhan Institute of Virology, and Chinese Academy of Sciences for the aforementioned reasons.

Respectfully submitted, this the 11th day of October, 2024.

> **STATE OF MISSISSIPPI ex rel. LYNN**
> **FITCH, ATTORNEY GENERAL**
> **STATE OF MISSISSIPPI**
>
>  */s/ Gerald L. Kucia*
> Gerald L. Kucia, Miss. Bar No. 8716
> Office of the Attorney General
> Post Office Box 220
> 550 High Street, Suite 1200
> Jackson, Mississippi 39205
> Telephone: (601) 359-4223