# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

THE STATE OFMISSISSIPPI,
*ex rel.* LYNN FITCH, in Her
Official Capacity as Attorney General
of the State of Mississippi

       **Plaintiff,**

                                Civil Action No. 1:20-cv-168-TBM-RPM

THE PEOPLE'S REPUBLIC OF CHINA,
THE COMMUNIST PARTY OF CHINA,
NATIONAL HEALTH COMMISSION OF
THE PEOPLE'S REPUBLIC OF CHINA,
MINISTRY OF EMERGENCY
MANAGEMENT OF THE PEOPLE'S
REPUBLIC OF CHINA, MINISTRY OF
CIVIL AFFAIRS OF THE PEOPLE'S
REPUBLIC OF CHINA, PEOPLE'S
GOVERNMENT OF HUBEI PROVINCE,
PEOPLE'S GOVERNMENT OF WUHAN
 CITY, WUHAN INSTITUTE OFVIROLOGY,
and CHINESE ACADEMY OF SCIENCES

       **Defendants.**

---

## PLAINTIFF STATE OF MISSISSIPPI'S PRE-TRIAL BRIEF

---

COMES NOW, the Plaintiff, State of Mississippi, *ex rel.* Lynn Fitch, Attorney General (hereafter "Mississippi"), and respectfully files this Pre-trial Brief and would show unto the Court as follows:

## I.    INTRODUCTION

China has inflicted substantial harm on the State of Mississippi through its actions during the COVID-19 pandemic. It is clear that China knew about the existence, dangers, and human-to-human transmissibility of COVID-19 long before the rest of the world. Rather than comply with its moral and legal obligations to share this information, China engaged in a concentrated campaign of deceit and misinformation. Although likely aware of the existence of COVID-19 before November 2019, and certainly aware of the human-to-human transmission of COVID-19 in November 2019, Defendants repeatedly and loudly denied the existence, and then transmissibility, of COVID-19 long after they knew their statements were false. Defendants restricted the spread of any information related to the virus, and publicly persecuted whistleblowers who tried to share this information.

While China and its agents were making these false representations, they were aggressively buying up America's supply of PPE and barring U.S. factories from shipping PPE to the United States. By the time the world became fully aware of the scope of the COVID-19 pandemic, it was too late—Defendants had already spent weeks (if not months) hoarding PPE. The resulting effects of China's hoarding were predictable: PPE shortages in the State of Mississippi at a time the medical system needed the supplies the most, and costs many times higher for those who were able to acquire the scant supply.

Reports and previously classified documents obtained from the federal government clearly paint this picture. The Department of Homeland Security, for example, has concluded that "the Chinese Government intentionally concealed the severity of COVID-19 from the international community . . . while it stockpiled medical supplies."[Department of Homeland Security, *New Analytic Technique Indicates China Likely Hid Severity of Covid-19 from the International Community While It Stockpiled Medical Supplies* (May 1, 2020), Exhibit 1]. The State Department, in a heavily redacted memo, suggests that Defendants knew about COVID-19 "earlier than they admit" and China's Chairman "Xi lied to obfuscate his role in the cover-up." [United States State Department Memorandum, *Subject: Say PRC Central Government – Not Local Officials – Responsible for the Coronavirus Cover-Up,* Exhibit 2]. The Congressional Research Service agrees, concluding that China nationalized control of U.S. factories to prevent the export of PPE to the United States and engaged in large-scale purchases of PPE that "depleted existing supplies in the United States." [Sutter, et al.; Cong. Rsch. Serv. R46304. *Covid-19 China Medical Supply Chains and Broader Trade Issues 15* (December 23, 2020), Exhibit 3]. To make matters worse, all of these actions occurred concurrent to (and, indeed, likely in coordination with) Defendants' long-running campaign to obfuscate and mislead the world on critical information about the COVID-19 virus and the ballooning pandemic. As the U.S. Office of the Director of National Intelligence reports, rather than engage in a transparent sharing of information about the COVID-19 pandemic, Defendants hindered research into the virus, resisted sharing

information and blamed other countries, including the United States. [Office of the Director of National Intelligence, *Updated Assessment on Covid-19 Origins*, Exhibit 4]. All of this was done in a continuing attempt by Defendants to avoid responsibility for their actions during the early days of the COVID-19 pandemic.

What cannot be disputed is the incredible cost Defendants' actions have imposed on Mississippi, including in terms of lives lost, businesses ruined, and other effects still felt to this day. In response to these harms, Attorney General Lynn Fitch, on behalf of the State of Mississippi and its citizens, sued The People's Republic of China, the Communist Party of China, and other related Defendants to recover damages for the injuries Defendants' actions inflicted on the State and its citizens. Defendants, despite being served by Mississippi, refused to appear and answer for their actions. As a result, each has defaulted on Mississippi's claims against them.

The evidence establishes that Defendants breached numerous state and federal regulatory and statutory duties preventing the kinds of anticompetitive commercial behaviors Defendants engaged in during the early days of the COVID-19 pandemic. Among this evidence is proof that Defendants nationalized U.S. factories in China, with Chinese officials directly seizing control of PPE production and refusing to allow U.S. companies to supply Mississippi (and the rest of the United States) with much-needed masks. This had a predictable effect, multiplying China's PPE production several times over while depriving the United States of production by overseas U.S. companies. At the same time China—despite being the source of much of the world's PPE supply—began aggressively purchasing PPE manufactured

or for sale in the United States. In January, 2020, alone, China imported 56 million respirators and surgical masks from the global market.  [Bradsher and Alderman, *The World Needs Masks.  China Makes Them But Has been Hoarding Them,* New York Times, March 13, 2020, Exhibit 5]. As a report published by Congress remarked, these efforts likely exacerbated the medical supply shortages in the United States. [Sutter].

## II.    PROCEDURAL HISTORY

Mississippi filed its Complaint on May 12, 2020. [Dkt. #1]. Pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention") and the Foreign Sovereign Immunity Act, 28 U.S.C. § 1608(a)(2) ("FSIA"), Mississippi sent a request to China's Central Authority to serve Defendants on or about August 17, 2021. On February 22, 2022, Mississippi received notice from the Ministry of Justice, People's Republic of China that service was rejected under Article 13 of the Hague Service Convention because, "[t]he execution of the request would infringe the sovereignty or security of the People's Republic of China (Article 13)." [Dkt. #12]. Article 13 of the Hague Service Convention permits rejection of properly submitted service requests "only if it deems that compliance would infringe its sovereignty or security."[1]

On April 27, 2022, Mississippi delivered documents to the Clerk's Office to serve Defendants People's Republic of China, People's Government of Hubei Province, People's Government of Wuhan City, National Health Commission of the People's

---

[1] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Article 13,  November 15, 1965 f4520725-8cbd-4c71-b402-5aae1994d14c.pdf (hcch.net).

Republic of China, Ministry of Emergency Management of the People's Republic of China, and the Ministry of Civil Affairs of the People's Republic of China to the Clerk's Office. The Clerk transmitted these documents to the U.S. Department of State on the same day.

Following communication of receipt from the U.S. Department of State, Mississippi provided translated copies of the reissued summons to the U.S. Department of State via the Clerk's Office, and the U.S. Department of State initiated the process of serving the governmental Defendants via diplomatic channels. Mississippi received the diplomatic notes from the U.S. Department of State confirming that service was effectuated for the Defendants and filed them with this court.  28 U.S.C. § 1608(a)(4)[2].

As of today's date, even as additional declassified intelligence and investigative reporting uncover further details of China's complicity in the COVID-19 pandemic, Defendants have failed to answer or otherwise defend against Mississippi's Complaint.  In fact, the package of diplomatic notes included a letter from the Ministry of Foreign Affairs of the People's Republic of China stating that they have no intention to "participate" in Mississippi's lawsuit. Exhibit A.

## III.  STANDARD OF REVIEW

The authority to grant a default judgment against the Defendants is found in Fed. R. Civ. P. 55(b)(2). Further, a decision to enter a default judgment is reviewed

---

[2] Mississippi served non-govermental Defendants Communist Party of China, Wuhan Institute of Virology, and the Chinese Academy of Sciences on January 5, 2024. [Dkt. #56, 57, 58].

only for an abuse of discretion. *SUA Ins. Co. v. Buras*, 421 Fed. Appx. 384, 385 (5th Cir. 2011) (citing *Rogers v. Harford Life & Accident Co.*, 167 F.3d 933, 936 (5th Cir. 1999)). "A defendant, 'by his default, admits the plaintiff's well-pleaded allegations of fact.'" *Allstate Property & Cas. Ins. Co. v. Pickett*, 2014 WL 202758, at 1 (S.D. Miss. 2014) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975)). A default judgment is proper "if those well-pleaded factual allegations establish a valid cause of action…" *Pickett*, 2014 WL at 1 (quoting *Nishimatsu Constr. Co.*, 515 F.2d at 1206). The Defendants have failed to respond or otherwise defend against Mississippi's Complaint, and a default judgment should be entered against them.

Defendants have not only failed to respond to Mississippi's Complaint, but they also sent a letter, in returning the diplomatic notes, addressed from the Ministry of Foreign Affairs of the People's Republic of China stating, "China does not recognize and will not participate in these two vexatious litigation lawsuits." Exhibit A. (referencing Mississippi's case and another private case pending in Florida).

## IV.  DEFAULT JUDGMENT IS PROPER IN THIS CASE

In determining whether to enter a default judgment, the Fifth Circuit requires district courts to examine six factors: "(1) whether material issues of fact exist; (2) whether there has been substantial prejudice; (3) whether the grounds for default are clearly established; (4) whether the default was caused by a good faith mistake or excusable neglect; (5) the harshness of a default judgment; and (6) whether the Court would consider itself obligated to set aside a default on the defendant's motion."

*Lindsayca USA, Inc v. de Venezuela*, 2022 WL 3588041 at *4 (S.D. Tex. Aug. 22, 2022) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998)).

First, as in *Lindsayca*, there are no material issues of fact. "Because [Defendants] have failed to answer the lawsuit, they are deemed to have admitted the allegations against them set forth in the Complaint." *Lindsayca*, 2022 WL 3588041 at *4. Second, there is no prejudice to Defendants. They were properly served and, other than to call Mississippi's suit "vexatious," Defendants "failed to respond to the lawsuit." *Id.* Third, the grounds for default are clearly established in the complaint and below. Fourth, there is no excusable neglect on the part of the Defendants. Defendants have instead advised that, though they have been properly served, they will not "participate" in Mississippi's lawsuit. Exhibit A. Fifth, a default judgment would not be harsh "when [Defendants] have not even bothered to respond to the lawsuit," especially considering the harm alleged in the Complaint. *Id.* Sixth, Mississippi knows of no facts that would cause the court to set aside the default judgment should it be challenged at a later date.

Courts have applied a "lenient standard" for factual findings by a trial court in FSIA default hearings, recognizing that "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (reversed on other grounds). "Given the difficulty of obtaining direct proof of the types of conduct for which the FSIA provides a remedy, the statute permits courts to credit

indirect evidence and to impose a lower evidentiary burden than they might apply in a different context." *Saharkhiz v. Islamic Republic of Iran*, case no. 19-cv-2938, 2023 WL 9196605, at *5 (D.D.C. Oct. 16, 2023) (slip copy). Such an evidentiary standard is especially appropriate here, where Defendants have "refused to appear in court and subject [themselves] to discovery, and [are] known to intimidate defectors and potential witnesses." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014). In such situations, "the Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to … differing situations.'" *Id.* (citing *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)); *see also Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 33 (D.D.C. 2016) (citing *Han Kim*). This approach recognizes the inherent difficulties of a plaintiff litigating a case (something normally not necessary against a defaulting defendant) against a party for which the plaintiff cannot seek or obtain discovery (a limitation not normally the case if the defendant appears and responds to the lawsuit). In other words, the standard recognizes the practical realities of demonstrating a claim against a hostile (and defaulting) state, and "is part of the risk a sovereign runs when it does not appear" after it has been properly served. *Id.* at 786.

"A plaintiff may submit multiple types of evidence to support FSIA claims, including 'testimony, documentation, and affidavits.'" *Saharkhiz*, 2023 WL 9196605, at *5 (quoting *Miango v. Democratic Republic of Congo*, 288 F.Supp.3d 117, 123

(D.D.C. 2018) (citing cases) (vacated on other grounds)). For example, a plaintiff may establish a defaulting foreign state defendant's liability through "evidence in the form of live testimony, videotaped testimony, affidavit, and original documentary and videographic evidence." *Owens*, 826 F.Supp.2d at 135; *see also Karcher v. Islamic Republic of Iran*, 396 F.Supp.3d 12, 16 n.3 (D.D.C. 2019) (allowing "official U.S. Government reports, records, and statements" as evidence in a FSIA default hearing "[u]nder the public records exception to the hearsay rule."); *Rux v. Republic of Sudan*, 495 F.Supp.2d 541, 544 (E.D. Va. 2007) (including as evidence at the FSIA hearing "unclassified U.S. Department of State Reports; the 9/11 Commission Report; Final Report of the National Commission on Terrorist Attacks Upon the United States" and "a transcript of federal criminal proceedings against Osama Bin Laden in 2001."); *Sotloff v. Syrian Arab Republic*, 525 F.Supp.3d 121, 127 n.1–n.3 (considering as evidence in a FSIA default hearing "The State Department Overview of State-Sponsored Terrorism" as "a public record," taking "judicial notice of facts" found in other judicial decisions in that circuit, and "written testimony and reports of Plaintiffs' expert witnesses."); *Elahi*, 124 F.Supp.2d at 99–100 (noting that the court accepted 105 documentary exhibits in a FSIA trial against defendants who were in default); *Saharkhiz*, 2023 WL 9196605, at *8 (considering evidence composed of the plaintiff's "own testimony and several news articles, publications, and reports" documenting the plaintiff's claims); *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F.Supp.2d 441, 460–61 (D.P.R. 2010) (finding that plaintiffs

satisfied their burden of the FSIA through "live and affidavit testimony" and "affidavits and reports.").

In the matter now before this Court, evidence clearly shows that the Defendants, through their course of conduct, should be held liable in this case. To support these claims, the State will introduce the following documents at the evidentiary hearing:

Exhibit 1:    Department of Homeland Security, *New Analytic Technique Indicates China Likely Hid Severity of Covid-19 from the International Community While It Stockpiled Medical Supplies* (May 1, 2020)

Exhibit 2:    United States State Department Memorandum, *Subject: Say PRC Central Government – Not Local Officials – Responsible for the Coronavirus Cover-Up*

Exhibit 3:    Sutter, *Covid-19: China Medical Supply Chains and Broader Issues* (December 23, 2020), Congressional Research Service

Exhibit 4:    Office of the Director of National Intelligence, *Updated Assessment on Covid-19 Origins*

Exhibit 5:    Bradsher and Alderman, *The World Needs Masks. China Makes Them, But Has Been Hoarding Them,* New York Times; March 13, 2020

Exhibit 6:    Marco Rubio, *A Complex and Grave Situation: A Political Chronology of the Sars-Cov-2 Outbreak*

Exhibit 7:    John Ratcliffe, *Holding China Accountable for its Role in the Most Catastrophic Pandemic of Our Time: Covid –19*

Exhibit 8:    Minority Staff of House Comm. on Foreign Affairs, *Report on the Origins of the COVID-19 Global Pandemic, Including the Roles of the Chinese Communist Party and the World Health Organization*

Exhibit 9:    Minority Staff of House Comm. on Foreign Affairs, *Report on the Origins of the COVID-19 Global Pandemic: An Investigation of the Wuham Institute of Virology*

Exhibit 10:    United States State Department, *Fact Sheet Activity at the Wuhan Institute of Virology* (January 15, 2021)

Exhibit 11:    Cecire, *Covid-19 and Domestic PPE Production and Distribution: Issues and Policy Options* (December 7, 2020), Congressional Research Service

## A.    Count I: Defendants Violated the Mississippi Consumer Protection Act

As originally set forth in the State's Memorandum in Support of Motion for Default Judgment [Dkt. #81], the Mississippi Consumer Protection Act ("MCPA") Miss. Code Ann. § 75-24-1 *et seq.*, governs prohibited acts and practices relating to unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce. Under § 75-24-5(1), there is a general prohibition against "Unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." For instance, the Mississippi Supreme Court upheld a chancery court finding that a drug manufacturer's practice of reporting fictitious prices constituted an unfair or deceptive practice. *In re Mississippi Medicaid Pharmaceutical Average Wholesale Pricing Litigation*, 190 So. 3d 829, 841-42 (Miss. 2015).

What constitutes an unfair or deceptive trade practice in Mississippi is guided by, but not limited to, interpretations of the Federal Trade Commission Act from the Federal Trade Commission and federal courts, 15 U.S.C. 45(a)(1). Miss. Code Ann. § 75-24-3(c); *Watson Labs., Inc. v. State*, 241 So. 3d 573, 590 (Miss. 2018). The Supreme Court has determined that a particular act or practice is unfair or deceptive if it has

the capacity or tendency to deceive. *FTC v. Raladam Co.*, 316 U.S. 149, 152 (1942). Here, the evidence presented to this Court establishes that the Defendants took many affirmative steps to hide information about COVID-19 from Mississippi and the world, including the virus' transmission capabilities, by suppressing vital and potentially life-saving medical information while spreading misinformation. This deception left Mississippi without crucial information needed to prepare for a global pandemic. Second, the evidence in this case supports that the Defendants hoarded personal protective equipment ("PPE") for the purpose of cornering the market, knowing that there would soon be a global uptick in demand. Third, the evidence presented shows that, after nationalizing PPE production and distribution, defendants misrepresented that the PPE sold was of a certain type and quality, when it was not, in direct violation of Miss. Code Ann Section 75-24-5(2)(e) and (g).

In response to a serious health threat, Defendants took action to contain information that was critical to mitigating the effects of COVID-19. Defendants' actions left Mississippi and the world at large with a lack of information, that *only* the Defendants possessed, which prevented Mississippi and others from taking reasonable precautionary measures in response to the then-unknown threat. The Defendants capitalized on this information asymmetry to hoard and raise prices of PPE, products the Defendants knew would be crucial in combatting the spread of the disease. It was not only Defendants' act of omission – concealing the seriousness of COVID-19 – but also actions of commission, i.e. profiteering in the PPE market, that constitute unfair and deceptive trade practices.

Defendants first began suppressing information about COVID-19 within China. [Dkt. #1, ¶¶ 68-70 (citing Yong Xiong, et al., *This Chinese Doctor Tried to Save Lives, but Was Silenced. Now He Has Coronavirus,* CNN (Feb. 4, 2020), available at: https://www.cnn.com/2020/02/03/asia/coronavirus-doctor-whistle-blower-intl-; Jeremy Page, et al., *How It All Started: China's Early Coronavirus Missteps,* THE WALL STREET JOURNAL (Mar. 6, 2020)]. On December 30, 2019, the Wuhan Municipal Health Commission released a notice that prohibited individuals or institutions from releasing treatment information to the public without authorization. [Dkt. #1, ¶ 69 (citing Xiong, *This Chinese doctor Tried to Save Lives, but Was Silenced. Now He Has Coronavirus*). Information about the virus shared on social media was stopped and key words were censored. [Dkt. #1, ¶¶ 70-72 (citing Page, *How It All Started*; Lotus Ruan, et al., *Censored Contagion How Information on the Coronavirus is Managed on Chinese Social Media,* UNIV. OF TORONTO, THE CITIZEN LAB (Mar. 3, 2020)]. Police action was taken against Chinese citizens who tried to share information via social media. [Dkt. #1, ¶¶ 73-76, 82 (citing Xiong, *This Chinese Doctor Tried to Save Lives, but Was Silenced*; Xie Haunchi, *Six Days of Silence When China Didn't Warn Public of Likely Pandemic,* ST. LOUIS POST DISPATCH (April 16, 2020), available at: https://www.stltoday.com/news/sixdays-of-silence-when-china-didnt-warn-public-of-likely-pandemic/article_ae11db70-6704-5b49-8040-78bf21579e07.html.)]. On January 1, 2020, Dr. Ai Fen, who ran an emergency department at a Wuhan hospital ordered her staff to wear masks, suspecting human-to-human transmission. [Dkt. #1, ¶ 78 (citing Page, *How It All*

*Started.*)]. The next day, Dr. Fen was censured by the hospital's disciplinary department for spreading rumors, and hospital leadership banned staff from discussing the virus in public or via text messaging. [Dkt. #1, ¶ 79 (citing Page, *How It All Started.*)]. On January 3, 2020, Defendant National Health Commission of the People's Republic of China ordered institutions to refrain from publishing any information about the disease and ordered labs to either transfer samples to designated institutions or destroy the samples. [Dkt. #1, ¶ 83 (citing Xiong, *This Chinese Doctor Tried to Save Lives, but Was Silenced.*)].

Defendants stalled virus testing efforts and delayed the release of information about the virus. On January 1, 2020, a genomics company received a call from an official at the Hubei Provincial Health Commission ordering the company to stop testing and destroy all existing virus samples from Wuhan. [Dkt. #1, ¶ 77 (citing Gao Yu, et al., *How Early Signs of the Coronavirus Were Spotted, Spread and Throttled in China*, THE STRAIGHT TIMES (Feb. 28, 2020), available at: https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china)]. On January 2, 2020, the Wuhan Institute of Virology completed sequencing the virus' genome. [Dkt. #1, ¶¶ 80-81 (citing Xiong, *This Chinese Doctor Tried to Save Lives, but Was Silenced.*)]. On January 5, 2020, a medical research center in Shangai notified Defendant National Health Commission of the People's Republic of China that one of their professors had mapped the genome as well. [Dkt. #1, ¶ 85 (citing Xiong, *This Chinese Doctor Tried to Save Lives, but Was Silenced.*)]. On January 9, 2020, Chinese authorities publicly

announced that the outbreak originated from a novel coronavirus. [Dkt. #1, ¶ 90 (citing Xiong, *This Chinese Doctor Tried to Save Lives, but Was Silenced*.)]. However, even though the virus was rapidly spreading and time was of the essence, they waited a week, until January 12, 2020, to share the genome with the international community. [Dkt. #1, ¶ 93 (citing Xiong, *This Chinese Doctor Tried to Save Lives, but Was Silenced*.)]. In 2023, the Director-General of the World Health Organization ("WHO"), Tedros Adhanom Ghebreyesus, said that the newly disclosed genetic material should have been shared when the first cases were detected in Wuhan in late 2019[3].

To make matters worse, information released by Defendants to the public was dangerously deceptive and contradicted then-existing evidence. On January 5, the WHO released a statement that information provided by the Chinese investigation team found "'no evidence of significant human-to-human transmission.'" [Dkt. #1, ¶ 87 (citing World Health Organization, *Disease Outbreak News, Pneumonia of Unknown Cause – China* (Jan. 5, 2020), available at: https://www.who.int/emergencies/disease-outbreak-news/item/2020-DON229]. On January 8, 2020, the WHO released another statement, again relying on information from Chinese officials, recommending no travel or trade restrictions with China. [Dkt. #1, ¶ 89 (citing World Health Organization, *WHO Statement Regarding Cluster of*

---

[3] Joe McDonald, China Health Officials Lash Out at WHO Chief, Defend Search for Origin of COVID-19, PBS (Apr. 8, 2023) available at: https://www.pbs.org/newshour/world/china-health-officials-lash-out-at-who-chief-defend-search-for-origin-of-covid-19

*Pneumonia Cases in Wuhan, China* (Jan. 9, 2020), available at: https://www.who.int/china/news/detail/09-01-2020-who-statement-regarding-cluster-of-pneumonia-cases-in-wuhan-china.)]. On January 11, 2020, the Wuhan City Health Commission issued a statement saying that "no related cases have been found" and that "no clear evidence of human-to-human transmission has been found."[Dkt. #1, ¶ 92 (citing Jim Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies,* NATIONAL REVIEW (March 23, 2020), available at: https://www.nationalreview.com/the-morning-jolt/chinas-devastating-lies)].

Defendants continued the campaign of denial or silence even as the virus spread beyond China's borders. The first case of COVID-19 was reported outside of China on January 13, 2020, but Chinese officials continued to deny human-to-human transmission. [Dkt. #1, ¶¶ 94-97 (citing Yu, *How Early Signs of the Coronavirus Were Spotted, Spread and Throttled in China;* Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies.*)]. When President and General Secretary Xi Jinping, leader of Defendants the People's Republic of China and the Communist Party of China, made his first public statement on the crisis on January 20, 2020, he was silent on the question of human-to-human transmission. [Dkt. #1, ¶ 98 (citing Page, *How It All Started.*)]. By the time this official statement was made millions of travelers had passed through Wuhan, and an estimated 3,000 additional people were infected. [Dkt. #1, ¶ 99 (citing Yu, *How Early Signs of the Coronavirus were Spotted, Spread and Throttled in China.*)].

A week after the virus had spread beyond China's borders, on January 20, 2020, Chinese authorities confirmed that human-to-human transmission was occurring. [Dkt. #1, ¶ 100 (citing Yu, *How Early Signs of the Corona Virus Were Spotted, Spread and Throttled in China;* Kuo, *China Confirms Human-to-Human Transmission of Coronavirus,* THE GUARDIAN (Jan. 20, 2020), available at: https://www.theguardian.com/world/2020/jan/20/coronavirus-spreads-to-beijing-as-china-confirms-new-cases.)]. This was confirmed by the WHO after conducting an investigation in China on January 20 and 21, 2020. Even after confirming human-to-human transmission, China continued to mislead Mississippi and the world about key statistics of COVID-19 and to spread other misinformation. [Dkt. #1, ¶¶ 103-105 (citing Neuman, *China Raises Wuhan Death Stats By Half To Account For Reporting Delays And Omissions,* NATIONAL PUBLIC RADIO (April 17, 2020), available at: https://www.npr.org/sections/coronavirus-live-updates/2020/04/17/836700806/china-raiseswuhan-death-stats-by-half-to-account-for-reporting-delays-and-omiss.;  Frank Miles, *2 Wuhan Whistleblowers Missing Months After Helping Expose Coronavirus Outbreak, Activists Say,* FOX NEWS (April 15, 2020), available at: https://www.foxnews.com/world/wuhan-whistleblowers-missing-exposing-coronavirus; Betz, *Guest on Chinese-Produced Arabic-language Program Claimed US May be to Blame for Coronavirus Pandemic,* FOX NEWS (April 19, 2020), available at:          https://www.foxnews.com/world/chinese-arabic-language-program-us-coronavirus-pandemic.)].

In early February of 2020, the Chinese government nationalized control of the production and distribution of PPE and other medical supplies[4]. Not only did China take over factory production located within China, including those factories that once made masks on behalf of American companies, but they also ramped up imports of PPE. [Dkt. #1, ¶¶ 118-120 (citing Keith Bradsher, et al., *The World Needs Masks. China Makes Them, but Has Been Hoarding Them,* N.Y. TIMES (Mar. 13, 2020), available at: https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html.)].

Having cornered the market on PPE production and possessing a hoard of supplies in the face of a global pandemic, Chinese manufacturers, under the control of the Chinese government, increased the price on these critical supplies. [Dkt. #1, ¶ 121 (citing Kaplan, *Peter Navarro: China 'Cornered' the Personal Protective Equipment Market and 'Is Profiteering' During Coronavirus Outbreak,* FOX NEWS (April 19, 2020), available at: https://www.foxnews.com/media/peter-navarro?msockid=15af3a6b9bfe6d00112f509ae96c3a]. As early as March 2020, the WHO reported that the price of surgical masks increased sixfold, N95 masks increased threefold, and surgical gowns doubled[5]. In April of 2020, a Canadian news source reported that Chinese manufacturers increased the price of N95 masks

---

[4] MICHAEL H. CECIRE, CONG. RESEARCH SERV., R46628, COVID-19 AND DOMESTIC PPE PRODUCTION AND DISTRIBUTION: ISSUES AND POLICY OPTIONS, DEC. 7, 2020 https://crsreports.congress.gov/product/pdf/R/R46628.

[5] Burki, *Global Shortage of Personal Protective Equipment,* SCIENCE DIRECT (July 2020), available at: https://www.sciencedirect.com/science/article/pii/S1473309920305016?ref=pdf_download&fr=RR-2&rr=7e2145979ba12447.

fivefold. *Canada Donated Masks to China. Chinese Mask Makers Now Price-Gouging Canada,* THINKPOL (Apr. 29, 2020) available at: https://thinkpol.ca/2020/04/29/canada-donated-masks-china-now-chinese-mask-makers-now-price-gouging-canada/ The Washington Post reported that White House officials believed China's actions were a "deliberate attempt by China to corner the market as it concealed and downplayed the danger posed by the outbreak". [Dkt. #1, ¶ 122 (citing Juliet Eilperin, et al., *U.S. Sent Millions of Face Masks to China Early This Year, Ignoring Pandemic Warning Signs,* WASHINGTON POST (April 18, 2020), available at: https://www.washingtonpost.com/health/us-sent-millions-of-face-masks-to-china-early-this-year-ignoring-pandemic-warning-signs/2020/04/18/aaccf54a-7ff5-11ea-8013-1b6da0e4a2b7_story.html)].

Without limiting the broad language conferred by subsection (1) of the MCPA, Miss. Code Ann. § 75-24-1 et seq, subsection (2) specifies certain acts and practices that violate this provision as well. One such prohibition includes the act of "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another[.]" Miss. Code Ann. § 75-24-5(2)(g). Under the rule set forth in Miss. Code § 75-24-5(2)(g), defendants misrepresented the standard, quality, and grade of PPE the state of Mississippi received from China.

The PPE, which China actually sold, was not only overpriced but also faulty and not the N95 and KN95 grade represented. [Dkt. #1, ¶ 124 (citing Brunnstrom, et al., *U.S. Asks China to Revise Export Rules for Coronavirus Medical Gear,* REUTERS

(April 16, 2020), available at: https://www.reuters.com/article/heathcoronavirus-usa-china/us-asks-china-to-revise-export-rules-for-coronavirus-medical-gearidUSL1N2C502N)]. A news report explained, "as its name advertises, the KN95 mask is meant to filter out 95% of aerosol particles."[6] A study conducted by a nonprofit patient organization, ECRI, found that up to 70% of KN95 masks imported from China did not meet these purported filtration standards. *Id.* Mississippi purchased N95 and KN95 masks manufactured in China[7]. An article on May 20, 2020, cited the executive director of the Mississippi Emergency Management Agency ("MEMA") who estimated that as of that time, Mississippi had purchased four million masks. *Id.* While reliance is not a required element of the MCPA, Mississippi purchased these masks believing them to be of their purported quality, when they were not.

### B.    Count II: Defendants Violated the State's Antitrust Laws

Mississippi also analyzed the Defendants' violations of its antitrust laws in its Memorandum in Support of Motion for Default Judgment. [Dkt. #81].  To restate, Miss. Code Ann. § 75-21-1 establishes the State's antitrust laws.  Miss. Code Ann. § 75-21-3 governs unilateral anticompetitive conduct and, in part, prohibits unilateral action to "restrain or attempt to restrain the freedom of trade or production." The

---

[6] Rodriguez, *Up to 70% of KN95 Masks Imported from China Don't Meet Filtration Standards, Study Says,* USA TODAY (Sept. 22, 2020), available at: https://www.usatoday.com/story/news/health/2020/09/22/covid-kn-95-marks-imported-china-dont-meet-standards-ecri/5806327002

[7] Giacomo Bologna, *Mississippi Emergency Agency Spent $20M On Coronavirus Supplies. Here's What We Bought,* CLARION LEDGER (May 20, 2020), available at: Mississippi coronavirus: MEMA spent millions on N95 masks from China (clarionledger.com).

restraint of trade must be unreasonable and be done "to a degree inimical to the public welfare." Miss Code Ann. § 75-21-3; *Brown v. Staple Cotton Coop. Ass'n*, 96 So. 849, 855 (1923) ("There must be an unreasonable or undue restraint of trade. It must be such a restraint of trade as is detrimental to the public interest.). Intent is not required for a unilateral violation of Mississippi state antitrust law. Miss Code Ann. § 75-21-3 ("with intent to accomplish the results herein prohibited or *without* such intent…") (emphasis added).

Defendants began their campaign to unlawfully restrain the freedom of trade by nationalizing the production and distribution of PPE and other medical supplies. [Dkt. #1, ¶¶ 118-119 (citing Bradsher, *The World Needs Masks*); CECIRE, CONG. RESEARCH SERV., R46628]. Defendants diminished the available supply of PPE in the global market by importing large quantities of PPE to hoard, in what former White House officials believed to be a "'deliberate attempt by China to corner the market.'" [Dkt. #1, ¶ 122 (citing Eilperin, *U.S. Sent Millions of Face Masks to China*)]. In addition, a Congressional Research Service report shows that in early February of 2020, China's Ministry of Commerce "directed its bureaucracy, local governments and industry to secure critical technology, medical supplies, and medical-related raw material inputs from the global market, a situation that likely further exacerbated supply shortages in the United States and other markets[8] The same report explains

---

[8]Karen M. Sutter, et al., CONG. RESEARCH SERV., R46304, COVID-19: CHINA MEDICAL SUPPLY CHAINS AND BROADER TRADE ISSUES, DEC. 7, 2020 COVID-19: China Medical Supply Chains and Broader Trade Issues (congress.gov) CRS Report R46304.

that these policies led to steep increases in the Chinese import of PPE and "contributed to sharp decreases in China's exports of these critical medical products to the world." *Id*. Defendants further restrained the trade of PPE by imposing export restrictions on PPE. [Dkt. #1, ¶ 123 (citing O'Keeffe, *China's Export Restrictions Strand Medical Goods*.)].

Defendants' actions placed an undue or unreasonable restraint on the trade of PPE. Defendants restrained the trade of PPE in furtherance of their efforts to control supply and garner profit. PPE. [Dkt. #1, ¶ 121 (citing Kaplan, *Peter Navarro: China 'Cornered' the Personal Protective Equipment Market*.)]. And it was clearly to a degree that was "detrimental to the public interest." *Staple Cotton*, 96 So. at 855. Defendants hoarded PPE supplies, exacerbating the supply shortage in a time of global need. Even a year after the President's proclamation declaring a national emergency concerning COVID-19, Mississippi hospitals were still experiencing PPE supply shortages[9]. The shortage in PPE also led to steep price increases, with at least one Mississippi hospital director reporting an increase of over six dollars per mask. *Id*. (from approximately $1.25/mask to $7.50/mask). Mississippi, and others, did not know how vital masks would be in combatting the spread of COVID-19, because of Defendants' actions to conceal information about the virus, and were subsequently forced to pay inflated prices as a further result of the Defendants' actions.

---

[9] John Fitzhugh, *Hospitals Still Seeing Higher Prices for PPE, Causing Logistic and Financial Challenges,* WLOX (Mar. 10, 2021), available at: https://www.wlox.com/2021/03/11/price-gouging-by-suppliers-affecting-hospitals

The detriment to the public, resulting from the shortage of PPE, goes beyond economic harm. The lack of access to a critical health care supply during a global pandemic endangered the lives and safety of countless citizens, particularly Mississippi's health care workers.

Defendants have also violated Mississippi's antitrust statutes by engrossing and forestalling trade. [Dkt. #1, ¶ 134]. Mississippi's antitrust statutes additionally prohibit unilaterally "engross[ing] forestall[ing] or attempt[ing] to engross or forestall any commodity." Miss. Code Ann. § 75-21-3 (c); *Georgia Pacific Corp. v. Cook Timber Co.*, 194 So.3d 118, 121 (Miss. 2016). This statutory provision has three elements: [1] unilateral action by a market participant, [2] engrossing or forestalling a commodity, and [3] results that are inimical to the public welfare. Miss. Code Ann. § 75-21-3 (c). The Mississippi Supreme Court has stated, "'engross,' for antitrust purposes, means 'to buy large quantities of (a stock or commodity) in an effort to corner the market and control the price.'" *Georgia Pacific*, 194 So.3d at 122 (Miss. 2016) (quoting Black's Law Dictionary 478 (abr. 9th ed.)). Also, in the same paragraph, the court stated, "'forestall' means '[t]o buy (goods) for the purpose of reselling at a higher price.'" *Id.*

Defendants' actions readily satisfy the first element— unilateral action by a market participant. Defendants took unilateral action to nationalize and take over companies who manufacture and produce PPE. The Defendants then sold PPE to the U.S. market, thereby participating in the market as market participants. [Dkt. #1, ¶¶ 126-129 (citing Athey, *Italy Gave China PPE to Help With Coronavirus — Then China Made Them Buy It Back*, THE SPECTATOR (April 4, 2020), available at:

https://www.spectator.com.au/2020/04/italy-gave-china-ppe-to-help-with-coronavirus-then-china-made-them-buy-it-back]. They further hoarded PPE and interfered with supply and demand patterns, thereby unjustly enriching themselves while trafficking PPE. [Dkt. #1,¶¶ 118-127, 130, 134-135 (citing Bradsher, *The World Needs Masks;* Kaplan, *Peter Navarro: China 'Cornered' the Personal Protective Equipment Market;* Eilperin, *U.S. Sent Millions of Face Masks to China Early This Year*].

Defendants' actions also satisfy the second element — engrossing or forestalling a commodity. *Black's Law Dictionary* defines "engross" as "to buy large quantities of (a stock or commodity) in an effort to corner the market and control the price.'" *Black's Law Dictionary,* 478 (abr. 9th ed.). Defendants bought large quantities of PPE. [Dkt. #1, ¶¶ 120-137]. They did this in an effort to corner the market. [*Id.* at ¶¶ 122, 134].

*Black's Law Dictionary* defines "forestall" as "[t]o buy (goods) for the purpose of reselling at a higher price." *Black's Law Dictionary,* 564 (abr. 9th ed.). Defendants did this as well; they bought PPE and resold it at higher prices. [Dkt. #1, ¶¶ 1, 6 ("reselling substandard PPE...at inflated prices."))].

Lastly, Defendants' actions satisfy the third element — the result of their conduct was inimical to the public welfare. [*Id.* at ¶¶ 106-117 (citing Neuman, *China Raises Wuhan Death Stats; Mississippi Department of Health, Coronavirus Disease 2019 (COVID-19)*, available at: https://www.msdh.ms.gov/msdhsite/_static/14,0,420.html#Mississippi; Bartash,

*Millions of Layoffs Set to Push Unemployment Rate to Highest Level since Great Depression*,    MARKET    WATCH    (May    4,    2020),    available    at:
https://www.marketwatch.com/story/millions-of-lost-jobs-may-push-unemployment-rate-to-highest-since-great-depression-2020-05-02; Wolfe, *Mississippi Is Fighting an Uphill Battle With Jobless Claims. A Decades-Long Shift in Employment Strategy Didn't Help*,    MISSISSIPPI    TODAY    (May    3,    2020),    available    at:
https://mississippitoday.org/2020/05/03/mississippi-is-fighting-an-uphill-battle-with-jobless-claims-a-decades-long-shift-in-employment-strategy-didnt-help/;    Ramsath, *'Deeply Disturbing': Coronavirus Impact on Mississippi's Economy,* The Clarion-Ledger    (Mar.    20,    2020),
https://www.clarionledger.com/story/news/politics/2020/03/20/coronavirus-impactmississippi-economy/2865088001/; Letter from Lieutenant Governor Delbert Hosemann, Speaker of the House Philip Gunn, Senate Appropriations Chairman Briggs Hopson, House Appropriations Chairman John Read (April 24, 2020))]. At least 303 people in Mississippi died from COVID-19 as of May 2, 2020. [*Id.* at ¶ 106 (citing United States Centers for Disease Control and Prevention, *Coronavirus Disease    2019    (COVID-19),    Cases    in    the    U.S.,*    available    at:
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.)].

According to the Centers for Disease Control and Prevention, from January 1, 2020 to July 1, 2023, 14,726 Mississippians have died from COVID-19. [Fitzhugh, *Hospitals still seeing higher prices for PPE*].

Many citizens suffered economic losses, as well. [Dkt. #1, at ¶¶ 109, 112]. Both Mississippi and the citizens of this state suffered direct economic damages as a result of the inflated prices for which the PPE was resold. Mississippi's government entities suffered direct economic losses as a result of the pandemic, including loss of revenues and budgetary shortages, with direct effects on state services, state pension funds, and many other state proprietary and economic interests. [*Id.* at ¶ 111]. All these things are "inimical to public welfare." Miss. Code Ann. § 75-21-3.

## V.  DAMAGES ARE PROPER IN THIS CASE

The State will introduce evidence that a judgment awarding damages is proper in this case.  Specifically, the State will introduce the testimony of J. Corey Miller, Mississippi's State Economist.  Mr. Miller has prepared a report that analyzes the economic losses that the state suffered as a result of the pandemic.  [Exhibit 12].  He is expected to testify that total economic losses sustained by the state exceed $12,000,000,000.00.  [Id.].

## VI.  CONCLUSION

The evidence in this matter supports that the Defendants engaged in a complex, long-running campaign to hoard PPE in the early days of the COVID-19 pandemic. Defendants did this while aggressively suppressing and misrepresenting their knowledge of the virus, taking advantage of this fraud and misrepresentation to further Defendants' goals to hoard additional PPE. In the course of these actions, Defendants breached the State's consumer protection and antitrust laws.  The Defendants' actions directly harmed the State of Mississippi and its citizens.

Defendants have refused to appear or otherwise answer for their actions, and each is in default. Mississippi will provide sufficient evidence to demonstrate both Defendants' liabilities and Mississippi's entitlement to damages. As such, Mississippi is entitled to a default judgment against Defendants.

For the foregoing reasons, the State of Mississippi respectfully requests that this Court: (1) enter a judgment of liability against all Defendants; (2) issue an award of damages against all Defendants in the amount this Court deems fair and appropriate to remedy the damages suffered by the State and its citizens by Defendants' actions; (3) order that Defendants pay prejudgment and post judgment interest on every amount of damages awarded by this court; and (4) award such further relief as the Court deems just and appropriate.

Respectfully submitted, this the 6th day of January, 2025.

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

 _/s/ James M. Rankin_
James M. Rankin, Miss. Bar No. 102332
Special Assistant Attorney General
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
550 High Street, Suite 1200
Jackson, Mississippi 39205
Telephone: (601) 359-4223