1                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF MISSISSIPPI
2                        SOUTHERN DIVISION

3

STATE OF MISSISSIPPI,
4  *ex rel.* LYNN FITCH, in Her
Official Capacity as Attorney General
5  of the State of Mississippi                      PLAINTIFF

6  V.                           CIVIL ACTION NO: 1:20CV168

7  THE PEOPLE'S REPUBLIC OF CHINA,
THE COMMUNIST PARTY OF CHINA,
8  NATIONAL HEALTH COMMISSION OF
THE PEOPLE'S REPUBLIC OF CHINA,
9  MINISTRY OF EMERGENCY MANAGEMENT
OF THE PEOPLE'S REPUBLIC OF CHINA,
10 MINISTRY OF CIVIL AFFAIRS OF THE
PEOPLE'S GOVERNMENT OF HUBEI PROVINCE,
11 PEOPLE'S GOVERNMENT OF WUHAN CITY,
WUHAN INSTITUTE OF VIROLOGY,
12 and CHINESE ACADEMY OF SCIENCES                   DEFENDANTS

13 _____

14              TRANSCRIPT OF EVIDENTIARY HEARING

15            BEFORE HONORABLE TAYLOR B. MCNEEL
                 UNITED STATES DISTRICT JUDGE
16
                    FEBRUARY 10, 2025
17
            DAN M. RUSSELL, JR., UNITED STATES COURTHOUSE
18                  GULFPORT, MISSISSIPPI

19 _____

20

21                    COURT REPORTER:

22            Kati Vogt, RPR, RMR, RDR, CRR
                 Official Court Reporter
23  U.S. District Court, Southern District of Mississippi
                 2012 15th Street, Suite 403
24              Gulfport, Mississippi  39501
                    (228) 563-1780
25            kati_vogt@mssd.uscourts.gov

1                           **A P P E A R A N C E S**

2

3

4

   REPRESENTING THE PLAINTIFF:
5
        CRYSTAL UTLEY SECOY, ESQ.
6       JAMES M. RANKIN, ESQ.
        Mississippi Attorney General's Office
7       P.O. Box 220
        Jackson, Mississippi  39205
8
        PATRICIA LOVERNE BEALE, ESQ.
9       Mississippi Attorney General's Office
        1141 Bayview Avenue, Suite 402
10      Biloxi, Mississippi  39530

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                          **PAGE**

3    WITNESSES:

4    COREY MILLER (via Zoom remote videoconference)

5        Direct Examination by Mr. Rankin.......... 72

6    CERTIFICATE OF COURT REPORTER................. 139

7

8

9                        **E X H I B I T S**

10                              I.D.        EVIDENCE

11   Exhibit P1              23            120
     Exhibit P2              23            122
12   Exhibit P3              24            122
     Exhibit P4              24            122
13   Exhibit P5              24            120
     Exhibit P6              24            120
14   Exhibit P7              25            123
     Exhibit P8              25            123
15   Exhibits P9 - 11        NOT OFFERED
     Exhibit P12             51            123
16   Exhibit P13             52            124
     Exhibit P14             54            125
17   Exhibit P15             68            125
     Exhibit P16             71            123
18   Exhibit P17             71            124
     Exhibit P18             83            126
19   Exhibit P19             90            126

20

21

22

23

24

25

1        **THE COURT:**  Please be seated.

2            Madam Clerk, will you please call the case.

3        **COURTROOM DEPUTY CLERK:**  In the United States

4    District Court for the Southern District of Mississippi,

5    Southern Division, State of Mississippi versus People's

6    Republic of China, et al., Civil Case Number 1:20cv168, set

7    for evidentiary hearing.

8        **THE COURT:**  Would counsel please enter their

9    appearances for the record, beginning with counsel for the

10   government -- or counsel for the State of Mississippi.

11       **MS. SECOY:**  Your Honor, Crystal Utley-Secoy, Director

12   of Consumer Protection for the Mississippi Attorney General's

13   Office.

14       **MR. RANKIN:**  James Michael Rankin, local enforcement

15   attorney for the Consumer Protection Division of the

16   Mississippi Attorney General's Office.

17       **MS. BEALE:**  Good morning, Judge.  I'm Tricia Beale,

18   also with the Attorney General's Office.  I'm just sitting

19   over here because we needed to spread out a little bit, if

20   that's okay with you.

21       **THE COURT:**  That's fine.

22           And do we have anyone in the courtroom here on behalf

23   of any of the defendants?

24   **(No response.)**

25       **THE COURT:**  I see none.

1          All right.  Before we get into the evidentiary

2     portions of this hearing, it does appear from the pretrial

3     brief, from the motion in support of default judgment, that

4     the State of Mississippi does intend to do some type of

5     presentation before we get into evidentiary hearing on

6     introduction and jurisdiction.  Is that -- is that correct?

7          **MS. BEALE:**  Yes, Your Honor.  I'm here to give an

8     introduction of the case and then talk about the Foreign

9     Sovereign Securities Act -- Immunities Act.  I'm sorry.

10          **THE COURT:**  Yes.  Are you ready to proceed?

11          **MS. BEALE:**  Yes, sir.

12          **THE COURT:**  All right.  You may proceed.

13          **MS. BEALE:**  Good morning, Judge.  My name is Tricia

14     Beale.  I'm the deputy director at the Mississippi Attorney

15     General's Office and on behalf of the State in the case that

16     is being heard today.  As you can see by the agenda, we each

17     kind of took a portion of the case that we're going to argue

18     today, and my portion is the introduction and the

19     jurisdiction.

20          As an initial matter, since none of the defendants

21     appeared in the case, we've been unable to conduct any

22     additional discovery, or any discovery, against some of the

23     defendants.  And so just as an initial matter, we'd like to

24     dismiss three of the defendants without prejudice.  The three

25     defendants are the People's Government of the Hubei Province,

1   the Ministry of Civil Affairs of the People's Republic of

2   China, and the Ministry of Emergency Management of the

3   People's Republic of China, and that's without prejudice.

4         **THE COURT:**  Okay.  Hold on one second.  Let me make

5   sure I have all three of those.  Are you going to be filing a

6   motion to dismiss those without prejudice?

7         **MS. BEALE:**  We can, or ore tenus, whichever the Court

8   would prefer.

9         **THE COURT:**  Okay.  I'll take that motion under

10  advisement if you're moving that ore tenus.  Please identify

11  again for the record the three defendants you're desiring to

12  have dismissed without prejudice.

13        **MS. BEALE:**  It's the People's Government of the Hubei

14  Province.

15        **THE COURT:**  Okay.

16        **MS. BEALE:**  The Ministry of Civil Affairs of the

17  People's Republic of China.

18        **THE COURT:**  Okay.

19        **MS. BEALE:**  And the Ministry of Emergency Management

20  of the People's Republic of China.

21        **THE COURT:**  All right.

22        **MS. BEALE:**  Your Honor, this case is about the

23  defendants -- and when I say "the defendants," I mean all of

24  the remaining defendants -- withholding information and lying

25  about the nature of the COVID-19 virus, hoarding personal

1    protective equipment, and cornering the market on the

2    equipment.  And if it's okay with you, Judge, I'd like to

3    refer to that as PPE, just to shorten it for the record.

4         **THE COURT:**  Sure.

5         **MS. BEALE:**  And then once they hoarded and cornered

6    the market, then they -- the defendants then turned around and

7    sold the PPE to the United States, when we needed it the most,

8    for a higher price.  The causes of action in this case are

9    under our Consumer Protection Act.  That's found at

10   Mississippi Code 75-24-1 et. seq.  The defendants engaged in

11   unfair methods of competition affecting commerce and unfair

12   and deceptive trade practices affecting commerce.  This case

13   is also brought under Mississippi's antitrust laws, which are

14   found at Mississippi Code 75-21-1 et. seq.  Because the

15   defendants hoarded PPE, they cornered the market for PPE, and

16   then they turned around and sold it at a higher price.

17        Your Honor, the reason why we're in federal court is

18   because of the foreign nature of the defendants.  We only

19   brought state law claims.  Usually in Attorney General

20   litigation, we file in Hinds County Chancery Court.  So we're

21   only in federal court due to the Foreign Sovereign Immunities

22   Act.  But the defendants in this case did the same thing

23   defendants have done in our other cases:  Violations of the

24   Consumer Protection Act affecting commerce, and violations of

25   our antitrust laws, but because the defendants are foreign

1    states and foreign agencies and instrumentalities, we're here

2    under the Foreign Sovereign Immunities Act, which, with your

3    permission, I'd like to call the Immunities Act for the

4    record.

5              **THE COURT:**  Sure.

6              A question for you.  So you just referred to the

7    defendants as including foreign states and agents and

8    instrumentalities.  One of the questions I'm going to have is

9    whether the Mississippi Consumer Protection Act and the

10   Mississippi antitrust laws apply to foreign states, agents,

11   and instrumentalities, and where that is in those acts

12   specifically.

13             **MS. BEALE:**  Yes, and Crystal is prepared to answer

14   that question for you.

15             **THE COURT:**  All right.  We can get to that later, but

16   I just wanted to let you know I am going to have a question

17   about that.

18             **MS. BEALE:**  Okay.  Thank you.

19             **THE COURT:**  And one other question I know I'm going

20   to have is it seems like you-all are taking the position -- of

21   course, I have six factors to analyze in any default judgment.

22   It seems like that you-all are taking the position in your

23   pretrial memorandum and your brief that the first factor,

24   whether material issues of fact exist, that essentially, I

25   don't even need to reach that factor because the defendants

1    are in default; in other words, de facto don't even have to

2    reach that factor.  It seems like that's the position you-all

3    are taking, and I just wanted to address that as well.  We

4    don't have to address it right now.  I'm not going to

5    interrupt your introduction, but I wanted to go ahead and give

6    you an idea of some of the questions that I'm going to have.

7    Thank you.

8             **MS. BEALE:**  Thank you.

9             So, Your Honor, under the Immunities Act, the first

10    question as to whether the Court has jurisdiction or not under

11    the defendants is whether they were properly served.  And yes,

12    all the defendants were properly served.  They were served

13    under USC -- 28 USC 1608(a), that's option (4), through the

14    State Department and diplomatic channels.  If you see Docket

15    Numbers 36 through 41, those defendants were properly served

16    on January 18, 2023; and then Docket Numbers 56 through 58,

17    those defendants were served on January 5, 2024.  So the

18    initial question to be answered is were the defendants

19    properly served, and yes, they were, under the Immunities Act.

20             And then -- so since we have proper service and

21    nobody answered to our lawsuit, the next question, then, is do

22    these defendants enjoy immunity or not.  And the Immunities

23    Act lists several exceptions, and the exception we are moving

24    under is the commercial activity exception, and that is found

25    in 28 USC 1605(a)(2).  And in this case, the immunity of the

1    defendants is abrogated by the commercial activity that they

2    committed.

3            The defendants' acts were commercial in nature.  The

4    commercial acts in China had a direct effect in the

5    United States.  The hoarding of the PPE and cornering the

6    market was connected to the United States paying a higher

7    price for the PPE, and the higher price was paid in the

8    United States when the -- you know, when the material got here

9    from China.

10           Now, the commercial activity at issue, the courts --

11    in the authorities, the courts always say, What is a

12    commercial activity?  And what it comes down to, is it the

13    type of activity a private player in the marketplace could do,

14    or is it something that only a foreign government could do?

15    Well, in this case, clearly it's the type of activity a

16    private commercial company would do.  And that definition is

17    found by the U.S Supreme Court in *Argentina v. Weltover*, which

18    is 112 S.Ct. 2160.  And that's an old case, and that has

19    withstood every challenge.

20           So the question is, is the type of activity that the

21    defendants engaged in the type that a private company would

22    engage in?  So the State alleges that the defendants withheld

23    information; they misled the United States about the COVID-19

24    virus during the critical weeks of the initial outbreak; they

25    withheld the fact that evidence showed human-to-human

1    transmission of the virus.  And withholding information and

2    misrepresenting evidence is the same type of conduct that

3    companies engage in that the Attorney General's Office sees

4    all the time.  I mean, that's a basis of a lot of our

5    litigation.  And one example is the case we had against

6    Johnson & Johnson for withholding information from the public

7    about the evidence showing natural talc was carcinogenic.

8    They knew it and withheld it.  And it's the same exact

9    situation here.  Johnson & Johnson knew about it and just kept

10    quiet and misrepresented what they knew, and people were being

11    diagnosed with cancer; but in that case, Johnson & Johnson was

12    held accountable for withholding the information, and we're

13    asking the Court to do the same thing here.

14        The actions undertaken by the defendants are no

15    different than what companies do, what they already have done.

16    The defendants knew that COVID-19 could be spread by

17    human-to-human contact.  They had evidence of it but withheld

18    the information, all while they're involved in the scheme to

19    hoard the PPE and then release it and make tons of money

20    because people in the United States are getting sick and dying

21    and in desperate need of it.

22        And I wanted to point out, Judge, that for PPE, we

23    always think it's a mask, but it's also gloves, it's also

24    hospital gowns, it's all kinds of things that the

25    United States needed right in that critical point, is the

1    direct effect.  We needed it the most then, and that's when

2    they are misrepresenting, hoarding, and then turn around and

3    sell it, and we have no choice but to buy it.

4         Your Honor, China is the leading supplier of PPE.

5    They manufacture at least 80 percent of the world's supply.

6    So we were basically held hostage by them -- by their -- and

7    that's classic antitrust activity, is, "Oh, yeah, you know,

8    we're -- we don't know what's happening.  This is fine," while

9    they're sitting there scheming in China to hold all the PPE

10   while all of us are, "Please ship it to us, please ship it to

11   us."

12        "Oh, no, no, no.  We're going to hold it."

13        And then when we need it the most, "Okay," and then

14   they ship it, and then we pay much higher prices because we

15   have to.  We didn't have a choice.  They were controlling the

16   PPE market, and this is classic antitrust behavior that the

17   Attorney General's Office sees all the time.

18        The defendants' actions did cause a direct effect in

19   the United States.  And it's -- it's a financial loss, but

20   it's more than that.  A direct effect that the United States

21   suffered was financial, but also loss of lives in that

22   critical time period, lost wages, economic losses, disruption

23   in education.  It caused a lot of damage here.  And, Your

24   Honor, a lot of the cases --

25        **THE COURT:**  But let me understand exactly what's the

1    liability, the causation of the damages argument is, kind of a

2    little bit more specifically.  Because it seems like a lot of

3    the pretrial brief and the memorandum in support of the motion

4    for default judgment are based on an allegation that these

5    defendants allegedly hoarded PPE and then the State of

6    Mississippi had to pay more for PPE.  Right?  That seems like

7    that's what a lot of the allegations are.

8         But it seems like what you're saying today and what

9    also was in the pretrial brief is you're -- it seems to be

10   you're alleging it was more than just paying an additional

11   price.  If we take a mask example, say if a mask costs -- and

12   I don't know what your evidence is going to show about this,

13   but just hypothetically if a mask costs two dollars initially

14   before COVID and then by the time the State of Mississippi got

15   around to buying it, it cost five dollars, where there's a

16   three-dollar increase.  It seems like that's going to be part

17   of your evidence, but it also seems like you're trying to seek

18   damages over and above that.

19             **MS. BEALE:**  Yes.

20             **THE COURT:**  So what is -- kind of hone in on that.

21   And you don't have to do it right now, but I am -- I am

22   curious what that is.

23             **MS. BEALE:**  Yes, and we have that evidence here.  The

24   evidence will show that the commercial activity of the

25   defendants, the commercial acts that they committed did cause

1    loss of lives here, lost wages, economic losses --

2        **THE COURT:**  But you're talking about the alleged

3    hoarding of the PPE.

4        **MS. BEALE:**  And the misrepresentations for not

5    telling us in the beginning -- it was -- they're all

6    intertwined.  They didn't tell us while they're hoarding,

7    cornering the market.  Then they release it.  So all these

8    damages result from their conduct of misrepresenting, lying to

9    us, cornering the market and then selling it to us, selling

10   the PPE to us.

11       **THE COURT:**  Okay.  But, I mean, are y'all going to be

12   seeking damages related to lost lives?

13       **MS. BEALE:**  Yes.

14       **THE COURT:**  Okay.

15       **MS. BEALE:**  Yes.  And we have evidence to show why

16   we're doing that and the connection and what the --

17       **THE COURT:**  The connection to a Consumer Protection

18   Act in an antitrust law.

19       **MS. BEALE:**  Yes.

20       **THE COURT:**  I mean, that's just -- it's not typical,

21   obviously.  Usually --

22       **MS. BEALE:**  Well --

23       **THE COURT:**  Usually -- I mean, obviously, antitrust

24   laws are designed for the protection of the consumer, and it's

25   usually based off of price and the damages from price, right,

1    is the vast majority of antitrust cases.  It focuses on the

2    protection of the consumer and then --

3              **MS. BEALE:**  Well, we --

4              **THE COURT:**  -- how the consumer was harmed by those

5    prices.

6              **MS. BEALE:**  Well, and we're also -- we filed this

7    complaint as *parens patriae* as well on behalf of people, on

8    behalf of individuals, not just for the State.

9              **THE COURT:**  Okay.

10             **MS. BEALE:**  And we're allowed to do that under, I

11   believe the case is, *Alfred Snapp*, S-N-A-P-P.  And I can get

12   that -- well, I think that's in our briefing.  It allows the

13   Attorney General's Office to bring a case on behalf of people,

14   lost lives.

15             **THE COURT:**  Okay.  But the two legal theories are the

16   Mississippi Consumer Protection Act and Mississippi's

17   antitrust laws.

18             **MS. BEALE:**  Yes.

19             **THE COURT:**  Right?

20             **MS. BEALE:**  State law.  Uh-huh.

21             **THE COURT:**  Right.  Okay.

22             **MS. BEALE:**  Yes, sir.

23             And, Your Honor, there are a lot of cases concerning

24   the Immunities Act.  Most of them, I guess I could say, are

25   not really in the Fifth Circuit.  I did locate one.  It's

1    called the *Voest-Alpine Trading and Bank v. Bank of China*,

2    142 F.3d 887, and I have a copy of it here for you.  And

3    there, the Fifth Circuit did at least confirm that a financial

4    loss -- minimally, a financial loss is a direct effect from a

5    commercial activity that happens abroad, direct effect in the

6    United States.  And the reason why I brought that -- even

7    though we're claiming lost lives, lost wages, it's just one

8    element of our claim.  And I brought that for you just because

9    you'll see cases from a lot of other circuits, and at least

10   the Fifth Circuit has affirmed that a financial loss is a

11   direct effect in the United States.

12           And, Your Honor, also as we asserted in our motion

13   for default judgment in Docket Number 81, the Missouri --

14   Missouri has a case similar to ours, and the Eighth Circuit

15   did also recognize the commercial activity exception under the

16   Immunities Act and found that the PPE hoarding claim was a

17   commercial activity which had a direct effect in the

18   United States.  The Court said in that opinion that China's

19   market power and its superior knowledge about the virus meant

20   that no one else other than the defendants created the effects

21   that resulted from the hoarding and then the shipping and then

22   us paying higher prices.  And the effects that we're alleging

23   are loss of lives, lost wages, economic damages, and paying

24   more for the PPE.

25           That's all I have, Judge.  Did you have any questions

1    for me?

2            **THE COURT:**  I don't have any more questions right

3    now.  Thank you.

4            **MS. BEALE:**  Thank you.

5            **MS. SECOY:**  Your Honor, may it please the Court, I

6    appreciate your patience as we walk through your questions

7    from our pretrial conference and your questions today.  We

8    hear you, and we will -- I believe we'll get through those.

9            I would also like to give an introduction on the

10   facts generally, and then we'll jump into facts specifically

11   per defendant.  And forgive me for reading.  I want to make

12   sure I capture everything.

13           Your Honor, the Chinese government intentionally

14   concealed the severity of COVID-19 starting in December

15   of 2019 in order to hoard, or in antitrust terms, engross and

16   forestall PPE by increasing imports and decreasing exports.

17   It stockpiled PPE before telling anyone that the country and

18   the Wuhan Institute for Virology knew that the pneumonia

19   taking over their country was viral and very contagious.

20   We're talking about actions in a small yet crucial period of

21   time that could have prevented the pandemic and avoided

22   hundreds of thousands of people from dying.  All of this so

23   they could corner the market.

24           According to Secretary of State Marco Rubio's

25   investigation, which I'll enter into evidence in a moment, the

1    PRC, People's Republic of China, the Institute for Virology,

2    and the Communist Party of China started preparing their

3    scientific community for a potential leak from their labs in

4    January 2018 because they had inadequate safety precautions.

5    As stated in the report and in Exhibit 9 of our pretrial

6    brief, which I'll also get into evidence -- that was the

7    report on the origins of COVID-19 and the investigation of the

8    Wuhan Institute for Virology by the Minority Staff of the

9    House Committee of Foreign Affairs -- it was no surprise to

10   them that in the fall of 2019, lab employees, military

11   athletes visiting Wuhan, and the general public in the area

12   became sick, just like 20 years ago with SARS.  They

13   immediately recognized the virus because they had been

14   studying its precursor since 2013 and had mapped the genome

15   sequence in 2018, as described in both of these exhibits.  The

16   Institute for Virology had even published a study on the

17   virus, and by the time of the leak, it was still 96 percent

18   the same.  They began working on a vaccine in November 2019,

19   according to the Journal of Science, but they chose to lie and

20   hide the nature of the virus so they could get busy engrossing

21   and forestalling PPE.

22        Rubio's report notes that the virus spread, and by

23   December 27th, hospitals in Wuhan had sent samples to Vision

24   Medicals who sequenced the virus on behalf of the Central

25   Hospital of Wuhan and shared this with the Chinese Academy of

1    Science, which then replicated the genome sequence by

2    January 2nd, yet the PRC did not notify the public or the

3    World Health Organization until January 9th of its viral and

4    contagious nature and did not share the sequence with the

5    World Health Organization until January 12th, a concern also

6    reported by the U.S. Director of National Intelligence.

7            By the time the World Health Organization reported

8    the global emergency, the virus had already spread by 100 to

9    200 times according to China's own CDC.  According to their

10   CDC scientists on January 29th, the virus had been doubling in

11   size every week, and they knew it was contagious at least, at

12   the very minimum, since mid-December 2019.  According to the

13   House Foreign Affairs Minority Report, which we will enter,

14   they could have prevented the pandemic if the PRC had not

15   acted unfairly and deceptively.  The report cites the medical

16   journal MedRxiv whose authors determined that China could have

17   reduced the number of cases by 95 percent if they had notified

18   the public around December 27th when they got their lab

19   results and when they had sequenced the genome.  So these

20   facts lead us here today.

21           I'd like to pause for a moment and briefly go over

22   the two statutes that the defendants had violated before going

23   into the factual details and the relationship amongst the

24   defendants.  So first, the Mississippi Consumer Protection Act

25   75-24-5(1) prohibits unfair methods of competition affecting

1   commerce and unfair or deceptive trade practices in or

2   affecting commerce.  Subsection (2) also prohibits

3   misrepresenting the quality and the characteristics of a good.

4   And whenever the Attorney General has reason to believe the

5   person is using, has used, or is about to use any practice

6   prohibited by this statute, then she can bring an action in

7   the public interest.  Subsection 15 talks about damages on

8   behalf of the State.  Subsection 19 goes into our penalties.

9   Subsection 11 covers any other remedy that the State can seek;

10  and James Rankin will go into further detail about our damages

11  and penalties sections.  Subsection 3(a) defines "person" as

12  any natural person, corporation, trust, association, and, I

13  quote, "any other legal entity."

14          **THE COURT:**  And I saw that definition in the

15  Mississippi Consumer Protection Act.  So I guess it's the

16  State's position that all defendants are considered legal

17  entities of some form or fashion, including --

18          **MS. SECOY:**  Yes.

19          **THE COURT:**  -- a foreign state?

20          **MS. SECOY:**  Yes.

21          **THE COURT:**  Okay.

22          **MS. SECOY:**  I think the language is very broad, "any

23  other legal entity."

24          Under 75-21-3(c), our state antitrust laws prohibit a

25  person or association of persons from engrossing or

1    forestalling any commodity to a degree that is inimical to the

2    public welfare.  The Mississippi Supreme Court has stated that

3    "engross," for antitrust purposes, means to buy large

4    quantities of a stock or commodity in an effort to corner the

5    market and control the price.  That was from *Georgia Pacific*,

6    194 So.3d.  And Your Honor, we have copies of all these cases

7    if you'd like a copy.

8            **THE COURT:**  Okay.  Sure.  That would be helpful.

9            **MS. SECOY:**  Do you want us just to hand them to you

10    as we make reference to them?

11            **THE COURT:**  Sure.  Well, you can do it at the end of

12    your presentation.

13            **MS. SECOY:**  Okay.

14            **THE COURT:**  That would probably be easier.  Thank

15    you.

16            **MS. SECOY:**  The Miriam Webster Dictionary defines

17    "forestall" as to prevent the normal trading in something by

18    buying or by diverting goods.  That will be important for us.

19            Getting back to the standard of proof under the

20    Immunities Act, many cases under the Immunities Act have

21    allowed U.S. Government reports in lieu of other forms of

22    evidence, such as *Karcher v. Islamic Republic of Iran* where

23    they allowed U.S. Government reports and records and

24    statements as evidence in an Immunities Act default hearing

25    under the public records exception to the hearsay rule, which

1    we intend to do today.  *Rux v. Republic of Sudan* also said

2    evidence at the Immunities Act hearing included unclassified

3    U.S. Department of State reports, a 9/11 Commission report,

4    and a couple of other similar documents.  *Sotloff v. Syrian*

5    *Arab Republic* allowed evidence in an Immunities Act default

6    hearing, A State Department Overview of State-Sponsored

7    Terrorism also as a public record, and the Court took judicial

8    notice of facts found elsewhere in addition to written

9    testimony of their experts.

10          So switching gears to each defendant, Your Honor, I'm

11   going to talk about -- I'm going to start off talking about

12   two of our exhibits.  Most of these are in the pretrial brief,

13   but we've had a couple of extras since then.  So I'd like to

14   enter into evidence Secretary of State Rubio's report as well

15   as a Congressional Research Primer on China.  These are both

16   public records under Rule of Evidence 803(8), and

17   self-authenticating official publications under Rule 902.

18          **(Brief pause in proceedings.)**

19          **THE COURT:**  We're just having a couple of technical

20   difficulties.  I'm going to get you to put back on the record

21   essentially what you just said after we reboot this.  Thank

22   you.

23          Okay.  Just restate for the record your position on

24   exactly what you would like for me to enter into evidence as

25   an exhibit, if you would.

1          **MS. SECOY:**  Your Honor, as I go through these, I have

2    a handful of exhibits.  Would you like me to go ahead and do

3    them all at once?

4          **THE COURT:**  Yeah, we can go ahead and do them all at

5    once.

6          **MS. SECOY:**  Okay.

7          **THE COURT:**  Thank you.

8          **MS. SECOY:**  That would probably help.

9          I believe that all of these are under those same

10   rules, the public record exception to hearsay and

11   self-authenticating official publications.

12         **THE COURT:**  Okay.

13         **MS. SECOY:**  Congressional Research Service - China

14   Primer.

15         **COURTROOM DEPUTY CLERK:**  Is that P1?

16         **MS. SECOY:**  Yes.

17         (Exhibit P1 marked for identification.)

18         **MS. SECOY:**  This is Secretary of State Marco Rubio's

19   report, A Complex and Grave Situation:  A Political Chronology

20   of SARS-COVID-2 Outbreak, also entered as a public record, an

21   unofficial publication.

22         **COURTROOM DEPUTY CLERK:**  That's P2?

23         **MS. SECOY:**  P2.

24         (Exhibit P2 marked for identification.)

25         **MS. SECOY:**  House Foreign Affairs Committee Minority

1    Staff Report, Final Report on The Origins of the COVID-19

2    Global Pandemic, Including the Roles of the Chinese Communist

3    Party and the World Health Organization, entered as a public

4    record and self-authenticating official publication.  P3.

5              (Exhibit P3 marked for identification.)

6         **MS. SECOY:**  This is an earlier version of the same

7    document, House Foreign Affairs Committee Report by Minority

8    Staff on The Origins of COVID-19, as P4.

9              (Exhibit P4 marked for identification.)

10        **MS. SECOY:**  Congressional Research Service Report on

11   The COVID-19 and Domestic PPE Production and Distribution:

12   Issues and Policy Options, also entered as a public record and

13   self-authenticating official publication, as P4.

14        **COURTROOM DEPUTY CLERK:**  P5?

15        **MS. SECOY:**  P5.  Thank you.

16             (Exhibit P5 marked for identification.)

17        **MS. SECOY:**  Similarly, Congressional Research Service

18   Report on COVID-19:  China Medical Supply Chains and Broader

19   Trade Issues, a public record and self-authenticating official

20   publication.  P6.

21             (Exhibit P6 marked for identification.)

22        **MS. SECOY:**  And this is an unclassified report from

23   the Department of Homeland Security on New Analytic Techniques

24   Indicate China Likely Hid the Severity of COVID-19 from the

25   International Community While it Stockpiled Medical Supplies.

1    We enter those on the same basis, as a public record and

2    official publication, as P7.

3                 (Exhibit P7 marked for identification.)

4          **MS. SECOY:**  I think this is my last one for this

5    group:  A Report by the Office of Director of National

6    Intelligence, National Intelligence Council, Updated

7    Assessment on COVID-19 Origins, as a public record and a

8    self-authenticating publication, official publication.

9          **COURTROOM DEPUTY CLERK:**  P8?

10         **MS. SECOY:**  Yes.  Thank you.

11                (Exhibit P8 marked for identification.)

12         **MS. SECOY:**  Those will get me a bit.

13         **THE COURT:**  Yes.  And you said that you are

14   entering -- you're asking for these to be entered under the

15   hearsay exception and under 902(11) related to public records?

16   Is that what --

17         **MS. SECOY:**  Official publications.  Rule of Evidence

18   803(8), and official publications under Rule 902.

19         **THE COURT:**  Okay.  So 803(8) and 902.  What part of

20   902?

21         **MS. SECOY:**  One moment, Your Honor.

22         **THE COURT:**  For authentication purposes.

23         **MS. SECOY:**  (5).  902, subsection (5), official

24   publications.

25         **THE COURT:**  All right.  Thank you.

1          **MS. SECOY:**   Thank you.

2          **THE COURT:**   Okay.  So what I'm going to do with all

3     these exhibits, they're officially marked for ID only.  I'm

4     going to take them under advisement for admissibility

5     purposes, because each one of these exhibits may require a

6     little bit of a nuanced ruling as to its admissibility, and in

7     order just to keep the hearing moving, I need to -- obviously

8     you'll have free rein to use them for all purposes of today's

9     hearing and tomorrow's hearing, but I'm going to take them

10    under advisement because I may have a little bit of a nuanced

11    ruling as to their admissibility.

12         **MS. SECOY:**   Okay.  Thank you.

13         Your Honor, may I proceed?

14         **THE COURT:**   You may.

15         **MS. SECOY:**   The Communist Party and People's Republic

16    of China are completely interwoven and control all of the

17    aspects of business and life in China, as stated on their

18    official websites and confirmed by the Congressional Research

19    - China Primer.  For example, as described by Secretary of

20    State Rubio's report, they have multiple reports describing

21    the Party's involvement and the PRC's involvement in every

22    agency and instrumentality, every entity, really, across

23    China.  For instance, there were nine reports in July of 2019

24    on the Institute for Virology describing how the Chinese

25    Communist Party dictated what should happen at the Chinese

1    Academy of Science and the Institute for Virology.

2         On June 20, 2019, the Wuhan Institute for Virology

3    Chinese Communist Party Secretary General -- and I apologize

4    for butchering their names -- Xiao Gengfu instructed staff on

5    how to get over biosafety challenges and held a followup

6    meeting on July 8th regarding processes in the lab that was in

7    question, the lab that studied the Coronaviruses.  The same

8    gentleman called a meeting to address problems from the

9    Institute and concerns amongst personnel, personnel issues, in

10   August of 2019.  So that's the Institute for Virology's

11   Communist Party Secretary General addressing issues related to

12   biosafety and personnel at the Institute for Virology.

13        In November 2019, PRC President Jinping sent written and

14   oral instructions to the Institute via the institute's parent

15   organization, the Chinese Academy of Science, to address

16   biosafety concerns.  The Institute for Virology described this

17   as instructions and demands from the Communist Party regarding

18   safety and security.  And that is in Secretary of State

19   Rubio's report.

20        A congressional report noted that the PRC required -- so

21   just getting into the facts.  That's kind of laying examples

22   of their relationship.  But getting into the facts at hand,

23   the congressional report noted that the PRC required all viral

24   samples to be destroyed or sent to the Institute for Virology

25   in order to centralize unique knowledge of the virus and to

1      give them an advantage.  They refused to allow World Health

2      Organization or other scientists to conduct a visit for over a

3      month after they finally told everyone that this was a

4      contagious virus.  And per Rubio's report, the National Health

5      Commission of the People's Republic of China sent a working

6      group to guide the City of Wuhan in their response on

7      December 31st, and, according to Rubio's report, they

8      coordinated with Wuhan officials to reprimand doctors who

9      attempted to warn the public.

10         On January 1st, they issued a gag order, the PRC issued a

11     gag order, which the Institute for Virology then implemented.

12     Per Rubio's report, when they finally admitted on January 9th

13     on state-run media that this was a Coronavirus, Xu Jianguo,

14     clinical biologist for the PRC and CDC, lied and said that

15     they hadn't sequenced the virus until January 7th, which we

16     know that it was sequenced at the end of December and then the

17     Institute replicated that on January 2nd.  So this -- I know

18     it's just five days, but the way the virus spread so quickly,

19     just five days makes a huge difference.

20         Oddly, even after making that announcement on state-run

21     media, they reverted back to the propaganda two days later,

22     and the National Health Commission issued a report that there

23     was no clear evidence of human-to-human contact,

24     human-to-human transmission, according to Secretary of State

25     Rubio.

 1          Within the internal government, they declared a state of

 2    emergency, but their CDC continued to tell the public that

 3    this was low risk and to falsify the number of cases by 15 to

 4    40 times, according to U.S. intelligence agencies and

 5    Secretary of State Rubio's investigation and report.  Our

 6    congressional research, which has been admitted and was

 7    Exhibit 3 in the pretrial brief, found that these lies and

 8    withholding of information were driven specifically by the

 9    PRC's market ambition, I quote, "to benefit state-controlled

10    firms."

11          Switching to the Communist Party of China, the Wuhan Party

12    Secretary, which is a communist-appointed official, is the

13    highest ranking authority in the City of Wuhan, more powerful

14    than the mayor.  Secretary of State Rubio found that the

15    Communist Party controlled the information distributed which

16    was withheld and misrepresented.  They possessed the

17    information and did not disclose it until others leaked it and

18    they were forced to address it, at which time even when the

19    information was leaked, they still misrepresented the nature

20    of the virus for months.

21          The Communist Party controls all of the PRC's state

22    administrative systems.  For instance, on October 31, 2019,

23    they adopted several governing policies including the

24    prevention of epidemics.

25          The Communist Party constructed, supervised, and

1    controlled the Institute for Virology, which is a branch of

2    the Chinese Academy of Science.  As listed on the Chinese

3    Academy of Science and Institute's websites and as cited by

4    the Minority Staff Report, which we've entered into evidence,

5    Wang Yanyi, Director General of the Institute for Virology, is

6    the Deputy Director of the Wuhan Communist Party.  Until

7    early 2020, Yuan Zhiming managed the lab -- the BSL-4 lab in

8    question and was Communist Party President at the Wuhan branch

9    of the Chinese Academy of Science.  We know they conducted an

10   inspection in September of 2019 per Secretary of State Rubio's

11   report citing the Chinese Academy of Science Website, and

12   leading up to the policy announcement regarding biosafety on

13   October 31st, the Chinese Communist Party actually told

14   insiders, as laid out of in the report, that the military

15   athletes that became ill when they visited Wuhan in the fall,

16   they became ill because there was a leak, and the Institute of

17   Virology, when talking about biosafety on their website,

18   reported in November of 2019 that this had occurred

19   repeatedly.

20       I just want to note that I referenced the National Health

21   Commission of the People's Republic in relation to People's

22   Republic of China activities.

23       Regarding the Wuhan Institute for Virology, when people

24   started talking about bad cases of pneumonia going around, the

25   Institute took down their database of viral sequences, as

 1    noted by the database monitoring system online, the Scientific

 2    Database Service Monitoring, which is a public record under

 3    Rule of Evidence 8 and a record of regularly conducted

 4    activity under 803, subsection (6).  But they took it down.

 5    This was discussed also in the Minority Staff Report.  Right

 6    when people would actually need to see the viruses that

 7    they've sequenced and studied and say, "Hey, this looks

 8    exactly like this.  This looks like the virus you have," they

 9    took it down.  No reason.

10        While her own colleagues came down with symptoms in

11    November of 2019 of the very virus they had been studying, the

12    U.S. State Department reported that Institute -- the

13    Institute's senior researcher, Shi Zhengli, stated that there

14    were zero infections amongst her staff.  She then trained all

15    of her new hires on the importance of secrecy, according to

16    the Secretary of State Rubio's report.

17        The City.  So according to Rubio's report for the City of

18    Wuhan, as cases began to arise in December, they joined in the

19    denial of person-to-person infection in the Wuhan Municipal

20    Health Commission Situational Report on Pneumonia Epidemic

21    Currently in Our City.

22        On December 30th, the Wuhan Municipal Health Commission

23    website continued to say pneumonia of unknown cause when the

24    Wuhan officials had already sequenced the virus.

25        After the PRC arrived on the 31st of December, the Wuhan

1    Municipal Health Commission issued another statement denying

2    human-to-human transmission.  A research journal, SSRN,

3    reported at this point -- and I would submit that that is a

4    learned treatise under Rule of Evidence 803(18) -- they

5    reported that at this point they had a surplus of evidence to

6    the contrary, yet they continued this propaganda on their

7    website repeatedly at least until January 20th of 2020.  We

8    have specific examples from the report on January 3rd,

9    January 5th, January 14th, and January 15th.

10        On January 1st, Wuhan also reported on social media that

11    they had dealt with the rumormongers, and the Communist

12    Party's official newspaper, The People's Daily, reiterated

13    this.  They're talking about Dr. Li and other doctors who

14    tried to warn the public, and they reprimanded him, they

15    punished him.  They made him sign a letter saying how he had,

16    you know, embarrassed the Communist Party and had lied to the

17    public, and then he died from the virus.  So the Minority

18    Staff Report goes into this, and they also have a letter

19    attached as an exhibit of the letter they forced Dr. Li to

20    sign.

21        According to the Minority Staff Report and in response to

22    questions and accusations, the mayor of Wuhan simply responded

23    that he could only disclose information with authority from

24    the Chinese Communist Party.

25        I'd also note that I referenced the Chinese Academy of

1     Science, the parent organization of the Wuhan Institute for

2     Virology, when discussing the other defendants.

3          Switching gears to our antitrust violations, the

4     Department of Homeland Security brief on that publication, New

5     Analytic Techniques, which I've included into our exhibits, it

6     noted that the PRC provides 80 percent of the global supply of

7     surgical facemasks, and that congressional research, which we

8     have admitted into evidence, reported that they provide

9     70 percent of masks and 55 percent of other PPE for the

10    United States, yet despite having the bulk of the market

11    already, they increased imports of masks by 278 percent, gowns

12    by 72 percent, and gloves by 32 percent.  Meanwhile, they

13    decreased their exports of masks by 48 percent and medical

14    supplies on average by 53 percent.

15         So this exhibit from the Department of Homeland Security,

16    when we review it, they've combined the product codes in their

17    figures, Your Honor, but the Congressional Research Service

18    titled China Medical Supply Chains and Broader Issues, they

19    have broken down those figures further, and so that will

20    become relevant as James talks to you about damages and

21    penalties.

22         We also noted that bulk orders require two to four weeks.

23    So for the imports to show up on January trade statistics,

24    they had to start hoarding all of this at the very first of

25    the month, at the very beginning of January 2020.

1    According to Congressional Research and the Minority Staff

2    Report, the PRC also commandeered U.S. factories located in

3    China.  Talk about diverting trade.  They nationalized and

4    commandeered 3M, Foxcomm, and GM for domestic Chinese use

5    only.  This is the essence of forestalling a commodity.

6    Their Ministry of Commerce also released circulars

7    instructing staff to buy up supplies and raw materials, as

8    cited in the Congressional Research Service Report.  Per these

9    instructions, Greenland, a PRC-controlled company, bought

10    3 million masks, 700,000 hazmat suits, and 500,000 pairs of

11    gloves in January and February of 2020.  After they stockpiled

12    the PPE, China turned around and sold what they didn't need at

13    sky-high prices, and a good bit of that was not even

14    quality -- the quality represented, and it was unusable.  We

15    have this graph here that will show just the extent of the

16    price increases.

17    So according to the Cambridge University Press study,

18    which I submit is a learned treatise under the exception to

19    hearsay, the disposable gowns peaked at $12 during the first

20    week of March, which is 13.7 times higher than pre-pandemic

21    prices; the average gown -- hospital gown was seven and a half

22    times higher than pre-pandemic prices; N95 respirators had a

23    peak price of $12, eight times higher than pre-pandemic

24    prices; and facemasks peaked at .55, which is 11 times higher.

25    And this is -- these are Chinese exports, when they finally

1   felt like they had enough and they could sell it.  Gloves

2   averaged two and a half times higher than the pre-pandemic

3   price.  This drastically impacted our frontline medical

4   responders' ability to do their jobs protecting us and

5   themselves.  The graph, just to show the impact, the light

6   orange demonstrates pre-pandemic prices on average, and the

7   dark orange shows the post-pandemic price.

8       When we were trying to get evidence for you, Your Honor,

9   despite the fact that the defendants were not cooperating and

10  were not cooperating with discovery, I learned that Office

11  Depot, when they were struggling to provide PPE despite the

12  fact that China was hoarding it, it forced them to become

13  vulnerable to scams, and they ended up filing two different

14  lawsuits against two different sets of scammers who tried to

15  defraud them because they were, you know, in a vulnerable

16  position in the wake of the hoarding and trying to find some

17  source of PPE.  And I have a copy of those two complaints if

18  you would like to see them.

19          **THE COURT:**  Are you offering those into evidence?

20          **MS. SECOY:**  Well, they -- I mean, I think they're an

21  example of the result -- you know, the result of their

22  hoarding.

23          **THE COURT:**  Okay.  But are you offering them into

24  evidence?  Or are you just kind of saying that this is -- it's

25  not really -- it's not really something that you're proving or

```
 1      attempting to prove from a causality standpoint?
 2              MS. SECOY:  Correct.
 3              THE COURT:  Okay.
 4              MS. SECOY:  I just wanted you to be aware of it.
 5              THE COURT:  Okay.
 6              MS. SECOY:  Okay.  So we just went through how each
 7      of the defendants individually committed overt acts in
 8      violation of the Consumer Protection Act and the antitrust
 9      law -- Mississippi state antitrust law.  These are all
10      activities in connection with commercial activity under the
11      Immunities Act.  As Tricia stated, a foreign state shall not
12      be immune from the jurisdiction of courts of the United
13      States or of the States in any case in which the action is
14      based upon an act outside the territory of the United States
15      in connection with a commercial activity of the foreign state
16      elsewhere and that that act causes a direct effect in the
17      United States.  As she mentioned, the Eighth Circuit has
18      already found that the harm received from COVID is a direct
19      effect from their hoarding.  And when determining whether a
20      party's allegations are well pled, the Court considers whether
21      a plaintiff's complaint contains a short and plain statement
22      of claim showing that the pleader is entitled to relief.  That
23      is under *Wooten* and then reiterated by *Twombly*.  We submit,
24      Your Honor, that our complaint goes well beyond a short and
25      plain statement.
```

1          Courts have applied a lenient standard for factual

2     findings by a trial court in Immunities Act default hearings,

3     recognizing that, quote, "firsthand evidence and eyewitness

4     testimony is difficult or impossible to obtain from an absent

5     and likely hostile sovereign."  That's in *Owens v. Republic of*

6     *Sudan*.  Given the difficulty of obtaining direct proof of the

7     types of conduct for which Immunities Act provides a remedy,

8     the statute permits courts to credit indirect evidence and to

9     impose a lower evidentiary burden than they might apply in a

10    different context, and that is quoting *Saharkhiz v. Islamic*

11    *Republic of Iran*.

12          **THE COURT:**  Now -- all right.  So, I mean, of course,

13    you're citing a good bit of law in your pretrial brief and

14    your memorandum in support of motion for default judgment that

15    goes through the traditional default judgment factors and

16    talks about well-pleaded factual allegations, it talks about

17    the first factor, which is whether there's any genuine issues

18    of material fact, and then a good bit of your brief also

19    focuses on the Immunities Act and how you are supposed to deal

20    with default judgments involving foreign states.  And it seems

21    like at times you're saying, Well, under the traditional

22    factors, the State of Mississippi doesn't really have to put

23    on evidence of liability because the defendants are in

24    default, but at times you're also -- when you're talking about

25    the Immunities Act, it seems like you're talking about the

1    State does have some type of evidentiary burden that it has to

2    meet with regard to liability, but it's just not as high as it

3    would be at a jury trial.  Do you see what I'm saying?  It

4    sounds like there's a little bit of a distinction there.

5            And so, of course, we are at hearing here, and this

6    is somewhat of a prove-up hearing, to some extent.  What is

7    your burden, do you think, in terms of demonstrating facts on

8    liability, if at all?

9        **MS. SECOY:**  Your Honor, we -- I would submit that we

10    need to follow *Lindsayca* which said because they failed to

11    answer, they've deemed to -- they've admitted our allegations.

12        **THE COURT:**  Okay.  So that's -- I mean, it's the

13    State's position that essentially y'all don't have to prove

14    facts that are well pled in the complaint.  As long as they're

15    well pled, then you don't have to prove any more facts, right?

16        **MS. SECOY:**  Correct.

17        **THE COURT:**  Is that fair?

18            And I think what you're also -- it seems like what

19    your position is, you're going to try to put forward some

20    facts that are not in the complaint, and you're looking to

21    prove those up.  Is that a fair assumption?

22        **MS. SECOY:**  Well, I mean, the -- you asked us to walk

23    through the liability and evidentiary as if we were having a

24    trial, and so we have attempted to do that, despite the fact

25    that we've had no discovery and zero cooperation from the

1    defendants.

2              **THE COURT:**  Okay.

3              **MS. SECOY:**  If it's okay with you, Your Honor, I was

4    just going to note that, you know, vicarious liability and

5    joint and several liability, and then go into the default

6    standard for this --

7              **THE COURT:**  Sure.  But as we're kind of getting into

8    that -- because we're starting to get into some specifics

9    about the alleged hoarding of the PPE, the rising of the costs

10   of the PPE, and the Fifth Circuit and some other courts have

11   had opinions about, kind of, in other contexts, where American

12   citizens were hoarding PPE, for example, or allegedly hoarding

13   PPE, and some courts have talked about how in light of COVID,

14   the prices were inevitably going to go up.  Right?  They were

15   inevitably going to go up because the demand all of a sudden

16   for PPE became so high worldwide.  And so what is the

17   distinction between the prices inevitably going up at least

18   some and how much the hoarding or alleged hoarding of the PPE

19   by these defendants caused the PPE prices to go up?

20             **MS. SECOY:**  I think that, you know, some of that is

21   hypothetical, you know, that -- an expectation of demand; but

22   what we know is that they took away the supply.  And when you

23   don't have supply, that's going to make the demand, the prices

24   worse, under just, you know, traditional antitrust theory.

25             So China provided 80 percent of global supply for

1    PPE.  They provided 70 percent to the United States.  And so

2    they had control over that market, and they removed that

3    supply from the market, which is just going to -- I mean, it

4    put people like Office Depot in, you know, a terrible position

5    to try to find it somewhere else when we didn't -- they -- we

6    had no notice from them.  If they had been honest and told us

7    the nature of the virus, you know, if they hadn't lied, then

8    people could have gone and -- it would have -- we would have

9    been able to prepare ourselves.  But they kept all the

10   information.  We had no clue about the nature of the virus and

11   were not able to prepare or protect ourselves.  So while, you

12   know, you could say that when demand goes up, prices go up,

13   but that -- that equation is much worse when you remove the

14   supply from the market.

15        It is true that once they, you know -- being the

16   major -- the primary supplier of PPE and they -- I mean, at

17   some point I think something said 11 times higher, when they

18   increased prices, it did cause the few domestic producers to

19   match those prices, and so then the whole market was, you

20   know, saturated with extremely high prices.

21        But just for the record, Your Honor, I submit that

22   each of the remaining defendants are liable for this conduct.

23   They're liable under the Consumer Protection Act and our state

24   antitrust laws.  They've caused a direct effect in the

25   United States, as stated in the complaint.  As we were just

1    discussing, we could not acquire PPE when we finally found

2    out, our frontline medical providers could not equip

3    themselves, we lost lives, livelihoods, not to mention the

4    permanent effect on our society thanks to schools and

5    businesses closing for months.  The two Congressional Research

6    Reports, those publications on the China Medical Supply Chain

7    and COVID-19 and Domestic PPE Production, go into those

8    impacts in great detail.  Those were -- I don't recall our

9    numbers for today, but those were pretrial Exhibits 3 and 11.

10            So again, the PRC and the Communist Party are

11    completely interwoven and control all aspects of life in China

12    from local governments to business.  Congress has found that

13    the PRC and the Communist Party, I quote, "exercise overall

14    leadership over all areas of endeavor in every part of the

15    country."  "Over all the areas of endeavor."  And that's in

16    the China Primer that we have submitted as an exhibit.

17            In addition to the Institute for Virology in the City

18    of Wuhan, all of the remaining named defendants are

19    responsible for every act described today.  Joint and several

20    liability exists where two or more wrongdoers contribute to

21    the injury of another by their several acts which operate

22    concurrently so that the effect of their damages suffered are

23    rendered inseparable.  These defendants worked together to

24    withhold information and deceive the public as part of their

25    scheme to hoard PPE before the rest of the world knew what was

1    happening, and they are all jointly and severally liable.

2            As stated in the State's Memo in Support of Default,

3    Docket Number 81, an Affidavit in Support of Default, the

4    State requests a default judgment be entered against all

5    remaining defendants.  The State followed all steps set forth

6    under the Hague Convention and provided by the State

7    Department to serve each and every defendant.  All of those

8    steps have been filed and documented with this court.  We have

9    set out their violations of law and will continue to discuss

10   the harm that they have caused when James joins me.

11           So in determining whether to enter a default

12   judgment, the Fifth Circuit, as you mentioned, requires the

13   six steps:  Whether material issues of fact exist; whether

14   there has been substantial prejudice; whether the grounds for

15   default are clearly established; whether the default was

16   caused by a good faith mistake or excusable neglect; the

17   harshness of default; and whether the Court would consider

18   itself obligated to set that aside.  That's from *Lindsayca v.*

19   *de Venezuela*.

20           As I mentioned, we take the position, as in

21   *Lindsayca*, that there are no material issues of fact because

22   the defendants have failed to answer the lawsuit, and they are

23   deemed to have admitted all of the allegations in the

24   complaint.  Just as an alternative, Your Honor, if you found

25   under the Immunities Act that you needed to, you know, work

1    through some level of an evidentiary hearing, as we are doing

2    today, I would note the lenient standard that that case law

3    references.

4         Second, there is no prejudice to the defendants.

5    They were properly served.  And other than to call

6    Mississippi's lawsuit vexatious, defendants have failed to

7    respond to the lawsuit.  And that letter, they actually -- you

8    know, the diplomatic notes confirm service of all of the

9    defendants, and that has been filed with the court.  And when

10   submitting the diplomatic notes, they included that nice

11   letter referring to our lawsuit as vexatious, and that is --

12   that was Exhibit A to our pretrial brief, and it's on the

13   docket with the diplomatic notes.  It's interesting they

14   couldn't appear here today, but they were fully capable of

15   appealing the federal ban against TikTok.  So they're capable

16   of litigating in the United States.  The defendants have

17   offered no defense to this default.  They had plenty of time

18   to respond to the complaint and to this motion.  We have been

19   at this for going on five years and we haven't heard a word

20   from them other than the letter, intention- -- like,

21   intentionally refusing to cooperate.

22        The culpability laid out in our complaint, our

23   pretrial brief, and here today, it's egregious.  We're talking

24   about a global pandemic that they could have prevented,

25   according to the exhibits, according to the reports that we've

1    submitted, or at least significantly lessened.  The harm to

2    the public interest in Mississippi is enormous.  And I would

3    note that we're also following the guidance of *Hibernia*

4    *National Bank*, which is a case in the Fifth Circuit from

5    Louisiana.  It was not a default proceeding, but they

6    discussed default as an aside.

7            This is not an administrative error.  They did not

8    think that they answered the complaint but actually failed to

9    submit it.  China has written to say that they are aware of

10   the lawsuit and refuse to answer.  They willfully did not

11   answer the complaint.  A default judgment would not be harsh

12   when the defendants have not even bothered to respond to the,

13   I quote, "vexatious lawsuit," especially considering the harm

14   that we've alleged in the complaint.  Mississippians and the

15   State of Mississippi deserve justice for what they have been

16   through thanks to the defendants, and any harshness of default

17   is incomparable.

18           Finally, we are aware of no facts that would with

19   cause this Court to set aside a default judgment should it be

20   challenged later.

21           The Immunities Act standard that I referenced earlier

22   is especially appropriate here when defendants have refused to

23   appear in court and subject themselves to discovery and are

24   known to intimidate defectors and potential witnesses.  They

25   had a similar situation in *Han Kim v. Democratic People's*

1    *Republic of Korea*.  The standard recognizes the practical

2    realities of demonstrating a claim against a hostile and

3    defaulting state and is part of the risk that sovereign

4    runs -- this is a quote from *Owens* -- when it does not appear

5    after being properly served.

6            The defendants have violated the State's Consumer

7    Protection Act as well as our state antitrust laws by

8    committing unfair methods of competition affecting commerce

9    and unfair and deceptive trade practices in and affecting

10   commerce.  The PRC, Communist Party, Wuhan, and the Institute

11   for Virology directly misled the public, including

12   Mississippians and the State of Mississippi, regarding the

13   nature of COVID-19 while the PRC engrossed and foresaw the

14   market of PPE.  And rather than respond to these allegations,

15   Your Honor, the defendants have chosen to be and are in

16   default.

17           So I would note when I was walking through the

18   Consumer Protection violations, there are 16 instances that we

19   know of where they withheld information and misled the public

20   that I walked through today.  I would also submit that

21   antitrust violations are also unfair trade practices; so I

22   think that these allegations overlap.

23           Unless you have further questions for me, Your Honor,

24   I'm going switch gears and invite my colleague, James Rankin,

25   to talk to you about damages and penalties and collectibility.

1          **THE COURT:**  So just on antitrust law, I mean, kind of

2     what category of antitrust law would you fit this into in

3     terms of monopoly, monopsony, you know, are we talking about

4     what would traditionally -- I know this is Mississippi

5     antitrust law, but would you say this is something that's more

6     akin to like a Section 2 Sherman Act claim?  You know, where

7     would this fall if I was looking for analogous case law in

8     terms of price-fixing or -- I mean, there's all these

9     different categories of antitrust law, right?

10          **MS. SECOY:**  Right.

11          **THE COURT:**  There's horizontal price-fixing, there's

12     vertical, there's all these other types of categories, and I'm

13     trying to understand exactly what you would say this falls

14     into if I was looking for analogous case law.

15          **MS. SECOY:**  So engrossing and forestalling are in

16     their own category.

17          **THE COURT:**  Okay.

18          **MS. SECOY:**  It's apart from mergers and acquisitions

19     or apart from a boycott or a general restraint of trade.  It's

20     a specific -- kind of a unique violation.

21          **THE COURT:**  Okay.  But it's engrossing and

22     forestalling --

23          **MS. SECOY:**  Yes.

24          **THE COURT:**  -- is the category that you would put it

25     in if I was looking for analogous case law.

1          **MS. SECOY:**  Absolutely.

2          **THE COURT:**  Okay.  Thank you.

3          **MS. SECOY:**  You're welcome.

4          And, Your Honor, I would add that that's unilateral

5    conduct that the -- it can be unilateral or an association to

6    commit that.

7          **THE COURT:**  Okay.  And you would -- it sounds like

8    your argument is it's joint and several liability.  So even

9    if --

10          **MS. SECOY:**  Right.

11          **THE COURT:**  I mean, how are you -- how are you

12    getting there for, say, the Chinese Academy of Sciences for

13    allegedly engrossing and forestalling?

14          **MS. SECOY:**  We believe that they intentionally

15    withheld information and misrepresented the nature of the

16    virus in order to buy them time to hoard the PPE.  So we

17    submit that it is -- it was all a scheme and that the

18    congressional reports that we submitted found the same thing,

19    that they -- they lied and withheld information to buy -- to

20    buy them time to scoop up all this PPE while the rest of the

21    world had no idea what was happening.  So while the

22    allegations we have today regarding the antitrust violations

23    are primarily focused on the People's Republic of China, we do

24    submit that they are jointly and severally liable for the

25    entire scheme together.

1              **THE COURT:**  Okay.  Thank you.

2              **MS. SECOY:**  Thanks.

3              **MR. RANKIN:**  May it please the Court.

4              Your Honor, my names is James Rankin, local

5       enforcement attorney in the Consumer Protection Division of

6       the Mississippi Attorney General's Office.  It is a privilege

7       for me to be here to speak to you today and address some of

8       the issues you inquired about in our pretrial conference.  I

9       have three specific topics to address, and I propose, given

10      that Tricia and Crystal were similarly occupied with answering

11      some of those questions you had, I would like to begin on the

12      issue of collectibility, and then secondly, damages, and

13      lastly, penalties.  The reason why I would like to pursue that

14      order is there was a -- there was some indication in the

15      hearing that collectibility was a concern with respect to

16      consideration of the default, the liability therein,

17      et cetera.  So what I would be proposing to do is to speak on

18      collectibility.  When I reach the topic of damages, I'm going

19      to present expert testimony from the State Economist for the

20      State of Mississippi, Corey Miller, who is with us by Zoom,

21      thankfully.  And then I would conclude with penalties.

22             I did not want to begin on the issue of

23      collectibility without having kind of noticed that it was

24      somewhat out of order, but given that you had asked, I thought

25      as a threshold issue, it was worth addressing.

1              **THE COURT:**  Okay.

2              **MR. RANKIN:**  Okay.

3              In our pretrial conference, you requested we

4    specifically address the issue of collectibility of whatever

5    judgment might result from this case.  I submit the following

6    to show that the law provides a sufficient mechanism and

7    procedure for such collection, and evidence shows that China

8    has assets in the United States sufficient to satisfy

9    potentially up to every last dollar that may be recovered,

10   including both damages and penalties.

11             Our law provides for execution of a judgment against

12   China for assets they hold in the United States pursuant to

13   the Uniform Enforcement of Foreign Judgments Act -- I could

14   use the acronym hence forward as UEFJA.  I'm not sure how much

15   simpler that makes it, but that's what I will use -- and the

16   Federal Rules of Civil Procedure.

17             First, a word about the Uniform Enforcement of

18   Foreign Judgments Act, UEFJA.  This is a mechanism that

19   Mississippi has passed to allow people who hold judgments from

20   other states to collect upon those judgments here in

21   Mississippi.  In Mississippi, our statute is Mississippi Code

22   11-7-301 et. seq.  Forty-eight states total in the United

23   States have adopted this as of this time, in my current

24   knowledge and information and belief.  That would exclude

25   California and Vermont.  The District of Columbia has also

1    adopted the UEFJA.  This would allow Mississippi, presumably,

2    in the event it were to be awarded the default judgment and

3    the respective damages and penalties requested, to collect in

4    any of those jurisdictions in the same manner that would be

5    set forth in the Federal Rules of Civil Procedure Rule 64,

6    seizing a person or property; Rule 69, execution, to obtain a

7    writ of execution to satisfy the judgment depending on the

8    nature of the assets in question.

9            I want to list for you and give you a brief detail of

10   some of the assets we've identified that are potentially there

11   for the purpose of collectibility.  There will be three

12   categories, I believe.  And at the conclusion of that, I will

13   make my way to damages.

14           I'm not sure exactly how the pattern was for the

15   introduction of the exhibits or what number we left off on,

16   but I do have a series of exhibits I can present in support of

17   all of this that I'm about to assert.

18           **THE COURT:**  We left off on P8 as to what was

19   introduced for ID only for this purpose, and I have taken

20   under advisement the admissibility.

21           Isn't that what you have, Miss Clerk?  P8?  Yeah.

22           So we're on P9, would be the next one.

23           **MR. RANKIN:**  Your Honor, if you'll give us one

24   moment, there may be some remaining items from Crystal's

25   presentation as well.

1          **THE COURT:**  Sure.

2      **(Brief pause in proceedings.)**

3          **MR. RANKIN:**  Okay.  So I think our numbering is a

4  little bit strange, but -- it was referred to in our pretrial

5  brief as Exhibit 12, but I think because we left off with

6  Exhibit 8.  In November, Corey Miller prepared an expert for

7  us, which I'll go ahead and get in the record, just for the

8  sake of chronology, based on what was laid out in the pretrial

9  brief, and it's his November 2024 report.  He will

10 authenticate in his testimony.  I'll go ahead and get this out

11 of the way.  That would be Number 9?  Is that correct?

12          **THE COURT:**  We can put it in as P12.

13          **MR. RANKIN:**  Okay.

14          **THE COURT:**  And we can just have 9, 10, and 11 as

15 unused for now.  That's fine.  Just so it doesn't get

16 confusing for -- because y'all have -- you have them attached

17 to your pretrial brief, and that may just make it easier.

18          **MR. RANKIN:**  Yes, Your Honor.  Whatever you prefer.

19          **THE COURT:**  Okay.  We'll just put it in as P12 for ID

20 only at this point in time.

21          (Exhibit P12 marked for identification.)

22          **MR. RANKIN:**  So that will lead us to the next

23 exhibit, which is 13.  I'll revisit the Exhibit 12 when I have

24 a word with Corey here in a moment.

25          Exhibit 13 is going to be a table from the U.S.

1    Department of Treasury, and that table shows that China holds

2    no less than $768.6 billion of U.S. Treasury securities as of

3    November 2024.  And I will go ahead and present that as

4    Number 13 here.

5                    (Exhibit P13 marked for identification.)

6         **MR. RANKIN:**  If you review back through the record

7    and the transcript, Your Honor, along with the exhibits,

8    you'll see in the first vertical column, the month of

9    November 2024, the second highest holder of U.S. Treasuries is

10   China, 768 billion -- 768.6 billion.  There's a link at the

11   top that takes you to the Treasury -- it's a hyperlink that

12   takes you to the Treasury's website and it shows that most

13   recent data.

14        The question might arise to you, simply because they

15   have these Treasury securities, how would that be something

16   that might be subject to judgment.  And I would present to you

17   several authorities that support the proposition that they may

18   very well be subject to the judgment, and collectibility could

19   be had through these securities.

20        Title 31 of the Code of Federal Regulations, Section

21   315.21 -- I think I have a copy of it here I can enter along

22   with the other complementary case law and statutes if you'd

23   like -- is the section in question that addresses the

24   possibility of satisfying this judgment through U.S. Treasury

25   bonds, and I will just mention part of it, and it's subsection

1    (a), where it says, Purchaser or officer under levy, the

2    Department of the Treasury will pay but not reissue a savings

3    bond to the purchaser at a sale under a levy, or to the

4    officer authorized under appropriate process to levy upon

5    property of the registered owner or co-owner to satisfy a

6    money judgment.  As required in most administrative laws, the

7    regulation cites its source of authority, and it cites

8    U.S. Code, Title 31, Section 3105, and Title 5, U.S. Code,

9    Section 301.

10        In addition to the regulation and the statute, case

11   law further reinforces the authority to execute on Treasury

12   bonds in satisfaction of a judgment.  The United States

13   Supreme Court in the case of *Free v. Bland*, that's 369 U.S.

14   663, stated that those regulations do not immunize the bonds

15   from execution in satisfaction of a judgment.  We have two

16   additional cases we can provide.  One is *Ex parte Little*,

17   67 So.2d 818, which says that a creditor who has reduced his

18   claim to judgment may subject the purchaser's interest in such

19   bonds to the payment of the purchaser's debts.  Another case,

20   *Iowa Methodist Hospital v. Long*, 12 N.W.2d 171, also states

21   that bonds may be levied upon in valid judicial proceedings.

22   Treasuries are hardly the only asset which would be

23   susceptible to execution of a judgment in this case.

24   Therefore, addressing your concerns about collectibility,

25   there are at least two more other categories.

1    The next exhibit I'm going to present is from the

2    USDA Farm Service Agency, U.S. Department of Agriculture, and

3    the report is entitled Foreign Holdings of U.S. Agricultural

4    Land through December 31, 2023.  And, Your Honor, this -- the

5    totality of this report, which is available online per the

6    link that's included in there, the totality of the report with

7    appendix is roughly around 300 pages, but the main body is

8    ten; so what I'm presenting to you is the main body of the

9    report.  If for some reason you were to need or locate, we

10   could, of course, supplement, or otherwise, online is

11   available.  So what I'm presenting now would be my next

12   exhibit, USDA Foreign Holdings of U.S. Agriculture.

13              **COURTROOM DEPUTY CLERK:**  P14.

14         (Exhibit P14 marked for identification.)

15         **MR. RANKIN:**  The report begins with several Roman

16   numeral pages, and then when you reach the Arabic numerals,

17   page 5, there's a section titled Chinese, Iranian,

18   North Korean, and Russian Investment in U.S. Agricultural

19   Land.  You'll see mentioned therein a statement on page 5 that

20   says, Chinese investments in U.S. agricultural land are spread

21   across the country.  The states with the largest Chinese

22   holdings are Texas, 123,708 acres of land; North Carolina,

23   44,263 acres; Missouri, 42,905 acres; Utah, 33,035 acres; and

24   Florida, 12,798 acres.

25         You will also see on that very same page it states,

1    The report provides that the acreage associated with China, or

2    any other country discussed in this report, should be

3    interpreted as a minimum.

4         I would also note for you in reference previously to

5    the UEFJA, that each one of the states I've discussed above

6    has passed that statute; Texas, North Carolina, Missouri,

7    Utah, and Florida.

8         In addition to land, we have on information and

9    belief a number of U.S. companies in which China has or may

10    have an ownership interest.  Still related to the previous

11    exhibit, you'll see on that same page 5 a reference to a

12    company known as Smithfield Foods believed to be owned by the

13    Wuhan group.  But in addition to Smithfield Foods, I would

14    read off some of the following that our own research has

15    identified as China either having ownership interest in or

16    ownership of a shell corporation that has ownership interest

17    in.  Those companies include General Electric, Smithfield

18    Foods, Syngenta, ByteDance, Riot Games, Morgan Stanley, Visa,

19    and Blackstone.  So I presented at least three different types

20    of assets which may be susceptible to execution of a judgment

21    in the event damages and penalties are awarded in this matter.

22         To address your question regarding collectability,

23    respectfully, Your Honor, I want to add the following, which

24    is when you brought the issue up, we spent some time

25    researching some case law on it, and we have the cases to

1    provide for you as well.  We have two Federal District Court

2    cases wherein collectibility was found to be generally

3    irrelevant to the question of liability.  One of them is

4    *U.S. v. Caldwell*, and the court states, While, as a practical

5    matter, the plaintiff may be unable to actually collect on

6    this judgment, matters of collectibility are generally

7    irrelevant to questions of liability.

8         The second case is *Zavala*, Z-A-V-A-L-A, *Alvarez, v.*

9    *Darbar Management, Incorporated*.  The case says, There is a

10   difference between the ability to pay and the obligation to

11   pay.  The financial position of a defendant affects the

12   ability to pay and thus, the collectibility of the judgment,

13   but it does not have much of a bearing on whether the

14   liability exists in the first place.

15        So to conclude on this portion with respect to

16   collectibility, to the extent that in the pretrial conference

17   or elsewhere it would have been considered to be a factor for

18   the purpose of the ruling on default, we would submit that it

19   should not be.  And in the event that it remains a factor, we

20   would submit that the evidence clearly reflects significant

21   amount of assets which could be subject to further judicial

22   process for the purpose of satisfying the judgment.

23        I'm going to move on now to the topic of damages with

24   your permission, Judge, if you have no questions on that.

25        **THE COURT:**  Sure.

1          **MR. RANKIN:**  Okay.  It is not lost on me, and it will

2     be mentioned in our expert, Corey Miller's, testimony, that as

3     attorney for the State of Mississippi, in the capacity of

4     *parens patriae*, I stand before you on behalf of no less than

5     11,857 dead Mississippians.  Death.

6          You raised questions earlier about the categories of

7     damages that would be rewarded in this case or could be

8     rewarded in this case, and I'll discuss that under the

9     statutory authority, but I think it's worth noting at the

10     outset of this discussion the solemnity of the moment, that

11     these 11,857 Mississippians have been told by Godless

12     communists that they are nothing more than vexatious.  The

13     definition of "vexation," colloquially, is "annoying."  The

14     People's Republic of China and the Chinese Communist Party

15     feels as if it can cause through this alleged conduct, as

16     we've presented here, no less than 11,857 deaths of

17     Mississippians and not only not respond in any meaningful

18     pleading, other than a letter, and not only not attend the

19     hearing of this matter, but to frame the very notion of this

20     claim as annoying.  The communists are annoyed by 11,857 dead

21     Mississippians.

22          With that being established, the case that was

23     referenced previously by Tricia, and we have a copy for you

24     today, U.S. Supreme Court case from 1982, that establishes the

25     *parens patriae* authority of our State on behalf of consumers,

1    both in statutory and common law.  I believe earlier we had a

2    brief discussion about the definition of a person.  The State

3    is a person under the statute.  And the case I can give you

4    for that is *Hood ex rel. State v. BASF Corp.*, 2006 WL 308378,

5    at page 11.  We also have a copy of that printed for you

6    today.

7           The following statutes that I will cite provide the

8    authority, an additional authority, for damages to be awarded

9    in this matter, and I think this will address some of your

10   concerns that were stated at the outset of the hearing about

11   the quality/quantity, et cetera, categorization of damages.

12   Mississippi Code Section 75-21-9 provides for the recovery of,

13   quote, "all damages of every kind sustained."  Mississippi

14   Code Section 75-24-11 provides that you may issue a judgment

15   or order, including restitution, as may be necessary to

16   restore any person in interest.  I would submit to you both of

17   these sections are very broad in their categorization of

18   damages.  Lastly, Mississippi Code Section 75-24-15 allows for

19   the recovery of any ascertainable loss of money or property.

20          With that set forth, and with a very patient State

21   Economist on the other end of our Zoom conference, I would

22   like to move at this point, with Your Honor's permission, to

23   take testimony from our expert, Corey Miller.

24          **THE COURT:**  All right.  Before we get into

25   Mr. Miller's testimony, I've got a few questions for you to

1    make sure I'm understanding the categorization of damages.

2            All right.  So the -- let's go through the categories

3    of damages.  Essentially, I think you have wrongful death

4    damages that you're putting forward in P12 on behalf of every

5    single Mississippian who died from COVID either as an

6    underlying or contributing cause of death.  Is that fair?

7            **MR. RANKIN:**  The categorization of the damages --

8    well, to answer your question, I believe so, yes.  The

9    categorization --

10           **THE COURT:**  That's one category, is kind of wrongful

11   death damages for every single Mississippian who died as a

12   result of an underlying or contributing cause of COVID-19.

13           **MR. RANKIN:**  The category would be loss of life.

14   Wrongful death, to the extent it would imply some type of

15   non-commercial tort, is not something we're arguing here, nor

16   is it something we would present, pursuant to the Eighth

17   Circuit's ruling, that the Court would have jurisdiction over.

18   So the damages are calculated in part, as Corey will testify,

19   Mr. Miller will testify, in the context of lives lost --

20           **THE COURT:**  What's the difference?  I mean, wrongful

21   -- I mean, loss of life and wrongful death, aren't they just

22   one and the same?

23           **MR. RANKIN:**  With respect to the cause of action, to

24   the extent that wrongful death refers to a cause of action,

25   we're here today on Consumer Protection Act and antitrust --

 1          **THE COURT:**  And that goes to the -- I mean, I don't

 2     think I saw any cases in the briefing where under the

 3     Mississippi Consumer Protection Act or Mississippi antitrust

 4     laws that loss of life has ever been sought as a damage remedy

 5     for Mississippi Consumer Protection laws or under Mississippi

 6     antitrust laws.  Have -- has Mississippi sought loss of life

 7     before?

 8          **MS. SECOY:**  Your Honor, in our Johnson & Johnson

 9     surgical mesh case that Tricia referenced earlier, we

10     certainly had people die, and I think that, you know, is a

11     result of a Consumer Protection violation.  I mean -- but we

12     ended up settling that particular case.  So we have seen

13     instances where death was a result of the misrepresentations.

14          I guess what James is trying to say is that we're

15     not -- we're not proceeding under a personal injury cause of

16     action.  And I -- it's just an extreme example, you know, of

17     the harm -- extreme and unusual example where unfair and

18     deceptive trade practices and antitrust practices literally

19     led to death.

20          **THE COURT:**  Yeah -- okay.  But it seems like what

21     y'all are alleging is that every single death, those that

22     either there was an underlying or a contributing cause of the

23     death was related to COVID-19 in the state of Mississippi is

24     related to a violation of the Mississippi Consumer Protection

25     Act and/or Mississippi antitrust laws.  In other words,

1    Mississippi would not have experienced a single death from

2    COVID-19 if there was no violation of Mississippi Consumer

3    Protection laws or no violation of Mississippi antitrust laws.

4         **MR. RANKIN:**  I will submit that's a correct

5    statement, Your Honor.

6         To the degree I was trying to distinguish between

7    wrongful death or loss of life is to assure that we are not

8    seeking any pursuit or recovery under a noncommercial theory.

9    And when 11,000 Mississippians die, I think the -- it almost

10   goes without saying that it would affect the economy.

11        And for purposes of defining commercial activity --

12   affecting commercial activity, the loss of life, mind you,

13   that is -- when I have said "no less than," that's because I'm

14   only referring to the years 2020, 2021, and 2022, which is a

15   generous cutoff, honestly, given some of what is out there.

16   But when 11,857 Mississippians die, there is an effect on the

17   commercial activity of the State of Mississippi.

18        **THE COURT:**  And the way you're valuing that effect on

19   commercial activity is you're saying the value of every human

20   life is $10 million.

21        **MR. RANKIN:**  Corey -- I would allow -- with respect,

22   Your Honor, I would allow Corey to testify as to that.  He has

23   a methodology and basis and foundation for those findings.

24   You know, I wouldn't want to mischaracterize his -- his own

25   words.

1          **THE COURT:**  Okay.  Because, I mean, at least that's

2    what you're putting forward in P12.  You're saying the

3    estimate of the statistical value of a human life for 2020

4    that we use is approximately $10 million.  You cite to some

5    type of a report called Gonzalez 2020.  Now, that's -- it's

6    different than the typical way that human life is, especially

7    economically, is pursued in a wrongful death case.  I mean,

8    usually if there's, I mean -- a value is put on human life,

9    it's based off of age, life expectancy, it's based off of

10   economic output that's expected, it's based off of whether

11   they're retired, it's based off of how much longer they have

12   in the working life, it's based off of their income,

13   et cetera, et cetera, et cetera, to determine the economic

14   value.  Now, non-economic is a whole separate thing, but the

15   economic value.  Right?

16         And so -- but I -- I am curious about that because

17   that's something new that you just -- it's just one number for

18   every single alleged life.  And then just to clarify, you-all

19   are not seeking non-economic damages.  It's only economic

20   damages.

21         **MR. RANKIN:**  We are -- in addition to damages for

22   lost lives, we are seeking them for loss of wages as well.

23         **THE COURT:**  But that's economic.

24         **MR. RANKIN:**  Yes.  The --

25         **THE COURT:**  I mean, in a lot of -- and I keep using

1    the term "wrongful death."  Y'all don't want me -- I mean, I

2    understand y'all's distinction, that you want to -- you want

3    to have a line of demarcation.  You're saying, Well, this is

4    not a wrongful death case.  But a lot of times in a wrongful

5    death case, the non-economic damages can be more than the

6    economic damages, and so -- but y'all are not seeking

7    non-economic damages related to loss of life for any

8    Mississippians, correct?

9            **MS. SECOY:**  I think, Your Honor, we would leave that

10   to the Court's discretion if you identified something in

11   addition to what we're presenting.  You know, our prayer for

12   relief included, you know, all just and fair relief, you know,

13   that the Court deems appropriate.  So I would defer to James

14   and to our economist, but if there's -- you know, we are open

15   to any remedy that you think is appropriate for the State of

16   Mississippi.

17           **THE COURT:**  But could I even award that under the

18   law?

19           **MS. SECOY:**  Yes, I think -- and James --

20           **MR. RANKIN:**  Your Honor --

21           **MS. SECOY:**  Your Honor talked to him about 75-21-9

22   that you mentioned a moment ago.

23           **MR. RANKIN:**  Yes, and specifically the language that

24   it says all damages of every kind sustained.  And the question

25   you -- several -- you raised very relevant concerns and

1  factors that are taken into account in determining a number,

2  and almost -- I don't know exhaustively, but almost every

3  factor you listed is one that Corey Miller is going to testify

4  was taken into account and addressed in his calculation.  So

5  he doesn't -- he doesn't just end with a 10 million number.

6  He then explains his methodology, which I would look forward

7  to presenting to you in his testimony.

8          **THE COURT:**  Okay.  Let me -- before we get there, so

9  we have the loss of life category of damages.  Okay?  What are

10  the other categories of damages?

11          **MR. RANKIN:**  Lost wages.

12          **THE COURT:**  Okay.  So loss of life, plus lost wages.

13  Okay.  But what's the distinction between loss of life and

14  lost wages?  If loss of life is encapsulating economic damages

15  for the lost life, then aren't lost wages economic damages

16  related to loss of life?

17          **MR. RANKIN:**  Your Honor, I think the question would

18  be more --

19          **THE COURT:**  Or -- or is lost wages for individuals

20  who did not perish, is what I'm --

21          **MR. RANKIN:**  Lost wages would be beyond the scope of

22  just individuals who passed away.

23          **THE COURT:**  Okay.

24          **MR. RANKIN:**  And I think that many of your concerns

25  will be addressed when Corey goes through the detail of his

1    report.  And as he will say specifically, as is in the report,

2    they did not guess, and the methodology is a reliable

3    principle by any evidentiary standard, as he will present.

4        **THE COURT:**  Okay.  So we have loss of life, we have

5    lost wages, and what are the other categories of damages?

6        **MR. RANKIN:**  Those are the categories that Corey will

7    be testifying to today.  He will also present to you --

8        **THE COURT:**  And those are the two primary categories

9    that the State of Mississippi is seeking damages related to?

10       **MR. RANKIN:**  Those are the two addressed in his

11   report, yes.

12       **THE COURT:**  All right.  Because in some cases, some

13   Consumer Protection cases that the State of Mississippi has

14   pursued, in other examples that I have seen, like a

15   price-gouging case, maybe, for example, a price-gouging case,

16   they say, you know, gas allegedly was X price at this gas

17   station; the gas station allegedly raised the price, maybe --

18   let's say gas, just to use a round number, was two dollars a

19   gallon before the alleged gouging, and then the gas station

20   raised the price to four dollars a gallon before the alleged

21   gouging, there's a two-dollar difference, and that gasoline

22   was sold to the public for a period of three months.  So then

23   the State of Mississippi -- I've seen this before -- they then

24   have pursued individuals for alleged price gouging and have

25   said, Well, over the course of that three months, you sold X

1   number of gallons at four dollars a gallon.  It was two

2   dollars a gallon before the alleged gouging.  You take that

3   difference and then you -- and then that's the damages and the

4   harm to the public.  It doesn't sound like that's what y'all

5   are attempting to pursue with regard to alleged hoarding of

6   PPE or the alleged misrepresentation.

7           **MR. RANKIN:**  Well, first I would submit that price

8   gouging is certainly not an exclusive remedy in this case.

9   And we do actually have some evidence related to price gouging

10  which Crystal can supplement the record with.  Corey's

11  testimony will not relate to price gouging.

12          **MS. SECOY:**  So, Your Honor, you're absolutely right,

13  and we -- we're missing some data since the defendants did not

14  cooperate.  Price gouging is a component of unfair and

15  deceptive trade practices when we're in a state of emergency,

16  and we were in a state of emergency.  We do have a spreadsheet

17  from our own -- from one of our own public records that lists

18  all of the price gouging complaints that we received up to

19  July 1st, 2020, so probably from like March 2020 through June,

20  and we made an excerpt of that because it includes consumer

21  private information.  We -- you know, we don't know if

22  these -- they're masks and gowns -- if these were directly

23  purchased from Chinese state-controlled firms or from domestic

24  producers.  We -- like I mentioned before, we do -- there is

25  evidence that, you know, Chinese -- China, when they

1    reintroduced the supply, they drastically increased the

2    prices, and then when state producers were able to

3    manufacture, they matched those prices.  And so it's a result

4    of their price hike.  But we don't know --

5        **THE COURT:**  But the State of Mississippi should know,

6    I mean, generally how much PPE cost prior to the pandemic --

7        **MS. SECOY:**  Yes.

8        **THE COURT:**  -- and then how much it cost during the

9    pandemic.

10       **MS. SECOY:**  Yes.

11       **THE COURT:**  Right?  You know that.

12       **MR. RANKIN:**  Correct.

13       **THE COURT:**  Okay.

14       **MS. SECOY:**  The reports that I submitted discuss how

15   much the prices increased, and my oral argument summarized

16   those.

17       **THE COURT:**  But you're not seeking damages related to

18   the price increases.

19       **MS. SECOY:**  Well, we don't have -- if you can help us

20   figure out how to reach that, we would -- we would love to

21   include it.  We're just -- we're missing some data points.

22   And so -- so two-fold here:  We have these complaints that

23   show what we received from consumers regarding masks and

24   gloves, and then we also looked at these as -- because we were

25   missing some of the data to determine if these were domestic

1    producers or PRC.  We -- James is going to talk to you about

2    how they amount -- they can be considered towards penalties.

3    You know, sometimes when -- if we can't connect the dots to

4    determine an exact figure for damages, it can go towards

5    penalties for intentional violations of the statute.  And so

6    James has a spreadsheet that he's going to walk through that

7    shows, you know, the number of masks hoarded -- number of PPE

8    hoarded across the country, and the -- and it summarizes our

9    penalty statutes for you as well.

10         So if you'd like, I can give you a copy of this

11    spreadsheet.  We have -- as I mentioned, it has consumer

12    information on it like their names, addresses, and phone

13    numbers, so we copied and pasted the spreadsheet without the

14    consumer private information for you.  So this is -- and this

15    is a public record from the State -- from the Attorney

16    General's Office.

17         **THE COURT:**  Okay.  Are you seeking to introduce this?

18         **MS. SECOY:**  Yes.

19         **THE COURT:**  Okay.  All right.  You may present that.

20    And that's going to be, I guess, P15.

21           (Exhibit P15 marked for identification.)

22         **MS. SECOY:**  And I apologize, James, for interrupting.

23         **MR. RANKIN:**  No problem.

24         **MS. SECOY:**  Again, we have the original spreadsheet,

25    but this is an excerpt because we needed to protect consumers'

1    personal information.  And it's a public record from the

2    Attorney General's Office.

3         **THE COURT:**  And this is going to be entered as ID

4    only.

5         And what we're going to do, just to make sure the

6    record is clear, is eventually, towards the end of this

7    hearing, once y'all have everything in as ID only, I want you

8    to make sure that you've put into the record your basis

9    evidentiary-wise for why every document should be admitted.

10   You've already done it for P1 through P8, I believe, but you

11   just need to make sure that you do it for all of them, because

12   right now I'm just going to basically enter every exhibit in

13   as ID only.  Then we'll have all of your arguments as to why

14   they're admissible, too, from an evidentiary perspective.  And

15   the record -- we need to make sure that all of that's in the

16   record.  All right?  Okay.

17        **MR. RANKIN:**  Your Honor, with your permission, I'd

18   like to proceed with calling witness Corey Miller.

19        **THE COURT:**  Yes.  You may proceed.

20        **COURT REPORTER:**  Judge, could I ask for a five-minute

21   break before we start that?

22        **THE COURT:**  Sure.  Yeah.

23        Before we do that, we're going to take approximately

24   a ten-minute recess.  How long do you think the testimony will

25   take?

1      **MR. RANKIN:**  I intend to review -- let Corey review

2    his CV for the purpose of satisfying you of his expertise.

3    His reports you'll find are actually, especially

4    comparatively, not very long.  We should be able to go through

5    them fairly quickly.  If indeed you have a number of questions

6    beyond those that I have, you know, it perhaps could take

7    longer.  Personally, I would not estimate more than 30

8    minutes.

9      **THE COURT:**  Okay.  Yeah, let's take approximately a

10   ten-minute recess, and then we'll have Mr. Miller testify, and

11   then we'll break for lunch after that.

12     **MR. RANKIN:**  That's great.

13     **THE COURT:**  All right.  Court will stand in recess.

14   **(Recess taken.)**

15     **THE COURT:**  Ready to proceed?

16     **MR. RANKIN:**  Thank you, Your Honor.

17     In anticipation of bringing in Corey, I want to go

18   ahead and introduce his CV.  And I think this item in

19   particular, based on your previous questions, you'll find of

20   utmost use, which is his updated report from February of this

21   year, 2025.

22     **THE COURT:**  Okay.

23     **MR. RANKIN:**  We will discuss -- essentially, this

24   report that I'm introducing, as he will explain, it's the

25   entirety of the November report and then there's an addendum

1    wherein he looks at an additional method for calculation that

2    was used in the Missouri case you had previously asked us

3    about.

4              **THE COURT:**  All right.  Thank you.

5              **MR. RANKIN:**  So I'll bring these up.

6              **THE COURT:**  All right.  So, Mr. Rankin, are you

7    looking to present these as exhibits into evidence, which

8    would be a supplement to P12?  That's the February 2025

9    report, and then also Mr. Miller's CV.

10             **MR. RANKIN:**  If that would be most convenient for you

11   to keep them all in one -- kind of one place.

12             **THE COURT:**  Yes.  Okay.  All right.  So the CV will

13   be -- I believe it will be P16, and the updated report from

14   Mr. Miller will be P17.

15             (Exhibits P16 and P17 marked for identification.)

16             **THE COURT:**  These are ID only because we're just

17   going to take up all the arguments from the State related to

18   the admissibility, and we can just kind of go through each one

19   to make sure y'all put all of your arguments on the record.

20   For now, we'll admit everything as ID only.  All right.

21                         **COREY MILLER,**

22       having appeared via Zoom remote videoconference and been

23       first duly sworn, was examined and testified as follows:

24                      **DIRECT EXAMINATION**

25                          - - -

1    **BY MR. RANKIN:**

2    Q.  Okay.  Mr. Miller, I'm not sure if you can see me or if

3    your view is just of the judge.

4    A.  That's correct.

5    Q.  Okay.  I just wanted to clarify at the outset so I knew

6    whether I had eye contact.

7    A.  Okay.  Now I see you.

8    Q.  Okay.  All right.

9        Mr. Miller, I already introduced into evidence your CV, a

10   report you prepared for us in November of 2024, and a

11   report -- a supplemental report with an addendum that you

12   prepared for February of 2025.  I know those are there also

13   because they were provided to me by you.  They are also there

14   in front of you, albeit via Zoom.  Therefore, I wanted to make

15   sure that we're working from the same page and that you would

16   authenticate the CV that I have here is the same one that you

17   have with you as well and these are all documents that were --

18   A.  Yes.

19   Q.  -- provided to me by you.

20   A.  Yes.

21   Q.  Okay.

22       **MR. RANKIN:**  We're pleased to have with us today the

23   State Economist for the State of Mississippi, J. Corey Miller.

24   **BY MR. RANKIN:**

25   Q.  Corey, I'm going to ask you several questions where you

1   can briefly give us a little bit of your background for the

2   purposes of establishing your expertise in economics.  I'm

3   looking at your CV.  I'm just going to walk through it with

4   you, and if at any point I or the judge would have any

5   questions, feel free to elaborate.

6       So it looks like with experience, what is your current

7   position?

8   A.  I am State Economist for the State of Mississippi and

9   Director of the University Research Center, which is a

10  division of the Mississippi Institutions of Higher Learning.

11  Q.  Would it be correct to go ahead and clarify that in your

12  reports we're going to see University Research Center often

13  referred to as URC?

14  A.  That's correct.

15  Q.  And, of course, Institutes of Higher Learning would also

16  be IHL?

17  A.  Yes.

18  Q.  The acronyms appear frequently.  I just wanted to go ahead

19  and get that out of the way.

20      I think it's important to note the significance to the

21  answer of this question, which is:  Mr. Miller, have you ever

22  testified as an expert in a trial before?

23  A.  No.

24  Q.  So you are not a hired mercenary in any way?

25  A.  No.  No.

1    Q.  You are not compensated in any way for this testimony

2    beyond the scope of your regular role as State Economist for

3    Mississippi; is that correct?

4    A.  That's correct.

5    Q.  I see you've also held previous positions with the State,

6    also in economics.  Would you like to review those?

7    A.  Yes.  From 2002 until 2014, I worked as a research

8    associate at Mississippi State University; and from 2014 until

9    November of 2020, I was an economic analyst with the

10   University Research Center.  Since November of 2020, I have

11   been State Economist for Mississippi.

12   Q.  Thank you, Mr. Miller.

13       You've also provided for us some information about your

14   education, if you'd like to briefly summarize.

15   A.  Yes.  I obtained a bachelor of science degree in

16   agribusiness from Mississippi State University in 1998;

17   obtained a master of science in agriculture and economics from

18   Mississippi State University in 2000; and from 2000 to 2001, I

19   completed 36 hours of Ph.D. economics courses at Virginia Tech

20   University.  Did not receive the Ph.D. degree, but I completed

21   some coursework.

22   Q.  Okay.  Mr. Miller, just to clarify on the testimony part,

23   I note in previous discussions with you, you advised me that

24   although you don't testify as a mercenary trial expert, is it

25   true that you've testified before our state's legislature on a

1    number of occasions related as an economics expert?

2    A.  Yes.

3    Q.  Can you describe somewhat the role you play there?

4    A.  Most of my testimony is with regard to the state of the

5    economy in Mississippi and the national economy and what our

6    forecast for that economy looked like.  I have testified on a

7    couple of occasions with regard to the labor market, labor

8    force dissipation in Mississippi, and also made presentation

9    on at least an annual basis, usually twice a year, on revenue

10   estimations for the general fund for Mississippi.

11   Q.  So is it fair to say that the State of Mississippi, in

12   terms of its representatives and its senators and the

13   legislature, relies on you as an economics expert routinely?

14   A.  Yes, I would agree with that.

15        **MR. RANKIN:**  Your Honor, based on the CV in its

16   entirety and the testimony, I would tender Mr. Miller as an

17   expert in the field of economics.

18        **THE COURT:**  I recognize that the State of Mississippi

19   is tendering Mr. Miller as an expert in the field of

20   economics, and based off of his CV and his testimony to date,

21   I will admit him as an expert in the field of economics, and

22   he can so testify as to his expert opinion in that field.

23        **MR. RANKIN:**  Thank you, Your Honor.

24 **BY MR. RANKIN:**

25   Q.  Mr. Miller, for the sake of simplicity, briefly I'm going

1    to make sure I clarify to the Court as well, we had requested

2    information from you which you provided in November of 2024,

3    which composed your initial report.  The entirety of that

4    report is retained and reiterated in your February of 2025

5    report.  And the reason that you updated your report was

6    specifically at my own request after having attended the

7    pretrial conference and being aware of some of the specific

8    questions that His Honor had regarding detailed factors and

9    specifics to be known in this case, especially with

10   relationship to PPE hoarding.  You've attached an addendum to

11   that report; is that correct?

12   A.  Yes, that's correct.

13   Q.  Okay.  So for the sake of simplicity, because the November

14   report is encompassed within the February report, I'm just

15   going to be reviewing and talking us through with you and

16   asking questions regarding the February 2025 report.  Is that

17   correct?

18   A.  Yes.

19   Q.  Okay.  Because you had been listening in, I think you may

20   be familiar with perhaps some of the questions that the Court

21   is interested in with regards to your methodology and

22   categorization of damages to the State, et cetera.  I'm sure

23   we will focus in on specific areas of the report, but first I

24   would just ask you if you would like to go ahead and just take

25   a look at what you have and give us what you feel is a most

1    precise summary of your findings, and also include within that
2    a reference to the addendum as well.  And hopefully with that
3    we'll have laid a sufficient foundation for any questions that
4    the judge may have specifically on your methodology.
5    A.   Okay.  Just to summarize our report, we estimated costs to
6    the Mississippi economy from COVID-19 from 2020 -- calendar
7    years 2020 through 2022, and in so doing, we estimated losses
8    from two primary sources:  Loss of life and loss of wages.
9        We based loss of life on the total number of deaths
10   reported by the Mississippi Department of Health across those
11   three years in question, which you mentioned earlier it was
12   11,857.  Based on the statistical methodology that we used and
13   we outlined in the report, we estimated the total statistical
14   value of those lives lost at almost $10.8 billion.
15       Again, using data from another agency, the U.S. Bureau of
16   Labor Statistics, in terms of lost wages, Mississippi lost
17   148,700 jobs in March and April of 2020.  And based on wage
18   estimates across sectors, again from the Bureau of Labor
19   Statistics in Mississippi, we estimate the value of the wages
20   lost from March 2020 through January 2022 at just under
21   $1.4 billion.
22       And neither of those adjustment -- neither of those
23   estimates has been adjusted for inflation.  So summing those
24   two primary sources of losses, we estimate that the total
25   economic cost of COVID-19 to the State of Mississippi

1    from 2020 through 2022 was just under $12.2 billion.  We think

2    that is a relatively conservative estimate as we did not

3    estimate any other costs, such as those costs associated with

4    so-called long COVID, people who contracted COVID and

5    initially recovered but may still be experiencing

6    repercussions from it that have prevented them from resuming

7    normal activities, and we also did not look at any costs

8    associated with emotional distress/mental anguish because we

9    don't -- as with these other costs we did not look at, we

10   don't believe there was sufficient data to -- to make a

11   determination.  And that's basically the summary of our

12   initial report.

13       Our addendum, as you noted, was based on work performed in

14   the Missouri case in which Dr. Joseph Haslag determined that

15   based on the supply of PPE coming from China, which was

16   70 percent, and that this PPE could reduce infections by

17   50 percent, he believes that that means the incidence rate

18   could have been 35 percent lower if PPE hoarding had not

19   occurred.  Based on that 35 percent number, we determined that

20   we could assign approximately $4.2 billion of our total of

21   almost 12.2 billion to the hoarding of PPE, or in other words,

22   had PPE hoarding not occurred, our estimate would have been

23   lower by approximately $4.2 billion.

24   Q.   Thank you, Corey.  I want to step in for just a second.

25   You were doing an outstanding job summarizing your findings,

1   and I wouldn't presume to think I could do any better, but I

2   know there are several matters of specific concern that were

3   asked by the judge that I wanted you to discuss.

4        One is he mentioned some factors and things and whether

5   they were or were not taken into account with respect to the

6   $10 million figure.  And shortly after, in your -- back in the

7   initial report, back on page 1 -- or -- yeah, the first text

8   page of it, you begin to explain some of the methodology and

9   the things that were taken into account with respect to life

10  expectancy, discount to present value, and many other factors

11  that Your Honor -- because you had used the example of

12  wrongful death, things that would be taken into account in

13  that particular situation.  And then also I'd point out, as

14  you previously said, that you did not take into account mental

15  anguish or emotional distress, which might be available in

16  some other tort claims.

17       So if you would, please tell us what you did with the

18  $10 million per life, where it comes from, how you used it.

19  A.  We looked for an example of what the value of a human life

20  was determined in 2020, and we found an example that was

21  calculated by a Professor Kip Viscusi from Vanderbilt

22  University, that he calculated for the federal government.  I

23  don't know which specific agency he used that he calculated

24  that for, but that $10 million is based on individual risk

25  preferences and probabilities of death.  Their determination

1    was that across a number of occupations ranging from

2    construction to office jobs, many different occupations, that

3    the odds of an individual's death in one of those occupations

4    was one in 25,000.  And they also determined that -- and I

5    assume this was done through a survey, as that's how it's

6    typically conducted -- that an individual knowing those odds,

7    the amount of compensation that he or she would require to

8    perform the job knowing those odds was about $400.  And

9    that's -- again, that's across all of those different

10   occupations.  So $400 times 25,000 is the $10 million.  So

11   that is the assessment they made in 2020 dollars at the time

12   that COVID was first occurring.

13       And so that $10 million, we used to value the lives lost

14   in Mississippi.  And unlike the way the federal government

15   typically uses that number, we discounted it across age ranges

16   in Mississippi and using the life expectancy in Mississippi of

17   -- which was 70.9 in, I believe, 2021.  I think we used

18   that -- that number for all three years.  We discounted that,

19   and that is how we arrived at the number we did.  Obviously

20   had we just multiplied 10 million times all of the lives lost,

21   we would have gotten the number much closer -- much higher and

22   closer to, I'll say, 120 million, but we did not do that

23   because we knew that much of the loss of life associated with

24   COVID came at the lower and higher ends of the life

25   expectancy, and so we discounted the number that way.  So that

1   was how we used that number.

2       We also took account for underlying or contributing cause

3   of death associated with COVID and we -- if it was a

4   contributing cause, we reduced the value as well.  So that was

5   how we arrived at our total amount for value of lives lost due

6   to COVID-19.

7   Q.  Okay.  Mr. Miller, I wanted to clarify a couple of things

8   before we get into the addendum.  The preparation and the

9   content of the November 2024 report, the Attorney General's

10  Office never made any suggestion to you of any method to

11  compute it at all.  This was your own --

12  A.  No.

13  Q.  -- understanding of a reliable principle and method?

14  A.  Yes.

15  Q.  I also wanted to point out to the Court something I think

16  we all can appreciate in a case like this where many things

17  seem uncertain.  In the second paragraph of your report, the

18  paragraph beginning with the word "before," a little ways

19  down, you say the phrase, We did not "guess."  Is that

20  correct?

21  A.  That's correct.

22  Q.  So your testimony, as you've said, based on reliable

23  principles and methods in the field of economics, leads you to

24  the numbers you have here today which you present here not as

25  someone hired specifically for the purpose of inflating the

1    numbers; and, in fact, rather, you present a conservative

2    number that, if anything, errs on the side of caution to avoid

3    overestimating the impact.  Is that correct?

4    A.  Yes, I agree with that.

5    Q.  You provide a list of references on page 4 of the report,

6    and, you know, I noticed myself it was a little bit different

7    than the way we would cite normally in legal pleadings where

8    we would provide the full citation up front and then short

9    afterwards, whereas your report kind of gives a short cite and

10   then a list of references at the end.  But those are

11   references to scholarly and other expert information that you

12   would have used in preparing the information; is that correct?

13   A.  That's correct.  And all of the data we used came from

14   secondary sources, and we reference those in the report.

15   Q.  Thank you, sir.

16       Page 5 of the February report is an addendum.  And the

17   addendum was produced by you as a result of our office asking

18   you to apply a methodology that was used in another case; is

19   that correct?

20   A.  That's correct.

21   Q.  Okay.  If you will, go ahead and just summarize --

22       **MR. RANKIN:**  First what I'd like to do is introduce

23   into the record, this is the report to which he is referring

24   in his addendum by Dr. Joseph Haslag, who was the expert in

25   the Missouri trial.  I use the term loosely "the Missouri

1    trial," but it's the same trial that Your Honor asked us about

2    previously in order to address and distinguish jurisdictional

3    issues with our case.  So I would like to submit this into the

4    record.

5                    **COURTROOM DEPUTY CLERK:**  That's P18.

6                    (Exhibit P18 marked for identification.)

7                    **THE COURT:**  All right.  P18 is marked for ID only,

8    but if you want to, obviously, elicit any testimony from the

9    State Economist regarding P18, including its admissibility,

10   please do so.

11                   **MR. RANKIN:**  Sure.

12   **BY MR. RANKIN:**

13   Q.  So, Corey, the reason I went ahead and introduced that

14   exhibit is you're referring to its methodology.  Specifically,

15   this was something we presented to you at our request for you

16   to take a look at this; is that true?

17   A.  That's true.

18   Q.  Okay.  If you will, summarize, in essence, your review of

19   Dr. Haslag's methodology and how you were able to apply it to

20   the present case.

21   A.  Well, with regard to the hoarding of PPE by the People's

22   Republic of China, as I stated earlier, he used two pieces of

23   information, two data points, to determine, one -- and I'm

24   quoting from the report now.  We start with two facts:  One,

25   70 percent of the supply of PPE coming from China; and two,

1   PPE reducing infections by 50 percent.  So using those two

2   rates, he was able to determine that infections or the

3   incidence rate would have been 35 percent lower had PPE

4   hoarding not occurred.  And so we made a calculation for

5   Mississippi based on his conclusion.

6       We made these separately, first.  For the value of wages

7   lost in Mississippi from March of 2020 through January

8   of 2022, we determined 35 percent of that, which was about

9   $483 million.  Then we used that 35 percent number or rate for

10  the value of lives lost that we determined, which ended up

11  being almost $3.8 billion.  So summing those two, we

12  determined that based on Dr. Haslag's assessment, that

13  approximately $4.3 billion of our estimate resulted from the

14  hoarding of PPE by People's Republic of China.

15  Q.   Thank you, Mr. Miller.  And just to clarify just for --

16  although you prefaced it with the word "approximately," you

17  give us the number of $4,260,077,991.  Is that correct?

18  A.   That's correct.

19  Q.   Thank you.

20      Is it fair to say that applying Dr. Haslag's method as you

21  did in the addendum, narrowing the case down to only what

22  would have been caused as a result of PPE hoarding, has

23  resulted in a reliable principle and a number here that is

24  essentially a -- sets a floor, if you will, a minimum number,

25  if you will, for what has been caused by the alleged activity

1    in this case?

2    A.  Yes.

3    Q.  Over $4 billion at a minimum caused by the hoarding of PPE

4    by the defendants; is that correct?

5    A.  That's correct.

6           **MR. RANKIN:**  Your Honor, if you have any specific

7    additional questions for Mr. Miller...

8           **THE COURT:**  Specifically how is the $10 million

9    figure reached relating to the value of human life for 2020?

10          **THE WITNESS:**  Well, again -- I'll repeat what I said

11   earlier -- it's based on individuals' risk preferences.  And

12   so I assume this was probably done through a type of survey,

13   could have been some other assessment, where the researchers

14   determined across a number of occupations, you know, that the

15   odds of death in working the occupation were one in 25,000.

16   You know, there's odds of death, obviously, no matter what

17   you're doing.  You know, there's some chance of death, you

18   know, just driving to work in the morning --

19          **THE COURT:**  Yeah, but doesn't -- I mean, that goes to

20   the likelihood or unlikelihood of someone dying.  I mean, what

21   is -- what is -- how was the economic value of a life

22   determined to be $10 million?

23          **THE WITNESS:**  Okay.  And what they do with those risk

24   preferences is then ask individuals what compensation would

25   they require knowing that.  You know, in addition to, you

1    know, the salary they would earn for performing a particular

2    job, just knowing those odds, what would it require, what

3    payment would be required for them to engage in those

4    activities.  And, again, across a number of individuals within

5    different occupations, they determined that amount was $400.

6    Again, that's in 2020 dollars.  And so that means implicitly,

7    each life is valued at $10 million, the product of 400 and

8    25,000.

9         And this is just one example.  Other federal

10   agencies --

11        **THE COURT:**  Wait.  Say that again.  Explain that.

12   $400 times 25,000.  But the $25,000 --

13        **THE WITNESS:**  Yes.

14        **THE COURT:**  -- the 25,000 number is coming from what?

15        **THE WITNESS:**  It is odds of death in a particular --

16   in not a particular occupation, across a number of

17   occupations, one in 25,000.

18        **THE COURT:**  Okay.  I've just seen -- I've seen the

19   value of life calculated many times before, and this is --

20   it's just new to me to hear it calculated in that form.  And

21   maybe that's perfectly -- perfectly fine.  It's just a new

22   form of calculation of death -- I mean calculation of the

23   value of human life.

24        All right.  So, now, it says in your report that you

25   didn't consider any transfer payments from the federal

1    government from the Coronavirus Aid Relief and Economic

2    Securities Act, the CARES Act, or other legislation.  So I

3    assume that means that any infusion of federal funds into

4    Mississippi's economy through PPP loans or anything else is

5    not being considered in this.

6        **MR. RANKIN:**  Your Honor, we would object to any

7    information --

8    A.  Correct.

9        **MR. RANKIN:**  -- related to a collateral source.  I

10   just want to preserve it on the record.  I'm not --

11       **THE COURT:**  Okay.

12       **MR. RANKIN:**  -- trying to object to your question --

13       **THE COURT:**  And so you would say that's a collateral

14   source.

15       **MR. RANKIN:**  I would -- I would present to you that

16   that's collateral source evidence, which is inadmissible in

17   this proceeding.

18       **THE COURT:**  Okay.  All right.  We may just want to

19   get in -- I may want some posttrial briefing about that.

20       **MR. RANKIN:**  Sure.  I just wanted to preserve it on

21   the record.

22       **THE COURT:**  About collateral sources.

23       **MR. RANKIN:**  The damages are not based on GDP.  In

24   fact, Mr. Miller, in the sense of deciding what would be the

25   most accurate measurement for the purpose of calculating the

1    damages to Mississippi, with no input from our office at all,

2    chose the methodology he did in his initial report.  There --

3    you know, I -- the methodology is certainly not one he created

4    himself.  It may -- it may be novel, perhaps, in this case,

5    but I know I, myself, have seen it used by organizations such

6    as Heritage Foundation and others; but that's anecdotal.

7              I think the main question for Mr. Miller is:

8  **BY MR. RANKIN:**

9    Q.  Is that methodology that you used with the $10 million, is

10   that a reliable principle and method?

11   A.  Yes.  It's used by a number of federal agencies in doing

12   cost benefit analyses, that same methodology.

13         And different federal agencies use different values of

14   human life, you know, depending on what -- what they find from

15   their research.  You know, the Environmental Protection Agency

16   has their number, the Federal Emergency Management Agency has

17   their number, and they use that in cost benefit analyses and

18   in other computations.

19   Q.  And so your opinion reflects a reliable application of

20   that reliable principle and method; is that correct?

21   A.  I believe so, yes.

22   Q.  And that's your opinion as an expert in the field of

23   economics?

24   A.  Yes.

25   Q.  Thank you.

1          **THE COURT:**  All right.  Anything else, Mr. Rankin?

2          **MR. RANKIN:**  I have no further questions.

3          **THE COURT:**  All right.

4     Thank you, sir.  Thank you for joining us.

5          That will conclude -- unless you want to consult with

6     your co-counsel.

7          **MR. RANKIN:**  I have no additional questions for

8     Mr. Miller.  I do have additional argument on the remainder of

9     the case.

10         **THE COURT:**  Yes.

11    Mr. Miller, thank you for your time today.  That will

12    conclude your testimony.

13         **THE WITNESS:**  Thank you.

14         **THE COURT:**  Mr. Rankin, do you want to -- it's now

15    1:08 p.m.  Do you all anticipate that we'll finish the hearing

16    today, or are we going to proceed into tomorrow as well?

17         **MR. RANKIN:**  Your Honor, I would certainly anticipate

18    today.  And in fact, the remainder of my argument should not

19    take up incredibly too much more of your time.

20         **MS. SECOY:**  I think on our end we may have like ten

21    more minutes.  And then we're open to going over the exhibits,

22    as you mentioned, and anything else you need to ask us.

23         **THE COURT:**  Okay.  Why don't we take a lunch break,

24    just so y'all can make sure that -- because you've now

25    introduced all exhibits.  I believe that's correct.  But just

1    so you can make sure, you can go ahead and make sure that all

2    exhibits that you want to have in the record have been

3    introduced, you can formulate all the arguments that you want

4    to make as to admissibility, make sure that that's clear in

5    the record and that's on the record, and then just any other

6    additional argument that you want to make with regard to

7    damages, remedies, penalties, et cetera, or any other issues

8    that y'all want to raise before we conclude today's hearing.

9            **MR. RANKIN:**  Your Honor, just to clarify, we did have

10   one additional exhibit.

11           **THE COURT:**  Okay.  Which one is that?

12           **MR. RANKIN:**  This is a summary exhibit.  It's a

13   spreadsheet, and it will be used with respect to the argument

14   on penalties and the numbers of items that were hoarded and

15   other violations of Mississippi law.

16           **MS. SECOY:**  So that's a summary exhibit preceding

17   from today's Exhibit Number 6, which was pretrial

18   Exhibit Number 3.

19           **THE COURT:**  Are you looking to introduce this as P19?

20   That's the next one that we have.

21           **MR. RANKIN:**  Yes, Your Honor.  If that's the next

22   number in the consecutive numbering, yes.

23           **THE COURT:**  Okay.  All right.  This will be marked

24   for ID only as P19.

25                  (Exhibit P19 marked for identification.)

 1           **THE COURT:**  And then if you-all will just -- we're

 2     going to put these exhibits up here at the front just so

 3     you-all can make sure that y'all are on the same page about

 4     exactly what has been introduced as ID only.  I believe I

 5     already have all the arguments for P1 through 8 that you-all

 6     want to present.  If you want to present any additional

 7     arguments on P1 through P8, we can do that after the lunch

 8     break.  But just so y'all know exactly what's been introduced

 9     as to ID only, we're going to put them up here for your

10     review.  Then you can present any additional arguments that

11     you want to make as to admissibility when we come back from

12     the lunch break, and you can present any other arguments that

13     you want to present on damages, on remedies, or any other

14     issue that you want to raise before we conclude today's

15     hearing.  Okay?

16           All right.  We are going to take a lunch break

17     until -- let's say until 2:30.  Until 2:30.  It's 1:11 right

18     now.  Thank you.

19           Court will stand in recess.

20      **(Recess taken.)**

21           **THE COURT:**  All right.  Mr. Rankin, are you ready to

22     proceed?

23           **MR. RANKIN:**  Yes, Your Honor.

24           **THE COURT:**  I will let y'all know, too, that one

25     thing that we're going to do procedurally is you're going to

1    be filing a post-hearing brief to address some legal issues.

2         So this is going to be a conversation today.  I'm not

3    going to be ruling from the bench today.  I'm eventually going

4    to need to issue a fairly lengthy written opinion addressing

5    the issues that the State of Mississippi is raising, of

6    course; but before that, you-all are going to be submitting a

7    post-hearing brief.  So we're going to kind of start that

8    conversation today about some things that I'm going to be

9    looking for in that brief in terms of some of the law that I'm

10   going to need to assist me with my ruling.

11        All right.  You may proceed.

12        **MR. RANKIN:**  Thank you, Your Honor. May it please

13   the Court.

14        We left off with expert testimony from the witness,

15   Corey Miller, on the issue of damages, and I just wanted to

16   conclude, before I moved on to penalties, by restating the

17   standards that were set forth in the statute regarding

18   damages.

19        **THE COURT:**  Yeah, and where are you in the statute

20   about damages, more specifically?

21        **MR. RANKIN:**  First, for Mississippi Code Annotated

22   75-21-9 is in the antitrust statute, and it provides for

23   recovery of all damages of every kind sustained.

24        **THE COURT:**  Okay.  And it's your position that that's

25   not just for private rights of action; that's also for the

1    Mississippi Attorney General to pursue on behalf of the State

2    of Mississippi.

3         **MR. RANKIN:**  That's correct, Your Honor, in its

4    position and role as *parens patriae*.

5         **THE COURT:**  What was that?

6         **MR. RANKIN:**  In its position and role as *parens*

7    *patriae*.

8         **THE COURT:**  Okay.  So in that role that the State of

9    Mississippi is pursuing -- because -- let me just back up.

10        So the Mississippi Consumer Protection Act and the

11   Mississippi antitrust laws does not specifically say anywhere

12   in there that the Mississippi Attorney General can recover

13   monetary damages for X.  Right?  It doesn't say that

14   explicitly anywhere.  And so I understand -- this is why I

15   wanted to kind of go ahead and start this conversation that

16   y'all can help me with briefing after the fact.  So it seems

17   like -- now, under the Mississippi Consumer Protection Act and

18   the Mississippi antitrust laws, it does specify some things

19   that the Mississippi Attorney General can do, very

20   specifically.

21        **MR. RANKIN:**  Yes, Your Honor.

22        **THE COURT:**  For example, under the Mississippi

23   Consumer Protection Act, I believe under 24-9, it says that

24   the Mississippi Attorney General can pursue injunctive relief.

25   There was a case in 2020 that Justice Maxwell prepared a

 1   written opinion on that addressed the Mississippi Consumer

 2   Protection Act and the Mississippi antitrust laws that dealt

 3   with the Mississippi Attorney General pursuing certain civil

 4   penalties, pursuing injunctive relief potentially, et cetera.

 5   And what I've been trying to find is a case where monetary

 6   damages have been pursued by the Mississippi Attorney

 7   General's Office either under the Mississippi Consumer

 8   Protection Act or the Mississippi antitrust laws, and I

 9   haven't found that yet.  And it may be just because it's never

10   been pursued before, or it's never been pursued and gone to

11   decision under the Mississippi Supreme Court.  Regardless, it

12   may be one of those two scenarios.

13        But what is -- I guess what you're saying is there's

14   a separate statute that essentially allows the Mississippi

15   Attorney General to pursue damages on behalf of its citizens,

16   and as a result of that, any Mississippi statute, which would

17   include the Mississippi Consumer Protection Act and

18   Mississippi antitrust laws, that specify a private right of

19   action for individuals allows the Mississippi Attorney General

20   to pursue that private right of action on behalf of its

21   citizens.  Is that kind of a fair way of saying it from a

22   statutory basis standpoint?

23        **MS. SECOY:**  Your Honor, we're happy to spell all this

24   out in writing posttrial -- post-hearing --

25        **THE COURT:**  Yes.

1          **MS. SECOY:** -- but 75-24-11 gives us the right -- and

2     I think James is going to go into this -- gives us the right

3     to pursue restitution for consumers, and it also includes --

4     it basically just says anything that the Court deems

5     appropriate to resolve the situation.  That's 75-24-11.  It's

6     very broad.

7          We have case law where the State has -- and cases

8     where the State has pursued damages for state agencies under

9     75-24-15.  And I believe there's -- there's a statute I'll

10    have to supplement the record with that says that the State

11    can pursue any remedy that an individual can pursue.  It's a

12    Mississippi state statute.  And then James mentioned the

13    75-21-9 as far as antitrust.

14         But we do have a number of cases where as far as

15    *parens patriae* and for state agencies, we have obtained

16    monetary recovery.  I think *AWP* --

17         **THE COURT:**  As *parens patriae*, is that a

18    constitutional ability of the Attorney General's Office to

19    pursue that?  Is it a statutory basis, or is that a common law

20    basis?  And you may not know the answer off the top of --

21         **MS. SECOY:**  All of the above.

22         **THE COURT:**  Okay.

23         **MS. SECOY:**  The *Snapp* case, that we'll provide for

24    you, S-N-A-P-P, it goes through every angle of that.  We

25    have -- *Gandy* is a great case that goes through the Attorney

1    General's statutory Mississippi Constitution and common law

2    basis for the Attorney General's authority, and we can include

3    that in our briefing.

4            **THE COURT:**

5            **MS. SECOY:**  And then James is going to talk to you

6    about penalties.  We have three or four statutes on penalties

7    that we haven't gone over yet today.

8            **THE COURT:**  Yes.  Well, I see that under the

9    Mississippi Consumer Protection Act, civil penalties can be

10   awarded if the action is brought under, at least as it's been

11   interpreted, under Title 75-24-9, Mississippi Code Annotated

12   75-24-9, if an injunction has been brought, is how it's been

13   at least --

14           **MS. SECOY:**  Correct.  So you're required to -- so

15   just to answer your -- before I forget, and we'll supplement

16   and provide these, but AWP, *Average Wholesale Pricing*, that

17   litigation, and *Watson* are both great examples of monetary

18   recoveries which has been reported in case law.

19           **THE COURT:**  But *Average Wholesale Price* litigation,

20   was that civil penalties or was that monetary damages?

21           **MS. SECOY:**  You know, I don't recall all of the

22   remedies in that case, sitting here today.

23           **THE COURT:**  Okay.

24           **MS. SECOY:**  And then you asked me -- I'm sorry.  What

25   was your last question?

1          **THE COURT:**  Well, and I know some of my questions are

2     going to blend all of y'all to some extent.  Some of them are

3     going to be kind of -- while they're on damages, there are --

4     there's a little bit of a nexus for the damages that I have

5     some of my questions.  So I'm perfectly fine for you answering

6     some, and you answering some, Mr. Rankin.

7          **MS. SECOY:**  Thank you.  Thank you for our informality

8     here.

9          75-24-9 and 19(1)(b), they require in order to pursue

10    penalties, the State must plead for injunctive relief.  And I

11    think that's what you were getting at that was discussed in

12    *Yazaki* and then in *Navient*.  But we have -- we have pled

13    injunctive relief.  We have asked for injunctive relief.

14    Getting the PRC to follow it, you know, would be a challenge,

15    but we have certainly asked for it.

16          **THE COURT:**  Okay.

17          **MS. SECOY:**  And I will sit down.

18          **MR. RANKIN:**  Injunctive relief is specifically

19    requested in the complaint, although -- I mean, it's at least

20    invoked in the initial complaint.

21          **THE COURT:**  Okay.

22          **MR. RANKIN:**  And on the specific statute that Crystal

23    had mentioned regarding restitution, some of the language

24    right after that -- this is 75-24-11 -- it says, Restitution

25    as made necessary to restore any person in interest.  Again,

1     fairly broad.

2          And then lastly, and I think we ended up discussing

3     this in that exchange, but also I was just going to recap that

4     Mississippi Code 75-24-15 allows recovery for any

5     ascertainable loss of money or property.

6          I wanted to move on to penalties, with Your Honor's

7     permission, if there were no more questions on damages at this

8     time.

9          **THE COURT:**  Sure.

10         **MR. RANKIN:**  Okay.  We have several different

11    provisions for penalties, all applicable in this matter.  The

12    final exhibit we presented, which I believe was Number P- --

13    is it -- at this point it's P19?  Is that correct?

14         **COURTROOM DEPUTY CLERK:**  Yes, P19.

15         **MR. RANKIN:**  Yes, P19.  The title at the top is

16    Penalties for Violations of Hoarding PPE.  And I believe

17    shortly before the break earlier, we introduced that as the

18    last exhibit for now.  It's a summary exhibit that includes

19    references to the authority that is in, I believe, Exhibit P6

20    regarding the Cambridge study.

21         I'm going to speak on specifically a number of items

22    hoarded, because the situation we face in this with respect to

23    penalties is, I think it's reasonable to expect that Your

24    Honor will ask me:  If these are awarded according to the

25    number of violations, what is that number?  And that's what

1    this spreadsheet and the exhibit tries to answer for you.

2         **THE COURT:** Okay. Ms. Butler, will you give me the

3    exhibits, please?

4         **MR. RANKIN:** So categorically, before referring to

5    the spreadsheet, I was just going to mention the applicable

6    penalty statutes. 75-24-19 is for civil violations and

7    penalties for Consumer Protection Act violation. Subsection

8    (b) allows for a civil penalty in a sum not to exceed $10,000

9    per violation. So if you were to ask me in reference to this

10   spreadsheet what -- you know, what we're getting at in terms

11   of trying to articulate the number of violations, that is one

12   of the statutory elements, if you will, to establish

13   penalties.

14        A little bit quirky, and it takes a minute to grasp,

15   it took me a minute, is Mississippi Code 75-21-7. This is in

16   the antitrust statute. And in the grand scheme of things,

17   it's not necessarily as large of a number; however, it's a

18   penalty for not less than $100 and not more than $2,000 for

19   each such violation. And the reason this is separate and

20   distinct, though, is if you look at the next sentence, you'll

21   see it says, Each month in which such person, corporation, or

22   association shall violate this chapter shall be a separate

23   violation. Your Honor, at this time we're only alleging three

24   months, January, February, and March of the year 2020. So

25   under this particular section, and it's noted -- you can see

1    it in the note on the spreadsheet as well, that's -- you know,

2    in the grand scheme of things, it's a smaller number, but it

3    is there.

4            Lastly --

5            **THE COURT:**  Where is that on the spreadsheet?

6            **MR. RANKIN:**  That is -- oh, it -- let's see.  It's

7    70- -- under the note, it says 75-21-7 allows a penalty for

8    each month in which there is a violation of no less than 100,

9    and no more than 2,000.  And then beneath that, it says, For

10   forestalling and engrossing PPE, the penalty, and then is

11   essentially based on three months total, the parenthetical.

12           **THE COURT:**  Okay.  Yeah.  Minimum of $300 and up to

13   $6,000.

14           **MR. RANKIN:**  You know, I wouldn't want to -- wouldn't

15   want to get too lost in that section given some of the other

16   provisions at stake, but as previously referenced also,

17   75-21-9 is the section that referred to the State recovering

18   all damages of every kind sustained.  And right after that, it

19   includes an additional penalty of $500.  That does not refer

20   to per violation.

21           So when we present to you what we have for your

22   consideration when trying to determine the number of times the

23   statute was violated, this chart proposes that each hoarded

24   item of PPE is a violation, and it --

25           **THE COURT:**  Now, where do we get this from, these

1    items of hoarded violations?  Where is the evidence for that?

2          **MS. SECOY:**  So this is pretrial Exhibit 3 and our

3    current Exhibit 6.  That's where the figures are from.  And so

4    we've presented it as a summarial exhibit on that report, and

5    then we have applied the penalties statute.  Specifically the

6    graph, I believe, is regarding, you know, penalties under

7    75-24-19(1)(b).  We've taken those figures from Exhibit 6 and

8    applied our statute to show what the penalties could be.

9          **THE COURT:**  Okay.  So this is from your Exhibit 3 and

10   your Exhibit 6 is how you get to, for example, masks, that

11   6,696,353 masks were hoarded.

12         **MS. SECOY:**  So it's -- let me come up there.  Our

13   current Exhibit 6, it was pretrial Exhibit 3, so it's the same

14   document.

15         **THE COURT:**  Okay.

16         **MS. SECOY:**  What we basically extrapolated in the

17   figures in your chart.  I think it starts around page 17.

18         **THE COURT:**  Hold on.  Let me get there.  You said

19   it's your pretrial Exhibit 3?  Is that right?

20         **MS. SECOY:**  Yes, Your Honor.

21         **THE COURT:**  Okay.  So your pretrial exhibit -- and

22   that's from the Congressional Research Service, the China

23   Medical Supply Chains and Broader Trade Issues?

24         **MS. SECOY:**  That's correct.

25         **THE COURT:**  Okay.  All right.  So where are you in

 1    this document?

 2         **MS. SECOY:**  I believe the charts start around

 3    page 17.  We tried to -- there are a couple of different

 4    charts over those next six pages that we analyzed to reach

 5    this document.  Because it shows the -- like, the change --

 6    the exhibit itself shows the change in exports from 2019

 7    to 2020, and then it also included the prices.

 8         **THE COURT:**  Okay.  And so -- yeah.  So just explain

 9    to me, how do we get to 6,696,353 number of masks that were

10    hoarded?

11         **MS. SECOY:**  The report refers to the price at the

12    time.  And so I believe we just divided the total amount of

13    items hoarded by the price of the item to reach the number of

14    items.

15         **THE COURT:**  Okay.

16         **MS. SECOY:**  We had the cash value divided by the

17    price would equal the number of items.

18         **THE COURT:**  Okay.  And this number is not discounted

19    for masks that are relative only to the state of Mississippi.

20    It's the -- it's the entire world?  Or it's the United --

21    well, I mean, is it the world or the United States?

22         **MS. SECOY:**  They -- we -- to get to the Mississippi

23    figure, we took the ratio by GDP.  So Mississippi -- and our

24    reported GDP is .5 percent of the United States GDP, and so we

25    adjusted it based on that.

1          In other instances where we've had a national damages

2     figure, we've adjusted that by population.  And we thought

3     that this was comparable to take the national figure and

4     adjust it by our percent of the U.S. GDP to get the

5     Mississippi versus United States ratio.

6              **THE COURT:**  Okay.  All right.

7          **MS. SECOY:**  And, Your Honor, we -- you know, we

8     submit that we would interpret 75-24-19(1)(b) granularly, and

9     that's why we have it as number of items hoarded multiplied by

10    the maximum under that statute, but it is your discretion

11    how -- you know, how you would want to apply the statute.

12    Under case law, the Court has the discretion.

13             **THE COURT:**  Okay.  Thank you.

14         **MS. SECOY:**  You're welcome.

15         And we just added the other penalties on this summary

16    exhibit, honestly, as a cheat sheet just so you would have a

17    list of those statutes.

18             **THE COURT:**  All right.

19         **MR. RANKIN:**  And lastly, on the note there, you'll

20    see at the bottom, when Crystal presented the various facts

21    and causation earlier today, it's our position that those

22    constitute another 16 violations.  And I believe the

23    breakdown, based on her facts, her -- let's see where I have

24    it.  It's 16 total for misrepresentation.  I believe that's

25    five for the PRC, People's Republic of China; three for the

 1    Wuhan Institute; and eight for the City of Wuhan.

 2            **THE COURT:**  Okay.  Where are you with that?  Where

 3    is -- where is that spelled out to me?

 4            **MR. RANKIN:**  Those 16 violations were asserted by

 5    Crystal in her presentation earlier.

 6            **THE COURT:**  Okay.  So that was -- that was orally

 7    delivered.  So I just need to go back and look at the

 8    transcript and make sure that I'm on the same page.

 9            **MR. RANKIN:**  Yes.

10            **THE COURT:**  Okay.  All right.  Anything else?

11            **MR. RANKIN:**  So, Your Honor, on the issue of damages,

12    you had heard in the approximate number a minimum in this

13    case, an absolute minimum of 4 billion, and that is for what

14    the Eighth Circuit has recognized is a valid cause of action

15    over which there would be jurisdiction under the FSIA.  That

16    will be for PPE hoarding alone.  The allegations that we have

17    put forth and the evidence we've put forth extend to

18    violations of the Consumer Protection Act beyond just

19    Mississippi antitrust act.  The total number, as you can see

20    in the spreadsheet, when you take the number of violations, is

21    approximately 20 million times 10,000.  Clearly we're dealing

22    with a very large number.

23            I would pose to you that based on everything that's

24    been presented today, unrebutted, that we're here on behalf of

25    those people who lost their lives, not as an annoyance, but

 1    speaking justice.  These statutes, the Consumer Protection Act

 2    and Antitrust Act, contemplate just a situation.  Clearly a

 3    global pandemic may not have been what everyone was expecting

 4    at that time, and there have been a number of years since

 5    then, but for the people that sustained these losses, in the

 6    case of lost wages, for example, that Mr. Miller testified to,

 7    people were furloughed, people had nowhere to work.  The

 8    impact of those deaths extends beyond simply the loss in

 9    population numbers in Mississippi at the time, and it extends

10    to every single person who was then in fear for their own

11    lives, whether it be for not wanting to go out in public,

12    restaurants being empty, being unable to provide services

13    adequately at that time.  Our expert Mr. Miller took a very

14    conservative approach in evaluating all of that data.  He had

15    other options.  We didn't go into them much, but he had others

16    that could have -- he could have given a much higher number.

17    He chose what he thought was the most valid and accurate

18    representation of the loss sustained to us as a result of this

19    conduct.

20         And then subsequent to our pretrial conference, based

21    on -- you gave us a number of really great detailed questions

22    to assist in presenting you with precise information -- I made

23    sure that we went back to him with what was filed most

24    recently in the Missouri case, with that expert's report, to

25    where he could, if Your Honor were to isolate this case down

1   to what I consider to be the bare minimum, which is the PPE

2   hoarding and nothing else; but even then, his own report

3   establishes approximately $4 billion as a minimum for damages.

4   That's before penalties.

5       He explained his methodology.  He's unrebutted.  No

6   one else is here to contradict his testimony.  He goes before

7   the legislature on a near annual basis, as he testified, and

8   our State relies on him for all other sorts of estimates.

9   What he presented to you was reliable methodology that he

10   stood behind.

11      Between the Eighth Circuit recognizing this cause of

12   action under the FSIA and our expert's testimony and the

13   evidence presented to you by Ms. Secoy, my colleague, it's

14   very clear that 4 billion would be a minimum.  And I would

15   pose to you that that would be our position.

16      There is no one -- and we are happy to address the

17   evidentiary issues you've raised, but no one here has raised

18   hearsay objections.  The People's Republic of China does not

19   deem the lives of Mississippians worthy of appearing in this

20   courtroom to raise those objections.  And while we're happy to

21   show you where and how our evidence meets whichever standard

22   is applicable, and it does, all of it, the silence -- when I

23   pause, the silence, with no questions other than those from

24   yourself to our expert, that has been justified to us and to

25   this Court as a response to something that is annoying and

1   vexatious.  This Court is not annoying and vexatious.

2   Ignoring this Court is conduct that has led us, by -- by the

3   People's Republic of China and the remaining defendants, has

4   led us to this default hearing.

5        The State has incurred considerable expense for which

6   we're also allowed to recover.  Serving process on these

7   entities, the State had to research service under the Hague

8   Convention.  We followed every single formality required of us

9   for this matter, and we're standing here unrebutted.

10       In your pretrial conference, you emphasized, and I

11  paid close attention to you, Your Honor, and I thank you for

12  the advice -- I know you wouldn't say "advice," but the

13  questions that you raised so that we would be able to

14  adequately present this case.  You emphasized the phrase "well

15  pled."  And Crystal came before you today and she articulated

16  what that standard was and is under our law.  And everything

17  that's before you is well pled.  Everything is admissible

18  evidence.  No hearsay objection has been stated by any

19  opponent in this court.

20       This penalty figure, admittedly, is a very large

21  number.  But when we talk about a floor, just as sure as we

22  talk about 4 billion roughly approximately being the floor,

23  the ceiling is astronomical.  I had to pause a number of times

24  to grasp exactly what was available, but I've shown you today

25  that even if you were to award the entire amount, all of it,

1    which is roughly $208 billion, that China has assets and

2    property in this country that are susceptible to that judgment

3    that you would issue, and that we have a process and a path in

4    place to pursue to the gates of hell every single dime that

5    Mississippi is entitled to as a result of these unfair and

6    deceptive business practices and these antitrust violations.

7         With that, I would make myself and Ms. Secoy and

8    Ms. Beale available for any additional questions you have.

9    And, of course, we look forward to the opportunity to address

10   anything you would raise with respect to a brief, as you

11   mentioned.

12        Also, if indeed -- I would request that if indeed the

13   Court were somehow considering to exclude something on the

14   basis of hearsay, that we would somehow know exactly which

15   provision that was going to apply.  Because we don't -- you

16   know, we're not in the position where we have a defendant

17   standing up articulating what and how they're objecting.  And

18   I appreciate Your Honor's concern for authentication and all

19   the formalities.  I would do it the exact same way if I were

20   you.  And you don't need me to verify your method; however, if

21   indeed anything about the standard of what has been presented

22   to you, you deem, in your own eyes, to be deficient, it is

23   something that I am confident with either supplementing the

24   record or in briefing, we can fully address to your

25   satisfaction.

1        I believe Mr. Miller established that 4 billion is

2    the floor approximately.  I would use his more precise number,

3    I think it was 4,260,077,991.  He said it himself.  It's not

4    guesswork.  It's not speculation.  He's an expert.  He's

5    unrebutted.  With that, Your Honor, if you have any additional

6    questions.

7        I know you want to give us some instructions on

8    things you would like for us to brief, and we will be happy

9    to -- to work this case up to whatever extent is necessary to

10   succeed, despite the fact that the defendants have so

11   disrespected this Court that they have put you in the place of

12   raising objections on their behalf, which you shouldn't have

13   to do.  We appreciate that you expressed the concerns, and

14   we're happy to address them, every single one; but, Your

15   Honor, I would respectfully submit that if there is anything

16   that, you know -- whether it be a certain provision of the

17   evidentiary rules, you know, that you find should have been

18   applied one way or the other, that we would have adequate time

19   to remedy whatever that is, because we don't -- we don't have

20   that level of specificity here, and we have a knowingly absent

21   stubborn set of defendants who are well aware that this

22   litigation has occurred, that it's -- that it's occurring this

23   very day.  They know we're here; and they're not.

24       With that, Your Honor, I yield to your questions or

25   anything else Ms. Secoy or Ms. Beale has.

1          **MS. SECOY:**  Your Honor, would you like us to go

2    through the exhibits?

3          **THE COURT:**  Yes.  We're going to do that in a little

4    bit.  I still -- let's make sure we do that.  And, look, I'll

5    make -- I'll make it clear why I want y'all to put your basis

6    on the record for the exhibits, because I very well may rule

7    at the end of today's hearing on the admissibility of the

8    exhibits.  My understanding from default judgment hearings,

9    number one, any default judgment hearing, there are some

10   courts that talk about the evidence that is presented at a

11   default judgment hearing has to be admissible, number one,

12   some courts talk about.  Some of them don't as much, but some

13   of them do.

14         Number two, whenever we are dealing with the Foreign

15   Sovereign Immunities Act, and Foreign Sovereign Immunities Act

16   says, it specifies, under Section 1608(e) that a judgment by

17   default cannot be entered or may not be entered against a

18   foreign state unless the claimant establishes his claim or

19   right to relief by evidence satisfactory to the Court.  So I

20   do believe that it would be very dangerous to drift into

21   reversible error if there was no basis put into the record

22   whatsoever for the admissibility of exhibits.  I believe I

23   have to hear the basis for the exhibits and make a finding on

24   the basis for the exhibits.

25         Of course, we are a nation of laws.  That's what

1    separates us.  We are -- from many other countries.  And I'm

2    not talking about China, but I'm just saying we're a nation of

3    laws.  That's what we are.  We are -- we are governed by the

4    rule of law.  That's what we're governed by.  And in any case,

5    whether it's a pro se plaintiff, whether it is an absent

6    party, and regardless of who the parties are, I am required to

7    follow the law and interpret the law, and that's my job.

8          **MS. SECOY:**  Your Honor, thank you, and I absolutely

9    understand.

10          James, if I may?

11          I believe what James is getting at is there's a case

12    regarding the Immunities Act, *Sotloff v. Syrian Arab Republic*,

13    which says this does not require a Court to step into the

14    shoes of the defaulting party and pursue every possible

15    evidentiary challenge.

16          **THE COURT:**  And I agree with that.  I'm not -- I'm

17    not here to be an advocate, by any stretch of the imagination.

18    I am here solely to understand what the law is presented by

19    you-all, to understand the basis, to understand the basis for

20    what the evidence is being offered, just if you take that

21    example, and then to make a finding based off of the law.

22          And so before we get into the exhibits, let's talk

23    about just some of the questions that I have.  Okay?  And then

24    we'll get into the exhibits.

25          All right.  So first off, Mr. Rankin, what is the

1    total number of damages that the State of Mississippi is

2    pursuing, and what are those categories of damages?

3        **MR. RANKIN:**  Your Honor, I would refer you to our

4    expert's report, the February 2025 report.

5        **THE COURT:**  Right.  And that one's over -- I get that

6    category.  That's over $4 billion in damages that was

7    identified by the State's economist, and that's related to

8    loss of life, number one, and lost wages, number two.

9    Correct?

10        **MR. RANKIN:**  Yes.  And the 4 billion is only with

11    respect to what resulted from PPE hoarding specifically.  And

12    the reason the remainder of his November report is contained

13    within the February report is the original number still

14    stands.  I mean, it -- the effect of this conduct which led to

15    Mississippi having the effect of COVID-19 remains -- all of

16    his previous numbers remain.  The addendum was not him cutting

17    his number down, other than at my request asking him, based on

18    what we saw in the pending litigation, when Your Honor asked

19    us in a previous order, you know, you asked us to address that

20    case and you wanted us to let you know how things were

21    different and how -- you know, where things were the same.

22    And I wanted to make sure when I knew that there was

23    up-to-date current information that you had the latest and

24    most precise figures and the most -- given that, you know,

25    other than apparently this case and the Missouri case, there

1    are not many others like this currently, I wanted you to have

2    the most accurate information.

3            So I would -- I would submit to you that in his

4    report, the original calculation of damages, which was

5    $12,171,651,402, represents the entirety of what he calculated

6    for the purposes of lives lost and wages lost.

7            There were many other things, as he stated, you know,

8    when he talked about the value of a life and things that can't

9    be taken in -- you know, in many ways is, quote,

10    "immeasurable," he says in his report.  He left out mental

11    anguish and emotional distress.

12            So Corey Miller was only comfortable with those two

13    categories.  That's what he felt was reliable.  He took a

14    conservative approach, and that was the total he came to.  I

15    came back to him and I said, Corey, there's an expert in

16    Missouri who thinks, you know, there's a way to get at even

17    more narrowly, if Your Honor were to limit our recovery to

18    only PPE hoarding --

19            **THE COURT:**  But I'm required to, aren't I?

20            **MR. RANKIN:**  I'm sorry?

21            **THE COURT:**  I'm required to, aren't I?  I mean,

22    that's what you're seeking.

23            **MR. RANKIN:**  Exactly.  Which is -- which is why I

24    made sure we had the exact number.

25            **MS. SECOY:**  We're not seeking -- I mean, we're

1    alleging violations of the Consumer Protection Act and

2    violations of antitrust statute.  So there's more conduct than

3    just the hoarding, you know, that the withholding of

4    information and the misrepresentations, we believe, were all

5    part of the scheme to give them time to hoard.

6         As I mentioned earlier, so we have -- we have Corey's

7    testimony regarding loss of life and livelihood.  You know, we

8    do have evidence of the number of masks hoarded, and we have

9    our -- you know, examples of our complaints, but we chose

10   to -- with the missing data figures, we've chosen to focus on

11   penalties.

12        **THE COURT:**  Well, not penalty -- I mean, the State

13   Economist testimony is not penalty testimony.

14        **MS. SECOY:**  Correct.

15        **THE COURT:**  It's monetary damage testimony.

16        **MS. SECOY:**  Correct.

17        **THE COURT:**  Right?

18        **MS. SECOY:**  Right.  I just wanted to be clear that

19   we're not just focusing on hoarding.

20        **THE COURT:**  Right.  But it -- okay.  But -- but it's

21   misrepresentation plus hoarding.

22        **MS. SECOY:**  Yes.

23        **THE COURT:**  Right?

24        **MS. SECOY:**  Correct.

25        **THE COURT:**  And they're intertwined --

1        **MS. SECOY:**  Yes.

2        **THE COURT:**  -- is, I think, the State's position.

3        **MS. SECOY:**  Yes, Your Honor.

4        **THE COURT:**  Okay.

5        **MS. SECOY:**  I think we're -- I think we're -- we're

6   probably ad nauseam trying to make sure we're answering your

7   questions.

8        **MR. RANKIN:**  Well, and the goal of requesting the

9   supplement was to provide the Court with as clear of

10  information as possible with what was related to what.  And I

11  think he did that by his own testimony and in a reliable

12  method and one that's been used in another court as well.

13       **THE COURT:**  So we've got the over $4 billion from the

14  State Economist.  That's one category.  And that's monetary

15  damages.  That's the only monetary damages, right?

16       **MR. RANKIN:**  Well, no.  Arguably, he -- well, not

17  just arguably; I mean, his original finding is a total of

18  12 billion approximately.

19       **THE COURT:**  But you're not seeking that.

20       **MR. RANKIN:**  No, we are.  We absolutely are.

21       **THE COURT:**  Well, what's that -- what's --

22       **MR. RANKIN:**  That includes -- the 4 billion is for

23  PPE hoarding.  The remainder includes conduct that is unfair

24  and deceptive under the Consumer Protection Act.

25       **THE COURT:**  Okay.  I'm trying to --

1          **MR. RANKIN:**  When one behaves in an unfair and

2    deceptive way that causes loss of life in the state and loss

3    of wages.

4          **MS. SECOY:**  He attributed the 4 billion to the part

5    of the conduct -- the steps in the scheme specifically to

6    the -- stopping the exports, drastically importing,

7    commandeering the U.S. companies in China.  He attributed

8    4 billion to those three steps.  And the other -- the rest of

9    it would be attributed to the first half of the scheme to

10   withhold and misrepresent the nature of the virus.  But he was

11   able to -- he was able to say, based on the research he

12   mentioned and the Eighth Circuit opinion, that at least -- at

13   minimum, 4 billion is attributed to the act of hoarding, which

14   we refer to as engrossing and forestalling under the Antitrust

15   statute.

16         **THE COURT:**  Okay.  All right.  I think I'm following.

17   So you're seeking over 12 billion.

18         **MR. RANKIN:**  Correct, Your Honor.

19         **THE COURT:**  Essentially 8 billion for

20   misrepresentation, 4 billion for hoarding PPE.  That's kind of

21   one way to categorize it, right, for monetary damages.  And

22   that's the monetary damages you're seeking.

23         **MR. RANKIN:**  Yes.

24         **THE COURT:**  All right.  Plus penalties.

25         **MR. RANKIN:**  Correct.

1              **THE COURT:**  And what is the total number of penalties

2     in terms of monetary?

3              **MR. RANKIN:**  Well, the spreadsheet and the number

4     stated takes into account -- there's a number in the right

5     column that's in bold, and then beneath it, a total maximum

6     number -- or total maximum dollar amount.  That amount

7     includes every item -- a violation for every single item

8     hoarded; it includes the 16 violations we mentioned that were

9     from the evidence presented by Crystal; and the total leaves

10    you, for penalties, to $208,362,801,127.96.

11             And clearly, as the statute states, it's a sum not to

12    exceed $10,000, and Your Honor is within his own discretion as

13    to what extent penalties will serve in this matter; but we

14    certainly think, based on the allegations that have been shown

15    and are unrebutted, that the conduct merits the imposition of

16    all penalties.

17             **THE COURT:**  Okay.  So the total monetary award is

18    close to 230 billion.

19             **MS. SECOY:**  I just wanted to make sure we had all

20    four penalty statutes covered in there.  So you're looking at

21    about 221 billion, I believe.

22             **THE COURT:**  Yes.  Yeah.  Yes.  About 221 billion.

23             **MS. SECOY:**  And we determined they have almost

24    800 billion in U.S. Treasury bonds.

25             **THE COURT:**  Okay.  All right.  Anything else before

1    we get into exhibits?  And then I'm going to give you some

2    instructions about supplemental briefing.

3              **MS. SECOY:**  Okay.

4              **THE COURT:**  Anything else?

5              **MR. RANKIN:**  That's it, Your Honor.  Thank you.

6    Nothing else.

7              **THE COURT:**  All right.  Let's make sure that you-all

8    have presented all of your exhibits and any evidentiary basis

9    that you want to for those exhibits, and I may be able to rule

10   on those today.

11             So I think you've already put forward P1 through 8.

12   Do you have anything else about P1 through 8?

13             **MS. SECOY:**  Your Honor, we -- I mentioned that those

14   were self-authenticating under -- as official publications

15   under Rule of Evidence 902(5) because they are official

16   documents that are published, they're found online.  If you

17   would like me to, I could go into more detail regarding the

18   nature of each of those, a congressional report, Marco Rubio's

19   investigation, just to show that they are what we purport them

20   to be.

21             **THE COURT:**  Well...

22             **MS. SECOY:**  If you'd like to walk through each one

23   individually.

24             **THE COURT:**  Sure.  Let's do that.

25             **MS. SECOY:**  So the first one was the Congressional

1    Research Service China Primer on China's Political System.

2    That's a public record under Rule 803 --

3            **THE COURT:**  Hold on.  Was that -- was that P1 in your

4    pretrial brief, too?

5            **MS. SECOY:**  No, Your Honor.

6            **THE COURT:**  It's different.

7            **MS. SECOY:**  We just added it.

8            **THE COURT:**  Okay.  Right.  That's right.  Because

9    it's new.  That's -- I need to --

10            **MS. SECOY:**  I know I should have added it at the end

11    and then I wouldn't have messed up our numbering system.

12            **THE COURT:**  That's okay.  All right.  So --

13            **MS. SECOY:**  A number of these -- we have three

14    reports by the Congressional Research Service.

15            **THE COURT:**  Right.  All three reports from the

16    Congressional Research Service are admitted for the reasons

17    that you have stated.

18            **MS. SECOY:**  Thank you.

19            **THE COURT:**  And the Department of Homeland Security,

20    which is -- that's -- wait.  That's not -- which one was --

21    hold on.  What was P1 again?

22            **MS. SECOY:**  So the pretrial Exhibit P1 is the

23    Department of Homeland Security.  And --

24            **THE COURT:**  But you have P1 is the Congressional --

25    wait.  Hold on a second.

1          **(Brief pause in proceedings.)**

2              **THE COURT:**  So P1 is the Congressional Research

3    Service.  Is that right?

4              **MS. SECOY:**  That was the Primer, the China Primer.

5              **THE COURT:**  Okay.

6              **MS. SECOY:**  Uh-huh.

7              **THE COURT:**  So all the Congressional Research

8    Service's ones are admitted -- that's P1, that's P5, that's

9    P6, right? -- for all the reasons that you've stated, for the

10   legal basis that you've stated.

11             (Exhibits P1, P5 and P6 admitted into evidence.)

12             **THE COURT:**  All right.  Let's do P2.  So P2 is the

13   Marco Rubio, A Complex and Grave Situation:  A Political

14   Chronology of the SARS-COVID-2 Outbreak.  That is...

15             **MS. SECOY:**  It's the thick one, and I think it's in a

16   rubber band.

17             **THE COURT:**  Okay.  And this is the one that was

18   presented today.

19             **MS. SECOY:**  Right.  It is -- it was --

20             **THE COURT:**  It's --

21             **MS. SECOY:**  -- the same as pretrial Exhibit 6.

22             **THE COURT:**  Okay.  And so who prepared this document?

23             **MS. SECOY:**  Senator Rubio's office prepared this

24   document.  He also had assistance from former Assistant

25   Secretary of Defense of Indo-Pacific Security, Randall

1    Schriver.  And I believe that Senator Rubio's report along

2    with the two minority staff reports are similar to the

3    Congressional Research Reports where they're -- you know,

4    Congress often will -- like for instance, they recently

5    submitted the report on PBMs.  You know, their -- as part of

6    their duty to the public as members of the Congress, they

7    research and submit reports regarding various activities

8    impacting the United States.  And --

9        **THE COURT:**  But Senator Rubio prepared this report,

10    which is P2?

11        **MS. SECOY:**  Yes.

12        **THE COURT:**  When he was a senator.  He's now

13    Secretary of State.

14        **MS. SECOY:**  Correct.

15        **THE COURT:**  And he prepared that in his -- in his

16    role as senator, I assume is what you're saying.

17        **MS. SECOY:**  Yes, Your Honor.  We have -- I believe

18    it's self-authenticating as an official publication, but also

19    under just traditional authentication, we don't have any

20    reason to believe that it's not what it appears to be.

21        **THE COURT:**  And I do note that for admissibility

22    purposes, one of the ways that a public record can be

23    admissible -- and this is a public record.  It was prepared by

24    Senator Rubio's office, according to you -- is that the

25    opponent does not show that the sources of information lack

1   trustworthiness.  There's no opponent showing that today.  And

2   it does appear to be a public record.  It does seem to fit

3   into hearsay exceptions, and it does appear to be

4   self-authenticating for public record purposes.  So that's

5   also admitted.

6               (Exhibit P2 admitted into evidence.)

7         **MS. SECOY:**  Thank you, Your Honor.

8         I believe the Minority Staff Report and Final Report,

9   which are pretrial Exhibits 8 and 9 --

10        **THE COURT:**  Those are P3 and P4.

11        **MS. SECOY:**  Correct.

12        **THE COURT:**  All right.  P3 and P4 are also admitted

13  for all the legal reasons that you've stated previously.  As

14  they're clearly public records, they fit into 803(8), and they

15  are self-authenticated.

16              (Exhibits P3 and P4 admitted into evidence.)

17        **MS. SECOY:**  We also have a report by the Director of

18  the Office of National Intelligence -- it's a short report up

19  there -- that I submit for the same reasons.

20        **THE COURT:**  Which --

21        **MS. SECOY:**  P8.

22        **THE COURT:**  P8?

23        **MS. SECOY:**  Uh-huh.  And I believe --

24        **THE COURT:**  Okay.  And that's also admitted as that's

25  a public record.  That is -- falls under 803(8), and it also

1    is officially authenticated.

2                    (Exhibit P8 admitted into evidence.)

3            **THE COURT:**  What about P7?  That's from the

4    Department of Homeland Security?

5            **MS. SECOY:**  Yes.  For the same basis, Your Honor.

6    That's --

7            **THE COURT:**  Okay.  And for the same reasons, P7 is

8    admitted.

9                    (Exhibit P7 admitted into evidence.)

10           **THE COURT:**  All right.  P9 has not been offered.  P10

11   has not been offered.  P11 has not been offered.

12           P12 is Mr. Miller's report, his initial report, and

13   then P17 is his supplemental report.  And, of course,

14   affidavits can be submitted in furtherance of a default

15   judgment hearing.  In addition to these reports, Mr. Miller

16   testified.  He testified consistent with these reports, and I

17   see no basis to exclude P12 or P17, and they shall be so

18   admitted.

19           I do note that P16 is a CV.  Ordinarily in jury

20   trials, CVs are not necessarily admitted.  For purposes of the

21   jury, they're used for demonstrative purposes.  But this is

22   not a jury trial, and I see no reason P16 shouldn't be

23   admitted.  So P12, P16, and P17 are also admitted.

24         (Exhibits P12, P16, and P17 admitted into evidence.)

25           **THE COURT:**  P13, that's the Major Foreign Holders of

1    Treasury Securities?

2            **MS. SECOY:**  Yes.  P13 and P14 are both public records

3    that -- they're published.  They're official publications

4    under 902(5), and we submit that they should be admitted into

5    evidence.

6            **THE COURT:**  Who publishes those?  Let me see if I can

7    find that.  The Major Foreign Holders of Foreign Securities --

8            **MR. RANKIN:**  Your Honor, on the chart itself there's

9    a link to the Treasury.gov website, which is where that

10   information is maintained, or that is the source from which we

11   printed the report.

12           **THE COURT:**  That's from the Treasury's website?

13           **MR. RANKIN:**  Yes.  And the link is provided, if you

14   -- on the top left.

15           **THE COURT:**  Okay.  And that's public information

16   available on the Department of Treasury's website?

17           **MR. RANKIN:**  Yes, Your Honor.

18           **THE COURT:**  Then -- hold on one second.  It shall be

19   so admitted, and I see no reason that it should not.  That's

20   P13.

21               (Exhibit P13 admitted into evidence.)

22           **THE COURT:**  Okay.  P14 is USDA Farm Service Agency

23   Report.  For the reasons you stated with regard to other

24   exhibits and this exhibit previously, that shall be so

25   admitted under 803(8) and under 902 and 903.

```
 1              (Exhibit P14 admitted into evidence.)

 2         THE COURT:  All right.  P15, that is the spreadsheet.

 3    Now, that would -- that's a different spreadsheet, though.

 4         MS. SECOY:  Right.

 5         THE COURT:  That's -- that's the spreadsheet that you

 6    offered, I believe, that has the list of names and some gloves

 7    and costs of gloves and masks, isn't that one?

 8         MS. SECOY:  Yes, that's -- that spreadsheet, it's a

 9    compilation of price gouging complaints that the Attorney

10    General's Office Consumer Protection Division received from

11    March 16, 2020, through June 29, 2020.  I personally compiled

12    this spreadsheet and updated it as we went through the

13    pandemic.  So I submit, Your Honor, that it's a record of

14    regularly conducted activity under Rule of Evidence 803(6).

15    It's also a public record of the Attorney General's Office

16    under Mississippi Code Annotated 25-61-1 et. seq. of price

17    gouging observed at the height of the pandemic by the Attorney

18    General's Office.

19         THE COURT:  Okay.  P15 shall be so admitted for the

20    reasons that you state.

21         MS. SECOY:  Thank you.

22         THE COURT:  All right.

23              (Exhibit P15 admitted into evidence.)

24         MS. SECOY:  James also included P18 as an exhibit or

25    attachment to Mr. Miller's report, so I believe it's really
```

126

1    part of that.

2            **THE COURT:**  Yes, and experts can rely on information

3    from other sources, and this was information that was clearly

4    relied on by Mr. Miller in his testimony.  And additionally,

5    it is a publicly available document in another case, I

6    believe, in the Eastern District of Missouri, in the State of

7    Missouri's case.

8            **MR. RANKIN:**  Yes, Your Honor.

9            **THE COURT:**  And so I see no reason that that should

10   be excluded, and P18 shall be so admitted.

11           (Exhibit P18 admitted into evidence.)

12           **THE COURT:**  Then we have P19, and that's essentially

13   just a demonstrative that explains the basis for the penalties

14   requested by the State of Mississippi.  There's nothing that

15   would prohibit the State of Mississippi from putting this in a

16   brief, for example.  Demonstratives are regularly used in

17   litigation, and I see no reason that P19 should be excluded.

18           So all exhibits that have been offered today are

19   admitted.

20           (Exhibit P19 admitted into evidence.)

21           **MS. SECOY:**  Thank you.

22           **THE COURT:**  All right.  Now, this brings us to a

23   conversation I want to have about supplemental briefing.

24   Let's first talk about some specifics that I would like to see

25   in the supplemental briefing, and then we'll talk about a

1    timeline.  Because I want to hear -- I want you to understand

2    kind of specifics, and then I'm going to ask you how long you

3    would like before you file your supplemental brief.

4         All right.  So big-picture standpoint, I mean, we are

5    traveling under the Foreign Sovereign Immunities Act to some

6    extent, right, jurisdictionally.  And so I quoted to you

7    previously the portion of the statute that deals with default

8    judgments and foreign states and it says -- Section 1608(e)

9    states that a Court may not enter a judgment by default

10   against a foreign state unless the claimant establishes his

11   claim or right to relief by evidence satisfactory to the

12   Court.

13        So similar to what y'all did in your memorandum in

14   support of motion for default judgment and similar to your

15   pretrial brief, I do want to have a firm understanding of what

16   your position is under the law as to the standard of review.

17   It seems like you-all are taking the position that essentially

18   if there are well pleaded factual allegations and defendants

19   have not appeared, then it's not really my role to look at the

20   evidence from a liability perspective.  Okay?  That seems to

21   be the view that y'all are taking.  That's -- I'm not so sure

22   about that.  And I understand that that is the view of a lot

23   of courts in your traditional default judgments.  I'm not so

24   sure about that with regard to the Foreign Sovereign

25   Immunities Act and specifically when 1608(e) says what it

1    says.

2    To me, it seems like I am required by law to, at the

3    very least, make sure that there is satisfactory evidence for

4    what the claimant is attempting to establish.  So that's kind

5    of a standard review issue.

6    There's also a jurisdictional issue.  There's also a

7    jurisdictional issue potentially under the Foreign Sovereign

8    Immunities Act with regard to commercial activity.  It seems

9    like that y'all are taking the position -- and I'm not saying

10    the entire case is not subject to the proper jurisdiction in

11    this court, but I think I have to do a jurisdictional analysis

12    to some extent, because it seems like what y'all are taking

13    the position of is the only way under the Foreign Sovereign

14    Immunities Act that I even could find liability against at

15    least some of these defendants is if there is commercial

16    activity.

17    **MS. SECOY:**  Uh-huh.

18    **THE COURT:**  Right?  Is that fair?

19    **MS. SECOY:**  We think that -- I mean, subsection (2)

20    is the basis of our jurisdiction --

21    **THE COURT:**  Right.  That's -- I mean, because there's

22    a number of different exceptions to the sovereign immunity of

23    foreign states under the Foreign Sovereign Immunities Act.

24    And, I mean, there's a host of exceptions, but the one y'all

25    are traveling under is commercial activity.  And so I do want

1    commercial activity to be analyzed.  It seemed like in your

2    prior briefs you were essentially saying, look, certainly what

3    the defendants engaged in impacted commercial activity to a

4    large extent, and so the exception is met.

5          I was looking at some of the cases on commercial

6    activities, because I'm going to have to analyze this in my

7    fairly lengthy opinion, I think, quite frankly, and that is

8    some of those cases they go through what commercial activity

9    looks like under the Foreign Service -- Foreign Sovereign

10   Immunities Act.  There's also a Foreign Services Immunities

11   Act, and I've been misspeaking at times, but the Foreign

12   Sovereign Immunities Act is what we're traveling under.  Just

13   for example, some cases point to how courts should look at the

14   nature of the course of conduct or the particular transaction

15   or act rather than by reference to its purpose.  And

16   additionally some courts have stated that a foreign government

17   remains immune with respect to its sovereign or public act but

18   not with respect to its acts that are private or commercial in

19   character.

20         **MS. SECOY:**  And that's in regard to subsection (2) to

21   -- this --

22         **THE COURT:**  Yeah.  Well, I think it's in regard --

23   it's the definition of "commercial activity," and there's

24   just --

25         **MS. SECOY:**  Okay.

1           **THE COURT:**  -- a number of cases kind of addressing

2      this.  Like for example, the *Republic of Argentina v.*

3      *Weltover*, that's a United States Supreme Court opinion from

4      1992 that can be found at 504 U.S. 607, at page 614.  504 U.S.

5      607, at page 614.  And additionally, *Saudi Arabia v. Nelson*,

6      507 U.S. 349, at page 360, a United States Supreme Court

7      opinion from 1993.

8           And so I do want a pretty good analysis of what --

9      for example, the misrepresentations that y'all are alleging

10     these defendants engaged in as it applies to a foreign state

11     or any other entity that could be subject to the Foreign

12     Sovereign Immunities Act, were those misrepresentations being

13     made in the sense of if my test is whether those acts are

14     being made in the same way a private or commercial character

15     would be made, or are those acts that are being made by a

16     sovereign through its, like, governmental role.  Do you see

17     what I'm saying?

18          **MS. SECOY:**  Uh-huh.

19          **THE COURT:**  And you'll have to kind of get into these

20     cases, but I do think there's going to have to be an analysis

21     of that.  Like, are the misrepresentations done by a foreign

22     state in its sovereign capacity, or are they done in the

23     commercial context?

24          **MS. SECOY:**  So earlier Tricia mentioned that we

25     compared it to our *Johnson & Johnson* case where they

1    misrepresented the nature of talc --

2          **THE COURT:**  Right.

3          **MS. SECOY:**  -- which is a natural element that they

4    used, in their baby powder case.  So for us, it's --

5          **THE COURT:**  Yeah.  And I think one of the reasons

6    it's going to have to get into the case law a little bit more

7    than that --

8          **MS. SECOY:**  Okay.

9          **THE COURT:**  -- is because Johnson & Johnson is a

10   commercial entity.  Johnson & Johnson is not a dual role.

11   Johnson & Johnson has no sovereign ability.  So it can't speak

12   as a sovereign, ever.  Right?

13         And so you're going to have to analyze cases for the

14   dual role purposes, because sovereigns can speak as purely a

15   sovereign, and it can act as purely a sovereign.  And just

16   because a sovereign says something that has an impact on

17   commercial activity, my view of the case law from what I'm

18   seeing, does not necessarily equate to commercial activity for

19   this statutory purpose.  Do you see what I'm saying?

20         **MS. SECOY:**  Yeah.

21         **THE COURT:**  There can be indirect consequences from

22   what a sovereign says to the global commercial activity or to

23   intrastate commercial activity or to interstate commercial

24   activity.  It can have indirect consequences whenever a

25   sovereign speaks.  But a sovereign can also speak in a way

1    that a commercial participant can speak and impact commercial

2    activity.  And I think that's what I want y'all to explain to

3    me is what you believe this falls under, under this bucket, as

4    you-all are advocating for the State of Mississippi.  I would

5    like to understand your position more on that commercial

6    activity from a jurisdictional standpoint.

7         **MS. SECOY:**  Okay.

8         **THE COURT:**  All right?  And then that -- so we talked

9    about standard of review.  We talked about jurisdiction.  And

10   then we talk about liability, and then we'll talk about

11   damages.

12        So liability, you pointed out to me today your legal

13   basis for why you believe a foreign state is subject to the

14   Mississippi Consumer Protection Act, and statutorily, what

15   your position is, under the plain language of the Act, it

16   refers to a legal entity, and you believe any -- you believe a

17   sovereign is a legal entity.  I would just like to see some

18   law supporting that, that a sovereign is a legal entity for

19   the purposes of what you believe the Mississippi Consumer

20   Protection Act is.

21        And similarly, similarly, under Mississippi antitrust

22   laws, what subjects a foreign state to Mississippi antitrust

23   laws.  I would like to kind of know that stat- -- like the

24   plain language of the statute that says that it's getting you

25   there.  And then, of course, if you have any case law from the

1    State of Mississippi or you have any case law from other

2    jurisdictions that have interpreted similar language legal

3    entities or similar language from a statute to apply to a

4    foreign sovereign, then feel free to point that out.  I mean,

5    these are some of the things that I'm going to be considering,

6    and I want y'all to know in advance and have the opportunity

7    to brief it in front of me.

8            We talked about this a little bit, but I just want to

9    put a little finer point on it and remind you, I am -- I do

10   want to know from your briefing the statutory basis and the

11   case law, if any, that supports the recovery of monetary

12   damages by the State of Mississippi through the Attorney

13   General's Office for violations of, number one, the

14   Mississippi Consumer Protection Act and, number two, the

15   Mississippi antitrust laws.  We had that discussion earlier.

16   I think y'all know kind of -- you know, you obviously know

17   your arguments.  You were able to, pretty quickly, orally

18   state them.  I would just like to you put them on paper --

19           **MS. SECOY:**  Sure.

20           **THE COURT:**  -- me to be able to see them, and also

21   add any additional context, color, or law supporting those

22   arguments that you would like to in a supplemental brief.

23           **MS. SECOY:**  Absolutely.  We're used to that question.

24   We can do that.

25           **THE COURT:**  And I've already started looking at some

1  of the cases interpreting the Mississippi Consumer Protection

2  Act and the Mississippi antitrust laws, and so any -- any

3  cases that you want to point out to me on those issues, feel

4  free as well.  I mean, just -- and, look, I've already started

5  highlighting Mississippi Encyclopedia -- Mississippi Practice

6  Encyclopedia of Mississippi Law and the Encyclopedia of

7  Mississippi Law for antitrust and Mississippi Consumer

8  Protection Act, and I've looked at the cases that are cited in

9  the Encyclopedia of Mississippi Law.  Like for example, the

10  Mississippi Consumer Protect Act can be found at Section 2561

11  of Encyclopedia of Mississippi Law, and under antitrust law,

12  it's 2560.  And so I was looking just if there was a -- just

13  a -- you know, as I mentioned before, I didn't see that just

14  definitive explicit recovery of monetary damages by the

15  Attorney General or by the State of Mississippi.  So I think

16  what y'all's argument is, is you're going to say, well, this

17  portion of the statute plus this portion of the statute or

18  maybe your constitutional or common law right to bring is how

19  you get there, but I want to kind of have that ability to seek

20  monetary damages explained to me under the law, because I just

21  didn't see it immediately offhand as I was researching in

22  advance of this hearing.

23        **MS. SECOY:**  Sure.

24        **THE COURT:**  And then I saw in that *State ex rel.*

25  *Fitch v. Yazaki North America* opinion from Mississippi Supreme

1    Court from 2020, and this is kind of also on the liability

2    issues, it talked about wholly intrastate conduct, wholly

3    intrastate conduct of antitrust law under Mississippi

4    antitrust issues.  And I know that what y'all are seeking

5    for -- related to antitrust violations are for engrossing or

6    forestalling, not for monopolies necessarily.  That's not

7    really -- it's really for engrossing or forestalling a

8    commodity, but that case, that *Yazaki North America* case, it

9    did kind of talk about intrastate conduct.  So to the extent

10   that you believe that case is not applicable to your situation

11   because you're arguing for a different type of violation under

12   the Mississippi antitrust laws related to engrossing or

13   forestalling, or to the extent that your argument is, We are

14   pointing to intrastate conduct violations or that are wholly

15   intrastate, I am curious what the State of Mississippi's

16   position is.

17         And I will say all of this is under the big picture

18   of not only do we have the Foreign Sovereign Immunities Act

19   where I -- it looks like to me I have to have -- I have to be

20   satisfied from an evidentiary standpoint on a number of

21   issues.  I think there is an undercurrent in any default

22   judgment proceeding that I have to be satisfied that the law,

23   the law, provides a basis, provides a basis for recovery

24   outside of the evidence itself that is presented.

25         And then we also -- y'all mentioned joint and several

1    liability for all defendants related to all -- kind of related

2    to all conduct, but certainly related to all violations of the

3    Mississippi Consumer Protection Act and Mississippi antitrust

4    laws, and I would like that to be briefed, joint and several

5    liability for all of those.  And not, obviously, just joint

6    and several liability from a tort perspective, but joint and

7    several liability from a Consumer Protection and an antitrust

8    perspective.

9          And then it was also raised today that any other

10   funds that were injected into Mississippi's economy or that

11   were used for wages or anything else in Mississippi's economy,

12   whether as PPE loans or other CARES Act relief, that that was

13   a collateral source, and I would just like to see that in your

14   brief as well, why I'm not supposed to consider that at all,

15   why that is a collateral source.

16         And feel free to request a transcript, just to make

17   sure.  It may be easier.  It may be easier.

18         **MS. SECOY:**  Yes, please.

19         **THE COURT:**  Now, that being said, I want to go ahead

20   and kind of point out these issues, because unfortunately for

21   y'all, y'all are not done.  I want to -- we're going to have a

22   supplemental brief that's going to be filed, and then I'm

23   going need to get to work.  And I'll be working in the

24   meantime, but I'm going to need to get to work on a fairly

25   detailed opinion.

1          So how much time do you all need?  Do you want to

2    confer and see?

3          **MS. BEALE:**  Do you know how long it would take to get

4    the transcript?

5          **COURT REPORTER:**  I would say hopefully seven days.

6          **THE COURT:**  And I'm not rushing you.  I know there's

7    some -- you know, I know this is a big case for all of you.  I

8    know that you want to put a lot of time and effort into it,

9    and I know that there are some unique issues that you don't

10   see in your daily practice.  I get that.  So I want you to

11   have as much time as you'd like.

12         **MS. SECOY:**  I mean, I -- and I know we're all ready

13   to put this to bed as well.  Does three months sound

14   reasonable?

15         **THE COURT:**  It's fine with me if you would like that

16   much time to fully research the issues and fully brief them.

17         **MS. SECOY:**  I think so.  And we'll get it to you

18   sooner if we can, but considering our other workload, as

19   director, wearing kind of multiple hats, it would be helpful.

20         **THE COURT:**  Yes.  Okay.  So we'll do three months

21   from today's date.  We'll enter a text order today that will

22   recognize that that was the request of the government -- of

23   the State of Mississippi to file that brief three months from

24   today's date, and that will be the deadline.  We'll put that

25   in the record as well.

1          Okay.  Anything else from the parties before we

2     conclude today's hearings?  Or not from the parties.  From the

3     State of Mississippi.

4          **MR. RANKIN:**  Your Honor, I want to thank you for

5     providing the clarity that you have with respect to what's

6     required for a supplemental brief as well, the same you did in

7     the pretrial conference.  It's very helpful -- especially in a

8     case where there's no party on the other side litigating, it's

9     very helpful to focus on what are the most relevant issues.

10    Thank you.

11         **MS. SECOY:**  Yes, thank you for taking your time with

12    us today.

13         **THE COURT:**  All right.  Anything else?

14         **MS. SECOY:**  No, Your Honor.

15         **THE COURT:**  All right.  That will conclude today's

16    hearing.  Court will stand adjourned.  Thank you.

17                        (Hearing concluded.)

18                            - - -

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

I, Kati Vogt, RPR, RMR, RDR, CRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenographic reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

S/ *Kati Vogt*
KATI VOGT, RPR, RMR, RDR, CRR
OFFICIAL COURT REPORTER