IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

THE STATE OF MISSISSIPPI,
*ex rel.* LYNN FITCH, in Her

Official Capacity as Attorney General
of the State of Mississippi,

      Plaintiff,

                              Civil Action No. 1:20-cv-168-TBM-RPM

THE PEOPLE'S REPUBLIC OF CHINA,
THE COMMUNIST PARTY OF CHINA,
NATIONAL HEALTH COMMISSION OF
THE PEOPLE'S REPUBLIC OF CHINA,
MINISTRY OF EMERGENCY
MANAGEMENT OF THE PEOPLE'S
REPUBLIC OF CHINA, MINISTRY OF
CIVIL AFFAIRS OF THE PEOPLE'S
REPUBLIC OF CHINA, PEOPLE'S
GOVERNMENT OF HUBEI PROVINCE,
PEOPLE'S GOVERNMENT OF WUHAN
CITY, WUHAN INSTITUTE OF VIROLOGY,
and CHINESE ACADEMY OF SCIENCES,

      Defendants.

---

**POST-HEARING BRIEF**

---

      COMES NOW, the Plaintiff, State of Mississippi, ex rel. Lynn Fitch, Attorney General

(hereafter "State"), and respectfully files this Post-Hearing Brief.

## INTRODUCTION

      On Monday, February 10, 2025,  the State appeared before this Honorable Court in an

evidentiary hearing to demonstrate the substantial harm each Defendant has jointly and severally

caused to the State and its citizens at the beginning of the COVID-19 pandemic through their anticompetitive, unfair, and deceptive scheme to conceal the severity of COVID-19 in order to hoard personal protective equipment ("PPE"). At the end of the hearing, the Court instructed the State to provide post-hearing briefing regarding the following topics:

1. Standard of Review under the Foreign Sovereign Immunities Act;

2. Commercial Nature of Course of Conduct;

3. China as a Legal Entity or Person for the Purposes of Mississippi Consumer Protection Act ("MCPA") and State Antitrust Laws;

4. Recovery of Monetary Damages by the State of Mississippi through the Attorney General's Office;

5. Whether an Antitrust Violation Needs To Be Wholly Intrastate;

6. Joint and Several Liability from a Consumer Protection and an Antitrust Perspective;

7. The Collateral Source Rule regarding Federal Aid.

Accordingly, the State provides the following to wit:

## I. Standard of Review under the Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act ("FSIA") applies to all litigation against foreign states and governments, including their agencies and instrumentalities. 28 U.S.C. § 1602, *et seq*. The FSIA "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v. Weltover, Inc*., 504 U.S. 607 (1992). "No judgment by default shall be entered by a court… against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). § 1608(e) does not require this court to demand additional

or different evidence than it would ordinarily receive in rendering its decision. *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53, 63 (D. D.C. 2008); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010). "In assessing the plaintiffs' evidence, this court may 'accept as true the plaintiff's uncontroverted evidence. *Elahi v. The Islamic Republic of Iran*, 124 F.Supp.2d 97, 100 (D.D.C.2000)." *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010).

Courts apply a "lenient standard" for factual findings by a trial court in FSIA default hearings, recognizing that "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (reversed on other grounds). "Given the difficulty of obtaining direct proof of the types of conduct for which the FSIA provides a remedy, the statute permits courts to credit indirect evidence and to impose a lower evidentiary burden than they might apply in a different context." *Saharkhiz v. Islamic Republic of Iran*, Case No. 19-cv-2938, 2023 WL 9196605, at *5 (D.D.C. Oct. 16, 2023) (slip copy); *Missouri ex rel. Bailey v. People's Republic of China*, No. 1:20-CV-00099-SNLJ (E.D. Mo. Mar. 7, 2025). "[T]he Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to ... differing situations.'" *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C.Cir.1981) (citing *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014).

Lastly, "it will be enough if the evidence show [*sic*] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *see also Bigelow v. RKO Radio*

*Pictures, Inc.*, 327 U.S. 251, 264 (1946) ("just and reasonable estimate" approved). "Once

liability has been established, 'the risk of uncertainty in calculating damages falls upon the

wrongdoer.'" *Comcast of Illinois X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007)

(*c*iting *Yonkers Branch - NAACP v. City of Yonkers*, 251 F.3d 31, 40 (2d Cir.2001)).

## II. Commercial Nature of Course of Conduct

"[A] foreign state shall be immune from jurisdiction of the courts of the United States

and of the States" unless an exception in this chapter applies. 28 U.S.C. § 1604. The most

significant and likely most utilized exception is the commercial activity exception found at 28

U.S.C. § 1605(a)(2), which provides that a foreign state shall not be immune from the

jurisdiction of United States courts in a case:

> in which the action is based upon a commercial activity carried on in the United
> States by the foreign state; or upon an act performed in the Unted States in
> connection with a commercial activity of the foreign state elsewhere; or upon an
> act outside the territory of the United States in connection with a commercial
> activity of the foreign state elsewhere and that act causes a direct effect in the
> United States.

"Commercial activity" can be "a regular course of commercial conduct or a particular

commercial transaction or act. The commercial nature of an activity shall be determined by

reference to the nature of the course of conduct or particular transaction or act, rather than by

reference to its purpose." 28 U.S.C. § 1603(d).[1]

The key question is whether the activity is "commercial" under the FSIA or if it is

connected with a commercial activity. "When a foreign government acts, not as regulator of a

market, but in the manner of a private player within it, the foreign sovereign's actions are

---

[1] However, the purpose of the activity can be considered to determine the nature of the activity. *Rush–Presbyterian–St. Luke's Medical Center v. Hellenic Republic*, 877 F.2d 574, 578 (CA7), cert. denied, 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989) (citing *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1393 (5th Cir.1985); *Segni v. Commercial Office of Spain*, 835 F.2d 160, 164 (7th Cir.1987*); Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1023 (9th Cir.1987) cert. denied, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988).

"commercial" within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc*., 504 U.S. 607, 614 (1992). *See also Saudi Arabia v. Nelson*, 113 S.Ct. 1471, 360 (1993).

In the instant litigation, Mississippi asserts that the foreign Defendants misrepresented the nature of the COVID-19 virus in order to further their scheme to corner the market on PPE while the rest of the world was unaware. The Defendants engaged in an extensive cover-up and misleading public relations campaign.[2] Further, the foreign Defendants bought up the supply of PPE, committed hostile takeovers of U.S. factories in China to prevent them from shipping PPE to the U.S. and to Mississippi, and then turned around and sold substandard PPE to Mississippi at inflated prices - all while hundreds of thousands of people across the globe, including in Mississippi, began to get sick and die. The foreign Defendants' actions and hoarding of PPE were initiated outside of the U.S. and had a direct effect in the U.S. pursuant to 28 U.S.C. § 1605(a)(2). A "direct effect" need not be substantial or foreseeable, but an "effect is 'direct' if it follows an immediate consequence" of the foreign defendants' activity. *Weltover*, 504 U.S. at 618.

In the recent decision in *Missouri ex rel Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024), the Eighth Circuit recognized the commercial activity exception to the FSIA and, based on the same Congressional Reports and State Department materials introduced into evidence by the State of Mississippi, found that Missouri's PPE hoarding claim survived the dismissal by the lower court because it was a commercial activity. *Id*. The Court reasoned that taking over mask-producing factories and buying up a substantial portion of the world's supply of PPE are the actions of a private player in the market. *Id*. at 938 (citing *Weltover,* 504 U.S. at 614). The Eighth Circuit also found that Missouri plausibly alleged that the Defendants'

---

[2] Hearing Transcript at 17-19 and 28-32; Complaint at 12-22.

anticompetitive behavior had a direct effect in the United States. *Id*. at 939. "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects." *Id.* Further, having taken over the factories and cornered the market before the rest of the world knew what was happening meant that once the virus spread, "China was able to maintain its stockpile and prolong the shortage." *Id*. The Eighth Circuit reasoned that "basic supply-and-demand principles tell us that these market effects depended little, if at all" on independent variables, "given the information asymmetry and tight timeframe that existed at the time." *Id. See also Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen*., 600 F.3d 661, 664– 66 (D.C. Cir. 2010); cf. Minn-Chem, 683 F.3d 845, 859 (concluding that "foreign supply restrictions, and the concomitant price increases forced upon . . . purchasers, were a direct—that is, proximate—cause of . . . subsequent price increases in the United States").

Hoarding, or in antitrust terms – engrossing and forestalling – a product is an act that a private player can commit. A hostile takeover of a company is an act that a private player can commit.[3] Withholding information and deceiving others to further an anticompetitive and unfair scheme in trade or commerce is an act that a private player can commit. For instance, several states, including the State of Mississippi, have alleged that Google violated federal and state antitrust laws, as well as consumer protection acts, by hiding how their advertising technology worked in order to take further control over the market and to take advantage of unknowing participants.[4]

---

[3] What Are Some Top Examples of Hostile Takeovers?, Investopedia,  Brian Beers, https://www.investopedia.com/ask/answers/042815/what-are-some-prominent-examples-hostile-takeovers.asp (Examples include the InBev acquisition of Anheuser-Busch in 2008, the Kraft Heinz Company takeover of Cadbury in 2010, and the Sanofi S.A. acquisition of Genzyme Transgenics Corp. in 2011.)
[4] Fourth Amended Complaint, *State of Texas et al. v. Google LLC*, ED Tex (May 5, 2023) (Memorandum Opinion and Order denying Motion to Dismiss and confirming right to recover as *parens patriae* entered Jan. 28, 2025).

Nevertheless, 28 U.S.C. § 1605(a)(2) only requires that the act be ***in connection with*** commercial activity. China made well over 6.2 trillion dollars on PPE in 2020.[5] The Chinese Academy of Sciences, the parent organization of the Wuhan Institute of Virology, has an annual revenue of ¥10.78 million.[6] The Defendants are clearly involved in commercial activity, and these actions were commercial in nature or, at minimum, connected with commercial activity.

### III. Defendants as a Person under the Mississippi Consumer Protection Act and State Antitrust Laws

The People's Republic of China ("PRC") and its Co-defendants constitute persons under the Mississippi Consumer Protection Act ("MCPA") and state antitrust laws. Under the MCPA, the term "person" is defined as "natural persons, corporations, trusts, partnerships, incorporated and unincorporated associations, and any other legal entity." Miss. Code § 75–24–3. The term "legal entity" is extraordinarily broad, and Merriam Webster defines it as an entity "having under the law rights and responsibilities and especially the capacity to sue and be sued."[7] Merriam Webster defines "association" as the act of associating, the state of being associated, or an organization of persons having a common interest.[8] All of the Defendants are legal entities that have rights and obligations under local and international law, including the ability to sue and be sued.[9] For instance, the Foreign Sovereign Immunities Act sets forth how foreign governments may be sued such as the PRC and its departments and political subdivisions including its National Health Commission and the People's Government of Wuhan City. The Wuhan Institute

---

[5] https://www.grandviewresearch.com/horizon/outlook/personal-protective-equipment-ppe-market/china.
[6] https://craft.co/chinese-academy-of-sciences
[7] https://www.merriam-webster.com/legal/legal%20entity
[8] https://www.merriam-webster.com/dictionary/association
[9] See Administrative Litigation Law of the People's Republic of China; Interpretation of the Supreme People's Court on Several Issues Concerning the Application of "Administrative Litigation Law of the People's Republic of China" 25 WAILJ 133Translated by Benjamin Minhao Chen , Zhiyu Li .Washington International Law Journal; https://journaloflawandsociety.co.uk/blog/administrative-lawsuits-and-government-citizen-relations-of-china/.

of Virology is part of the Chinese Academy of Sciences, which is governed by the executive branch, or State Council, of the PRC.[10]

The Defendants would qualify as associations as well by definition. The Chinese Academy of Sciences is organized for a common interest as the national academy for natural sciences for the PRC and one of the largest research organizations in the world.[11] Meanwhile, the Communist Party of China ("CPC") is a "unified entity organized according to its program, constitution and the principle of democratic centralism."[12]

Similarly, Mississippi's antitrust law, Miss. Code Ann. § 75-21-3, applies to "[a]ny corporation, domestic or foreign, or individual, partnership, *or association of persons whatsoever,*" in other words any kind. (emphasis added.) The Defendants, as described in the above paragraph, each constitute an association of persons.

The Eastern District of Missouri  also treated the same Defendants as persons under Missouri antitrust law, which has a very similar definition.  "'Person' means any individual, corporation, firm, partnership, incorporated or unincorporated association or any other legal or commercial entity." Mo. Rev. Stat. § 416.021.2. Relying on the same exhibits that the State entered into evidence in this matter, the Eastern District of Missouri found that, under state and federal antitrust law

> Defendants engaged in monopolistic actions to hoard PPE through both the nationalization of U.S. factories and the direct hoarding of PPE manufactured or for sale in the United States. At the same time, China was misleading the world about the dangers and scope of the COVID-19 pandemic in order to facilitate, and extend, Defendants' campaign to hoard PPE… *Id.* at 939. That is a textbook example of monopoly power. See *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1024 (8th Cir. 2020) ("Monopoly power is defined as the power to control prices or exclude competition.") (quoting *Concord Boat Corp. v. Brunswick Corp*., 207 F.3d 1039, 1060 (8th Cir. 2000))… China's

---

[10] Npc.gov.cn
[11] www.cas.cn.
[12] http://www.china.org.cn/

monopoly power resulted from 'classic anticompetitive behavior'… *Bailey*, 90 F.4th at 938… The effect of all of these actions was that China managed to exploit its monopoly power not because of "a superior product, business acumen, or historic accident," but rather because it concealed, suppressed, and lied about the coronavirus while aggressively hoarding the world's supply of PPE. *Grinnel Corp*., 384 U.S. at 571. These actions, suppressing and misrepresenting the existence, and then transmissibility, of the COVID-19 virus, were taken while China was hoarding PPE from an unsuspecting world.

*Missouri ex rel. Bailey v. People's Republic of China*, No. 1:20-CV-00099-SNLJ  at 11,12,14, 16, 22 (E.D. Mo. Mar. 7, 2025) (citing Sutter, Covid-19:  China Medical Supply Chains and Broader Issues, Congressional Research Service (MS Exhibit No. P6); The Covid-19 and Domestic PPE Production and Distribution: Issues and Policy Options, Congressional Research Service (MS Exhibit No. P5); Minority Staff of House Comm. on Foreign Affairs, Report on the Origins of the COVID-19 Global Pandemic, Including the Roles of the Chinese Communist Party and the World Health Organization (MS Exhibit No. P3 and 4); Keith Bradsher, et al., The World Needs Masks. China Makes Them, but Has Been Hoarding Them, N.Y. Times (Mar. 13, 2020) (MS Complaint at 25).[13]

15 U.S.C. § 7 defines a person for antitrust purposes to include "corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." The Second Circuit in  *Celestin v. Caribbean Air Mail, Inc*. allowed an antitrust case against a foreign sovereign to proceed. The court held that the act of state doctrine did not bar adjudication of the Sherman Act antitrust claim brought by the plaintiffs, since the validity of the act is not being challenged, but rather the anticompetitive nature of the act giving rise to liability.  30 F.4th 133 (2d Cir. 2022). Likewise, in *Pfizer, Inc. v. Government of India*, the court reasoned that Congress intended the

---

[13] Available at:https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html.

definition of "person" under the Sherman Act to be interpreted broadly, including foreign

sovereigns as within the definition.

> It is apparent that this definition is inclusive rather than exclusive, and does not by itself imply that a foreign government, any more than a natural person, falls without its bounds... [T]he legislative history of the Sherman Act demonstrates that Congress used the phrase "any person" intending it to have its naturally broad and inclusive meaning.

434 U.S. 308, 312, (1978). "It follows then, that corporate or governmental status in most

instances is not a bar to the imposition of liability on an entity as a "person" under the Act*." U.S.*

*Postal Serv. v. Flamingo Indus. (USA) Ltd*., 540 U.S. 736, 744–45 (2004).

In their analysis, courts have treated federal and Mississippi state antitrust claims as

"analytically identical." *Walker v. U-Haul Co. of Miss*., 734 F.2d 1068, 1070 n.5 (5th Cir.), on

reh'g, 747 F.2d 1011 (5th Cir. 1984); *Waggoner v. Denbury Onshore, L.L.C*. 612 Fed.Appx. 734,

736 ftnt 2 (5th Cir. 2015); *Georgia Pacific Corp. v. Cook Timber Co., Inc*., 194 So.3d 118 (Miss.

2016) (applied Sherman Act analysis.) *See also Pope v. Mississippi Real Estate Comm'n*, 695 F.

Supp. 253, 270 (N.D. Miss. 1988), aff'd, 872 F.2d 127 (5th Cir. 1989).


## IV. Recovery of Monetary Damages by the State of Mississippi through the Attorney General's Office

### A.  Violations of Law and Authority of the Attorney General

As background, the State has alleged and demonstrated at the evidentiary hearing the

following claims against the Defendants:

1.  A violation of the MCPA for deceptive trade practices under Miss. Code Ann. § 75-24-5(1) by misrepresenting the nature of the Covid virus, which upon information

and belief came from the Wuhan Institute of Virology, and withholding information

that they possessed concerning the virus;

2.  A violation of the MCPA for committing an "unfair method of competition affecting

commerce" by hoarding PPE under Miss. Code Ann. § 75-24-5(1);

3.  A violation of state antitrust law, Miss. Code Ann. § 75-21-3, for restraining the

freedom of trade and forestalling and engrossing PPE.

Mississippi has brought forth evidence establishing Defendants' liability and its right to

relief pursuant to the standard provided in 28 U.S.C. § 1608(e). The authority of the State to

bring this action on behalf of the State *and* as *parens patriae* on behalf of consumers is settled in

statutory and common law. The State is charged with the responsibility to enforce the MCPA and

authorized to bring such claims. Miss. Code Ann. § 75-24-1. Enforcement of the Mississippi

antitrust statutes "shall be brought by and in the name of the State of Mississippi upon relation of

the attorney general…" Miss. Code Ann. § 75-21-1. See *Hood ex rel. State v. BASF Corp*., 2006

WL 308378, at *3 (Miss. Ch. Jan. 17, 2006), *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel.,*

*Barez*, 458 U.S. 592 (1982).

> The Attorney General is a constitutional officer possessed of all the power and
> authority inherited from the common law as well as that specifically conferred
> upon him by statute. This includes the right to institute, conduct and maintain all
> suits necessary for the enforcement of the laws of the state, preservation of order
> and the protection of public rights.

*Gandy v. Reserve Life Insur.* 279 So.2d 648, 649 (Miss. 1973). In addition, Mississippi law

entitles the State to all forms of relief and "all remedies to which individuals are entitled..." Miss.

Code Ann. § 11-45-11. The State possesses multiple bases for recovering damages and/or

restitution in this matter to address the harm caused by the Defendants to the State of Mississippi

and its citizens.

**B.  Recovery as a Person under the MCPA and Mississippi Antitrust Laws**

The State is authorized to recover monetary damages under both MCPA subsections 11

and 15. "The court may make such additional orders or judgments, including restitution, as may

be necessary to restore to any person in interest any monies or property, real or personal, which

may have been acquired by means of any practice prohibited by this chapter…"

Miss. Code Ann. § 75–24-11.

> In addition to all other statutory and common law rights, remedies and defenses,
> any person who purchases or leases goods or services primarily for personal,
> family or household purposes and thereby suffers any ascertainable loss of money
> or property, real or personal, as a result of the use or employment by the seller,
> lessor, manufacturer or producer of a method, act or practice prohibited by  §  75-
> 24-5 may bring an action… to recover such loss of money or damages…

Miss. Code Ann. § 75-24-15.

As described above, "person" under the MCPA is defined as, "natural persons,

corporations, trusts, partnerships, incorporated and unincorporated associations, and any other

legal entity." Miss. Code Ann. § 75-24-3.While we have established that the Defendants are

persons for the purposes of the MCPA and state antitrust law, the state is also a person for the

purposes of the MCPA as well because it is also a legal entity. A state is a legal entity and is

entitled to the fundamental rights and privileges belonging to every legal entity. [14]  Therefore, the

state is specifically authorized to pursue and recover the remedies provided in Miss. Code Ann. §

75-21-9. *Mississippi ex rel. Hood v. Entergy Mississippi, Inc*., 2019 WL 1433772 (S.D. Miss.

2019)  (citing *Tirrell v. Johnston*, 171 A. 641 (1934), aff'd, 293 U.S. 533 (1934).)

As previously discussed herein, courts have treated federal and Mississippi state antitrust

claims as "analytically identical." *Walker v. U-Haul Co. of Miss*., 734 F.2d 1068, 1070 n.5 (5th

---

[14] The State as a Legal Entity, Ljupka Petrevska, International Journal of Economics and Law, August 2022 (Vol.12, No. 35)

Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984); *Waggoner v. Denbury Onshore*, L.L.C. 612

Fed.Appx. 734, 736 ftnt 2 (5th Cir.2015); *Georgia Pacific Corp. v. Cook Timber Co., Inc.*, 194

So.3d 118 (2016) (applied Sherman Act analysis.) *See also Pope v. Mississippi Real Estate*

*Comm'n*, 695 F. Supp. 253, 270 (N.D. Miss. 1988), aff'd, 872 F.2d 127 (5th Cir. 1989).

The U.S. Supreme Court in *State of Ga. v. Evans* held that "[n]othing in the Act, its

history, or its policy, could justify so restrictive a construction of the word 'person' in s 7 as to

exclude a State. Such a construction would deny all redress to a State, when mulcted by a

violator of the Sherman Law, merely because it is a State." 316 U.S. 159, 162–63 (1942).[15]

Recently in the similar action against the PRC and related Defendants before the Eastern

District of Missouri, the court found that

> Although Georgia and India were acting as plaintiffs in their respective antitrust
> actions, the Supreme Court further held, in the same term as *Pfizer*, that the term
> "person" is read the same regardless of whether the State or foreign nation is a
> plaintiff or defendant. *City of Lafayette, La. v. Louisiana Power & Light Co.*, 435
> U.S. 389, 397 (1978). As such, this Court finds that both Missouri and Defendants
> qualify as "persons" under the relevant antitrust statutes.

*Missouri ex rel. Bailey v. People's Republic of China*, No. 1:20-CV-00099-SNLJ  at 22 (E.D. Mo.

Mar. 7, 2025).

**C. Authority to recover under Miss. Code Ann. § 75–21–7**

The Mississippi Antitrust Act states that the Attorney General may bring a suit for

***forfeiture*** and recovery of penalties in "the name of the state on the relation of the attorney

general ..." Miss. Code § 75–21–7 (1972) (emphasis added). While the State has authority to

recover as *parens patriae* on behalf of its citizens as described below, the District Court for the

---

[15] *See also City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389 (1978) (definition of "person" or covered by antitrust laws includes cities, whether as public body suing as plaintiffs seeking damages for antitrust violations or being sued as defendants).

Southern District of Mississippi in *State v. Abbott* found that it was not necessary to decide whether the State of Mississippi has the authority to pursue *parens patriae* claims in the manner asserted because of the State's statutory rights under Miss. Code Ann. § 75–21–7.  As in the present case, the state brought an action under both the MCPA and the state antitrust laws, and the court found that "[t]his statute clearly gives the Attorney General of the State the authority to bring suit in the name of the State for violations of Mississippi antitrust law." *State of Miss. v. Abbott Laboratories, Inc*., 900 F. Supp. 26, 31 (S.D. Miss. 1995).

### D.  Recovery as *Parens Patriae*

The Mississippi Code also states that "the Attorney General ... shall have the powers of the Attorney General at common law ..." Miss. Code Ann. § 7–5–1 (1972). In *Alfred L. Snapp & Son, Inc., v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982), the United States Supreme Court explained that every state has the ability to represent the interests of all citizens in cases raising matters of sovereign interest. Accordingly, the District Court for the Southern District of Mississippi recognized this authority to recover as *parens patriae* under Mississippi antitrust laws and the MCPA in *Hood ex rel. Mississippi v. Microsoft Corp*, 428 F.Supp.2d 537, 545-546 (S.D. MS 2006). Subsequently, this right was acknowledged and not disputed by the United States Supreme Court in *Mississippi ex rel. Hood v. AU Optronics Corp*., 571 U.S. 161, 164 (2014).

In the seminal case of *Snapp*, the Supreme Court held that *parens patriae* is "inherent in the supreme power of every State ... often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." *Snapp*, 458 U.S. at 600 (citing *Mormon Church v. United States*, 136 U.S. 1, 57 (1890)). "First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in

general." A State may maintain a *parens patriae* action if the State can articulate a quasi-sovereign interest apart from the interests of private parties. A State has a quasi-sovereign interest in the economic conditions of its citizens. The indirect economic effects of the injury must be considered as well as "whether the State has alleged injury to a sufficiently substantial segment of its population." *Snapp*, 458 U.S. at 607 and 609. One indicator of whether a State has standing to sue as *parens patriae* is "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id*. at 607.  An express grant of *parens patriae* authority is not needed for an attorney general to bring an action on behalf of the state to recover *parens patriae* damages. *Hood v. BASF 2006 WL 308378* at 3 citing *State of Louisiana, ex rel. Ieyoub v. Borden, Inc*., 1995 WL 59548, *3 (citing *State of Texas v. Scott & Fetzer Co*., 709 F.2d 1024 (5th Cir. 1983)).

*Parens patriae* actions are disfavored where the injury falls "on a small group of citizens who are likely to challenge" the harm directly. *Maryland v. Louisiana*,  451 U.S. 725, 739 (1981). But where "a great many citizens ... are faced with increased costs aggregating millions of dollars per year" and "cannot be expected to litigate [the issue] given that the amounts paid by each consumer are likely to be relatively small," *parens patriae* suits are appropriate. *See also In re Edmond*, 934 F.2d 1304 (4th Cir. 1991) (state's recovery as restitution under *parens patriae* authority.)

*Hood v. BASF* is an excellent example where the court awarded damages to the State under both the state antitrust law and the MCPA, finding that the State was entitled to damages and/or restitution under both statutes as a person and as *parens patriae*. In that case, the State purchased food that was illegally overpriced because of the Defendant's illegal monopoly, and the court held that "it is only logical that if the State is a person under the Mississippi Consumer

Protection Act, then the State, using the food it purchased, would fulfill the requirement of "personal use." *Hood ex rel. State v. BASF* 2006 WL 308378 at 12 (cited 13 times by various courts including the Mississippi Supreme Court and the Southern District.) The fact that the State of Mississippi has already addressed anticompetitive conduct, like the Defendant's, through its antitrust laws and the MCPA, is evidence that the State of Mississippi has a quasi-sovereign interest and standing as *parens patriae* for all of its citizens. *Mississippi ex rel. Hood v. Entergy Mississippi, Inc*., 2019 WL 1433772 (S.D. Miss. 2019).

### E.  Penalties under the MCPA and State Antitrust Laws

In addition to damages and/or restitution, Mississippi has three statutes applicable to this litigation that provide penalties as a result of the Defendants' actions. Mississippi seeks penalties against the Defendants based on the number of alleged violations of its antitrust statute and MCPA. The following is an analysis of these statutes according to the facts of this case, as well as the pertinent penalty sections.

### 1.  Miss. Code Ann. § 75-21-7: Penalty for Violation of Antitrust Laws

The Defendants are liable for penalties for violating Mississippi's antitrust statutes of not less than one hundred dollars ($100.00) and not more than two thousand dollars ($2,000) per violation. Under this particular statute, each month that the Defendants violated the antitrust statutes shall be a separate violation.  Mississippi has established that the Defendants' violated its antitrust laws by restraining trade as well as by forestalling and engrossing PPE for at least a three-month period from January - March 2020, which would render *maximum penalties under this statute of $6,000.00.*

### 2.  Miss. Code Ann. § 75-21-9. Additional Penalty for Violation of Antitrust Laws

In addition to damages awarded, the Defendants are liable for a penalty of five hundred dollars ($500.00) *for each instance of injury*. Considering that well over 11,000 Mississippians died as a result of the Defendants' actions and the harm caused to the State and to rest of its citizens, this figure could be enormous, and the State defers to the discretion of this Honorable Court to determine an appropriate amount.[16]

### 3. Mississippi Consumer Protection Act Subsection § 75-24-19(1)(b). Civil penalties.

The Defendants are liable for penalties for violating the MCPA in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation.

a) As summarized in Exhibit P19, which was admitted into evidence at the February 10, 2025, evidentiary hearing, the Defendants hoarded 20,836,254 items of PPE. ***The State submits that each item hoarded counts as a separate violation, totaling $208,362,544,627.96.*** In addition, the Defendants unlawfully increased the price of the PPE, when the PRC eventually sold it to Mississippi, in nine (9) separate categories of PPE, such as masks, garments, and gloves. Due to the Defendants' lack of cooperation with this Honorable Court, we do not have discovery to help determine the exact amount of PPE resold at inflated prices.

b) Mississippi presented evidence to show Defendants misrepresented and withheld information regarding the COVID-19 virus at least sixteen (16) times to further their scheme and to corner the market while the rest of the world was unaware. ***Each instance would constitute a violation, potentially totaling $160,000.***

***The two amounts combined under this statute total $208,362,794,627.96.***

---

[16] One could say as a starting point that, at minimum, 11,857 deaths multiplied by $500 would reach $5,928,500.

***With the current information available, the penalties that could be awarded under all three statutes in this matter is $208,362,794,627.96 + $6,000 + $500 = $208,362,801,127.96 (plus any multiplier for Miss. Code Ann. § 75-21-9 that this Honorable Court may apply)****.*

### V.  Whether an Antitrust Violation Needs To Be Wholly Intrastate

In its Complaint, the State alleged that "[t]he Defendants' acts violated Miss. Code Ann. § 75-21-3, including but not limited to subsections (a) and (c), by restraining or attempting to restrain the freedom of trade concerning PPE and/or by engrossing or forestalling, or attempting to engross or forestall, PPE by hoarding PPE…[17] Anticompetitive conduct affecting "both the inter and intra state commerce in a commodity is necessarily subject to the laws both of the general government and of the states affected thereby." *Standard Oil of Kentucky v. State,* 65 So. 468, 470 (1914) (only overruled on question of making a special appearance). *Standard Oil* involved a national price-fixing scheme related to petroleum by defendant Standard Oil and its subsidiaries.  The Court noted that no petroleum products were produced in the State of Mississippi.  All petroleum sold and distributed in Mississippi by Standard Oil Company of Kentucky was clearly imported.  Yet, once the petroleum was in and was sold in Mississippi, it became "incorporated into the general mass of property [in Mississippi]."  *Standard Oil*, 65 So. 468, 470 (Miss. 1914).  The *Standard Oil* court then looked to the U.S. Supreme Court's holding in *Leisy v. Hardin*, 135 U.S. 100 (1890) when it stated that an article

> loses its [interstate] character as such when the transportation has been completed and it is mingled with and becomes a part of the general mass of property in the state of its destination.  It then becomes, in so far as the power of the general and state governments to regulate commerce is concerned, subject exclusively to the operation of state laws.

*Standard Oil*, 65 So. at 470.

---

[17] Complaint at 28.

In *Hood ex rel. State v. BASF Corp*, Mississippians had been illegally overcharged by purchasing products distributed across the country, which contained price-fixed vitamins, and the defendant claimed the Complaint should be dismissed because the State had allegedly not shown any "wholly intrastate" transactions allegedly necessary for a valid claim. However, the learned chancellor correctly pointed out that "the Mississippi Supreme Court held that these foreign companies and their national monopoly were subject to the Mississippi Antitrust Act . . . . The notice requirements for the federal pleading standard have been satisfied as both interstate and intrastate conduct has been alleged as stated in [the above language from] *Standard Oil*". *Hood v. BASF* 2006 WL 308378 at 8.

*State ex rel. Hood v. Yazaki* discussed this issue in 2020, but, unlike the case at hand and *Hood v. BASF*, the State in *Yazaki* failed to make any mention that the auto parts were imported into Mississippi whatsoever. 294 So.3d 1178, 1182-83 and 1190 (Miss. 2020). Therefore, Yazaki is distinguishable and did not overturn *Standard Oil of Kentucky v. State.*

Furthermore, the United States Supreme Court has consistently held that the Commerce Clause "does not exclude all state power of regulation" and that "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless ... affect interstate commerce or even ... regulate it." *Southern Pacific Co. V. Arizona,* 325 U.S. 761, 766–67, (1945); *see St. Joe Paper Co. v. Superior Court*, 120 Cal.App.3d 991, (1981), cert. denied, 455 U.S. 982, (1982). The United States Supreme Court has also shown a longtime willingness to defer to state regulation. See *Waters–Pierce Oil Co. V. Texas*, 212 U.S. 86 (1909); *Standard Oil Co. of Kentucky v. Tennessee*, 2176 U.S. 413 (1910); *Straus v. American Publishers' Ass'n*, 231 U.S. 222 (1913). Therefore, Mississippi is not precluded from exercising jurisdiction to enforce its own antitrust law unless its doing so places an undue burden on interstate commerce, which

has not been alleged by the Defendants in default. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978). The United States Supreme Court has given the State of Mississippi the ability to punish illegal antitrust conduct that affects the state. The Defendant's conduct is clearly a local concern with local impact, and regulating it would have no undue burden on interstate commerce. The Eastern District of Missouri agreed and found in the Attorney General's action that state antitrust law is able to form a valid basis for a claim even in instances where the state law claim "regulates or affects interstate commerce." *Missouri ex rel. Bailey v. People's Republic of China*, No. 1:20-CV-00099-SNLJ (E.D. Mo. Mar. 7, 2025) *(*citing *Bennett Bldg. Supplies, Inc. v. Jenn Air Corp.*, 759 S.W.2d 883, 889 (Mo. App. E.D. 1988)).

The State has alleged in its Complaint and in the evidentiary hearing that the PRC and related Defendants' restraint on the flow of PPE to Mississippi by taking over U.S. companies and forestalling and hoarding PPE, from the United States and specifically from Mississippi, had a direct anticompetitive effect on Mississippi. Mississippi relied on the PRC for PPE, from masks to ventilators, and experienced a severe shortage, which exacerbated the impact of the pandemic.[18] Former Mississippi Emergency Management Agency ("MEMA") Director Greg Michel stated that "***almost all [medical-grade masks]are made… mostly in China. The prices for those N95 and KN95 masks had tripled and quadrupled***." After the shortage from the PRC's hoarding and take over of U.S. companies, it took his team three weeks to identify new vendors. *Id.*

> After they stockpiled the PPE, ***China turned around and sold what they didn't need [to Mississippi] at sky-high prices***, and a good bit of that was not even quality -- the quality represented, and it was unusable… So according to the Cambridge University Press study… the disposable gowns peaked at $12 during

---

[18] *Rural Hospitals in Mississippi Were Already on a Cliff. Coronavirus Could Push Them Over*, Giacomo Bologna, Clarion Ledger (March 27, 2020*); Mississippi Emergency Agency Spent $20M on Coronavirus Supplies. Here's What We Bought*, Giacomo Bologna, Clarion Ledger (May 20, 2020).

the first week of March, which is 13.7 times higher than pre-pandemic prices; the
average gown -- hospital gown was seven and a half times higher than pre-
pandemic prices; N95 respirators had a peak price of $12, eight times higher than
pre-pandemic prices; and facemasks peaked at .55, which is 11 times higher. And
this is -- these are Chinese exports, when they finally felt like they had enough
and they could sell it. Gloves averaged two and a half times higher than the pre-
pandemic price. This drastically impacted our frontline medical responders' ability
to do their jobs protecting us and themselves.

(Hearing Transcript at 34-35.) (emphasis added). MEMA spent more than $20 million on Covid-

19 as of May 20, 2020.[19] "In addition to the toll on human life and health, the pandemic caused

enormous economic disruptions… in Mississippi, with over 203,000 Mississippians filing jobless

claims between March 15, 2020 and April 25, 2020."[20] The Defendants in default have offered

no defense or explanation.

### VI. Joint and Several Liability under Consumer Protection and Antitrust

### A. Joint and Several Liability under Consumer Protection

The Defendants are jointly and severally liable for their MCPA violations. The Southern

District of Mississippi "recognize[d] the long-standing principle of tort liability that the liability

of joint tortfeasors is joint and several" when applying the North Carolina version of the MCPA,

which is very similar. *In re On-Site Fuel Service, Inc*., 2020 WL 3712868 at 12 and 28 (Bankr.

S.D. Miss 2020).

In addition, "[c]ourts will be guided by the interpretations given by the Federal Trade

Commission ["FTC"] and the federal courts to § 5(a)(1) of the Federal Trade Commission Act

(15 USCS 45(a)(1))." Miss. Code Ann. § 75-24-3(c). Under the FTC Act, "courts have justly

---

[19] *Id*. (May 20, 2020).
[20] Complaint at 23 citing Jeffry Bartash, Millions of Layoffs Set to Push Unemployment Rate to Highest Level since
Great Depression, Market Watch (May 4, 2020), available at: https://www.marketwatch.com/story/millions-of-lost-
jobs-may-push-unemployment-rate-tohighest-
since-Great-Depression-2020-05-02; Anna Wolfe, Mississippi Is Fighting an Uphill
Battle with Jobless Claims. A Decades-long Shift in Employment Strategy Didn't Help.,
Mississippi Today (May 3, 2020), available at: https://mississippitoday.org/2020/05/03/mississippi-is-fighting-an-
uphill-battle-with-joblessclaims-a-decades-long-shift-in-employment-strategy-didnt-help/.

imposed joint and several liability where a common enterprise exists." *F.T.C. v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) (citation omitted). Entities participating in a common enterprise are jointly and severally liable for the injuries caused by their conduct. *See FTC v. Investment Developments, Inc*., 1989 WL 62564, 1989 U.S. Dist. LEXIS 6502 at 29 (E.D.La., June 8, 1989).  *F.T.C. v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008). One way to establish such liability is through a common control group, such as the PRC and CPC in the present case. *See FTC v. AmeriDebt, Inc*., 343 F.Supp.2d 451, 462 (D.Md.2004). It is not necessary to prove any particular number of entity connections and any specific connection. Instead, it must be proved that the defendants maintained an "unholy" alliance*. F.T.C. v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008). There is no better way to describe the scheme committed by the Defendants at hand. The City of Wuhan and the Wuhan Institute for Virology adhered to the PRC and CPC's leadership in misrepresenting the nature of the virus while the PRC cornered the market, despite the extraordinary harm to Mississippi and the rest of the world from their efforts. As confirmed by the Mayor of Wuhan, the CPC controlled (and controls) every move they make.[21] The CPC "exercise[s] direction and control over the actions of all other Defendants,"  including China's official government.  Given its role, it is in substance the same "body politic that governs [China]." *Samantar v. Yousuf*, 560 U.S. 305,  314 (2010).

Courts have also adopted a common enterprise exception to common-law principles of corporate structure to permit defendants to be jointly and severally liable where the individuals and the entities may have used "corporate structures to circumvent" legal prohibitions. F.*T.C. v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 808-09 (D.S.D. 2013)(Lange, J.)(citing *P.F. Collier & Son Corp. v. F.T.C.*, 427 F.2d 261, 267 (6th Cir. 1970)). Cf. *F.T.C. v. Kuykendall*, 371 F.3d 745,

---

[21] Complaint at 14-22 and 25-27; Hearing Transcript at 17-19 and 26-35.

759 (10th Cir. 2004)(noting that the common enterprise doctrine may have applied had the FTC supplied sufficient evidence for the theory). *See also Fed. Trade Comm'n v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257 (S.D. Fla. 2019).

## B. Joint and Several Liability under Antitrust

As described above, courts have treated federal and Mississippi state antitrust claims as analytically identical. And "[a]nti-trust liability under § 1 of the Sherman Act is joint and several." *In re Uranium Antitrust Litig*., 617 F.2d 1248, 1257 (7th Cir. 1980). "Joint or common liability arises when [an] act is committed by several persons acting in concert. It means that [each] is entirely responsible for the damage resulting from that concerted conduct. A successful plaintiff may look to any one of the defendants for full satisfaction of a damage award." *In re Uranium Antitrust Litig*., 617 F.2d 1248, 1257 (7th Cir. 1980). The Court in *MacMillan Bloedel Ltd. v. Flintkote Co*. held "[t]he universal common-law rule is that each of two or more persons whose tortious conduct causes harm is liable to the injured party for the entire harm and each may, therefore, be sued separately and held liable for all of the damage. This principle applies to antitrust liability." *MacMillan Bloedel Ltd. v. Flintkote Co*., 760 F.2d 580, 584–85 (5th Cir. 1985). Joint and several liability is another vital instrument for maximizing deterrence.[22]

## VII.    The Collateral Source Rule regarding Federal Aid

Mississippi courts recognize the collateral source doctrine, which prohibits defendants from introducing potential collateral sources of recovery to mitigate damages. *Raymond James, N.A., Tr. of E.C. Care Tr. v. Natchez Hosp. Co*., LLC, No. 5:19-CV-103-DCB-MTP, 2021 WL 5055668, at 5 (S.D. Miss. Sept. 22, 2021). "Under [the collateral source] rule, a defendant tortfeasor is not entitled to have damages for which he is liable reduced by reason of the fact that

---

[22] *See* Lewis A. Kornhauser & Richard L. Revesz, *Sharing Damages Among Multiple Tortfeasors*, 98 Yale L.J. 831 (1989*). Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd*., 281 F.3d 629, 633 (7th Cir. 2002).

the plaintiff has received compensation for his injury by and through a totally independent source, separate and apart from the defendant tortfeasor." *Bailey v. Comcast of Louisiana/Mississippi/Texas, LLC*, 671 F. Supp. 3d 730, 736 (S.D. Miss. 2023). "Mississippi has adopted and follows the 'collateral source rule.'" *Cent. Bank of Mississippi v. Butler*, 517 So. 2d 507, 511–12 (Miss. 1987).

At the evidentiary hearing, the Court specifically mentioned PPP (Paycheck Protection Program) loans and CARES Act (Coronavirus Aid, Relief, and Economic Security Act) relief during the testimony of the State's expert, Corey Miller, and at the conclusion of the hearing. (Hearing Transcript at 87-87, 136.) The State contends that any evidence of federal funding it received, including but not limited to PPP Loans and CARES Act relief, would be inadmissible under the collateral source rule based on the above cited cases because any such federal funds would indeed be from "a totally independent source, separate and apart" from the Defendants named in this action. *See Bailey,* 671 F. Supp. 3d at 736. Further, no such evidence has been introduced by the Defendants in this case that they have, either individually or collectively, provided any relief or compensation to the State as a result of the conduct alleged herein that would somehow reduce the damages owed to the State.

Likewise, the categories of damages and the basis for calculation used by Mr. Miller are separate and apart from any alleged relief provided to the State by the federal government. PPP loans to businesses or individuals are in no way synonymous with the category of lost wages calculated by the State's expert because they are not forgiven in all circumstances. *See* https://www.pandemicoversight.gov/ ("Some businesses had their loans forgiven, others have to pay them back.") The other category of damages calculated by Mr. Miller, loss of life, is also not synonymous with any of the relief intended under the CARES Act. The largest portion of federal

funds allocated to Mississippi were, in fact, used for "Education Stabilization" and other categories in which compensation for loss of life is not contemplated. *See* https://www.pandemicoversight.gov/data-interactive-tools/states/ms.

For the reasons stated above, the Defendants are not entitled to any mitigation or reduction of the damages owed to the State because of any alleged payments the State received from the federal government. The collateral source rule precludes the consideration of any such payments to "reduce or diminish the amount of damages," and for that purpose "the admission of such evidence is reversible error." *Loyacono v. Travelers Ins. Co.*, 163 So. 3d 932, 938 (Miss. 2014).

## CONCLUSION

As described in the February 2025 Report of State Economist Corey Miller and during the Evidentiary Hearing, the Defendants contributed to the deaths of 11,857 Mississippians. As a result of the Defendants' actions, our frontline medical providers struggled to equip themselves, and we lost lives and livelihoods - not to mention the permanent effect on our society because schools and businesses closed for months. The State is entitled to relief under the MCPA and state antitrust laws to redress this egregious harm on behalf of itself and on behalf of its citizens as *parens patriae*. As demonstrated above, the State is not barred by the FSIA. If the court needs additional information or is not inclined to grant the relief requested, the State respectfully requests the opportunity to supplement its briefing.

Respectfully submitted, this the 2nd day of May, 2025.

FOR PLAINTIFF STATE OF MISSISSIPPI
LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

*/s/ Tricia L. Beale*

Tricia L. Beale, Miss. Bar No. 99113
Crystal Utley Secoy, Miss. Bar No. 102132
James M. Rankin, Miss. Bar No. 102332
Consumer Protection Division
Mississippi Attorney General's Office
1141 Bayview Ave., Suite 402
Biloxi, Mississippi 39530
Telephone:  228-386-4404
tricia.beale@ago.ms.gov

Post Office Box 220
550 High Street, Suite 1200
Jackson, Mississippi 39205
Telephone: (601) 359-4213
crystal.utley@ago.ms.gov
james.rankin@ago.ms.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2025, a true and accurate copy of the foregoing was electronically filed by using the Court's CM/ECF system to be served on all counsel of record entered in the case.

This the 2nd day of May, 2025.

*/s/ Tricia L. Beale*
Tricia L. Beale