IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

THE STATE OF MISSISSIPPI, ex rel.
LYNN FITCH, in her official capacity as
Attorney General of the State of Mississippi,

    Plaintiff,

v.

THE PEOPLE'S REPUBLIC OF CHINA,
THE COMMUNIST PARTY OF CHINA,
NATIONAL HEALTH COMMISSION OF
THE PEOPLE'S REPUBLIC OF CHINA,
MINISTRY OF EMERGENCY
MANAGEMENT OF THE PEOPLE'S
REPUBLIC OF CHINA, MINISTRY OF
CIVIL AFFAIRS OF THE PEOPLE'S
REPUBLIC OF CHINA, PEOPLE'S
GOVERNMENT OF HUBEI PROVINCE,
PEOPLE'S GOVERNMENT OF WUHAN
CITY, WUHAN INSTITUTE OF
VIROLOGY, and CHINESE ACADEMY
OF SCIENCES,

    Defendants.

Civil Action No.1:20-cv-168-TBM-RPM

**SUPPLEMENTAL *AMICUS CURIAE* BRIEF
OF THE CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW**

    The China Society of Private International Law (the "Society") respectfully supplements its *Amicus Curiae* Brief to address the Court's question in its Order [59] denying Plaintiff's first Motion for Default Judgment [43] and to address issues of law in the current default judgment proceeding.

    In its Order [59], the Court asked how it should view the Eighth Circuit Court of Appeals' ruling in a similar case brought by the State of Missouri, *State of Missouri ex. rel. Schmitt v. The People's Republic of China*, 610 F. Supp. 3d. 1174 (E.D. Mo. July 8, 2022), *aff'd in part, rev'd in*

1
**EXHIBIT A**

*part sub nom. State of Missouri, ex rel. Bailey v. The People's Republic of China*, 90 F.4th 930 (8th Cir. 2024) (collectively, "Missouri Case"). The defendants in the Missouri Case are the same Chinese entities sued in the instant matter.

In the Missouri case, the district court *sua sponte* dismissed all claims for lack of subject-matter jurisdiction. *Schmitt,* 610 F. Supp. 3d at 1195. On review, the Eighth Circuit affirmed all dismissals except one, the so-called "hoarding" claim. *Bailey*, 90 F.4th at 939. The appeals court held that Missouri's so-called "hoarding" claim is different and satisfies the commercial activity exception to sovereign immunity under the FSIA. Specifically, the court found that Missouri's complaint alleges "classic anticompetitive behavior, except on a country-wide scale,"[1] and that it somehow satisfies the commercial activity exception's "direct effect" requirement. The Society disagrees with the Eighth Circuit's ruling and respectfully submits that this Court should deny Plaintiff's Motion for Default Judgment [80] and dismiss the action *sua sponte*.

**I. The Eighth Circuit's opinion does not affect a finding of lack of subject matter jurisdiction in this case.**

    **A. Based on the Eighth Circuit's own reasoning, the alleged hoarding did not have a direct effect on the alleged harm in the United States.**

Both Missouri and Mississippi allege that Defendants engaged in "hoarding" of personal protective equipment ("PPE"). In the current case, we previously analyzed in detail that Defendants' alleged "hoarding" was not a commercial activity under the FSIA because the alleged restriction of exports and taking over manufacturing are quintessentially sovereign regulatory

---

[1] Alleged acts "on a country-wide scale" by Chinese defendants, none of which is a business entity manufacturing or selling masks, necessarily are acts of a sovereign under the FSIA. A "private player" in the market does not have the ability to act on a "country-wide scale" and certainly not to "[t]ak[e] over mask-producing factories." *Bailey*, 90 F.4th at 938.

functions. *See Amicus* Brief, [50] at 6–8[2]; *see also Barnet as Trustee of 2012 Saretta Barnet Revocable Trust v. Ministry of Culture and Sports of the Hellenic Republic*, 961 F.3d 193, 201 (2d Cir. 2020) ("Nationalizing property is a distinctly sovereign act."); *Comparelli v. Republica Bolivariana de Venezuela*, 891 F.3d 1311, 1319 (11th Cir. 2018) ("expropriation is a uniquely sovereign act, as opposed to a private act") (internal citation and quotation marks omitted).

However, even if the alleged "hoarding" was a commercial activity, Mississippi's complaint does not and cannot satisfy the commercial activity exception's "direct effect" requirement. *Id*. at 12–16. In this regard, the Eighth Circuit admitted it struggled with the "direct effect" requirement. *Bailey*, 90 F. 4th at 938 ("The closest call is whether the [anticompetitive] behavior had a 'direct effect in the United States.'"). For good reason.

In concluding that a "direct effect" was adequately alleged for the "hoarding" claim, the Eighth Circuit focused on Missouri's allegation that "China 'bought up much of the rest of the world's supply' of masks." *Id*. at 938. The court states that "[t]hose supply reductions allegedly led to an *immediate* shortage in Missouri, which then allowed the defendants to enter the market and sell lower-quality masks." *Id*. (emphasis added). The Missouri complaint, however, does not allege an "immediate" effect in Missouri. Rather, the Eighth Circuit expressly found that injuries alleged by Missouri were not immediate but were the product of innumerable "actors," "factor[s]," and "actions" that occurred during the pandemic between the alleged "hoarding" and the harm that "eventually" reached Missouri. *See id.* at 937–38. The court described in great detail the progression of the virus over time, the sequence of events that necessarily occurred before any

---

[2] We have also noted that, while Defendants are all qualified as foreign states, Plaintiff fails to allege with specificity which Defendant(s) were involved in the production, purchase, or sale of PPE, and that additionally, Plaintiff resorts to inappropriate group pleading. *See Amicus* Brief, Doc. [50] at 8–10.

3
**EXHIBIT A**

harm "eventually" reached Missouri, and the "numerous actions by third parties" that influenced the spread of the virus and the demand for masks during this "intervening" time period. The court calls these third parties "intervening actors." *Id*. at 937. Specifically:

> At least one infected individual (and probably more) *had to travel* from China *to other parts of the world*. The virus *then* had to spread and *eventually* reach the United States. Only at that point could an infected individual have brought the virus to Missouri.
>   It took *several more steps* from there for Missouri's economy to suffer. Infections *had to reach a high enough level* in the United States and Missouri for federal, state, and local governments to issue *stay-at-home orders*. Missourians *then* had to [decide whether or not to] follow them. *Only then* did schools and businesses close, state expenditures grind to a halt, and medical facilities close their doors to visitors.

*Id*. (emphases added).

In the current action, The Society also cited examples of these intervening factors in its *Amicus* Brief [50], including the U.S.'s attitude toward the effectiveness of PPE and its domestic policy regarding wearing masks continues to evolve.[3] Quite literally, every country in the world was seeking PPE throughout the pandemic. Every nation, *including the United States*, issued and modified policies that affected the "production, purchasing, and import and export of medical equipment" including masks.[4] Each policy or modification was a stark example of "intervening factors" that caused "numerous actions by third parties," all of which broke any direct causal chain

---

[3] *See, e.g.*, The Lancet Microbe, Editorial, *US CDC's Unexpected Change of Stance on Mask Use*, THE LANCET, May 20, 2021, https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00122-1/fulltext (last visited May 3, 2025); Deborah Netburn, *A Timeline of the CDC's Advice on Face Masks*, LOS ANGELES TIMES, July 27, 2021, https://www.latimes.com/science/story/2021-07-27/timeline-cdc-mask-guidance-during-covid-19-pandemic (last visited May 3, 2025) ("The story of mask requirements in the United States has had many twists and turns since the early days of the pandemic").

[4] *See, e.g.*, Memorandum on Allocating Certain Scarce or Threatened Health and Medical Resources to Domestic Use (Apr. 3, 2020), available at https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-allocating-certain-scarce-threatened-health-medical-resources-domestic-use/ (last visited May 3, 2025).

between the defendants' alleged "hoarding" and eventual harm in Missouri. Missouri Complaint, ¶¶ 1, 40; *Bailey*, 90 F. 4th at 937–38 (internal citation omitted).

With myriad "intervening actors," the Eighth Circuit found that the defendants' alleged actions during the first few "weeks of the initial outbreak" including the alleged hoarding, (Missouri Complaint, ¶ 1), were "remote and attenuated" from harm in Missouri. *Bailey*, 90 F. 4th at 937. The court acknowledged "it is impossible to directly trace the economic and other harms identified in Missouri's complaint" to alleged "malfeasance and deception" by defendants, *id*. at 937–38, including the alleged hoarding.

As a result, whatever can be said about the effects of alleged "hoarding" cannot be said to have been direct or immediate, based on the Eighth Circuit's own reasoning. Notably, even the court itself was divided on this issue. Chief Judge Smith stated in his dissent, "the ripple effects that Missouri complains of occurred at the end of a long chain of causation. . . . [T]he effect of hoarding would have manifested only over time with the spread of COVID *and* resulting consumption of and need for PPE that became more urgent over time." *Id.* at 941 (Smith, J., dissenting) (cleaned up) (emphasis original).

Accordingly, The Society respectfully submits that the Eighth Circuit's opinion concerning the subject matter jurisdiction over the "hoarding" claim has no persuasive value in the instant matter.

    **B. Notable distinctions exist between the Missouri complaint considered by the Eighth Circuit and Plaintiff's Complaint in the instant case.**

For purposes of subject matter jurisdiction, which is determined based on the allegations stated in the complaint, *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015), there are also notable distinctions between the Missouri complaint and the Mississippi Complaint. Specifically, the Mississippi Complaint fails to allege that "hoarding" of PPE caused an "immediate" shortage in

Mississippi; that Defendants "bought up much of the rest of the world's supply" of PPE[5]; that Chinese businesses are the only supplier of PPE for any buyer in the State of Mississippi; or that Defendants had influence over the PPE output of other countries.

These distinctions are significant. Plaintiff blames Defendants for the world's PPE shortages without so much as mentioning, much less alleging, other countries, factors, and actors and their effect on global PPE supply and demand as the virus spread. Accordingly, Plaintiff's allegations concerning supply and demand are wholly speculative. Therefore, for purposes of subject matter jurisdiction, while the Eighth Circuit found the State of Missouri had adequately alleged a direct effect, that conclusion carries even less weight here in light of these distinctions between the complaints.

### C. Plaintiff does not sufficiently allege "direct effect."

In addition, barebones allegations that there are direct effects do not make it so. For example, the Complaint alleges that "Mississippi's government entities have suffered *direct* economic losses as a result of the *pandemic*, including loss of revenues and budgetary shortages, with *direct effects* on state services, state pension funds, and many other state proprietary and economic interests." Complaint, ¶ 111 (emphases added); *see also* Complaint, ¶¶ 12, 13, 38. Not only is this allegation about the pandemic, as a whole, and not each Defendant specifically, but a bald allegation of "economic losses" in the United States does not suggest, much less establish, the "direct effect" required by the FSIA. The mere fact that a "commercial activity outside of the United States caused . . . financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States." *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 262 (5th Cir. 2016). This is because:

---

[5] Missouri Complaint, ¶ 132.

> To allow such a loss to be the basis for jurisdiction "would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state." . . . Such a result, we held, was inconsistent with Congress's intent to limit jurisdiction to those cases in which the act caused a "direct" effect.

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1190 (10th Cir. 2008) (Gorsuch, J.) (internal citations omitted). *See also Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 79 (2d Cir. 2010) (suggesting that a financial loss to a single American individual or firm is not enough, "standing alone," to satisfy the commercial-activity exception) (cited in *Bailey*, 90 F.4th at 939).

## II. Even if this Court concludes that the Complaint adequately alleges subject-matter jurisdiction, Plaintiff fails to present a prima facie case for the purpose of default judgment under the FSIA.

Under the FSIA, even if this Court concludes there is subject-matter jurisdiction over Plaintiff's claims, no default judgment may be entered against the defaulting foreign state Defendants "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." *Bailey*, 90 F.4th at 940 (citing 28 U.S.C. § 1608(e)). Section 1608(e), which mirrors Federal Rule of Civil Procedure 55(d)[6], provides foreign states with the same protections from default judgments that the federal government enjoys. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). This shows Congress's intent that foreign states be treated with respect and that they cannot be subject to "unfounded default judgments rendered solely upon a procedural default." *Compania Interamericana Exp.-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 950–51 (11th Cir. 1996); *cf. Campbell v. Eastland*, 307 F.2d 478, 492 (5th Cir. 1962), *cert. denied*, 371 U.S. 955 (1963) (holding that requirement of [Rule 55(d)] that claim

---

[6] Formerly Fed. R. Civ. P. 55(e).

against government must be established before default can be entered must be strictly enforced in order to protect government from baseless claims).

Section 1608(e) "codifies in the FSIA context the long-standing presumption that due process requires plaintiffs seeking default judgments to make out a prima facie case." *Moore v. United Kingdom*, 384 F.3d 1079, 1090 (9th Cir. 2004). For a plaintiff to prevail in an FSIA default proceeding, the plaintiff must present a legally sufficient prima facie case, that is, a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff. *Lanny J. Davis & Assocs. LLC v. Republic of Eq. Guinea*, 962 F. Supp. 2d 152, 162 (D.D.C. 2013); *see also Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007) (noting that Section 1608(e) requires the court to satisfy itself that there exists an adequate legal and factual basis for plaintiffs' claims). The plaintiff must "provid[e] satisfactory evidence as to each element of the claim[] upon which relief [is] sought." *Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996). *See, e.g.*, *Moore v. United Kingdom*, 384 F.3d 1079, 1090 (9th Cir. 2004) (dismissal for failure to state a claim is proper because plaintiff is not entitled to a default judgment against the United Kingdom where plaintiff has not adequately alleged that he has "a claim or right to relief"); *Abdulla v. Embassy of Iraq*, No. 12-2590, 2013 U.S. Dist. LEXIS 127914 (E.D. Pa. Sep. 9, 2013), *aff'd*, 598 F. App'x 824 (3d Cir. 2015) (denying motion for default judgment against Iraqi Embassy for breach of contract because, *inter alia*, plaintiff fails to show breach).

In determining whether a plaintiff has presented a prima facie case, the court may not simply accept the unsupported allegations in the complaint as true, and the plaintiff must provide some form of evidentiary support. *Herrick v. Islamic Republic of Iran*, No. 1:21-CV-168, 2022 WL 3443816, at *1 (S.D. Tex. Aug. 17, 2022) (citing *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d

379, 386 (D.D.C. 2015)); *Lanny J. Davis & Assocs. LLC v. Republic of Eq. Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013). The court must base its findings of fact and conclusions of law upon evidence admissible under the Federal Rules of Evidence. *Owens v. Republic of Sudan*, 864 F.3d 751, 786 (D.C. Cir. 2017). In addition, the evidence must be sufficient for the court to come to the "logical conclusion" that the defendant is responsible for the plaintiffs' injuries. *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 38–39 (D.D.C. 2023) (citing *Han Kim*, 774 F.3d at 1051).

Simply put, if a plaintiff fails to present a prima facie case from a legal and factual standpoint with admissible evidence, the court should not enter a default judgment. This is the case here.

### A. Plaintiff fails to establish a claim under the Mississippi Consumer Protection Act ("MCPA") because the MCPA does not have extraterritorial effect.

Both Counts in Plaintiff's Complaint are brought under Mississippi statutes. The U.S. Supreme Court has held for over 100 years that state law does not apply extraterritorially—that is, state law does not apply beyond a state's borders. *See, e.g.*, *New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("it would be impossible to permit the statutes of [one State] to operate beyond the jurisdiction of that State"; describing this rule as "so obviously the necessary result of the [U.S.] Constitution that it has rarely been called into question"); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 & n.16 (1996) (citing *Head* and reaffirming that states cannot regulate extraterritorially); *see also Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489-90 (4th Cir. 2007) ("The principle that state laws may not generally operate extraterritorially is one of constitutional magnitude," "reflect[ing] core principles of constitutional structure."). In some circumstances, figuring out the line between permissible "domestic" and impermissible "extraterritorial" applications of state law can be challenging. Here, however, Mississippi is seeking to apply its state law to a foreign sovereign's conduct in a foreign country

when that conduct has no particular connection or nexus to Mississippi. This kind of "highly intrusive international projection of state regulatory power," *Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 736 (2012), is a serious threat to foreign sovereignty.

In addition, Mississippi law presumes that state statutes do not apply beyond the state's boundaries unless the statute's "language, purpose, subject matter, or history" clearly indicates an extraterritorial intent. *See Tattis v. Karthans*, 215 So. 2d 685, 689 (Miss. 1968). Courts interpreting Mississippi law generally apply a presumption that a statute is intended to have no extraterritorial effect:

> [T]he presumption is that the statute is intended to have no extraterritorial effect, but to apply only within the territorial jurisdiction of the state or country enacting it, and it is generally so construed. An extraterritorial effect is not to be given statutes by implication. Accordingly, a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it. These rules apply to statutes using general words, such as "any" or "all," in describing the persons or acts to which the statute applies.

*Id.* at 689–90 (citing 50 Am. Jur. Statutes § 487). *See, e.g.*, *Pharm. Rsch. & Manufacturers of Am. v. Fitch*, No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365, at *13 (S.D. Miss. July 1, 2024) (holding that a Mississippi House Bill's references to "340B entities, manufacturers, and pharmacies" were general terms that presumptively apply only to entities within Mississippi's jurisdiction).

With regard to the MCPA statutes that Plaintiff cites, the presumption should similarly apply because the MCPA uses general terms such as "any person" and "any such prohibited method, act or practice" for the scope of its applicability, *see* Miss. Code Ann. § 75-24-5(1), and defines "person" as "natural persons, corporations, trusts, partnerships, incorporated and unincorporated associations, and any other legal entity." *See* Miss. Code Ann. § 75-24-3. This definition does not clearly indicate that foreign states would come within the purview of the MCPA.

In addition, there is no clearly expressed or indicated intent to operate beyond Mississippi's jurisdiction in MCPA's language, purpose, subject matter, or legislative history. Accordingly, the presumption of no extraterritorial effect should apply, and that The Society submits that Plaintiff fails to establish a claim against foreign state Defendants under the MCPA.

    **B. Plaintiff fails to establish a claim under the Mississippi antitrust laws because they do not apply to Defendants who are foreign states.**

With regard to Count II brought under Mississippi's antitrust laws, in addition to the impermissibly extraterritorial application of state law described above, Mississippi's claim fails for another reason. This Court has observed that "[c]ourts have analyzed Mississippi's antitrust law in the same manner as federal antitrust laws." *Major Mart v. Mitchell Distrib. Co.*, 46 F. Supp. 3d 639, 656 (S.D. Miss. 2014) (citing *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir. 1984) (treating Mississippi and federal antitrust claims "as analytically identical"); *Hardy Bros. Body Shop, Inc. v. State Farm Mut. Auto. Ins. Co.*, 848 F. Supp. 1276, 1290 (S.D. Miss. 1994)).

Federal case law has been clear for decades that foreign states are not subject to liability under federal antitrust laws—just as it does not impose liability on domestic sovereigns. *See, e.g.*, *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1298 (D. Del. 1970) ("The Sherman Act does not confer jurisdiction on United States courts over acts of foreign sovereigns. By its terms, it forbids only anticompetitive practices of persons and corporations.") (footnote omitted); *cf. F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224 (2013) (federal antitrust laws do not apply to sovereign States as defendants).

The Second Circuit Court of Appeals agreed on this in *Hunt v. Mobil Oil Corp.*, an antitrust case. In *Hunt*, the plaintiffs alleged that they and certain private oil companies entered into anticompetitive agreements to resist the Libyan government's demands. The plaintiffs' reliance on these agreements ultimately led to the loss of the plaintiffs' oil production and assets in Libya.

While Libya was not named as a defendant, the Second Circuit considered Libya's liability and held that "Libya cannot be guilty of a Sherman Act violation . . . because it is not a person or corporation within the terms of the Act but a sovereign state." 550 F.2d 68, 78 n.14 (2d Cir. 1977) (citing *Interamerican Refining*, 307 F. Supp. at 1298), *cert. denied*, 434 U.S. 984 (1977).[7]

Thereafter, a California federal court reviewed *Interamerican Refining* and *Hunt*, and further explained why foreign states are not subject to U.S. antitrust liability in *Int'l Asso. of Machinists & Aerospace Workers v. Org. of Petroleum Exporting Countries*, 477 F. Supp. 553 (C.D. Cal. 1979), *aff'd on other grounds*, 649 F.2d 1354 (9th Cir. 1981) ("*IAM*"). In that case, the plaintiff labor union alleged that the Organization of Petroleum Exporting Countries (OPEC) and its member nations engaged in price fixing of crude oil in violation of the Sherman Act, which caused the plaintiff to suffer harm by paying higher prices for gasoline. The court first noted that there is no statutory basis for imposing antitrust liability on foreign states:

> Section 8 of the Sherman Act, 15 U.S.C. § 7, and section 1 of the Clayton Act, 15 U.S.C. § 12, define "person" or "persons," "to include corporations and associations existing under or authorized by the laws of the Territories, the laws of any State, or the laws of a foreign country." This statutory language does not support the conclusion that foreign sovereigns are "persons" subject to Sherman Act liability.

*IAM*, 477 F. Supp. at 570. The court then considered the legislative intent of the Sherman Act. In this regard, it analyzed the Supreme Court's reasoning in *Parker v. Brown*, 317 U.S. 341 (1943), where the Supreme Court held that the Sherman Act does not prohibit actions by a U.S. state:

> The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. . . .
> There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act

---

[7] In *Hunt*, the Second Circuit also dealt with the "act of state" doctrine, which is a separate doctrine with separate requirements. 550 F.2d at 72–75; *cf. Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 144–45 (2d Cir. 2022) (addressing the applicability of the act of state doctrine to antitrust claims).

> declared that it prevented only "business combinations." 21 Cong. Rec. 2562, 2457; see also at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by Individuals [sic] and corporations, abundantly appears from its legislative history.

*IAM*, 477 F. Supp. at 570 (citing *Parker*, 317 U.S. at 351). The *IAM* court held that the same considerations "apply with equal force to foreign nations," *IAM*, 477 F. Supp. at 570, and noted that "Congress has never indicated any intent to extend liability of the Sherman Act to actions of a foreign sovereign." *Id.* at 572.

Relatedly, the *IAM* court also analyzed *Pfizer Inc. v. India*, 434 U.S. 308 (1978), where "the Supreme Court held that a foreign nation may be a 'person' under [the federal] antitrust laws *as a plaintiff* for the purpose of bringing suit." *IAM*, 477 F. Supp. at 572 (emphasis added). The *IAM* court noted that in reaching this result, the determining factor for the Supreme Court was that the Judiciary was not "require[d] . . . in any way to interfere in sensitive matters of foreign policy." *Id.* (citing *Pfizer*, 434 U.S. at 319). In this regard, the Supreme Court recently noted that "statutes affecting international relations" should be interpreted in a way "to avoid, where possible, producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation." *Republic of Hungary v. Simon*, 145 S. Ct. 480, 494 (2025) (cleaned up).

However, where foreign nations are sued as defendants in an antitrust action, as here, the *IAM* court cautioned that "[t]o include foreign nations within the ambit of "persons" who may be sued as defendants . . . would require judicial interference in sensitive foreign policy matters." *IAM*, 477 F. Supp. at 572. As a result, the *IAM* court refused to extend the *Pfizer* ruling and instead concluded that "a foreign nation may sue, but not be sued, under the United States antitrust laws." *IAM*, 477 F. Supp. at 572 (dismissing the entire antitrust action against defendant foreign nations "because they cannot be made defendants . . . in this antitrust suit and no valid claim for relief can

be alleged or proved against them"). As the *IAM* court explained, "this determination is consistent with the [Supreme] Court's rulings concerning domestic States under the antitrust laws," which "may sue, but not be sued." *Id*. at 572 n.19 (citing *Georgia v. Evans*, 316 U.S. 159 (1942), and *Parker*, 317 U.S. at 341).

If an intent to regulate *domestic* sovereigns "is not lightly to be attributed to Congress," *Parker*, 317 U.S. at 451, the myriad foreign-relations concerns that would arise if U.S. law were interpreted to directly regulate the conduct of foreign sovereigns abroad make clear that this result too "is not lightly to be attributed to Congress." *Id*.

Because foreign states cannot be sued under federal antitrust laws, they similarly cannot be sued under Mississippi antitrust laws. "[W]here a court finds no federal antitrust violations, allegations of state law antitrust violations may be dismissed as well." *Hardy Bros. Body Shop, Inc. v. State Farm Mut. Auto. Ins. Co.*, 848 F. Supp. 1276, 1290 (S.D. Miss. 1994). As such, Plaintiff fails to establish a claim under the Mississippi antitrust laws.

### C. Plaintiff fails to prove the "direct effect" alleged in the Complaint.

In addition, Plaintiff has failed to present evidence satisfactory to this Court for any legal nexus between Defendants' alleged anticompetitive acts and the injury to establish its "claim or right to relief."

Because this Court has held that all Defendants are "foreign states," Plaintiff, as the party opposing immunity, now has the burden not only to adequately allege subject-matter jurisdiction, but "to *present evidence* that one of the exceptions to immunity applies." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000) (emphasis added; internal citations

omitted).[8] However, with respect to the commercial activity exception that Plaintiff invokes, Plaintiff has failed to show that the PPE restrictions allegedly imposed by Defendants had a "direct effect" in Mississippi.

*Even if* we assume Defendants—a foreign sovereign and governmental entities—engaged in the hoarding as Plaintiff alleges, the chain of events that led to the alleged injury is filled with intervening causes. In fact, Plaintiff's Exhibit P-18 for the evidentiary hearing agrees on this point when it states that PPE hoarding affects the infection rates, which affects the implementation of sequestration and lockdown policies, which affects production, which affects economic damages. *See* Exhibit P-18, Joseph H. Haslag, Addendum to Report on the Economic Impact of the COVID-19 Pandemic: Quantifying the Damages to the Missouri Economy, Doc. [86-16] at 1.

One of the most obvious independent intervening causes is the coronavirus itself: how and when it got to the United States and Mississippi; its transmissibility in different environments; its numerous variants, each with different transmissibility and infectious rates, etc. For example, had the virus become increasingly less infectious and/or less likely to make people sick over time, or had the vaccines been more effective or available to the public sooner,[9] Mississippi might not have needed PPE as much as it did. But how coronavirus spread and how it changed over time is unforeseeable and beyond Defendants' control.

---

[8] Of note, the Eighth Circuit in the Missouri case did not hold that Plaintiff had adequately *proved* that the alleged hoarding had a direct effect in the United States; it merely found that "Missouri has plausibly *alleged* that the defendants' anticompetitive behavior had 'a direct effect in the United States.'" *Mo. ex rel. Bailey v. People's Republic of China*, 90 F.4th 930, 939 (8th Cir. 2024) (citing 28 U.S.C. § 1605(a)(2)) (emphasis original). In fact, even on the pleadings, the Eighth Circuit noted that this issue is a "close[] call." *Id.* at 938.

[9] In this regard, Dr. Haslag's report started with a flawed premise that "without PPE hoarding, infection rates would have been reduced," *see* Doc. [86-16] at 1, because the alleged PPE hoarding is not the only factor that affects the infection rates, and possibly not even the dominant one.

The responses of the U.S. society to the pandemic are also intervening causes. Defendants have no control over how the federal government depleted national PPE stockpiles before the pandemic even began, when the federal government invoked the Defense Production Act, or the pandemic's disruptions to global supply chains. Defendants also have no control over if and when the U.S., state, and local governments issued travel bans, started quarantine, issued gathering restrictions and stay-at-home orders,[10] mandated mask wearing, started vaccination, or took any other measures to suppress the spread of the coronavirus.

Likewise, Defendants have no control over how businesses in the U.S. and Mississippi reacted to the pandemic, or how many people intended to get vaccinated, not to mention people's travel to and within Mississippi, which may lead to interpersonal transmission. Any of these examples could affect the containment of the pandemic and the need for PPE.

Further, the medical professionals' understanding of the efficacy of PPE (in particular masks), and the governments' and the public's acceptance of or skepticism toward using masks are also independent intervening factors over which Defendants have no control.

Accordingly, we submit that Plaintiff fails to "present evidence" of a direct effect sufficient to bring this case within the FSIA's commercial-activity exception. *Kelly*, 213 F.3d at 847.

### D. The "lenient standard" proposed by Plaintiff for factual findings is improper.

In addition, given that this Court has to decide whether Plaintiff has established a prima facie case as a matter of law, we submit that the evidentiary standard proposed by Plaintiff is improper and that the Court should not rely on Plaintiff's trial exhibits in rendering any judgment due to their lack of trustworthiness.

---

[10] In fact, Dr. Haslag's report expressly acknowledges that governmental policies directly affect Plaintiff's economic damages. *See* Doc. [86-16] at 1 ("The economic damages can be traced directly to sequestration and lockdown policies implemented at the Federal level.").

Plaintiff in its Pre-trial Brief proposes that this Court adopt a "lenient standard" for factual findings. Doc. [83] at 8 (citing *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)). The proposed "lenient" evidentiary standard is inapposite because *Owens* is a terrorism case. The court specifically noted that "[t]his lenient standard is particularly appropriate ***for a FSIA terrorism case***, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely ***hostile sovereign***." *Owens*, 864 F.3d at 785 (emphases added). The court reasoned that in terrorism cases, firsthand evidence is difficult to obtain:

> [F]irsthand evidence of terrorist activities is difficult, if not impossible, to obtain. Victims of terrorist attacks, if not dead, are often incapacitated and unable to testify about their experiences. Perpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection. Eyewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation.

*Owens*, 864 F.3d at 787. *See also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) (allowing expert declarations, noting that because the DPRK refused to participate in the litigation and intimidated potential eyewitnesses, the plaintiffs could offer no direct evidence of their relative's torture and killing by the DPRK).

Here, Plaintiff does not plead any terrorist acts. Plaintiff also fails to explain why China should be deemed a "hostile sovereign" or why firsthand evidence or eyewitness testimony is not required. As such, the Court should not adopt the proposed "lenient standard" for factual findings.

But in any event, we respectfully submit that Plaintiff's trial exhibits fail to satisfy even a lenient evidentiary standard and should not be relied on by the Court in rendering any judgment. They are improper evidence because of their nature of being untrustworthy as inadmissible hearsay. This untrustworthiness remains the same whether or not Defendants are present to challenge the exhibits' admissibility, and the Court should not rely on them merely because Defendants are absent.

In fact, even in terrorism cases, courts have found that inadmissible hearsay is not proper evidence in the default judgment context without a defendant present to object. *See Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) (holding that news articles are hearsay and that "[i]t would be wholly inappropriate to permit" an FSIA plaintiff "to satisfy the requirement of 28 U.S.C. § 1608(e) by submitting an unsubstantiated newspaper article"); *Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599 (GMH), 2023 U.S. Dist. LEXIS 125650, at *22 n.9 (D.D.C. July 6, 2023) (finding the majority of documentary evidence in support of the plaintiff's motion for default judgment including news articles and press releases "inadmissible, irrelevant, or both"). Accordingly, we submit that the Court should not accept Plaintiff's trial exhibits that are inadmissible hearsay, such as journal and newspaper articles.

Further, although a properly qualified expert may base his opinion upon otherwise inadmissible sources of information under certain conditions, *see* Fed. R. Evid. 703, the expert's opinion cannot be used "as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (internal citation omitted). "The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *Id.*

Similarly, for evidence to be admissible under the public-records exception, Fed. R. Evid. 803(8), the person making the report must have observed matters firsthand and acted pursuant to a legal duty. *United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 626 n.10 (5th Cir. 1992); *United States v. Perlmuter*, 693 F.2d 1290, 1293 (9th Cir. 1982) (same). The assumption that "an administrative body's findings may be assumed to be trustworthy . . . has substantially diminished force when extended to the sources outside the investigative agency from which the agency culls the information for its report." *Brown v. Sierra Nev. Mem'l Miners Hosp.*, 849 F.2d 1186, 1190 (9th

Cir. 1988); *see also United States v. Pendas-Martinez*, 845 F.2d 938, 943 (11th Cir. 1988) ("Because the hearsay statements within the [Coast Guard] report have not been shown to be admissible under any of the exceptions to the hearsay rule, the unredacted [report] was inadmissible."). Accordingly, we submit that this Court should not rely on Plaintiff's government reports with heavy reliance on third-party materials and limited trustworthiness of findings. They, too, cannot serve as "evidence *satisfactory to the court*" as required by 28 U.S.C. § 1608(e).

## CONCLUSION

For the reasons set forth herein, The China Society of Private International Law respectfully submits that the commercial activity exception under the Foreign Sovereign Immunities Act does not bar immunity, that Defendants are immune to this suit, and that this Court should dismiss this action for lack of subject-matter jurisdiction. Even if this Court finds subject matter jurisdiction exists, The Society submits that Plaintiff fails to present a legally sufficient prima facie case and fails to "establish[] [its] claim or right to relief" to support a default judgment under the FSIA.

Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC

BY:  /s/ Sterling Kidd
  D. STERLING KIDD

*Counsel for The China Society
of Private International Law*

**EXHIBIT A**

OF COUNSEL:

D. Sterling Kidd (MSB No. 103670)
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC
PHYSICAL: One Eastover Center, 100 Vision Drive, Suite 400
Jackson, Mississippi 39211
MAILING: Post Office Box 14167
Jackson, Mississippi 39236
Telephone: (601) 351-2400
skidd@bakerdonelson.com

**EXHIBIT A**