## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**THE STATE OF MISSISSIPPI**                                                    **PLAINTIFF**
*ex rel.* LYNN FITCH, *in her official*
*capacity as Attorney General of the*
*State of Mississippi*

**v.**                                              **CIVIL ACTION NO. 1:20-cv-168-TBM-RPM**

**THE PEOPLE'S REPUBLIC OF CHINA;**
**THE COMMUNIST PARTY OF CHINA;**
**NATIONAL HEALTH COMMISSION OF**
**THE PEOPLE'S REPUBLIC OF CHINA;**
**PEOPLE'S GOVERNMENT**
**OF WUHAN CITY;** *and* **WUHAN**
**INSTITUTE OF VIROLOGY**                                          **DEFENDANTS**

## MEMORANDUM OPINION AND JUDGMENT

Mississippi sued Chinese Defendants for consumer protection and antitrust violations during a once-in-a-lifetime pandemic. Mississippi now asks the Court to enter judgment because China intentionally defaulted and refused to appear. China's default plays a significant role in this Court's review. The Court must accept Mississippi's factual allegations as true, except those relating to the amount of damages. China also waived all affirmative defenses.

Mississippi alleges that China engaged in deceptive and monopolistic practices by nationalizing factories owned by North American companies that manufactured personal protective equipment (PPE), hoarding premium PPE, and fraudulently selling substandard PPE to Mississippi during the COVID-19 pandemic. China was able to do this because it downplayed COVID-19's severity to the rest of the world while it cornered the PPE market. As a result, Mississippi claims that many Mississippians lost their jobs and lives, and Mississippi brought this

suit seeking relief. But Mississippi is not the first state to bring such a suit. Earlier this year, on similar claims, another federal court found that China caused over eight billion dollars in damages to Missouri's economy. And, after trebling the damages, the Missouri federal court entered judgment for nearly twenty-four and a half billion dollars against the same absent defendants.

Mississippi experienced similar state-wide harms. Applying the Missouri expert's methodology, Mississippi has provided satisfactory evidence that China's misconduct caused more than four billion dollars in actual damages under Mississippi's broad applicable statutes. Mississippi law also authorizes the Court to fashion and impose a penalty for each hoarded PPE. A $1,000 per-violation penalty, totaling more than twenty billion dollars in penalties, is justified. Mississippi did request a larger amount. But this Court's award recognizes the severity of the misconduct, while also confining the penalties to the appropriate legal framework.

China orchestrated a scheme that artificially raised both PPE prices and the *need* for PPE in the first place. Such conduct calls for a historic penalty to achieve deterrence, thereby protecting the public. China's actions contributed to whether COVID-19 would result in an epidemic or a pandemic, furloughs or layoffs, and for some, life or death. At the same time, however, the penalty amount is proportional and appropriate under the law. Further, the resulting figure aligns with prior awards for other state-wide harms. And the scope of the award is similar to Missouri's. For all of the reasons detailed below, Mississippi is entitled to default judgment in the amount of $25,098,412,991, plus postjudgment interest and costs.

## I. BACKGROUND AND PROCEDURAL HISTORY

Again, because China[1] intentionally defaulted, the Court must accept as true Mississippi's well-pleaded facts and uncontroverted evidence. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011). This reflects a lenient standard, given that here, China represents an absent party and a hostile sovereign. *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *rev'd on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418, 140 S. Ct. 1601, 206 L. Ed. 2d 904 (2020). Mississippi submitted a lengthy complaint full of factual allegations, as well as written evidence in support of its claim. *See* [1], pps. 1-30; [81], pps. 1-26; [86], Exs. 1-17; [87]; [88], pps. 1-26. The Court takes the following factual allegations as true.

The COVID-19 pandemic was caused by the severe acute respiratory syndrome coronavirus 2, also referred to as SARS-CoV-2. *See* Mississippi Complaint, [1], p. 9. Humans first contracted COVID-19 at least as early as November 17, 2019. *Id*. (citing Josephine Ma, *Coronavirus: China's First Confirmed Covid-19 Case Traced Back to November 17*, S. China Morning Press (Mar. 30, 2020)). Laboratory testing of the first patients attributed the illness to a novel coronavirus associated with a severe respiratory disease in humans. *Id*. at p. 10 (citing Li-Li Ren et al., *Identification of a Novel Coronavirus Causing Severe Pneumonia in Human: A Descriptive Study*, 133 Chinese Med. J. 1015, 1022-23 (2020)).

The virus spread rapidly worldwide. In May 2020, the United States Centers for Disease Control and Prevention reported that there were 1,092,815 confirmed cases of COVID-19 in the United States and 64,283 deaths. *Id*. at p. 22 (citing U.S. Ctrs. for Disease Control & Prevention,

---

[1] As discussed later, the Court collectively refers to each Chinese Defendant as "China" when applicable. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 140 (3d Cir. 2019) (Although "there is a strong presumption that a foreign sovereign and its instrumentalities are separate legal entities," a court may "ignore the formal separateness" when "a foreign sovereign exerts dominion . . . beyond normal supervisory control").

*Coronavirus Disease 2019 (COVID-19), Cases in the U.S.*). Of those confirmed cases and deaths, 7,550 of the confirmed cases and 303 deaths were from Mississippi. *Id.* at p. 23 (citing Miss. Dep't of Health, *Coronavirus Disease 2019 (COVID-19)*).

Government responses to the COVID-19 pandemic required the shutting down of businesses and schools, which significantly disrupted Mississippians' lives. *Id.* at pps. 23, 25. In May 2020, over 30 million jobs were lost in the United States, and approximately 203,000 Mississippians filed jobless claims. *Id.* at 23. (citing Jeffry Bartash, *Millions of Layoffs Set to Push Unemployment Rate to Highest Level Since Great Depression*, Mkt. Watch (May 4, 2020); Anna Wolfe, *Mississippi is Fighting an Uphill Battle with Jobless Claims. A Decades-Long Shift in Employment Strategy Didn't Help*, Miss. Today (May 3, 2020)). The Mississippi government suffered a loss of revenue, which directly affected state services and pension funds. *Id.* As an example, all Mississippi agency directors were instructed on April 24, 2020, to be "very judicious" about spending in the next fiscal year as the COVID-19 shutdowns were projected to have a tremendous impact. [1-1], p. 1.

**A. China contributed to the concealment and misrepresentation of essential information regarding the COVID-19 virus.**

As early as December 27, 2019, the Chinese government knew that a coronavirus had developed when Wuhan health officials notified a local laboratory that patients had a new strain of coronavirus similar to the SARS-CoV virus that caused the 2003 SARS pandemic. [86-4], p. 9. (House Foreign Affs. Comm., 116th Cong., *The Origins of the COVID-19 Global Pandemic, Including the Roles of the Chinese Communist Party and the World Health Organization* 8 (2020) (Minority Staff Final Report)). Three days later, the Wuhan Municipal Health Commission released a notice to medical institutions that patients who had visited the Wuhan Seafood Market developed a

"pneumonia-like illness." Mississippi Complaint, [1], p. 14 (citing Yong Xiong & Nectar Gan, *This Chinese Doctor Tried to Save Lives, but was Silenced. Now He has Coronavirus*, CNN (Feb. 4, 2020)). But the Wuhan Municipal Health Commission delayed the release of this information to the international community as medical institutions were warned not to release treatment information to the public without authorization. *Id.*

For weeks, China denied that the virus could spread through human-to-human transmission, despite facts suggesting otherwise. One of the earliest known patients, a man associated with the Wuhan Seafood Market, started to show symptoms on December 1, 2019. *Id.* at p. 10 (citing Chaolin Haung et al., *Clinical Features of Patients Infected With 2019 Novel Coronavirus in Wuhan, China*, 395 Lancet 497, 500 (2020)). Five days later, his wife, who was not associated with the food market, started to show symptoms, indicating human-to-human transmission. *Id.* Similarly, starting in late December, there was a quick increase in cases not linked to the market, further suggesting human-to-human transmission. *Id.* (citing Qun Li et al., *Early Transmission Dynamics in Wuhan, China, of Novel Coronavirus–Infected Pneumonia*, 382 New England J. Med. 1199, 1206 (Jan. 29, 2020)).

On December 31, 2019, the Taiwan Centers for Disease Control emailed the World Health Organization, informing it of reports concerning at least seven atypical pneumonia cases in China and that sick patients were being isolated for treatment, suggesting a suspicion of human-to-human transmission. [86-4], pps. 10-12. In fact, Taiwan believed the evidence of human-to-human transmission was enough to justify its implementation of enhanced border control and quarantine measures. *Id.* Still, on January 3, 2020, the Wuhan Municipal Health Commission claimed there was no evidence of human-to-human transmission. [1], p. 17 (citing Jim Geraghty, *The*

*Comprehensive Timeline of China's COVID-19 Lies*, Nat'l Rev. (Mar. 23, 2020)). Relying on Chinese officials' statements, the World Health Organization made a similar statement to the international community that there was no evidence of significant human-to-human transmission. *Id.* at p. 18 (citing World Health Org., *Pneumonia of Unknown Cause – China* ( Jan. 5, 2020)).

Dr. Ho Pak-leung, the head of the University of Hong Kong's Centre for Infection, publicly stated on January 4, 2020, that human-to-human transmission was highly likely. [86-4], p. 12. But on January 11, the Wuhan Municipal Health Commission again stated that there was no clear evidence. [1], p. 19 (citing Jim Geraghty, *The Comprehensive Timeline of China's COVID-19 Lies*, Nat'l Rev. (Mar. 23, 2020)).

On January 5, a medical research center in Shanghai notified the Chinese National Health Commission that a professor had identified a SARS-like coronavirus from the completed genome mapping of a sample from Wuhan. Mississippi Complaint, [1], pps. 17-18 (citing Jeremy Page et al., *How It All Started: China's Early Coronavirus Missteps*, The Wall St. J. (Mar. 6, 2020)). The sharing of genome information is a "critical step" towards the containment of a virus and the development of vaccines. *Id.* at pps. 19-20. Despite the essentiality of this information, China did not confirm that there was an outbreak of a novel coronavirus until January 9, 2020, and the genome information was not shared with the international community until January 12. *Id.* at p. 19.

After the first case of the virus outside of China was reported in Thailand on January 13, Ma Xiaowei, the head of the Chinese National Health Commission, informed Chinese Communist Party leaders that the situation had "changed significantly" and there was a high risk of transmission during the upcoming travel season. [86-4], pps. 14-15. The National Health

Commission then sent health officials certain instruction manuals on responding to an outbreak with PPE requirements and orders not to publicly disclose the information. *Id.*

In the end, the Wuhan City Health Commission did not acknowledge human-to-human transmission until January 20, 2020, while at the same time, Chinese President Xi Jinping made no mention of human-to-human transmission during his first public statement regarding the virus that same day. [1], pps. 20-21 (citing Jeremy Page et al., *How It All Started: China's Early Coronavirus Missteps*, The Wall St. J. (Mar. 6, 2020); Lily Kuo, *China Confirms Human-to-Human Transmission of Coronavirus*, The Guardian ( Jan. 20, 2020)). Immediately, the World Health Organization began to investigate, and it confirmed that human-to-human transmission was occurring. *Id.* at p. 21 (citing World Health Org., *Mission Summary: WHO Field Visit to Wuhan, China 20-21 January 2020* ( Jan. 22, 2020)).

Mississippi alleges that China made numerous other misrepresentations and concealments of essential information about the virus. For example, on April 17, the death toll in Wuhan was upwardly revised by more than a thousand deaths, which China attributed to "incorrect reporting, delays, and omissions." *Id.* at p. 22 (citing Scott Neuman, *China Raises Wuhan Death Stats by Half to Account for Reporting Delays and Omissions*, Nat'l Pub. Radio (Apr. 17, 2020)). And China took affirmative steps to limit individuals' ability to communicate about the virus. Research at the University of Toronto identified the censorship of words about the virus on Chinese social media platforms, such as WeChat. *Id.* at p. 14 (citing Lotus Ruan et al., *Censored Contagion: How Information on the Coronavirus is Managed on Chinese Social Media*, The Citizen Lab (Mar. 3, 2020)). This censorship substantially limited the public's ability to share information about the COVID-19 virus. *Id.*

Further, China suppressed medical professionals from communicating about the virus. In early January, Wuhan law enforcement took legal measures against eight individuals, believed to be doctors, for "publish[ing] and shar[ing] rumors online," which "sent a chill throughout the city's hospitals" and stopped information from being shared. *Id*. at pps. 15-16 (citing Yong Xiong et al., *This Chinese Doctor Tried to Save Lives, but was Silenced. Now He has Coronavirus*, CNN (Feb. 4, 2020); Xie Haunchi, *Six Days of Silence When China Didn't Warn Public of Likely Pandemic*, St. Louis Post Dispatch (Apr. 16, 2020)). After Dr. Ai Fen, who ran an emergency department at a Wuhan hospital, ordered her staff to wear masks because she suspected human-to-human transmission, Dr. Fen was summoned by her hospital's discipline department and reprimanded for spreading rumors. *Id*. at p. 16 (citing Jeremy Page et al., *How It All Started: China's Early Coronavirus Missteps*, The Wall St. J. (Mar. 6, 2020)). Then, hospital leadership banned staff from communicating about the disease. *Id*. at pps. 16-17.

In January 2020, a Hubei Provincial Health Commission official ordered a genomics company to stop testing samples of the virus from Wuhan and to destroy all existing samples. *Id*. at p. 16 (citing Gao Yu et al., *How Early Signs of the Coronavirus Were Spotted, Spread and Throttled in China*, The Straight Times (Feb. 28, 2020)). And the National Health Commission similarly ordered institutions not to share information on the virus and required laboratories to destroy samples or transfer them to designated institutions. *Id*. at p. 17 (citing Jeremy Page et al., *How It All Started: China's Early Coronavirus Missteps*, The Wall St. J. (Mar. 6, 2020)).

At the same time, China did not make an effort to stop or slow the spread of the virus in its own country. Despite knowledge of a novel coronavirus, China went ahead with Lunar New Year celebrations, where approximately five million people left Wuhan without being screened. *Id*. at

pps. 13-14 (citing Jeremy Page et al., *How It All Started: China's Early Coronavirus Missteps*, The Wall St. J. (Mar. 6, 2020)). Again, relying on Chinese officials' statements, the World Health Organization advised against any travel restrictions to China. *Id.* at pps. 18-19 (citing World Health Org., *WHO Statement Regarding Cluster of Pneumonia Cases in Wuhan, China* (Jan. 9, 2020)). During the week of public silence following the confirmation of the first case outside China in Thailand, more than 3,000 people were infected. *Id.* at p. 21 (citing Gao Yu et al., *How Early Signs of the Coronavirus Were Spotted, Spread and Throttled in China*, The Straight Times (Feb. 28, 2020)).

Zuo-Feng Zhang, an epidemiologist at the University of California, Los Angeles, estimated that had China acted even six days earlier, when it knew there was a concern of an outbreak, there would have been far fewer patients. [86-4], p. 36. The United States House of Representatives Foreign Affairs Committee, in its report on the origins of the pandemic, also concluded that the Chinese Communist Party could have curbed the number of cases in China had it followed relevant international laws and publicly responded to the virus sooner. *Id.* at pps. 4-5.

**B. China engaged in a campaign to hoard PPE**

As China misrepresented and concealed information regarding the COVID-19 virus, it began to stockpile PPE. Mississippi Complaint, [1], p. 26 (citing Juliet Eilperin et al., *U.S. Sent Millions of Face Masks to China Early this Year, Ignoring Pandemic Warning Signs*, Washington Post (Apr. 18, 2020)). PPE includes items in the following categories: masks, numerous types of protective garments, and many kinds of gloves. [86-17], p. 2. Starting in early February 2020, China "nationalized control of the production and distribution of medical supplies in China," ordering all production for domestic use. [86-7], p. 3 (Karen M. Sutter et al., Cong. Rsch. Serv., R46304, *COVID-19: China Medical Supply Chains and Broader Trade Issues* 1 (Dec. 7, 2020)). As a result,

United States manufacturers with factories in China, such as Minnesota-based company 3M, shifted significant efforts to manufacture medical PPE for China. *Id.* at pps. 20-21. Also, China directed its national and local governments to secure supplies from the global market. *Id.* at p. 21. This significantly increased China's imports of essential PPE and materials needed to make N95 masks. *Id.*

Along with the drastic increase in imports of essential PPE, there was a counter-decrease in Chinese exports of medical products. *Id.* For example, China did not allow its companies to supply the United States with PPE or COVID-19 test kits. [1], p. 26 (citing Kate O'Keefe*, China's Export Restrictions Strand Medical Goods U.S. Needs to Fight Coronavirus, State Department* Says, The Wall St. J. (Apr. 16, 2020)). Additionally, when the United States was undertaking efforts to contain the COVID-19 virus, Medicom, a Canadian mask manufacturer, reported that the Chinese government did not authorize it to export PPE from China. [86-7], p. 25-26. Ultimately, China's actions led White House officials to believe that its hoarding of PPE was an intentional attempt to "corner the market." [1], p. 26 (citing Juliet Eilperin et al., *U.S. Sent Millions of Face Masks to China Early this Year, Ignoring Pandemic Warning Signs*, Washington Post (Apr. 18, 2020)).

China's actions caused a PPE shortage in the United States. [86-7], p. 16. Even a year after the declaration of a national emergency, Mississippi hospitals were still experiencing PPE supply shortages and price increases. [81], p. 20 (citing John Fitzhugh, *Hospitals Still Seeing Higher Prices for PPE, Causing Logistic and Financial Challenges*, WLOX (Mar. 10, 2021).

## C. China sold substandard PPE to the United States

Though China did eventually sell PPE to the international market, numerous countries reported that the masks and test kits were faulty. [86-6], pps. 26-27. Similarly, the United States

purchased hundreds of thousands of N95 and KN95 masks that were produced in China, which are meant to filter out ninety-five percent of aerosol particles. [81], pps. 17-18 (citing Adrianna Rodriguez, *UP to 70% of KN95 Masks Imported from China Don't Meet Filtration Standards, Study Says*, USA Today (Sep. 22, 2020)). But in late 2020, the nonprofit Emergency Care Research Institute issued a high-priority hazard alert against masks imported from China when up to seventy percent of the KN95 masks tested failed to meet filtration standards, leaving the masks ineffective against the spread of COVID-19. *Id*. Dr. Marcus Shabaker, ECRI President and CEO, expressed concerns about the safety of health care workers and patients when wearing these masks. *Id*.

China later imposed new export quality control measures for PPE. [86-7], p. 26. This, however, led to many products remaining in warehouses as manufacturers were unable to receive necessary clearances. *See id.*; Mississippi Complaint, [1], p. 26 (citing David Brunnstrom et al., *U.S. Asks China to Revise Export Rules for Coronavirus Medical Gear*, Reuters (Apr. 16, 2020)). The United States, concerned that China's quality controls were delaying the delivery of necessary products and being used as a pretext to further hoard necessary PPE, requested China to ease the export restrictions. [81], p. 17 (citing David Brunnstrom et al., *U.S. Asks China to Revise Export Rules for Coronavirus Medical Gear*, Reuters (Apr. 16, 2020)).

**D. China has willfully defaulted in this case**

Mississippi commenced this action on May 12, 2020, with the filing of its complaint [1]. Mississippi attempted to serve China through China's Central Authority pursuant to the 1965 Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Service Convention"). [11]. The State received notice from the Ministry of Justice of the People's Republic of China on March 22, 2022, that China refused to accept service

under the Hague Service Convention, claiming the execution of service would infringe on China's sovereignty or security. [13], pps. 1-2.

In April 2022, Mississippi tendered summonses for each Chinese Defendant to the Clerk of Court of the Southern District of Mississippi, whose office transmitted the summonses to the United States Department of State. Following confirmation of receipt from the Department of State, Mississippi reissued translated copies of the summonses in September 2022. On March 30, 2023, the Department of State served China's Ministry of Civil Affairs [36], Ministry of Emergency Management [37], National Health Commission of the People's Republic of China [38], People's Government of Hubei Province [39], People's Government of Wuhan City [40], and People's Republic of China [41] through diplomatic channels. Subsequently, Mississippi served the Chinese Communist Party [56], Wuhan Institute of Virology [57], and the Chinese Academy of Sciences [58] directly on February 20, 2024.[2]

Following Mississippi's Motions for Entry of Default [60], [61] against China, the Clerk of Court entered default against China—including each Defendant—on March 5, 2024. Accordingly, Mississippi filed the instant Motion for Default Judgment [80] on October 11, 2024, to which it attached a letter from China's Ministry of Foreign Affairs stating that "China does not recognize and will not participate in [this] vexatious litigation lawsuit[]." [81-1], p. 1. This Court held an evidentiary hearing earlier this year, during which the Court heard arguments and evidence regarding subject matter jurisdiction, China's liability, and Mississippi's damages. At the hearing,

---

[2] Pursuant to Mississippi's Notice of Voluntary Dismissal [94], Defendant Chinese Academy of Sciences was terminated as a party on May 13, 2025, and is not captioned as a Defendant above. Additionally, at the evidentiary hearing on this matter, Mississippi made an *ore tenus* motion to voluntarily dismiss three of the Defendants: the People's Government of Hubei Province, the Ministry of Civil Affairs of the People's Republic of China, and the Ministry of Emergency Management of the People's Republic of China. Seeing no reason that Mississippi's *ore tenus* should not be granted, the Court now dismisses without prejudice those Defendants.

Mississippi requested the opportunity to have three months to file a supplemental brief on the Motion for Default Judgment [80],[3] which Mississippi has now filed [88]. The Motion for Default Judgment is now fully briefed. Prior to reaching the merits, the Court will *sua sponte* consider whether it has jurisdiction.

## II. JURISDICTION

The Foreign Sovereign Immunities Act "provides the exclusive jurisdictional basis for suits in the United States against foreign states." *Juels v. Fed. Rep. of Germany*, 32 F.3d 566, 1994 WL 442492, at *1 (5th Cir. Aug. 2, 1994) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983); 28 U.S.C. § 1330). "At the threshold of every action in a District Court against a foreign state, [] the court must satisfy itself that one of the [Foreign Sovereign Immunities Act] exceptions applies—and in doing so it must apply the detailed federal law standards set forth in the Act." *Verlinden*, 461 U.S. at 493-94, 495 n.20 (the rule applies "even if the foreign state does not enter an appearance to assert an immunity defense").

Though the Court's jurisdiction has obviously not been challenged by China, this Court must still make sure that jurisdiction is proper. *See generally Missouri ex rel. Schmitt v. People's Republic of China*, 610 F. Supp. 3d 1174 (E.D. Mo. 2022), *aff'd in part, rev'd in part and remanded sub nom. Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024); *see also Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 59 (D.D.C. 2007) ("[T]he Court may proceed to consider the merits of a claim against a foreign state only if . . . one of the [Foreign Sovereign

---

[3] The Court previously granted [50] the China Society of Private International Law's motion [46] to file a brief of amicus curiae. After Mississippi refiled its motion for default judgment, the China Society of Private International Law filed a second motion [89] and attached its second proposed brief of amicus curiae. The Court has reviewed the proposed brief, and it does not alter the Court's conclusion on any issue. Additionally, for the reasons put forward by Mississippi, the China Society of Private International Law's motion for leave to file a brief of amicus curiae [89] is denied.

Immunities Act]'s enumerated exceptions to sovereign immunity applies to that claim."); *Siderman v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) (holding that the district court erred in failing to determine subject matter jurisdiction under the Foreign Sovereign Immunities Act as a threshold matter); *Chen v. China Cent. Television*, No. 06CIV414PAC, 2007 WL 2298360, at *4-6 (S.D.N.Y. Aug. 9, 2007) (*sua sponte* raising subject matter jurisdiction under the Foreign Sovereign Immunities Act), *aff'd sub nom.*, 320 F. App'x 71 (2d Cir. 2009).

The Foreign Sovereign Immunities Act's default rule is that "foreign states are generally immune from suit in United States courts." *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 145 S. Ct. 1572, 1576, 221 L. Ed. 2d 867 (2025). But a foreign state loses its sovereign immunity if one of the exceptions applies. 28 U.S.C. § 1604. And when an "exception applies, jurisdiction usually follows." *CC/Devas (Mauritius) Ltd.*, 145 S. Ct. at 1578. "That is because the Act's jurisdiction provision, 28 U.S.C. § 1330, pegs both subject-matter jurisdiction and personal jurisdiction to exceptions." *Id.* Section 1330(a) vests federal courts with "original jurisdiction" to hear claims "to which the foreign state is not entitled to immunity" under Sections 1605 through 1607. Section 1330(b) "automatically" bestows personal jurisdiction "whenever (1) 'an exception to immunity applies' and (2) 'service of process' has been accomplished." *CC/Devas (Mauritius) Ltd.*, 145 S. Ct. at 1580 (quoting *Samantar v. Yousuf*, 560 U.S. 305, 324 n.20, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010) (declining to apply the "minimum contacts" test)).

Mississippi has properly demonstrated that it followed "all procedural steps required by the Federal Rules of Civil Procedure," the Foreign Sovereign Immunities Act, and "the Hague Service Convention in effectuating service." [81], p. 6. Therefore, there are only two pertinent jurisdictional questions. First, are the Defendants "foreign states" under Section 1603(a), entitling

them to a presumption of immunity? Second, if so, does an exception apply, stripping them of immunity? *See Frank v. Antigua & Barbuda*, 842 F.3d 362, 368 n.5 (5th Cir. 2016) (citing *Verlinden*, 461 U.S. at 488-89). If both answers are yes, then Section 1330's jurisdictional provisions are necessarily satisfied. *See CC/Devas (Mauritius) Ltd.*, 145 S. Ct. at 1580.

**A. The Chinese Defendants are all a foreign state under the Foreign Sovereign Immunities Act**

Section 1603 of the Foreign Sovereign Immunities Act defines a "foreign state" as "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). And "agency or instrumentality of a foreign state" refers to any entity:

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . .

*Id.* § 1603(b). All of the remaining Chinese Defendants—the People's Republic of China, the Communist Party of China, the National Health Commission of the People's Republic of China, the People's Government of Wuhan City, and the Wuhan Institute of Virology—are considered a foreign state under the Foreign Sovereign Immunities Act. *See Missouri*, 90 F.4th at 934 (holding that the same defendants all "qualified as one" foreign state).

First, the People's Republic of China, as the country's "officially recognized government" and the "body politic that governs [the] territory," is a foreign state. *Id.*; *see also Samantar*, 560 U.S. at 314; *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 169 (3d Cir. 2023).

Second, is the Communist Party of China. As Mississippi alleges, the Chinese Communist Party is the sole governing party in China. [1], p. 5. Its General Secretary becomes the President of the People's Republic of China, and the People's Republic of China and the Chinese Communist Party "essentially act as one and the same entity." *Id.* Moreover, the Chinese Communist Party

"exercise[s] direction and control over the actions of all other Defendants." *Id.* Although to an American eye, and at first glance, the Chinese Communist Party "may look like a nongovernmental body, . . . it is in substance the same 'body politic that governs [China].'" *Missouri*, 90 F.4th at 935 (citing *Samantar*, 560 U.S. at 314); *see Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 196 (2d Cir. 2019) ("[A]n entity can be a 'foreign state' if it is an alter ego of a foreign state."); *The American Heritage Dictionary* 1706 (5th ed. 2016) (defining the "state" as "[t]he supreme public power within a sovereign political entity").

Third, the National Health Commission of the People's Republic of China is "the nation's top health authority" and "a ministry of the [People's Republic of China's] State Council charged with formulating health policies." [1], p. 5, 17. As a ministry of the official state government, the National Health Commission is a "political subdivision" under Section 1603(a)(2). *See* 28 U.S.C. § 1603(a)(2); *Missouri*, 90 F.4th at 935; *see also Berg v. Kingdom of Netherlands*, 24 F.4th 987, 992–94 (4th Cir. 2022) (treating Dutch ministries as "political subdivisions"); *Garb v. Republic of Poland*, 440 F.3d 579, 594 (2d Cir. 2006) (calling Poland's Ministry of the Treasury "an integral part of Poland's political structure") (citation omitted). It too is a foreign state.

Fourth, the People's Government of Wuhan City, while not part of China's centralized national government, is nevertheless a political subdivision of China. *See* 28 U.S.C. § 1603(a)(2). "Ministries qualify, as we explain above, because of their direct connection to the official government. But so do provincial- and township-level bodies like the . . . People's [Government] of Wuhan City." *Missouri*, 90 F.4th at 935 (citing *Big Sky Network Can. Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1189 (10th Cir. 2008) (holding that the Sichuan Province and Qingyang District in China are political subdivisions)).

16

Finally, Mississippi alleges that the Wuhan Institute of Virology, which is a research institute located in Wuhan, acted in concert with the other Chinese Defendants regarding the covering up of the COVID-19 virus and the hoarding of PPE. [1], p. 7. For instance, Mississippi entered into evidence a report by then-Senator Marco Rubio describing how the "state-run" Wuhan Institute of Virology engaged in at least thirteen political meetings with Chinese Communist Party officials in July and August of 2019, *see* [86-2], pps. 85-98, the Chinese Communist Party Secretary General Xiao Gengfu issued directives to Wuhan Institute of Virology personnel concerning biosafety, *id.* at pps. 86-87, and General Secretary Xi Jinping gave oral and written safety instructions to the Wuhan Institute of Virology, *id.* at pps. 122-23. And once the outbreak began in China, Wuhan Institute of Virology Director Wang Yanyi, at the order of the National Health Commission, circulated a notice within the Wuhan Institute that strictly prohibited the disclosure of any information related to the virus. *Id.* at p. 147. The National Health Commission also instructed the Wuhan Institute of Virology to destroy samples of the COVID-19 virus in the lab. *Id.*

The Wuhan Institute of Virology, while "legally separate from the government," acted in concert with and at the direction of the Chinese government and is, therefore, "still closely enough connected" that it qualifies as an "organ" of China. *Missouri*, 90 F.4th at 935 (citing 28 U.S.C. § 1603(b)(2)); *see Photos v. People's Republic of China*, No. 3:20-cv-656-K-BN, 2020 WL 6889016, at *5 (N.D. Tex. Nov. 24, 2020) (finding that where the Wuhan Institute of Virology's "core function is governmental," it could be served with process as an agent of foreign state under the Foreign Sovereign Immunities Act); *see also Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995) (holding that an entity was an organ of the state, in part because the entity's "ability to act

independently" was "narrowly circumscribe[d]"). Because each Chinese Defendant qualifies as a "foreign state" under the Foreign Sovereign Immunities Act, they are immune from this Court's jurisdiction, unless Mississippi can show that an immunity exception applies.

**B. The Foreign Sovereign Immunities Act's commercial activity exception applies**

Mississippi asserts that China's conduct falls under Section 1605(a)(2)'s third clause. The Foreign Sovereign Immunities Act abrogates immunity for some "commercial activity" in Section 1605(a)(2). It states:

> *A foreign state shall not be immune* from the jurisdiction of courts of the United States or of the States in any case in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; *or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States*.

28 U.S.C. § 1605(a)(2) (emphasis added). In other words, the third clause applies if: "(1) defendants engaged in 'commercial activity' outside the United States; (2) the suit is 'based upon' an act outside the United States 'in connection' with such commercial activity; and (3) the act had a 'direct effect' inside the United States." *Missouri ex rel. Schmitt*, 610 F. Supp. 3d at 1189; *accord Frank*, 842 F.3d at 368.

Mississippi alleges these elements are satisfied because, as a commercial actor, China "hoarded PPE, cornered the market, raised prices, and sold faulty PPE in Mississippi and elsewhere." [81], pps. 5-6 (citing [1], ¶¶ 118-27). From the outset, it is notable that the Eighth Circuit has addressed this precise issue. In fact, Mississippi's factual allegations are, in large part, verbatim to Missouri's allegations in *Missouri ex rel. Schmitt*, 610 F. Supp. 3d 1174. *Compare* [1] *with* Complaint, No. 1:20-cv-00099, Dkt. No. 1. This Court finds the Eighth Circuit's reasoning persuasive.

**1. Commercial activity element**

Mississippi argues China engaged in commercial activity by hoarding and selling PPE. A "commercial activity" is one in the "regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Moreover, the "commercial character of an activity" is not based on its purpose. *Id.* Rather, it is "determined by reference to the nature of the course of conduct or particular transaction or act." *Id.* When a foreign government is the inquiry's focal point, the Supreme Court says that "a state engages in commercial activity under the restrictive theory where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 360, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992)). In other words:

> [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its nature rather than its purpose, the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'

*Nelson*, 507 U.S. at 360-61 (quoting *Weltover, Inc.*, 504 U.S. at 614) (emphasis in original).

In *Missouri*, the Eighth Circuit overturned the district court's finding that Missouri's hoarding claim was not commercial activity. There, Missouri's hoarding claim took aim at the "production, purchasing, and import and export of medical equipment, such as [PPE], used in COVID-19 efforts." *Id.* In support, Missouri made two allegations. First, "the defendants hoarded masks and then sold lower-quality equipment in the United States." *Missouri*, 90 F.4th at 938. Second, "China 't[ook] over factories that ma[de] masks on behalf of American companies,' which

essentially halted the export of high-quality masks to the United States." *Id.* The Eighth Circuit held these actions were "commercial in 'nature'" because "[t]ogether, they identify classic anticompetitive behavior, except on a country-wide scale." *Id.* As the court reasoned, "[t]aking over mask-producing factories," buying up the PPE on a global scale, and "selling those items for a profit" were the actions of a "private player" in the market. *Id.* Here, just like Missouri's hoarding claim, Mississippi notes that China's hoarding behavior included: "the production, purchasing, and import and export of medical equipment, such as masks and other PPE necessary to COVID-19 efforts." [1], ¶ 38. And Mississippi also makes exactly the same supporting factual allegations. *See* [1], ¶¶ 118-27. The Court agrees with the Eighth Circuit. Private entities engage in this behavior, albeit on a much smaller scale. Indeed, federal and state legislatures drafted antitrust laws to prevent it. Mississippi's allegations show that China—including each Chinese Defendant—engaged in commercial activity.

### 2. Based upon element

Under Section 1605(a)(2), the complaint must be "based upon" the commercial activity. A complaint is "based upon" the commercial activity if "the elements of a claim that, if proven, would entitle a plaintiff to relief under the theory of the case." *Nelson*, 507 U.S. at 357. But the Court need not analyze each element of Mississippi's causes of action. Rather, "courts should zero in on the 'core' of the suit, that is, the 'acts that actually injured them'" *Missouri ex rel. Schmitt*, 610 F. Supp. 3d at 1190 (quoting *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 136 S. Ct. 390, 193 L. Ed. 2d 269 (2015)).

The Eighth Circuit found that Missouri's complaint, *as alleged*, was based upon commercial activity, and the Court agrees here as well. Missouri's "overarching theory [was] that China

leveraged the world's ignorance about COVID-19" by "manipulating the worldwide personal-protective-equipment market." *Missouri*, 90 F.4th at 939. Mississippi's complaint hinges on the same theory. Indeed, Count One of Mississippi's complaint under the Mississippi Consumer Protection Act alleges that China engaged in unfair and deceptive trade practices "through its concerted effort to cover up the seriousness of COVID-19, utilize time afforded by said cover-up to hoard PPE, nationalize companies manufacturing and producing PPE, sell sub-standard PPE back to a desperate world, [all] while keeping quality materials to itself." [1], p. 28. And Count Two under the Mississippi Antitrust Act claims that China "created an environment ripe for the need of PPE, hoarded PPE so as to interfere with natural supply and demand patterns, and engaged in trafficking of such products to its unjust enrichment." *Id*. Both of Mississippi's causes of action seek to recover Mississippi's alleged damages stemming from China's commercial activity—the hoarding and selling of PPE. Mississippi's complaint is based upon commercial activity.

### 3. Direct effect element

Under this prong, the commercial activity must have "caused a direct effect in the United States." 28 U.S.C. § 1605(a)(2). This inquiry focuses on the conduct's effect, not the resulting injury. "[A]n effect is 'direct' if it follows 'as an immediate consequence'" of the defendant's activity. *Weltover, Inc.*, 504 U.S. at 618 (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991), *aff'd*, 504 U.S. 607, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992)). There must also be "no intervening element, but rather, [it must] flow in a straight line without deviation or interruption." *Frank*, 842 F.3d at 369 (quoting *Princz v. Fed. Republic of Ger.*, 26 F.3d 1166, 1172 (D.C. Cir. 1994)). Very importantly, the effect need not be "substantial" or "foreseeable." *Id.* at 368-69 (quoting *Weltover, Inc.*, 504 U.S. at 618). But it must be more than "purely trivial." *Id.*

Unlike Missouri's hoarding claim, the Eighth Circuit affirmed the district court's dismissal of three of Missouri's other causes of action,[4] which dealt with allegations about virus research, the management of China's healthcare system, and the operation of media platforms for commercial gain. *Missouri*, 90 F.4th at 937. Assuming the activities were commercial in nature, the court held that their effects were too remote and attenuated. *Id.* For example, the court reasoned, the virus's spread required intervening actors—an infected individual had to travel outside of China, then the virus had to spread to the United States, then to Missouri. *Missouri*, 90 F.4th at 937. Likewise, for Missouri's economy to suffer, "[i]nfections had to reach a high enough level in the United States and Missouri for the federal, state, and local governments to issue stay-at-home orders." *Id.* And "Missourians then had to follow them." *Id.* "Only then did schools and businesses close, state expenditures grind to a halt, and medical facilities close their doors to visitors." *Id.* Considering the necessary links in the causal chain, the court held "it is impossible to directly trace the economic and other harms identified in Missouri's complaint to virus research in Wuhan, operation of the Chinese healthcare system, and social-media censorship." *Id.* at 937-38. Notably, Mississippi's complaint only diverges from Missouri's complaint in this respect—Mississippi did not bring similar claims.

To be sure, the Eighth Circuit held Missouri's hoarding claim was "different." *Id.* at 938. The Court agrees with the Eighth Circuit's conclusion. China's hoarding allegedly affected Mississippi and Missouri immediately for the same reasons. Before the pandemic became public knowledge, Mississippi and Missouri both alleged that China began hoarding its own mask production. [1], ¶ 118. China then began purchasing the majority of the world's mask supply,

---

[4] Specifically, Missouri brought causes of action under Public Nuisance, Abnormally Dangerous Activities, and Breach of Duty by allowing transmission of COVID-19. *See Missouri ex rel. Schmitt*, 610 F. Supp. 3d at 1179.

transitioning from a "net exporter of PPE" to a "large net importer." *Id.* ¶ 120. The PPE shortage "led to an immediate shortage in [Mississippi], which then allowed [China] to enter the market and sell lower-quality masks." *Missouri*, 90 F.4th at 938. And "[o]ther market players simply had no time or ability to respond." *Id.* at 939 (citing *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986)). China's "market power and [] superior knowledge about the virus meant that no one else other than [it] had to act" to create the PPE shortages and rising costs. *Id.* (citing *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen.*, 600 F.3d 661, 664–66 (D.C. Cir. 2010)). As a result, healthcare providers immediately began paying higher premiums or faced shortages. *See id.* at 938 ("The most basic supply-and-demand principles tell us that these market effects depended little, if at all, 'on variables independent' of [China's] conduct given the information asymmetry and tight timeframe that existed at the time.").

Moreover, although the Eighth Circuit noted the hoarding's direct effect was the "closest call," *id.*, the Fifth Circuit's standard is more straightforward. The Eighth Circuit requires more than just a financial effect. *See id.* (ruling Missouri's complaint properly alleged noneconomic effects because the virus "made it difficult to 'safely and effectively treat[] patients with the virus'"). But the Fifth Circuit does not require a showing of noneconomic effects. As long as it is an immediate consequence of the defendant's activity, "a financial loss in the United States" suffices. *Frank*, 842 F.3d at 369 (quoting *Voest–Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 897 (5th Cir. 1998)). Even if Mississippi had not alleged that China's conduct also caused noneconomic losses—which it did—Mississippi's financial loss alone would be satisfactory. For example, even a year after the pandemic began, Mississippi hospitals were still experiencing PPE supply shortages and price increases, from approximately $1.25 per mask to $7.50. [81], p. 20.

In sum, the Court concludes that Mississippi has satisfactorily alleged that its complaint is based upon China's commercial activities, which had a direct effect in Mississippi. China's conduct, therefore, falls under the Foreign Sovereign Immunities Act's commercial activity exception in Section 1605(a)(2). This exception strips China's immunity under Section 1604 and grants the Court jurisdiction under Section 1330. *See CC/Devas (Mauritius) Ltd.*, 145 S. Ct. at 1580.

### III. MOTION FOR DEFAULT JUDGMENT

Section 1606 of the Foreign Sovereign Immunities Act provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." It does not provide substantive law. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620 103 S. Ct. 2591, 77 L. Ed. 2d 46 (1983). But it does set out the standard of review in the default judgment context. It mandates that "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the Court." 28 U.S.C. § 1608(e). Mississippi, "in other words, must provide 'evidence satisfactory to the court' on its claims of liability and damages before it may obtain a judgment against the Defendants." *Missouri ex rel. Bailey v. People's Republic of China*, 769 F. Supp. 3d 877, 891 (E.D. Mo. 2025).

Securing a default judgment is a three-step procedure: first, the defendant's default; second, the clerk's entry of default; and third, entry of a default judgment. *Twist & Shout Music v. Longneck Xpress, N.P.*, 441 F. Supp. 2d 782, 783 (E.D. Tex. 2006) (citing *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996)). The first two steps have been satisfied here. Thus, the only issue left to consider is whether the Court should enter a default judgment. To determine whether a

default judgment should be entered, the Court conducts a three-question analysis: (1) "whether the entry of default judgment is procedurally warranted;" (2) "whether there is a sufficient basis in the pleadings for the judgment;" and (3) "what form of relief, if any, the plaintiff should receive." *J & J Sports Productions, Inc. v. Morelia Mexican Rest., Inc.*, 126 F. Supp. 3d 809, 814 (N.D. Tex. 2015). The Court will address each in turn.

## A. Entry of a default judgment is procedurally warranted

"Default judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 847 F.2d 274, 276 (5th Cir. 1989). The Fifth Circuit has identified six factors for district courts to examine before entering a default judgment: "(1) whether material issues of fact exist; (2) whether there has been substantial prejudice; (3) whether the grounds for default are clearly established; (4) whether the default was caused by a good faith mistake or excusable neglect; (5) the harshness of a default judgment; and (6) whether the Court would consider itself obligated to set aside a default on the defendant's motion." *Lindsayca USA, Inc. v. Petroleos de Venzuela, S.A.*, No. 4:21-cv-00037, 2022 WL 3588041, at *4 (S.D. Tex. Aug. 22, 2022), *report and recommendation adopted sub nom.*, No. 4:21-cv-00037, 2022 WL 4588588 (S.D. Tex. Sep. 29, 2022) (citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998)).

First, no material issues of fact exist. A defaulted defendant "admits the plaintiff's well-pleaded allegations of fact." *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). Allegations of fact need not be "detailed" to be well-pled, but "the pleading must present 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 498 (5th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). Across thirty pages, Mississippi's complaint lays out in detail China's alleged misconduct, underlying circumstances, and subsequent effects at issue in this lawsuit. The complaint also includes outside sources substantiating the veracity of its allegations. It goes well beyond Federal Rule of Civil Procedure Rule 8(a)(2)'s "short and plain statement" requirement. The Court has no pause in concluding Mississippi's factual allegations are well-pled and undisputed given China's default.

Second, China's intentional default has brought "the adversary process to a halt, effectively prejudicing [Mississippi]'s interests." *Ins. Co. of the W. v. H & G Contractors, Inc.*, No. C-10-390, 2011 WL 4738197, at *3 (S.D. Tex. Oct. 5, 2011) (citing *Lindsey*, 161 F.3d at 893). This case has largely been pending for five years because of China's explicit refusal to participate.

Third, both the record and China's intentional refusal to participate in this litigation mean that the grounds for default are clearly established. "When the defendant[s'] failure to respond is 'plainly willful, as reflected by [the defendants'] failure to respond either to the summons and complaint, the entry of default, or the motion for default,' then grounds for default are clearly established." *Sheikh Ali v. Mt. Run Sols., LLC*, No. 4:21-cv-453-SDJ-KPJ, 2021 WL 7617198, at *3 (E.D. Tex. Dec. 22, 2021) (quoting *Graham v. Coconut LLC*, No. 4:16-cv-606, 2017 WL 2600318, at *2 (E.D. Tex. Jun. 15, 2017)).

Fourth, there is no indication in the record that China's failure to participate was caused by a good-faith mistake or excusable neglect. Rather, China plainly told Mississippi that it "does not recognize and will not participate in [this] vexatious litigation lawsuit[]." [81-1], p. 1. This "mitigate[es] the harshness of a default judgment." *John Perez Graphics & Design, LLC v. Green Tree Inv. Grp., Inc.*, No. 3:12-cv-4194-M, 2013 WL 1828671, at *3 (N.D. Tex. May 1, 2013). And the

Court recognizes that China has had over two years to participate in this case since being served via diplomatic channels in 2023. *See Wash. Int'l Ins. Co. v. Jones*, No. EP-22-cv-00131-DCG, 2023 WL 2658572, at *4 (W.D. Tex. Feb. 10, 2023) (finding that a default judgment would not be unduly harsh when the defendant had nine months to respond to the lawsuit); *Sheikh Ali*, 2021 WL 7617198, at *3 (finding that the defendant's failure to respond to the lawsuit over six months mitigated the harshness of entering a default judgment).

Lastly, the Court is unaware of any facts that would give rise to "good cause" to set aside the default if challenged by China. The entry of a default judgment in this case is procedurally warranted.

**B. Mississippi has alleged a sufficient basis in its pleadings for judgment**

"To prevail in a [Foreign Sovereign Immunities Act] default proceeding, the plaintiff[] must present a legally sufficient *prima facie* case, in other words, 'a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff.'" *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010) (quoting *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008)). But, as noted above, the Foreign Sovereign Immunities Act does not provide substantive law. Rather, "where state law provides a rule for liability governing private individuals, the [Foreign Sovereign Immunities Act] requires the application of that rule to foreign states in like circumstances." *First Nat. City Bank*, 462 U.S. at 620.

At this stage, "[a] defendant, 'by his default, admits the plaintiff's well-pleaded allegations of fact." *Allstate Prop. & Cas. Ins. Co. v. Pickett*, No. 5:12-cv-157-DPJ-FKB, 2014 WL 202758, at *1 (S.D. Miss. Jan. 17, 2014) (quoting *Nishimatsu Constr. Co., Ltd.*, 515 F.2d at 1206). When considering a claim against a defaulting sovereign, "the court may 'accept as true the plaintiffs'

uncontroverted evidence.'" *Owens*, 826 F. Supp. 2d at 135 (quoting *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)); *see Gates*, 580 F. Supp. 2d at 63 ("By its failure to appear and defend itself, [the foreign sovereign] put itself at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to prove its points.").

"Courts apply a 'lenient standard' for factual findings by a trial court in [Foreign Sovereign Immunities Act cases], recognizing that 'firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign.'" *Missouri*, 769 F. Supp. 3d at 891 (quoting *Owens*, 864 F.3d at 785). Because it may be difficult to obtain direct proof of conduct by a defaulting sovereign, the Foreign Sovereign Immunities Act "permits courts to credit indirect evidence and to impose a lower evidentiary burden than they might apply in a different context." *Saharkhiz v. Islamic Republic of Iran*, Case No. 19-cv-2938, 2023 WL 9196605, at *5 (D.D.C. Oct. 16, 2023).

Courts have found such an evidentiary standard appropriate when defendants have "refused to appear in court and subject [themselves] to discovery, and [are] known to intimidate defectors and potential witnesses." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014). "[T]he Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'" *Id.* (citing *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

Of course, "[e]ven after default, . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." 10A *Wright & Miller's Federal Practice & Procedure* § 2688.1 (4th ed. updated

2025); *see Pickett*, 2014 WL 202758, at *1 ("[A] default judgment is only proper if [] well-pleaded factual allegations establish a valid cause of action . . . . Thus, the Court's duty in considering a motion for default judgment is 'to ensure that [the] Plaintiff is entitled to a judgment as a matter of law based on the admitted factual allegations of the Complaint.'") (quoting *Forman Perry Watkins Krutz & Tardy LLP v. Kelly Cap., LLC*, No. 2:11-cv-176–KS–MTP, 2011 WL 5983296, at *1 (S.D. Miss. Nov. 29, 2011)). Accordingly, considering Mississippi's evidence, the Court must analyze whether Mississippi's uncontroverted factual allegations sufficiently allege a *prima facie* case under the Mississippi Consumer Protection Act and the Mississippi Antitrust Act.

### 1. The Mississippi Consumer Protection Act

Section 75-24-9 of the Mississippi Consumer Protection Act authorizes Mississippi's Attorney General to bring a suit, on behalf of Mississippi, against any "person" reasonably believed to have used, is about to use, or is using "any method, act, or practice, prohibited by Section 75-24-5." Mississippi contends that China is subject to the Mississippi Consumer Protection Act's limitations as a "person." [1], ¶ 129.

### a. China is a "person" under the Mississippi Consumer Protection Act

The Mississippi Consumer Protection Act defines "person" as "natural persons, corporations, trusts, partnerships, incorporated and unincorporated associations, and any other legal entity." MISS. CODE ANN. § 75-24-3. Mississippi argues that China falls under the definition of a "legal entity." [88], p. 7. Merriam-Webster defines "legal entity" as "an entity having under the law rights and responsibilities and especially the capacity to sue and be sued." *Legal Entity*, Merriam-Webster, https://www.merriam-webster.com/legal/legal%20entity; *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 485 123 S. Ct. 1655, 155 L. Ed. 2d 643 (2003) (Breyer, J., concurring in

part) (The Foreign Sovereign Immunities Act "seeks to guarantee [] protections to the foreign nation not only when it acts directly in its own name but also when it acts through separate legal entities."); *Crystallex Int'l Corp.*, 932 F.3d at 140. Indeed, the Court already found above that the Foreign Sovereign Immunities Act enables these Chinese Defendants, as either a foreign state, or agencies, or instrumentalities of a foreign state, to be sued in a court of the United States when a foreign sovereign immunity exception applies. The Court is satisfied that the definition of "person" found in the Mississippi Consumer Protection Act is sufficiently broad to bring all of these Chinese Defendants within its purview.

### b. Mississippi made a *prima facie* showing that China violated § 75-24-5(1) and (2)(g)

Mississippi alleges that China violated Sections 75-24-5(1) and 75-24-5(2)(g) of the Mississippi Consumer Protection Act. "Mississippi does not require a finding of fraud for an act to be deemed unfair or deceptive." *Mississippi ex rel. Fitch v. Eli Lilly & Co.*, 620 F. Supp. 3d 532, 542 (S.D. Miss. 2022).

Section 75-24-5(1) contains a general prohibition. It prohibits "unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." MISS. CODE ANN. § 75-24-5(1). This section does not define such unfair methods or deceptive practices. Rather, the Mississippi legislature instructs that "interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act" should "guide" a court's analysis. MISS. CODE ANN. § 75-24-3(c). Under the Federal Trade Commission Act, a "trade practice is unfair if three factors are met: (1) it causes or is likely to cause a substantial injury; (2) the injury is not outweighed by any countervailing benefits to consumers or competition that the practice produces, and (3) the injury could not have been reasonably

avoided." *Eli Lilly & Co.,* 620 F. Supp. 3d at 542 (quoting *In re Miss. Medicaid Pharma. Avg. Wholesale Price Litig.*, 190 So. 3d 829, 841 (Miss. 2015)). Unlike its general counterpart, the Mississippi legislature listed specific examples of unfair or deceptive trade practices in Section 75-24-5(2). Subsection (2)(g) prohibits parties from "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another." MISS. CODE ANN. § 75-24-5(2)(g).

Mississippi's substantive allegations with respect to Section 75-24-5(1) are threefold: China (1) engaged in a "concerted effort to cover up the seriousness of COVID-19," (2) nationalized certain companies that were manufacturing and producing PPE in order to hoard PPE from the rest of the world, and (3) sold sub-standard PPE to the world and kept the quality materials to themselves. [1], pps. 27-28. Mississippi also alleges that China "misrepresented that the little PPE it allowed for the rest of the world, including Mississippi, was of a standard, quality, or grade in violation of MISS. CODE ANN. § 75-24-5(2)(g)." [1], ¶ 132. And Mississippi does not allege this in a conclusory manner.

*First,* China laid the groundwork for its scheme by intentionally creating informational asymmetry between countries by suppressing essential information at the pandemic's beginning and by hoarding PPE. On December 30, 2019, the Wuhan Municipal Health Commission released a notice to medical institutions stating that patients had contracted a pneumonia-like illness, but the notice warned against "release[ing] treatment information to the public without authorization." *Id.* at p. 14. That same day, the Chinese government censored a message from a doctor concerning patients with an illness that the doctor suspected to be a coronavirus. *Id.* China also censored keywords about the virus on social media. *Id.* On January 1 or 2 of 2020, Wuhan

police arrested eight people who had published rumors of the coronavirus. *Id.* The Chinese government also broadcast an announcement on state television warning that the further spreading of rumors would be met with "zero tolerance." *Id.* at p. 15.

At the same time, Wuhan and Hubei Province officials ordered researchers to stop testing samples from Wuhan for genome sequences relating to the coronavirus and to destroy all existing samples. *Id.* at p. 16. Dr. Ai Fen, an official at a Wuhan hospital who suspected the disease of human-to-human transmission, was disciplined for ordering her staff to wear masks, which hospital leadership claimed caused panic. *Id.* Leadership also banned staff from discussing the disease. *Id.* at pps. 15-16. On January 2, 2020, the Wuhan Institute of Virology completed its genome sequencing of the COVID-19 virus, but that discovery was not announced at that time. *Id.* at p. 16.

The next day, the National Health Commission "ordered institutions not to publish any information related to the unknown disease, and ordered labs to transfer any samples they had to designated testing institutions, or to destroy them." *Id.* at p. 17. Even after the genome sequencing was complete, government officials in Wuhan were publicly claiming that there was "no clear evidence of human-to-human transmission." *Id.* A few days later, a professor at a research center in Shanghai also identified the existence of the coronavirus and mapped its genome using a sample from Wuhan. *Id.* at pps. 17-18. The discovery of this genome mapping was not immediately made public, either. *Id.* at p. 18. The World Health Organization released a statement on January 5, 2020, relying on information received from Chinese officials, that there was no evidence of human-to-human transmission from the coronavirus. *Id.*

When the United States Centers for Disease Control tried to send a research team to China, China refused them entry. *Id.* Then, on January 8, the World Health Organization declined to

recommend any travel restrictions, even for travel to and from China, based on the false belief that the virus did not pose a serious risk. *Id.* Wuhan officials continued to double down that the virus could not spread between humans, while claiming on January 11, 2020, that no new cases of the virus had been detected since January 3. *Id.* at p. 19. And China did not share the genome sequence, which was critical to containing the virus and developing a vaccine, until January 12. *Id.* at p. 20.

The first case outside of China was reported in Thailand on January 13, 2020, and by the time Chinese President Xi Jinping made his first public statement on the virus in late January, millions of travelers had passed through Wuhan, and over 3,000 people had been infected while Chinese officials remained silent. *Id.* at pps. 20-21. Chinese officials did not confirm human-to-human contact until January 20 and did not take steps to quarantine Wuhan residents until January 23, 2020. *Id.* at p. 21.

*Second*, while China had been aware of the virus for several weeks, its silence unleashed the virus on "an unsuspecting world," creating a situation where China could stockpile PPE while the rest of the world, including the United States, was forced to play catch-up. *See Missouri*, 769 F. Supp. 3d at 894. According to a Congressional Report entered into evidence, the Chinese government, in early February 2020, nationalized control of the production and distribution of PPE in China. [86-7], p. 20. China's nationalization efforts "denied the United States and other countries . . . timely access to critical medical supplies." *Id.* at p. 21. Multinational PPE manufacturers, like U.S.-based 3M and Canadian company Medicom, reported that their facilities in China had been taken over to meet China's domestic demand, while China allowed only smaller manufacturers to export PPE. *Id.* at pps. 25-26.

Additionally, China imposed new export quality checks for PPE that further slowed exports and prioritized exports to certain countries ahead of the United States, which inhibited the United States from obtaining needed PPE. *Id.* at p. 26. And China not only nationalized American factories to hoard would-be exports, but it also ramped up imports of PPE. [81], p. 15 (citing Keith Bradsher et al., *The World Needs Masks. China Makes Them, but Has Been Hoarding Them*, N.Y. Times (Mar. 13, 2020)). In February 2020, the Chinese Ministry of Commerce "directed its bureaucracy, local governments and industry to secure critical technology, medical supplies, and medical-related raw material inputs from the global market, a situation that likely further exacerbated supply shortages in the United States." *Id.* at p. 19. These policies led to steep increases in the Chinese import of PPE and "contributed to sharp decreases in China's exports of these critical medical products to the world." *Id.* China also imposed formal export restrictions on PPE. *Id.* China's actions left countries and states, such as Mississippi, with no alternative sources to purchase PPE for the protection of their citizens once the pandemic's true nature came to light.

*Third*, without any competitors, China was free to pass off substandard PPE to the rest of the world, including Mississippi. For example, the smaller manufacturers, which China permitted to export PPE, sent items to the United States that were found to be unusable. [86-6], p. 8. And the PPE that China did permit to be exported to the U.S. was not the N95 and KN95 grade that was represented. [81], p. 17 (citing David Brunnstrom et al., *U.S. Asks China to Revise Export Rules for Coronavirus Medical Gear*, Reuters (Apr. 16, 2020)). "[A]s its name advertises, the KN95 mask is meant to filter out 95% of aerosol particles," but a study conducted by a nonprofit organization found that up to seventy percent of KN95 masks imported from China did not meet this standard. *Id.* (citing Adrianna Rodriguez, *Up to 70% of KN95 Masks Imported from China Don't Meet Filtration*

*Standards, Study Says*, USA Today (Sep. 22, 2020)). It is undisputed that Mississippi purchased N95 and KN95 masks manufactured in China. [81], p. 18 (citing Giacomo Bologna, *Mississippi Emergency Agency Spent $20M on Coronavirus Supplies. Here's What We Bought.*, Clarion Ledger (May 20, 2020)). Greg Michel, who was then the executive director of the Mississippi Emergency Management Agency, estimated that as of May 20, 2020, Mississippi had purchased four million masks. *Id.*

Taking Mississippi's factual allegations as true, Mississippi has made a prima facie showing that China violated Sections 75-24-5(1) and 75-24-5(2)(g). The Mississippi Supreme Court's decision in *Average Wholesale Price Litigation* is further instructive. 190 So. 3d 829. There, Mississippi alleged that a pharmaceutical wholesaler—acting in tandem with other wholesalers—reported artificially inflated prices for medications to national data services. *Id.* at 834-35. Mississippi's Medicaid program relied on these prices to calculate reimbursements to pharmacies. *Id.* at 834. The Mississippi Supreme Court held that the trial court did not err in determining that this conduct was unfair and deceptive because "[t]he 'prices' were exaggerated to the extent that they were not even prices." *Id.* at 841-42. The court reasoned that Mississippi incurred a substantial injury to the tune of nearly twenty-four million dollars by overpaying pharmacies. *Id.* It also did not find any "countervailing benefits to consumers or competition." *Id.* And, finally, the Mississippi Supreme Court concluded that Mississippi could not have reasonably avoided the injury because its reliance on the reported prices "mirrored the practice of similar programs nationwide." *Id.* at 841-42; *see also Eli Lilly & Co.*, 620 F. Supp. 3d at 542 (holding Mississippi's allegations survived the pleading stage because it "alleged that all three Manufacturer Defendants reported exaggerated prices, knowing that other entities, including the State, relied on these prices").

As in *Average Wholesale Price Litigation*, the Court finds that all three elements are met. Mississippi alleges that China's conduct caused billions of dollars in damages to the State, its citizens, and businesses. It clearly alleges a substantial injury. Next, the Court is unaware of any countervailing effects that may have even remotely benefited consumers or Mississippi's market. Finally, Mississippi could not have reasonably avoided its injuries. Mississippi's reliance on China for PPE "mirrored the practice" of other American states and foreign countries. Indeed, Mississippi and everyone else had no other option but to rely on China based on the alleged facts. Because Mississippi has shown by evidence satisfactory to the Court that China covered up essential information about the coronavirus, hoarded premium PPE, and misrepresented the quality of PPE it exported to the United States, Mississippi has established China's liability under Sections 75-24-15(1) and 2(g).

**2. The Mississippi Antitrust Act**

Section 75-21-7 of the Mississippi Antitrust Act authorizes Mississippi's Attorney General to bring suit, on behalf of Mississippi, against any "person" or "association of persons" in violation of the statute. Once again, Mississippi contends that China fits within this definition and is subject to the statute's prohibitions. [88], p. 8.

**a. China is a "person" under the Mississippi Antitrust Act**

Unlike the Mississippi Consumer Protection Act, the Mississippi Antitrust Act does not define "person." But the Court is satisfied that the Antitrust Act applies to China for two reasons.

First, "person" is regularly used by state legislatures and Congress to broadly encompass legal entities. For example, Missouri's antitrust law defines "person" as "any individual, corporation, firm, partnership, incorporated, or unincorporated association or any other legal or

commercial entity." MO. REV. STAT. § 416.021(2). This definition is nearly identical in diction and substance to the Mississippi Consumer Protection Act's definition. To be sure, in *Missouri*, the Eastern District of Missouri came to the same conclusion. 769 F. Supp. 3d at 896.

Also, in analyzing federal antitrust law, courts have treated the Mississippi Antitrust Act as "analytically identical" to the Sherman Act. *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir. 1984), *on reh'g*, 747 F.2d 1011 (5th Cir. 1984). The Supreme Court held that the Sherman Act's definition of "person," which "include[s] corporations and associations existing under or authorized by . . . the laws of any foreign country," "is inclusive rather than exclusive, and does not by itself imply that a foreign government, any more than a natural person, falls without its bounds." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312 n.9, 98 S. Ct. 584, 54 L. Ed. 2d 563 (1978). "It follows then, that corporate or governmental status in most instances is not a bar to the imposition of liability on an entity as a "person" under the [Sherman] Act." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744-45 124 S. Ct. 1321, 158 L. Ed. 2d 19 (2004). The Court finds that similarly, China—which includes the Chinese government itself, and agents and instrumentalities of China—is included in the Mississippi Antitrust Act's definition of "person."

### b. China is liable under the Mississippi Antitrust Act

Mississippi contends that China violated subsections (a) and (c) of Section 75-24-3. [1], ¶ 134. But the Court must satisfy itself that the Mississippi Antitrust Act applies to China's conduct because Mississippi law requires an additional "substantive" showing in the conspiracy context. "A conspiracy to monopolize any commodity" is only punishable under Mississippi law if it is "accomplished in part by transactions which are wholly intrastate." *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1189 (Miss. 2020) (citation modified) (quoting *Standard Oil Co. of Ky. v.*

*State*, 65 So. 468, 471 (Miss. 1914), *overruled in part on other grounds by Mladinich v. Kohn*, 164 So. 2d 785 (Miss. 1964)).

### i. Mississippi properly alleged that China's conduct was accomplished in part by wholly intrastate transactions

In *Standard Oil of Kentucky*—the "leading case on Mississippi's antitrust statute"—the Mississippi Supreme Court "held that a conspiracy to monopolize trade" must "have as one of its objects a monopoly in the intrastate trade therein to be accomplished *in part at least* by transactions which are also wholly intrastate." *Yazaki N. Am., Inc.*, 294 So. 3d at 1188 (emphasis added).

The Mississippi Supreme Court decided *Standard Oil of Kentucky* in 1914, nearly three years after the United States Supreme Court's ruling relating to the breakup of the Standard Oil Company of New Jersey. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S. Ct. 502, 55 L. Ed. 619 (1911). The United States Supreme Court held that Standard Oil of New Jersey and its related companies, including Standard Oil of Kentucky, had engaged in an illegal trust and thereby unlawfully monopolized the petroleum industry. *Id.* at 78-79. After the dissolution of Standard Oil, Standard Oil of Kentucky was awarded the rights to run its oil operation in Kentucky, Mississippi, Alabama, Georgia, and Florida. *Standard Oil Co. (Ky.) v. Humble Oil & Ref. Co.*, 363 F.2d 945, 946 n.3 (5th Cir. 1966). But Standard Oil of Kentucky continued to work closely with other Standard Oil entities. It "did not produce and refine its own crude oil but restricted its operations to the marketing level." *Id.* at 947. Before the dissolution of the illegal trust in 1911, Standard Oil of Kentucky received its product from Standard Oil of New Jersey. After the dissolution, it continued to receive the majority of its oil from Standard Oil of New Jersey. *Id.* at

948. Standard Oil of Kentucky also sold products bearing Standard Oil of New Jersey's "Esso" brand name. *Id.* at 951 n.21.

Although Standard Oil of Kentucky and Standard Oil of New Jersey proceeded as separate corporate entities with distinct ownership, the Attorney General of Mississippi brought suit on behalf of the state, arguing that, notwithstanding the United States Supreme Court's *Standard Oil* opinion, "the conspiracy had remained in effect, and that the conspirators had continued to act in concert as theretofore in the same manner and for the same purpose." *Standard Oil of Kentucky*, 65 So. at 470. Mississippi alleged that Standard Oil of Kentucky monopolized both inter- and intrastate commerce in petroleum products, excluded other companies from selling petroleum in Mississippi, and sold its products in Mississippi "at different places on the same day at different prices . . . in order to destroy competition at such places." *Id.*

And while none of the petroleum at issue was produced in Mississippi, but was imported from other states in interstate commerce, the monopolistic sales and distributions were made "after the petroleum products had been received by [Standard Oil of Kentucky] in [Mississippi] and had become incorporated into the general mass of property therein . . ., thereby constitut[ing] intrastate commerce." *Id.* Accordingly, the Mississippi Supreme Court held that Standard Oil of Kentucky's conduct was "governed by the state's laws." *Id.*

This prologue on the *Standard Oil of Kentucky* case helps show that it is not too dissimilar from this one. There, the Mississippi Supreme Court held that the Mississippi Antitrust Act may apply to commerce that is both interstate and intrastate. Specifically, the Mississippi Supreme Court held that state antitrust law applied to a trust-busted Standard Oil affiliate, which had clearly

been engaging in interstate commerce. The product involved in the illegal transactions, petroleum, was not made in Mississippi, but was itself transported in interstate commerce into Mississippi.

With that in mind, it is of no concern that China is a large foreign sovereign that transacted in PPE with the rest of the United States. Nor does it matter that the PPE itself was not manufactured in Mississippi. The record shows that China was the largest producer of PPE in the world. When it engrossed and forestalled PPE, this left Mississippi consumers, including the state government itself, with no meaningful alternative sources for PPE items and resulted in large price increases on these items within the State of Mississippi. After the PPE from China was received in Mississippi, it was "incorporated into the general mass" of PPE products in Mississippi. *See id.* China's actions with respect to artificially increasing the prices of PPE and restricting domestic companies like 3M from importing their products into Mississippi exacerbated the price increases and shortages experienced by Mississippi consumers. And Mississippi's government and consumers experienced these effects directly by purchasing the masks from China directly *or* from Mississippi companies that were reselling the PPE. These purchases were performed in part at least by transactions that were intrastate. Mississippi has the authority to police China's actions under the Mississippi Antitrust Act. *See Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *5 (Miss. Ch. Jan. 17, 2006) (finding that Mississippi's claim for price-fixing under the Mississippi Antitrust Act could proceed where, after the defendants' products "reached the State of Mississippi, their final destination, the [products] were under the jurisdiction of Mississippi's laws."); *Missouri*, 769 F. Supp. 3d at 895 (Missouri's state law antitrust claim was valid even where

it regulated or affected interstate commerce).[5]

### ii. Mississippi made a *prima facie* showing that China violated § 75-21-3(a) and (c)

Section 75-21-3(a) prohibits the unlawful "restrain[ing] or attempt to restrain the freedom of trade or production." MISS. CODE ANN. 75-21-3(a). And subsection (c) forbids engrossing or forestalling any commodity. MISS. CODE ANN. 75-21-3(b). "[E]ngross, in the antitrust sense, means 'to buy large quantities of (a stock or commodity) in an effort to corner the market and control the price.'" *Ga. Pac. Corp. v. Cook Timber Co.*, 194 So. 3d 118, 122-23 (Miss. 2016) (citing *Engross*, BLACK'S LAW DICTIONARY 478 (abr. 9th ed.)). "'Forestall' means '[t]o buy (goods) for the purpose of reselling at a higher price.'" *Id.* at 123 (citing *Forestall*, BLACK'S LAW DICTIONARY 564 (abr. 9th ed.)).[6] China need not have intended to restrain, engross, or forestall. *See* MISS. CODE ANN. 75-21-3. But the results must be to a "degree inimical to public welfare." *Id.*

Here, taking Mississippi's allegations and evidence as true, China restrained freedom of trade and production, and engrossed and forestalled PPE. It was widely reported, in the early stages of the pandemic, that China had "claimed mask factory output for itself." [1], p. 25 (citing Keith

---

[5] This case is distinguishable from *Yazaki N. Am., Inc.*, 294 So. 3d 1178. There, the court dismissed Mississippi's state antitrust claim because "the complaint contained no allegation that the defendant manufacturers sold [automotive wire harness systems] in Mississippi or that the auto manufacturers, suppliers, or distributors who bought the [systems] were in Mississippi." *Id.* As a result, the court reasoned, "it was not the inclusion of allegations of interstate conduct but rather the *omission* of allegations of wholly intrastate transactions that led to its [Mississippi Antitrust Act] claim being dismissed." *Id.* at 1189 (emphasis added). Here, however, Mississippi has sufficiently alleged that China's monopoly was accomplished "in part" by "wholly intrastate transaction[s]." *Id.* (citing MISS. CODE ANN. § 75-21-1). In *Yazaki*, automotive wire harness systems might have been used by Mississippians while driving, but there were no allegations that Mississippians ever actually directly purchased any. In this case, Mississippi political subdivisions (i.e., hospitals and counties in the state) and Mississippi citizens all directly purchase PPE items for widespread use.

[6] Engrossing and forestalling are common law offenses that shaped the modern Sherman Act. *See* William Boyd, *Just Price, Public Utility, and the Long History of Economic Regulation in America*, 35 Yale J. on Regul. 721, 723 n.2 (2018) (citing Donald Dewey, *The Common Law Background of Antitrust Policy*, 41 Va. L. Rev. 759, 762-66 (1955)). At English law, forestalling was "the buying of goods on their way to market or otherwise interfering with their entrance into the market." Dewey, *Common Law Background of Antitrust Policy*, at 763 (citing Forestallers Act, 1552, 5 & 6 EDW. 4, c. 14). Engrossing, on the other hand, "lay in buying in bulk with the object of enhancing the market price." *Id.*

Bradsher et al., *The World Needs Masks. China Makes Them, but Has Been Hoarding Them*, N.Y. Times (Mar. 13, 2020)). At the time, White House officials claimed that China had taken over factories that produced masks on behalf of American companies, including 3M. *Id.* "During . . . that six-week interval when [China was] hiding the virus from the world, China went from a net exporter of personal protective equipment—they are the largest producer of that in the world—to a large net importer." *Id.* at pps. 25-26. In a Congressional Research Service report presented at the evidentiary hearing, Karen M. Sutter—a specialist in Asian trade and finance—concluded that China's activity with respect to PPE "contributed to sharp decreases in China's exports of these critical medical products to the world." [86-7], p. 21. China also restrained the trade of PPE by imposing export restrictions on PPE items. [1], p. 26 (citing Kate O'Keeffe, *China's Export Restrictions Strand Medical Goods U.S. Needs to Fight Coronavirus, State Department Says*, The Wall St. J. (Apr. 16, 2020)).

And evidence entered into the record by Mississippi shows that United States's imports of PPE fell drastically from 2019 to 2020. Comparing the period of January to February 2019 versus that same period in 2020, China's exports of PPE to the United States experienced: a nineteen percent drop for masks, forty-eight percent for women's or girls' protective garments, twenty-eight percent for men's or boys' protective garments, eight percent for surgical rubber gloves, thirteen percent for plastic gloves, thirty-five percent for other rubber gloves, twenty-one percent for knitted gloves, and thirty percent for textile gloves. [86-7], pps. 22-23. At the same time, the cost per unit of these PPE items rose dramatically. A single gown increased from its pre-pandemic price of $0.87 to $6.60 (658.6% increase), face masks from $0.05 to $0.45 (800% increase), and gloves from $0.05 to $0.12 (140% increase). Ria Patel et al., *Cost of Personal Protective Equipment During the First Wave*

*of the Coronavirus Disease 2019 (COVID-19) Pandemic*, 44 Infection Control & Hosp. Epidemiology 1897, 1898 (2023).

The unrebutted evidence presented by Mississippi shows that China took over the production of PPE so that these items could be stockpiled for itself, while the rest of the world battled the pandemic in its early stages. This not only reduced the amount of PPE available in the United States, but the scarcity of these items rapidly drove up prices and allowed China, as the world's largest producer of these items, to profiteer from a scarcity it created. In other words, for the purpose of the Mississippi Antitrust Act, China committed textbook engrossing and forestalling to a "degree inimical to public welfare." Along with interfering with the production of these items and the trade of them with the United States, Mississippi has supported its claim that China violated Mississippi Code Sections 75-21-3(a) and (c).

To conclude, Mississippi has sufficiently established liability, in the default judgment context, against China for violating the Mississippi Consumer Protection Act and the Mississippi Antitrust Act. Now, the Court must determine Mississippi's damages.

### C. Mississippi has presented satisfactory evidence that it is entitled to damages

Before discussing how damages are analyzed in this type of default judgment situation, it is important to note some issues that are precluded from consideration. The Court may not consider liability issues at this phase. *See Black v. Lane*, 22 F.3d 1395, 1398 (7th Cir. 1994); *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 3 (1st Cir. 2002). Such issues include certain aspects of proximate causation as it relates to liability.[7] *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty*

---

[7] The extent to which the Court may consider intervening causes—an aspect of proximate causation—in its damage analysis is a matter of debate. Some courts have considered limiting factors after the unlawful conduct in assessing damages. *See e.g.*, *Dolphin Tours, Inc. v. Pacifico Creative Serv.*, 773 F.2d 1506, 1510–13 (9th Cir. 1985) (noting intervening factors, which reduce or eliminate the alleged loss, go "only to the amount" of the plaintiff's injuries, not

*Corp.*, 973 F.2d 155, 159 (2d Cir. 1992). Nor may the Court consider affirmative defenses, such as set-off claims, comparative fault, or failure to mitigate damages. *See id.*

With that in mind, the evidentiary threshold remains the same under the Foreign Sovereign Immunities Act at the damages stage. The Court may not enter a default judgment unless the plaintiff establishes its "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). But the Court's deference to the plaintiff's allegations shifts downward slightly. While a default judgment conclusively establishes the defendant's liability on the merits, "it does not establish the amount of damages." *U.S. For Use of M-CO Const., Inc, v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987). As a result, the Court continues to accept the plaintiff's well-pleaded factual allegations as true, except those relating to the amount of damages. *Id.*; *see also* FED. R. CIV. P. 8(b)(6).

That said, the Court's role in probing the methodology and calculations underlying the plaintiff's claims is still limited. A damages calculation in a default judgment case is sufficient "if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result may be only approximate." *Sino Star Glob. Ltd. v. Shenzhen Haoqing Tech. Co. Ltd.*, No. 4:22-CV-980, 2025 WL 1668216, at *5 (E.D. Tex. Jun. 12, 2025) (quoting *DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 330 (5th Cir. 1997); *accord Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S. Ct. 248, 75 L. Ed. 544 (1931). This "indirect type of proof may include estimates based on assumptions, at least so long as the assumptions rest on adequate bases." *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 24 (5th Cir. 1974).

---

causation). Other courts conclude that default judgment establishes nearly every aspect of proximate causation. *See e.g., Crossley v. Moore*, 182 So. 3d 462, 469 (Miss. Ct. App. 2015) (holding plaintiff's damages were not "speculative" because "the cause of the damages was not on the table, due to the [defendant's] default judgment"). Nevertheless, as explained later, Mississippi has demonstrated through satisfactory evidence that some of its requested damages "naturally flow from the injuries pleaded." *Greyhound Exhibitgroup, Inc.,* 973 F.2d at 159.

This is so because "[o]nce liability has been established, 'the risk of uncertainty in calculating damages falls upon the wrongdoer.'" *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 947 (8th Cir. 2007) (quoting *Yonkers Branch—NAACP v. City of Yonkers*, 251 F.3d 31, 40 (2d Cir. 2001); *see also Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S. Ct. 574, 90 L. Ed. 652 (1946) ("The wrongdoer shall bear the risk of the uncertainty which his own wrong has created."). Nevertheless, "even where the defendant by his own wrong has prevented a more precise computation," the Court may not base its verdict "on speculation or guesswork." *Bigelow*, 327 U.S. at 264.

In the Fifth Circuit, for cases such as this, "[d]amages should not . . . be[] awarded without a hearing or a demonstration by detailed affidavits establishing the necessary facts." *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979). After holding such an evidentiary hearing and receiving supplemental briefing from Mississippi, this Court is prepared to determine damages.[8] Mississippi seeks actual damages, statutory penalties, injunctive relief, and interest.[9]

---

[8] The Chinese Defendants are jointly and severally liable under the Mississippi Consumer Protection Act and the Mississippi Antitrust Act. *See F.T.C. v. WV Universal Mgmt., LLC.,* 877 F.3d 1234, 1240 (11th Cir. 2017) (noting that under the Federal Trade Commission Act—[which guides this Court's interpretation of the Mississippi Consumer Protection Act]—"courts have justly imposed joint and several liability where a common enterprise exists"); *In re On-Site Fuel Serv., Inc.,* 2020 WL 3712868, at 12, 28 (Bankr. S.D. Miss. 2020) (recognizing "the long-standing principle of tort liability that the liability of joint tortfeasors is joint and several" when applying the North Carolina version of the MCPA, which is similar to Mississippi's statute); *see also MacMillan Bloedel Ltd. v. Flintkote Co.,* 760 F.2d 580, 584-85 (5th Cir. 1985) ("The universal common-law rule is that each of two or more persons whose tortious conduct causes harm is liable to the injured party for the entire harm and each may, therefore, be sued separately and held liable for all of the damage. This principle applies to antitrust liability.") (internal citations omitted).

[9] In addition to postjudgment interest, Mississippi requested "all prejudgment interest authorized by law" in its complaint. [1], p. 30. Perhaps later recognizing that it may not be entitled to prejudgment interest, *see Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n,* 964 So. 2d 1100, 1117 (Miss. 2007) (requiring either liquidated damages or bad faith), Mississippi did not renew its request in its motion for default judgment. The Court will treat this omission as a waiver of prejudgment interest. *See id.* (considering the omission of prejudgment interest in a motion for default judgment to be a waiver even where the plaintiff sought prejudgment interest in the complaint); *Herrera v. Tri–State Kitchen and Bath, Inc.*, No. CV 14-1695-ARR-MDG, 2015 WL 1529653, at *13 (E.D.N.Y. Mar. 31, 2015) (failure to seek prejudgment interest in motion for default judgment constituted waiver).

### 1. Actual damages

Mississippi claims that its actual damages, which represent the "total economic cost of COVID-19 in the state of Mississippi," are $12,171,651,402. [86-15], pps. 4-5. This value is the sum of the following two categories: (1) the economic value of Mississippian deaths and (2) the costs to Mississippi and its citizens from employment loss. *Id.* at p. 4. Mississippi seeks these damages under Section 75-21-9 of the Mississippi Antitrust Act, [88], p. 12, and Section 75-24-11 of the Mississippi Consumer Protection Act, *id.*

Mississippi's bases for relief are unique. The Court is unaware of cases brought under these Mississippi statutes analyzing these types of damages. Instead, Mississippi has typically requested actual damages for the violation's primary economic effect—the difference between an item's elevated price and its price in a competitive market. *See, e.g.*, *Average Wholesale Price Litig.*, 190 So. 3d at 841 (seeking nearly twenty-four million dollars "in overpayments to pharmacies"); *BASF Corp.*, 2006 WL 308378, at *14 (basing actual damages on illegal overcharge). Mississippi was a market participant, and it purchased approximately four million masks by May 2020. [81], p. 18. Unlike Missouri, Mississippi chose not to base part of its damages on overpayments. *See Missouri*, 769 F. Supp. 3d at 899 (awarding nearly $123 million for "heightened PPE expenditures by the State of Missouri caused by Defendants' hoarding of PPE"). Mississippi may have made this strategic call based on the differences in Mississippi and Missouri law. Regardless, before assessing the extent of damages, the Court must first conclude whether either act provides relief for such damages in the first place.

### a. Right to relief under the Mississippi Antitrust Act

The Court begins its analysis "where all such inquiries must begin: with the language of the statute itself." *Republic of Sudan v. Harrison*, 587 U.S. 1, 8, 139 S. Ct. 1048, 203 L. Ed. 2d 433 (2019) (quoting *Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412, 132 S. Ct. 1670, 182 L. Ed. 2d 678 (2012)). Section 75-21-9 provides the Mississippi Antitrust Act's right to recover actual damages. It states: "Any person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it . . . ." *Id.* In other words, Section 75-21-9 breaks down into three general categories: (1) the appropriate plaintiff; (2) the type of harm; and (3) allowable damages. And each category contains very broad language.

The first category is easily satisfied. "Any person, natural or artificial," may seek relief under Section 75-21-9. Mississippi seeks to redress injuries to itself, its natural citizens, and its businesses. As indicated by the clause "natural or artificial," Mississippi's natural citizens and its artificial business entities constitute "any person." *See Person*, Merriam-Webster, https://www.merriam-webster.com/dictionary/person; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text* 273 (2012) ("Traditionally the word *person* . . . denotes not only natural persons (human beings) but also artificial persons such as corporations, partnerships, associations, and both public and private organizations.") (emphasis in original). Mississippi is also entitled to recover as a "person." As the Court previously noted in the merits analysis, Section 75-21-7 authorizes the Mississippi Attorney General to bring suit to redress violations of the Mississippi Antitrust Act. *See Moore ex rel. State of Miss. v. Abbott Lab'ys, Inc.,* 900

F. Supp. 26, 31 (S.D. Miss. 1995) ("This statute clearly gives the Attorney General of the State the authority to bring suit in the name of the State for violations of Mississippi antitrust law.").[10]

Aside from its statutory authority to recover for injuries to the State of Mississippi itself, Mississippi also enjoys "*parens patriae*" authority to recover on behalf of its citizens for antitrust violations. "A state may maintain a *parens patriae* action if the State can articulate a quasi-sovereign interest apart from the interests of particular private parties." *Mississippi ex rel. Hood v. Entergy Miss., Inc.*, No. 3:08-CV-780-CWR-LRA, 2019 WL 1433772, at *1 (S.D. Miss. Mar. 30, 2019) (quoting *BASF Corp.*, 2006 WL 308378, at *3). Mississippi has such a quasi-sovereign interest.[11] In this case, Mississippi is properly exerting its *parens patriae* authority to redress the injuries to Mississippi citizens on account of China's hoarding activities with respect to PPE during the COVID-19 pandemic. *See Entergy Miss., Inc.*, 2019 WL 1433772, at *1.

---

[10] Other federal courts have reached the same conclusion when construing similar antitrust statutes. In *State of Georgia. v. Evans*, the Supreme Court held:

> We can perceive no reason for believing that Congress wanted to deprive a State, as purchaser of commodities shipped in interstate commerce, of the civil remedy . . . which is available to other purchasers who suffer through violations of the Act. . . . Nothing in the [Sherman Act], its history, or its policy, could justify so restrictive a construction of the word 'person' in [Section] 7 as to exclude a State. Such a construction would deny all redress to a State . . . merely because it is a State.

316 U.S. 159, 162-63, 62 S. Ct. 972, 86 L. Ed. 1346 (1942). The Eastern District of Missouri, when it assessed Missouri's antitrust claims under state and federal law against the same Chinese defendants, also found "that both Missouri and Defendants qualify as 'persons' under the relevant antitrust statutes." *Missouri*, 769 F. Supp. 3d at 893 (citing *City of Lafayette, La. v. La. Power & Light Co.*, 435 U.S. 389, 397, 98 S. Ct. 1123, 55 L. Ed. 2d 364 (1978)).

[11] *See, e.g.*, *Entergy Miss., Inc.*, 2019 WL 1433772, at *1 (holding that Mississippi had a quasi-sovereign interest to "pursue monetary damages on behalf of Mississippi consumers injured by" defendant under Mississippi's consumer protection and antitrust statutes); *BASF Corp.*, 2006 WL 308378, at *3 (finding that Mississippi had standing as *parens patriae* to address illegal monopolies under the Mississippi Antitrust Act and Mississippi Consumer Protection Act on behalf of "all of its citizens") (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982)); *Mississippi ex rel. Hood v. AU Optronics Corp.*, 701 F.3d 796, 803 n.1 (5th Cir. 2012) ("In its complaint, Mississippi identified a valid quasi-sovereign interest in preventing illegal antitrust conduct prohibited under [the Mississippi Antitrust Act] and [the Mississippi Consumer Protection Act].") (Elrod, J., concurring).

Mississippi's alleged harms fall into the second category. Section 75-21-9 permits recovery for "injured or damaged" plaintiffs. Notably, its text does not contain any qualifiers limiting what must be "damaged" or "injured," like its federal counterpart. For example, Section 4(a) of the Clayton Act limits recovery to "any person who shall be injured in his *business or property*." 15 U.S.C. § 15(a) (emphasis added). The Supreme Court has acknowledged the clause "business or property" excludes "personal injuries suffered." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979). Many state antitrust statutes also limit recovery for harm to businesses or property.[12] Absent such qualifiers, the Court must conclude that any injury or damage, whether to a business, property, or even one's person, is a type of harm that Section 75-21-9 provides redress.[13]

Mississippi claims the costs incurred from employment loss and each Mississippian's death left it "injured or damaged." "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." *Reiter*, 442 U.S.

---

[12] *See e.g.*, ARIZ. REV. STAT. ANN. § 44-1408 (1974); DEL. CODE ANN. tit. 6, 6 2108 (2024); CAL. BUS. & PROF. CODE ANN. § 16750 (1987); 740 ILL. COMP. STAT. ANN. 10/7 (2010); ME. REV. STAT. ANN. tit. 10, § 1104 (2024); MD. CODE ANN., Com. Law § 11-209 (2018); MICH. COMP. L. ANN. § 445.778 (1985); N.D. CEN. CODE ANN. § 51-08.1-08 (2021); OR. REV. STAT. ANN. § 646.780 (2023); 6 R.I. GEN. L. ANN. § 6-36-11 (2014); TEX. BUS. & COM. CODE ANN. § 15.21 (1983); UTAH CODE ANN. § 76-16-511 (2025); VA. CODE ANN. § 59.1-9.12 (2023).

[13] A Mississippi Supreme Court decision does not change this analysis. In *Owens Corning v. R.J Reynolds Tobacco Co.*, an asbestos manufacturer sued tobacco companies for antitrust violations on behalf of cigarette smokers. 868 So. 2d 331, 334 (Miss. 2004). Summary Judgment was affirmed for the defendants because there was "no showing on antitrust injuries." *Id.* at 343. However, it appears the Mississippi Supreme Court rested its conclusion on the asbestos manufacturer's absence in the cigarette market. But, here, Mississippi purchased the PPE and then dispensed the PPE to its citizens and businesses. Likewise, Mississippi citizens purchased PPE. Moreover, the asbestos manufacturer bore the burden of proving causation because the case was at the summary judgment stage. China, on the other hand, admitted causation in large part by way of its default. *See Greyhound Exhibitgroup, Inc.,* 973 F.2d at 159 (noting if proximate cause is properly alleged in the complaint, it is largely admitted upon default); *see also Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 244 (2d Cir. 1999), *as amended* (Aug. 18, 1999) ("[I]n general, state cases are often distinguishable on the issue of proximate causation given the state's unique role relative to protection of its citizens . . . and certain state statutes that permit states to maintain actions on behalf of their citizenry.").

at 339. Both words have naturally broad and inclusive meanings. Injured means "to inflict bodily hurt on" or "to impair the soundness of." *Injure*, Merriam-Webster, https://www.merriam-webster.com/dictionary/injured. Death surely counts as an injury. And damage is defined as "loss or harm resulting from injury to person, property, or reputation." *Damage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/damage. Thus, lost wages constitute damage. *See Reiter*, 442 U.S. at 338 ("Money, of course, is a form of property."). Furthermore, these statutory terms are not rendered redundant simply because "damages" also encompasses "injury." *See Reiter*, 442 U.S. at 339. Mississippi's alleged harms fall within Section 75-21-9.

The fact that Mississippi bases its actual damages on certain other effects of China's hoarding instead of the unlawful overcharge does not undermine the Court's conclusion. Section 75-21-9 provides recovery for damages or injuries caused by the lawful conduct, "or by its effects direct or indirect." Indeed, the Eighth Circuit held "the lack of safe and effective treatment of patients with the virus" constituted a redressable injury. *Missouri*, 90 F.4th at 940 n.2 (citation modified). It also found the "'billions of dollars' Missouri lost in revenue" constituted a "more *direct* economic injury." *Id.* (emphasis added). In light of Section 75-21-9's broad language, Mississippi alleges compensable injuries.

Mississippi's requested damages also satisfy the third category. Under Section 75-21-9, a proper plaintiff who suffers an appropriate harm is entitled to "all damages of every kind sustained by him or it." Mississippi traditionally divides actual damages into "economic and non-economic components." Johnny C. Parker, *Mississippi Law of Damages* § 2:10 (3d ed. Sep. 2025 update). The Mississippi legislature has also statutorily capped actual damages in specific contexts. *See, e.g.*, MISS. CODE ANN. § 11-46-15 (1992) (claims against government entities). Neither of these

distinctions, however, has any bearing on Mississippi's request for over twelve billion dollars in actual economic and non-economic damages because Section 75-21-9 permits recovery for "*all* damages of *every kind*." (emphasis added).

The Mississippi Antitrust Act's text-based purpose further supports the Court's conclusion. "A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text* 63 (2012). Section 75-21-39 states: "This chapter *shall* be liberally construed in all courts to the end that trusts and combines may be suppressed, and the benefits arising from competition in business preserved to the people of this state." (emphasis added). The Court acknowledges that Mississippi's requested actual damages are unique. But Section 75-21-9 is just as unique. Any limitation on Mississippi's requested damages, as alleged, would contradict Section 75-21-9's plain meaning and Section 75-21-39's explicit directive.[14] In sum, the Court is satisfied that Mississippi is (1) an appropriate plaintiff (2) that suffered a redressable harm and (3) seeks recoverable damages under Section 75-21-9.

### b. Calculation of actual damages

Mississippi seeks over twelve billion dollars in actual damages based on Corey Miller's expert report. [86-15], pps. 4-5. Miller is the Chief Economist for Mississippi and the University Research Center's director. [86-14], p. 2. His responsibilities include "economic forecasting, socio-economic policy analysis, and monitoring collections of state general fund revenue." *Id.* Miller also

---

[14] The Mississippi Consumer Protection Act also contains broad language. *See* MISS. CODE ANN. §§ 75-24-11, 23. Out of an abundance of caution, the Court finds that Mississippi could also obtain its requested actual damages under the Mississippi Consumer Protection Act. However, since there is a textual basis for actual damages under Mississippi's Antitrust Act, it is unnecessary to analyze the Consumer Protection Act's text any further. Additionally, as set forth below, the Court is primarily awarding actual damages based on Mississippi's Antitrust Act and not on its Consumer Protection Act.

serves as chair of the Revenue Estimating Group, where he works closely with the Legislative Budget Office, Department of Revenue, and Department of Finance and Administration. *Id.* He has authored over thirty publications, including eighteen articles in peer-reviewed journals. *Id.* at p. 3. In his initial report, Miller calculated that Mississippi's total economic harm was $12,171,651,402 based on (1) the economic value of the deaths of Mississippians attributable to COVID-19, and (2) the costs associated with the loss of employment due to COVID-19. [86-15], pps. 4-5.

COVID-19 deaths were placed in two categories: first, those deaths where COVID-19 was the *underlying* cause of death, and second, those deaths where the virus was a *contributing* cause. *Id.* at p. 3. Citing academic and governmental authorities, Miller calculated the statistical value of a life that was lost if one died in a given age range. He also assigned a greater value to the death if COVID-19 was an underlying cause rather than a contributing one. Using these numbers, Miller determined "the statistical value of lives lost in Mississippi due to COVID-19 from 2020 through 2022 [was] $10,791,338,029." *Id.* at p. 4.[15]

---

[15] To calculate the value of a lost life, Miller relies upon a methodology that has been accepted by some courts and criticized by others. *See Arpin v. United States*, 521 F.3d 769, 775 (7th Cir. 2008) ("[I]f we know both the probability of a fatal accident and the benefit that a person would demand to bear it, we can estimate the value of a life and use that value to calculate damages in wrongful death."); *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, No. MD 16-2695 JB/LF, 2023 WL 6121894, at *26 n.13, *55-56 (D.N.M. Sept. 19, 2023). Federal agencies also base health and safety regulations on this methodology. [87], pps. 79-80. Other courts, however, have criticized its use. *See Fams. Advoc., LLC v. Sanford Clinic N.*, No. 3:16-CV-114, 2019 WL 1548911, at *8 (D.N.D. Feb. 11, 2019) (finding expert's report unreliable because it did not connect the general data to the specific situation), *report and recommendation adopted*, No. 3:16-CV-00114, 2019 WL 1442162 (D.N.D. Mar. 31, 2019); *Sullivan v. City of Buena Park*, No. SACV2001732CJCADSX, 2022 WL 2965664, *6-7 (C.D. Cal. Apr. 11, 2022) (same). Even Dr. Kip Viscusi, a professor at Vanderbilt and pioneer of the method, cautions against its use in some tort cases. Nonetheless, Miller's use of the methodology is reliable for this rare and extraordinary default judgment case, even if the methodology may not be appropriate for every case. Further, unlike traditional wrongful death cases where the decedent's damages are more easily ascertainable, Mississippi's calculation must account for 11,857 deaths across all ages, occupations, and health. Unlike the experts in *Families Advocate, LLC* and *Sullivan*, who attributed a single monetary value to each plaintiff, Miller discounted the base "statistical value" of each Mississippian death based on these factors. [87], pps. 79-80.

For the economic cost from employment loss, Miller calculated, across a variety of industry sectors, the total value of wages lost in Mississippi from March 2020 to January 2022 was $1,380,313,373. *Id.* These lost wages reflect not only the wages lost by Mississippians themselves, but also the reduction in income tax collected by the State of Mississippi and an increase in state unemployment benefits that Mississippi had to pay out. Adding this number to the statistical value of Mississippian deaths, Mississippi calculated "the total economic cost of COVID-19 in the state of Mississippi" was $12,171,651,402. *Id.* at pps. 4-5.

Mississippi characterizes its calculation as "conservative." *Id.* at p. 5. Indeed, Miller's report notes that Mississippi did not estimate "any damages associated with mental anguish and emotional distress," or "costs associated with so-called 'long-COVID'—those individuals who contracted COVID-19 and recovered but have been able to resume normal activities" because Mississippi "does not believe sufficient data exists to make any determination about the costs associated with such cases." *Id.* In this respect, Mississippi follows Missouri's lead, where it claims to have "sought the most conservative estimate of direct damages." *See Missouri*, 769 F. Supp. 3d at 897. Still, after trebling its actual damages, the court awarded Missouri around twenty-four billion dollars in damages. *See id.* at 898.

Initially, Mississippi attributed its total economic damages to how China handled COVID-19 generally. In other words, Mississippi claimed that it would not have suffered over twelve billion dollars in damages but for China's misrepresentations *and* hoarding. But, after the Eighth Circuit issued its opinion and remanded *Missouri*, Mississippi's counsel asked Miller to prepare an addendum to his initial report. [87], pps. 112-13. As clarified by Mississippi's counsel at the

evidentiary hearing, the addendum identifies the amount of damages attributable to China's misconduct under the Mississippi Antitrust Act. *Id.* at p. 116.

In his addendum, Miller claims that more than four billion dollars is "attributable to [China's] hoarding of personal protective equipment." [86-15], p. 7; *accord* [87], p. 116. In determining this number, Miller relied on a formula created by Dr. Joseph H. Haslag, the expert in *Missouri*, 769 F. Supp. 3d at 897 (describing Dr. Haslag's qualifications). Mississippi also submitted Dr. Haslag's fifteen-page report, where he walks through the transmission mechanism "through which the cause (the purposeful hoarding of PPE equipment) affects the economic damages." [86-16], p. 3. Using this formula, Miller found China's hoarding of PPE was the direct cause of $4,260,077,991 in damages. [86-15], p. 7 (noting Dr. Haslag's finding that the incidence rate "could have been 35 percent lower if PPE hoarding had not occurred"). The Court is satisfied that Miller's new projection, as it relates to the Mississippi Antitrust Act, is reliable.

As for the Mississippi Consumer Protection Act, Mississippi maintained at the evidentiary hearing that the other eight billion dollars in damages stem from China's "misrepresentation[s]." [87], p. 116. But, unlike China's misrepresentations about mask quality, Mississippi attributes these damages "to the first half of the scheme," such as China's withholding and misrepresenting information about COVID-19's nature. [87], p. 116; *accord id.* at p. 4. The Court is not convinced.

The Court does not have jurisdiction under the Foreign Sovereign Immunities Act to award actual damages for China's conduct leading up to its hoarding of PPE. Indeed, Missouri raised similar claims about China's "malfeasance and deception" in its virus research and social-media censorship "behind the spread of COVID-19," which caused losses of jobs, income, and business opportunities. *Missouri*, 90 F.4th at 937. And the Eighth Circuit dismissed these claims for lack of

jurisdiction because it was "impossible to directly trace the economic and other harms" to China's conduct before it began hoarding PPE. *Id.* at 937-38. Likewise, in the jurisdictional analysis above, the Court only found that China's hoarding of PPE and misrepresentations to the quality of its masks directly affected Mississippi. It may not now award damages caused by prior misrepresentations that would not have survived the pleading stage.

Furthermore, even if the Court did have jurisdiction, Mississippi has not shown that its damages under the Mississippi Consumer Protection Act "naturally flow from the injuries pleaded." *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159. Mississippi did allege China's "concerted effort to cover up the seriousness of COVID-19" as support that China violated MISS. CODE ANN. § 75-24-5(1). *See* [1], pps. 27-28. But it did so as context for its substantive allegation—that Mississippi and its citizens were consumers of China's substandard PPE—constituting the actual violation of the Mississippi Consumer Protection Act. *See id.* And Mississippi likely chose to side-step this evidentiary issue at the merits stage, given that China admitted, by way of its default, all of Mississippi's well-plead factual allegations. *See* [87], at pps. 67-68 (noting if Mississippi could not "connect the dots to determine the exact figure for [actual] damages," then it had alternative calculations for determining statutory penalties). Nevertheless, Mississippi may not now base its actual damages solely on contextual allegations just because the Court found China liable for misrepresenting the quality of its masks. Those damages would not "naturally flow" from China's more general misrepresentations about COVID-19 under the Mississippi Consumer Protection Act. *See Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159.

Finally, even if Mississippi's actual damages did naturally flow from its factual allegations, any attempt to attribute all or a percentage of the eight billion dollars to China's misrepresentations

would amount to "speculation or guesswork." *Bigelow*, 327 U.S. at 264. The addendum does not address Mississippi's actual damages under the Mississippi Consumer Protection Act. And although Miller's addendum attributed more than four billion dollars in damages to China's hoarding of PPE, it does not necessarily show the corollary that China's misrepresentations caused the other eight billion dollars in damages. Instead, Mississippi just generally claims an additional eight billion dollars to reach its original calculation of $12,171,651,402, which represents "the total economic cost of COVID-19 in the state of Mississippi." [86-15], pps. 4-5

The Court ultimately finds that Mississippi has established actual damages under the Mississippi Antitrust Act through evidence satisfactory to the Court, pursuant to Section 1608(e) of the Foreign Sovereign Immunities Act. *See Missouri*, 769 F. Supp. 3d at 897; 28 U.S.C. § 1608(e). The amount awarded to Mississippi is $4,260,077,991 in actual damages.

### 2. Statutory penalties

Mississippi requests statutory penalties under both the Mississippi Antitrust Act and the Mississippi Consumer Protection Act. Under Mississippi law, a statutory penalty imposes liability "for a fixed sum without reference to the damage inflicted by the commission of the wrong." *State to Use of Rogers v. Newton*, 3 So. 2d 816, 623 (Miss. 1941). Such statutes are "strictly construed."

### a. The Mississippi Antitrust Act

The Mississippi Antitrust Act provides for two kinds of statutory penalties. First, in Section 75-21-7, violators "shall forfeit not less than one hundred dollars ($100.00) nor more than two thousand dollars ($2,000.00) for every such violation." MISS. CODE ANN. § 75-21-7. Under the Act, each month in which it is violated constitutes a separate violation. *Id.* Second, the Mississippi Antitrust Act permits recovery for a person "injured or damaged by a trust and combine as herein

56

defined, or by its effects direct or indirect," for "damages of every kind sustained by him or it and in addition a penalty of five hundred dollars ($500.00)." MISS CODE ANN. § 75-21-9. The $500 penalty may be "recovered in each instance of injury." *Id.* Mississippi seeks damages under both sections: $6,000 under Section 75-21-7 and an amount to be determined by this Court under Section 75-21-9, though Mississippi argues that the State should award $500 for each death (11,857) sustained by Mississippians from COVID-19. [88], pps. 16-17.

### i. Section 75-21-7

Mississippi seeks just $6,000 under Section 75-21-7 for the first three months of 2020, relating to China's engrossing and forestalling of PPE from January to March 2020. Those three months constitute three separate violations under the statute. *See* MISS. CODE ANN. § 75-21-7. Mississippi has proven by evidence satisfactory to the court that China engrossed and forestalled masks for at least that three-month period, and the Court will award Mississippi $6,000 for those three months of violations.

### ii. Section 75-21-9

Mississippi asserts that each death of a Mississippian from the COVID-19 virus qualifies as an "instance of injury." But this Court cannot award statutory damages for all of these deaths, because China's engrossing and forestalling of PPE under the Mississippi Antitrust Act did not have a "direct effect" on every single COVID-19 death in Mississippi. As the Court found above, and pursuant to Mississippi's expert report, thirty-five percent of the lives lost in Mississippi due to COVID-19 from 2020 to 2022 were "attributable to the hoarding of [PPE] by the People's Republic of China." [86-15], p. 7. Mississippi put forward evidence that 4,150 of the 11,857 deaths in Mississippi were directly caused by China's PPE hoarding. And Section 75-21-9 assigns a penalty

of $500 for each instance of injury. MISS. CODE ANN. § 75-21-9. Multiplying 4,150 deaths by this $500 penalty, the Court will levy $2,075,000 in statutory penalties against China for the injuries caused by China's engrossing and forestalling of PPE. Such a penalty, alongside Mississippi's actual antitrust damages, furthers the statute's text-based purpose of "suppressing all trusts and combines" through deterrence. *See BASF Corp.,* 2006 WL 308378, at *12.

### b. The Mississippi Consumer Protection Act

As mentioned above, the Mississippi Consumer Protection Act prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices affecting commerce." *Yazaki N. Am., Inc.*, 294 So. 3d at 1184 (quoting MISS. CODE ANN. 75-24-5(1)). One of its enforcement provisions authorizes Mississippi's Attorney General, on behalf of Mississippi, to restrain such practices by seeking an injunction. *See* MISS. CODE ANN. § 75-24-9. When such an injunction is appropriate, the Mississippi Consumer Protection Act also permits the Court to impose a penalty for each violation of Section 75-24-5. Miss Code Ann. § 75-24-19(1)(b). Given the statutory framework, the Mississippi Supreme Court has held that "[i]f there is no action for injunctive relief under [Section] 74-25-9, there is no action to recover civil penalties under Section 75-24-19." *Yazaki N. Am., Inc.*, 294 So. 3d at 1184 (noting the statute's purpose is "not to punish past violations" but to "restrain or enjoin unfair methods of competition through *injunctive* relief) (emphasis in original). Accordingly, the Court will first discuss Mississippi's request for injunctive relief under Section 75-24-9 before addressing the imposition of penalties under Section 75-24-19.

### i. Injunctive relief

The requirements for an injunction under the Mississippi Consumer Protection Act are less burdensome than those for a common-law injunction. The statutory injunction has three elements:

(1) "the attorney general[] 'having reason to believe that any person is using, has used, or is about to use any method, act or practice prohibited by Section 75-24-5;'" (2) the "proceedings would be in the public interest;" and (3) "the purpose of the action must be 'to restrain by temporary or permanent injunction the use of such method, act or practice.'" *Navient Corp. v. State ex rel. Fitch*, 313 So. 3d 1034, 1041 (Miss. 2021) (quoting MISS. CODE ANN. 74-24-9) (citation modified). The "controlling issue" under the third element "is whether the State has alleged facts that support a reasonable inference of *present or future* illegal conduct that needs to be enjoined." *Yazaki N. Am., Inc.*, 294 So. 3d at 1186 (emphasis in original); *accord Navient Corp.*, 313 So. 3d at 1042. But Mississippi need not "plead the common-law-injunction prerequisites of no adequate remedy at law and irreparable injury." *Yazaki N. Am., Inc.*, 294 So. 3d at 1186.

Taking Mississippi's factual allegations in its complaint as true, the Court concludes that Mississippi is entitled to an injunction under the Mississippi Consumer Protection Act. First, Mississippi's Attorney General had reason to believe that China engaged in unfair methods of competition or deceptive trade practices before this suit was brought. Mississippi's complaint notes various journalistic and governmental sources reporting before May 2020 that China was hoarding quality PPE for itself while selling defective PPE to the United States, including Mississippi. *See* [1], pps. 25-28. Second, Mississippi's complaint makes clear that the injunction is in the public's interest. China's alleged hoarding and selling of faulty PPE disrupted Mississippi's free market, leaving its citizens at a higher risk of contracting COVID-19 while footing the bill for overpriced PPE. Enjoining this type of behavior benefits every Mississippi citizen. *See BASF Corp.,* 2006 WL 308378, at *13 ("A fair market, that protects the citizens of Mississippi from illegal overcharges, is obviously in the best interest of the public.").

The Court now turns its attention to the third element. The Court recognizes that the pandemic has ended—even if individuals are still contracting COVID-19. But Mississippi's complaint plainly notes that China's alleged unlawful actions with respect to PPE were still ongoing at the time the complaint was filed. Indeed, Mississippi alleged: "Defendants have engaged in a continuing course of conduct. Defendants' bad acts—as well as the resulting harm to the health, well-being, safety, comfort, economic interests, and rights of Mississippi and its residents— continue unabated." [1], ¶ 139. And China *chose* not to rebut this point by intentionally defaulting. The Court finds that Mississippi has "alleged facts that support a reasonable inference of *present or future* illegal conduct that needs to be enjoined." *Yazaki N. Am., Inc.*, 294 So. 3d at 1186 (emphasis in original); *accord Navient Corp.*, 313 So. 3d at 1042.

Even if Mississippi had not alleged that China's activities were ongoing, though, the Court would still find an injunction proper under the circumstances. To be sure, such an allegation is not required for the Court to reasonably infer that China may engage in future unlawful conduct. Indeed, the Supreme Court of Mississippi has acknowledged, "[c]ertainly, [that] there could be cases in which the nature of the past conduct would support seeking to enjoin future conduct." *Yazaki N. Am., Inc.*, 294 So. 3d at 1186 (citing *BASF Corp.*, 2006 WL 308378); *Navient Corp.*, 313 So. 3d at 1042 (same). For example, in *BASF*, the defendant and others acted together "in a combination of activities to suppress competition by fixing the price, and allocating the markets and sales of volumes of vitamins" sold in Mississippi. 2006 WL 308378, at *1. The court granted statutory injunctive relief under Section 75-24-9. *Id.* at 12-13. It reasoned that "the lack of cooperation from the Defendant and the Defendant's previous acts leads the Attorney General to

reasonably believe that the Defendant will use these illegal acts in the future if not monitored." *Id.*
at 13.

The case before this Court looks remarkably similar to *BASF*. Taking Mississippi's factual
allegations as true, China engaged in a "combination of activities" that violated the Mississippi
Consumer Protection Act to manipulate the PPE market, to which Mississippi and its citizens were
customers. Moreover, by way of its default, China has not cooperated at all.

Accordingly, the Court permanently enjoins China from using any method, act, or practice
prohibited by Section 75-24-5 of the Mississippi Consumer Protection Act. MISS. CODE ANN. § 75-
24-9. More specifically, China shall not engage in unfair methods of competition or unfair or
deceptive trade practices in or affecting commerce by hoarding PPE and misrepresenting or
concealing the essential facts of a public health crisis that has a reasonable likelihood of affecting
the availability of PPE in the United States and Mississippi. *See* MISS. CODE ANN. § 75-24-5(1).
Nor shall China represent that PPE items are of a particular standard, quality, or grade if they are
not of that standard, quality, or grade. *See id.* § 75-24-5(2)(g). The Court grants Mississippi's claim
for injunctive relief.

### ii. Calculation of statutory penalties under the Mississippi Consumer Protection Act

The Mississippi Consumer Protection Act authorizes a penalty of up to ten thousand
dollars for each knowing and willful violation of Section 75-24-5. MISS. CODE ANN. § 75-24-
19(1)(b). "A knowing and willful violation occurs when the court finds from clear and convincing
evidence that the party committing the violation knew or should have known that his conduct was
a violation of Section 75-24-5." *Id.* §75-24-19(3). It is unnecessary to rehash all of Mississippi's

factual allegations and evidence again. China knowingly and willfully violated the Mississippi Consumer Protection Act.

Before calculating an appropriate statutory penalty, it is necessary for the Court to set out what constitutes a violation under the Mississippi Consumer Protection Act. The Mississippi Supreme Court has largely already addressed this question. Comparing the Mississippi Consumer Protection Act to the federal False Claims Act, "which contains a similar per-violation penalty as Mississippi's [Consumer Protection Act]," it held "the focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the [penalties]." *Average Wholesale Price Litig.*, 190 So. 3d at 847 (citing *United States v. Bornstein*, 423 U.S. 303, 313, 96 S. Ct. 523, 46 L. Ed. 2d 514 (1976)). Applying this principle, the Mississippi Supreme Court held that the number of occasions the offender reported a false average wholesale price of a drug, "rather than the number of occasions Medicaid reimbursed a claim using a reported [average wholesale price]," was the correct calculation for the number of violations. *Id*. "The number of times pharmacies were overpaid is merely a consequence of the alleged fraud, not the fraudulent conduct itself." *Id*. (citing *State v. Abbott Lab'ys*, 816 N.W.2d 145, 173-74 (Wis. 2012)). Each time China hoarded an item of PPE, it violated the Mississippi Consumer Protection Act. *See generally West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236, 61 S. Ct. 179, 85 L. Ed. 139 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law.").

China's default did not prevent Mississippi from obtaining data to infer the amount of times China violated the Mississippi Consumer Protection Act for penalty purposes. Mississippi submitted evidence at the evidentiary hearing that China hoarded 20,836,254 items of PPE—

masks, women's or girls' protective garments, men's or boys' protective garments, surgical rubber gloves, plastic gloves, other rubber gloves, knitted gloves, and textile gloves. [86-17], p. 2. Mississippi arrived at this number by finding the difference between China's PPE exports to the United States in 2019 and 2020. For example, in 2019, the United States imported $3,171,956,472 worth of masks. *Id.* In 2020, this value fell by nineteen percent, representing a $602,671,729.68 decrease in mask imports. *Id.* During this time, each mask cost $0.45. *Id.* Dividing China's $602,671,729.68 decrease in exports by $0.45, Mississippi calculated that China hoarded 1,339,270,510 masks from the United States. And multiplying this number by 0.5 percent (0.005), which is Mississippi's percent of the United States's gross domestic product, Mississippi's share comes out to 6,696,353 masks. *Id.*

Mississippi performed the same calculations for each category of PPE. Across every category, Mississippi claims that it would have received an additional 20,836,254 items of PPE but for China's hoarding. *Id.* Mississippi seeks the statutory maximum of $10,000 per violation, totaling more than 208 billion dollars. *Id.*[16]

But the Court may not simply rubber-stamp Mississippi's request. Instead, "[i]n default-judgment cases involving statutes that leave the amount of the civil penalty to the discretion of the court, courts generally have tailored the penalty to the offense and attendant circumstances." *See*

---

[16] In addition to the hoarding violations, in a single conclusory sentence, Mississippi seeks penalties for another twenty-five violations—"9 violations per category for the unlawful price hikes for PPE and 16 violations for unfair trade practices"—under 75-24-19. *Id.* But Mississippi does not mention or explain how these additional violations are not duplicative. Indeed, as noted above, the Court's penalty is based "upon the specific conduct of the person from whom the Government seeks to collect the [penalties]." *Average Wholesale Price Litig.*, 190 So. 3d at 847 (citing *Bornstein*, 423 U.S. at 313). Mississippi has already claimed that China's hoarding is the pertinent conduct. Absent any explanation from Mississippi, it is unclear how Mississippi's specific hoarding allegations would not subsume its additional general allegations of unlawful price hikes and unfair trade practices. The Court, therefore, declines to include these twenty-five additional violations in its award.

*United States v. Gant*, 268 F. Supp. 2d 29, 33 (D.D.C. 2003). The Mississippi Consumer Protection Act leaves such discretion to the court.[17] In setting a statutory penalty range, the Mississippi Legislature granted discretion to the factfinder. The Legislature could have set the Mississippi Consumer Protection Act penalties at a specific amount, as it has done in other statutes.[18] But there is no such set penalty here. Instead, the Mississippi Consumer Protection Act authorizes the Court, in its discretion, to determine the penalty's amount, so long as the penalty does not exceed $10,000 per violation. MISS. CODE ANN. § 75-24-5.

Under its discretion, the Court will award Mississippi a $1,000 statutory penalty for each violation, resulting in a total penalty award of $20,836,254,000. Some may argue that the penalty is too high because it may greenlight similar penalties against businesses—both small and large— where violations can easily amass. Some may say that this penalty is too low given the egregiousness of China's conduct and its continuing stance. Notwithstanding these concerns, the Court is satisfied that such a penalty is "tailored [] to the offense and attendant circumstances," *see Gant*, 268 F. Supp. 2d at 33, for four reasons.

First, the penalty recognizes the severity of China's misconduct. China's conduct was particularly blatant because it was the sole player. Its scheme did not rely on other independent groups to perform distinct functions. Instead, China orchestrated every move. As a result, its misconduct was interrelated, from the misrepresentations related to the virus itself, to the hoarding

---

[17] And, under the Foreign Sovereign Immunities Act, this discretion lies solely with federal courts. *Juels*, 1994 WL 442492, at *1 (citing *Verlinden*, 461 U.S. at 485 n.5) (stating the Foreign Sovereign Immunities Act "provides the exclusive jurisdictional basis for suits in the United States against foreign states").

[18] For example, Section 95-5-10(2) of the Mississippi Code makes statutory penalties available to landowners whose trees are cut down, deadened, destroyed, or taken away without their consent, at a rate of $55 for certain trees. MISS. CODE ANN. § 95-5-10(2). And even in this case, Section 75-21-9 of the Mississippi Antitrust Act sets a $500 per injury penalty for illegal trust activities. MISS. CODE ANN. § 75-21-9.

of PPE, to the passing off of sub-standard PPE that was held out to be of a sufficient quality. And it did so, at least in part, "by the desire to profit from increased worldwide demand of PPE" during the pandemic. [1], p. 27. The Mississippi Consumer Protection Act was designed to redress injuries having to do with these kinds of unfair and deceptive trade practices. Not only does this penalty accurately reflect the nature of China's conduct, but it also aligns with the "very idea" of civil penalties—an "intent to punish past, and to deter future, unlawful conduct, [and] not to ameliorate the liability of wrongdoers." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639, 101 S. Ct. 2061, 68 L. Ed. 2d 500 (1981) (analyzing the Clayton Act's treble damages provision).

Second, the $1,000 per violation is sufficient to deter similar future conduct, especially considering the number of alleged violations, nearly twenty-one million. The Mississippi Supreme Court in *Average Wholesale Price Litigation*—the only case discussing the Mississippi Consumer Protection Act's statutory penalty—affirmed an award in favor of Mississippi of $1,000 per violation for 2,699 violations. 190 So. 3d at 847. In doing so, it held that the trial court did not abuse its discretion by not awarding the maximum $10,000 per violation that Mississippi sought then and now seeks here. *Id.* And, if China does not pay, Mississippi alleges that it can collect through Chinese-owned assets—such as farmland and business holdings—located in the United States. [87], pps. 54-56. Regardless, there is no indication that China cannot satisfy the judgment or withstand its effects. As a result, the penalty amount is sufficient to achieve deterrence, thereby protecting the public.

Third, the Court's award of $1,000 per violation strikes a balance in the range permitted by the Mississippi Consumer Protection Act. Imposing no statutory penalty would not deter China's conduct in the future. In fact, it would do the exact opposite. *See U.S. ex rel. Bunk v. Gosselin World*

*Wide Moving, N.V.*, 741 F.3d 390 (4th Cir. 2013) (noting the imposition of no FCA penalties "because the claims were so voluminous provides a perverse incentive for dishonest contractors to generate as many false claims as possible, siphoning even more resources from the government"). And any fine lower than $1,000 per violation would minimize China's actions with respect to COVID-19. *Cf. Average Wholesale Price Litig.*, 190 So. 3d 829. But a per-violation penalty of $10,000 would be inappropriate, where a violation constitutes a single instance of hoarding a single mask, glove, or garment. Moreover, this Court recognizes that while Mississippi used its best efforts to calculate China's alleged 20,836,254 hoarding violations, this number represents a projection based on other figures rather than the actual number of items hoarded. *See* [86-17], p. 2. The precise number of hoarding violations by China may be higher or lower.[19]

Nonetheless, the penalty captures the PPE's relative cost during the pandemic. The Court recognizes that a $1,000 per-violation penalty costs much more than any single glove, mask, or garment, even when PPE prices were elevated during the pandemic. But this case is unique. China's unilateral conduct not only artificially raised the prices for PPE, but it also played a major

---

[19] The Economic Security Mission Center evaluated theories other than China's hoarding that could explain "the sudden shift in China's imports and exports of medical goods in January." [86-8], p. 4. But it did not find any of them "compelling." *Id.* Furthermore, Mississippi's final estimate is arguably more conservative because its formula does not seem to fully factor in the price increases of PPE from 2019 to 2020. In other words, Mississippi's formula treats "money spent" as "PPE bought" even though a dollar spent on PPE in 2019 went farther than it did in 2020. Mississippi potentially could have based its estimation on a more aggressive formula that first found the number of masks imported each year before calculating the difference between the two years. For example, the United States imported $3,171,956,472 worth of masks that cost $0.05 each in 2019. [86-17], p. 2. Dividing these numbers, the United States imported 63,439,129,440 masks. Mississippi received 0.5 percent, or roughly 317,195,647, masks in 2019. In 2020, a single mask cost $0.45. And mask imports from China to the United States decreased by $602,671,729.68 that year. *Id.* This means that the United States presumably imported $2,568,684,742.30 worth of masks in 2020. This figure is the equivalent of 5,708,188,316 masks, leaving Mississippi with its share of 28,540,941 masks in 2020. Subtracting Mississippi's 2020 share from its 2019 share suggests that Mississippi received 288,654,706 fewer masks in 2020. But, by dividing China's decrease in exports by $0.45 (the elevated price per mask in 2020), Mississippi's posited penalty formula presumes that a mask in 2019 cost the same price as one in 2020, resulting in a seemingly more conservative estimate of 6,696,353 masks. Not to mention, each PPE category would reflect a similarly drastic increase if Mississippi chose to apply the more aggressive calculation.

role in increasing the *need* for PPE in the first place. As COVID-19 started spreading, PPE became one of the differences between an epidemic or a pandemic, furloughs or permanent layoffs, and, for some, life or death. In this sense, the relative cost of PPE greatly exceeded its market value. Therefore, the Court is satisfied that these circumstances call for a $1,000 per-violation penalty.

Fourth, the penalty is proportional to the harm that resulted from China's misconduct. Again, in *Average Wholesale Price Litigation*, the Mississippi Supreme Court upheld a $1,000 penalty under the Mississippi Consumer Protection Act for the 2,699 times a generic pharmaceutical provider reported fictitious reimbursement prices to Mississippi Medicaid. 190 So. 3d at 835. There, the defendant's reported prices were on average 866 percent higher than the drugs' actual costs. *Id.* at 834. Here, on the one hand, China's fraudulent scheme led to similar harms in Mississippi. As previously noted, the prices for face masks, gowns, and gloves rose by 800 percent, 658.6 percent, and 140 percent, respectively. The prices for PPE were also "exaggerated to an extent that they were not even prices." *Id.* at 842.

But on the other hand, Mississippi's harm extends far beyond overpaying for PPE, unlike its damages in *Average Wholesale Price Litigation*. China's scheme exacerbated the spread of the virus in Mississippi. It handicapped Mississippi healthcare workers' ability to serve patients. Families could not visit their loved ones who were sick in the hospital. Many Mississippians died alone. China's scheme helped flip humanity's social fabric upside down—schools, churches, local clubs, community organizations, businesses, to name a few, all shut down. And the ones that did reopen did so with their members wearing overpriced, substandard PPE in an effort to escape the nightmare as quickly and safely as possible. While Mississippians suffered, China enriched itself from the sale of PPE that belonged to American companies.

To be sure, it is hard to fashion a penalty when China's conduct significantly impacted every Mississippian and the state itself. But the Court is satisfied that its penalty aligns with similar awards based on a state-wide scale. For example, in 1997, Mississippi received over four billion dollars over a twenty-five-year period, and millions of dollars in annual payments in perpetuity in the tobacco settlement headed by Mississippi on behalf of its citizens. Bobby Harrison, *Landmark Tobacco Lawsuit Settled 25 Years Ago—What Happened to Money?*, Miss. Today (Jun. 26, 2022). Accounting for inflation, Mississippi's settlement award would double in today's economy. And British Petroleum settled with Mississippi for over two billion dollars, including nearly six hundred million in Clean Water Act penalties, for its role in the Deepwater Horizon Oil Spill. *Total Restoration Funds to Mississippi $2.174 Billion*, Miss. Dep't. of Env't Quality (last visited Sep. 30, 2025). And there were other significant payments made to Mississippi citizens as a result of the BP oil spill for their own individualized harms—whether to their business or otherwise. Regardless, these large settlements reflect the state-wide harm caused by tobacco and the oil spill.

The Court's penalty reflects this reality. For example, Missouri received more than sixteen billion dollars in similar penalties against China. *See Missouri*, 769 F. Supp. 3d at 898; *see also State Farm Fire & Cas. Co. v. Aberdeen Enterprizes II, Inc.*, No. 18-CV-654-TCK-FHM, 2020 WL 4550390, at *5 (N.D. Okla. Aug. 6, 2020) (noting trebled damages "punish and deter"). Of course, the Court acknowledges that it is awarding Mississippi over four billion dollars more in penalties than Missouri received, which may appear counterintuitive given that Missouri has a larger population and economy.[20] Nevertheless, differences in their litigation strategy and state statutes warrant Mississippi's higher award. For example, unlike Mississippi, Missouri did not allege that

---

[20] Mississippi's budget for Fiscal Year 2025 amounted to $7,035,260,068. Joint Legis. Budget Comm., *Calculated Funds Available for Funding Fiscal Year 2025 Budget* 3 (2024).

China violated its consumer protection statutes. It only pursued damages under federal and state antitrust statutes. *See generally Missouri*, 769 F. Supp. 3d 877. Furthermore, the antitrust statutes at issue in *Missouri* penalize the defendant by trebling actual damages. *Id.* at 898 (quoting 15 U.S.C. §§ 15(a), 15c(a); MO. REV. STAT. § 416.121). The Mississippi Consumer Protection Act, on the other hand, imposes a per-violation penalty independent of a plaintiff's actual damages. MISS. CODE ANN. § 75-24-19(1)(b). Not to mention, Mississippi's statute also requires a heightened evidentiary threshold—the violation must be knowingly and willfully made—unlike Missouri's antitrust statute. *Compare* MISS. CODE ANN. § 75-24-19(1)(b) *with* MO. REV. STAT. § 416.121(1).

Even though a $1,000 per-violation penalty is not as much as Mississippi desires, it is still more than Mississippi has recovered in the past for other state-wide harms, and it is on par with the penalties imposed in the *Missouri* case given the statutory differences. The penalty's total amount is also proportional to Mississippi's actual damages.[21] Accordingly, this Court awards Mississippi $20,836,254,000 in statutory penalties for its Mississippi Consumer Protection Act claim.

---

[21] Mississippi does not cite a case where any court has ever imposed a $10,000 per-violation penalty where the plaintiff alleged millions of violations. Still, while the *Average Wholesale Price Litigation* court affirmed $23,661,618 in actual damages and $2,699,000 in civil penalties, *see* 190 So. 3d at 835, 848, the severity of China's misconduct, and its resulting harm, calls for a penalty amount on a similar scale, notwithstanding the millions of alleged hoarding violations. The Court is satisfied that $1,000 per violation accomplishes this goal. Also, while other courts have approved larger variances between per-violation penalties and actual damages, the total amount was drastically lower. *See, e.g.*, *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1306, 1316 (11th Cir. 2021) (affirming nearly $1.2 million penalty for $755 in actual damages); *United States v. Mackby*, 221 F. Supp. 2d 1106, 1108, 1114-15 (N.D. Cal. 2002) (approving $555,000 penalty for $58,000 in actual damages), *aff'd*, 68 F. App'x 776 (9th Cir. 2003); *United States v. Byrd*, 100 F. Supp. 2d 342, 343, 346 (E.D. N.C. 2000) (approving $1,320,000 penalty for $85,012 in actual damages); *Bunk*, 741 F.3d at 409-11 (reversing district court and instructing it to award $24 million penalty even though plaintiff "sought no [actual] damages"). These cases do involve the Excessive Fines Clause of the Constitution, and the Court is not finding that China is entitled to its protections. But they are helpful guideposts, nonetheless.

### 3. Postjudgment interest

Unlike prejudgment interest, "[f]ederal law governs postjudgment interest in federal cases," even those where state substantive law applies. *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 456 (5th Cir. 2013); *see Harris v. Mickel*, 15 F.3d 428, 431 n.4 (5th Cir. 1994) (explaining that postjudgment interest is a procedural rule that applies "regardless of otherwise applicable state law"). And even though Mississippi did not request postjudgment interest in its complaint or motion for default judgment, "[p]ost-judgment interest is awarded as a matter of course." *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010) (citing 28 U.S.C. § 1961(a)); *see Reeves v. Int'l Tel. & Tel. Corp.*, 705 F.2d 750, 752 (5th Cir. 1983) (holding that postjudgment interest is "allowable of right, not as a matter of discretion").

Under Section 1961, interest "shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Post-judgment interest under Section 1961 is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." Other courts have also awarded postjudgment interest against foreign states sued under the Foreign Sovereign Immunities Act. *See Missouri*, 769 F. Supp. 3d at 899; *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 78 (D.D.C. 2021); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 127 (D.D.C. 2015). This Court does the same and awards postjudgment interest at the statutory rate.

## IV. CONCLUSION

IT IS ORDERED AND ADJUDGED that the State of Mississippi *ex rel.* Lynn Fitch's Motion for Default Judgment [80] is GRANTED.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants, the People's Republic of China, the Communist Party of China, the National Health Commission of the People's Republic of China, the People's Government of Wuhan City, and the Wuhan Institute of Virology, are permanently enjoined from using any method, act, or practice prohibited by Section 75-24-5 of the Mississippi Consumer Protection Act. More specifically, these Chinese Defendants shall not engage in unfair methods of competition or unfair or deceptive trade practices in or affecting commerce prohibited by Section 75-24-5(1) of the Mississippi Consumer Protection Act by hoarding PPE and misrepresenting or concealing the essential facts of a public health crisis that has a reasonable likelihood of affecting the availability of PPE in the United States and Mississippi. Nor shall these Chinese Defendants represent that PPE items are of a particular standard, quality, or grade if they are not of that standard, quality, or grade in violation of Section 75-24-5(2)(g) of the Mississippi Consumer Protection Act.

IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff, the State of Mississippi *ex rel.* Lynn Fitch, is awarded a default judgment against Defendants the People's Republic of China, the Communist Party of China, the National Health Commission of the People's Republic of China, the People's Government of Wuhan City, and the Wuhan Institute of Virology, jointly and severally, in an amount of $25,098,412,991.[22] Pursuant to 28 U.S.C. § 1961, interest shall run on this amount from this day forward at the statutory rate. Plaintiff, the State of Mississippi *ex rel.* Lynn Fitch, is entitled to its costs of court allowable under 28 U.S.C. § 1920.

IT IS FURTHER ORDERED AND ADJUDGED that the State of Mississippi *ex rel.* Lynn Fitch's *ore tenus* motion to dismiss the People's Government of Hubei Province, the Ministry of

---

[22] This number is the sum of $4,260,077,991 in actual damages, $2,081,000 in antitrust penalties, and $20,836,254,000 in consumer protection penalties.

Civil Affairs of the People's Republic of China, and the Ministry of Emergency Management of the

People's Republic of China is GRANTED.

IT IS FURTHER ORDERED AND ADJUDGED that this case is closed.

THIS, the 14th day of November, 2025.


              **TAYLOR B. McNEEL**
              **UNITED STATES DISTRICT JUDGE**